**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re

HELLO LIVING DEVELOPER NOSTRAND LLC,

    Debtor.

Chapter 11

Case No. 21-22696 (SHL)

## DECLARATION OF LEO MUCHNIK IN SUPPORT OF
## NOSTRAND MEZZ LENDER, LLC'S MOTION TO DISMISS CHAPTER 11 CASE
## OR, ALTERNATIVELY, FOR RELIEF FROM THE AUTOMATIC STAY

LEO MUCHNIK, under penalty of perjury, declares:

1.      I am a member in good standing of the bar of the State of New York and of this Court and an attorney at Greenberg Traurig, LLP, counsel for Nostrand Mezz Lender LLC (the "Mezz Lender").

2.      I submit this declaration in support of *Nostrand Mezz Lender, LLC's Motion to Dismiss Chapter 11 Case or, Alternatively, for Relief from the Automatic Stay* (the "Motion"), filed contemporaneously herewith.[1]

3.      Annexed hereto as **Exhibit 1** is a true and correct copy of the Proof of Claim No. 4-1 filed by Mezz Lender in the above-captioned case on April 11, 2022.

4.      Annexed hereto as **Exhibit 2** is a true and correct copy of the Dismissal Order.

5.      Annexed hereto as **Exhibit 3** is a true and correct copy of the Sale Order.

6.      Annexed hereto as **Exhibit 4** are, upon information and belief, true and correct copies of the Debtor's Operating Agreement and the First Amendment.

7.      Annexed hereto as **Exhibit 5** is, upon information and belief, a true and correct copy of the Designation of Independent Manager Agreement.

8.      Annexed hereto as **Exhibit 6** is a true and correct copy of the Proposed Disclosure Statement the Debtor filed with this Court.

---

[1]    All capitalized terms not defined herein have the meanings ascribed to them in the Motion.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge, information, and belief.

Executed on this 14th day of April, 2022
at New York, New York

/s/ *Leo Muchnik*
Leo Muchnik

# **EXHIBIT 1**

**(Mezz Lender Proof of Claim)**

| Fill in this information to identify the case: |
|---|
| Debtor 1 | Hello Living Developer Nostrand LLC |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Southern District of New York |
| Case number | 21-22696 |

## Official Form 410

# Proof of Claim

04/19

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case.** Do not use this form to make a request for payment of an administrative expense. **Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Nostrand Mezz Lender LLC
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☐ No
☑ Yes. From whom? 1580 Nostrand Mezz, LLC

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Greenberg Traurig, LLP c/o Alan J. Brody
Name

500 Campus Drive, Suite 400
Number    Street

Florham Park        NJ        07932
City            State        ZIP Code

Contact phone 973-443-3543

Contact email BrodyA@gtlaw.com

Where should payments to the creditor be sent? (if different)

Nostrand Mezz Lender LLC
Name

15 West 27th Street, 6th Floor
Number    Street

New York City        NY        10001
City            State        ZIP Code

Contact phone 646.854.6810

Contact email jsimpson@archre.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____

Filed on _____
              MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

---

**7. How much is the claim?**  $ _See Addendum_

**Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

---

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See Addendum

---

**9. Is all or part of the claim secured?**

☐ No

☑ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☑ Other. Describe:     See Addendum

**Basis for perfection:**     See Addendum

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**     $ ___ See Addendum

**Amount of the claim that is secured:**     $ ___ See Addendum

**Amount of the claim that is unsecured:** $ ___ See Addendum ___ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**     $ ___ See Addendum

**Annual Interest Rate** (when case was filed) ___ See Addendum ___ %

☐ Fixed

☑ Variable

---

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**     $ _____

---

**11. Is this claim subject to a right of setoff?**

☐ No

☑ Yes. Identify the property: **See Addendum** _____

---

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

|  | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3:  Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    04/06/2022
              MM / DD / YYYY

_Signature_

Print the name of the person who is completing and signing this claim:

| Name | Jeffrey | Simpson |
|---|---|---|
|  | First name    Middle name | Last name |

Title     Authorized Signatory

Company     Nostrand Mezz Lender LLC
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address     15 West 27th Street, 6th Floor
Number    Street

New York                          NY          10001
City                              State       ZIP Code

Contact phone    646.854.6810          Email  jsimpson@archre.com

Alan J. Brody
**GREENBERG TRAURIG, LLP**
500 Campus Drive, Suite 400
Florham Park, New Jersey 07932
Telephone: (973) 443-3543
Email: BrodyA@gtlaw.com

Nathan A. Haynes
Leo Muchnik
**GREENBERG TRAURIG, LLP**
One Vanderbilt Avenue
New York, New York 10017
Telephone: (212) 801-9200
Email: HaynesN@gtlaw.com
           MuchnikL@gtlaw.com

*Attorneys for Nostrand Mezz Lender LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| HELLO LIVING DEVELOPER NOSTRAND LLC, | Case No. 21-22696 (SHL) |
| Debtor. | |

### ADDENDUM TO PROOF OF CLAIM OF NOSTRAND MEZZ LENDER LLC

1.      Nostrand Mezz Lender LLC ("Lender") hereby submits this Addendum together with the exhibits annexed hereto and the proof of claim to which it is affixed (collectively, the "Proof of Claim").

2.      The Debtor owns 100% of the equity interest in Hello Nostrand LLC ("Hello Nostrand" and the ownership interests, the "Ownership Interests"), which, in turn, owns a parcel of real property commonly known as 1580 Nostrand Avenue, Brooklyn, NY 11226 (the "Property").[1]

3.      The Debtor is the borrower on a mezzanine loan with an original principal amount of up to $3,000,000 (the "Mezz Loan").

---

[1]    Hello Nostrand is not a debtor herein and has not otherwise filed a petition for bankruptcy relief.

4.      On or about March 8, 2022, Lender acquired the Mezz Loan from 1580 Nostrand Mezz, LLC.[2]

5.      The Mezz Loan is secured by security interests in, among other things, the Debtor's Ownership Interests in Hello Nostrand. In addition, Mr. Eli Karp executed various guarantees in connection with the Loans including, without limitation, a guaranty for the Mezz Loan.

6.      The Maturity Date under the Mezz Loan was the earlier of March 31, 2021 or such sooner date, by acceleration or otherwise (the "Loan Maturity Date") and has not been repaid. Moreover, the Debtor had breached the Loan Agreement prior to the Loan Maturity Date.

7.      The Debtor also owes Mezz Lender for late fees, protective advances and other amounts, all of which have also accrued interest and default interest.

8.      As of December 21, 2021 (the "Petition Date"), the Debtor owed Lender no less than $4,651,176.44, plus additional fees and expenses (including legal fees). Additional amounts are continuing to accrue or otherwise be incurred.

## Claims

9.      Lender hereby asserts claims against the Debtor under the Mezz Loan for secured obligations of the Debtor and any deficiency amount that may arise. As more fully described below, and as summarized in the calculation of amounts due in Exhibit A annexed hereto, the amounts asserted in this Proof of Claim include, among other things: (a) principal, (b) interest, and (c) fees and expenses.

---

[2]     Hello Nostrand is a borrower under various fours loans (collectively, the "Mortgage Loan" and together with the Mezz Loan, the "Loans") with an affiliate of Lender (the "Mortgage Lender"), secured by, among other things, a mortgage on the Property.  Mortgage Lender acquired the Mortgage Loan.

2

10.    The documents that support this Proof of Claim (collectively, the "Claim Support Documents") include, without limitation, the following:[3]

    i.    Mezzanine Loan Agreement – attached as Exhibit B

    ii.    Mezzanine Promissory Note – attached as Exhibit C

    iii.    Ownership Interests Pledge and Security Agreement  – attached as Exhibit D

    iv.    Share Certificate – attached as Exhibit E

    v.    Instruction to Register Pledge – attached as Exhibit F

    vi.    Confirmation Statement and Instruction Agreement – attached as Exhibit G

    vii.    Omnibus Assignment of Loan Documents (Mezzanine Loan) – attached as Exhibit H

    viii.    Conditional Guaranty – attached as Exhibit I

a.  Principal

11.    The original principal amount owed by the Debtor under the Mezz Loan is $2,900,000.

12.    In addition, on August 2, 2021, a protective advance of $905,419.61 was made under the Mezz Loan Agreement.

b.  Interest[4]

13.    The original interest rate was the greater of (a) eleven percent (11%) plus LIBOR per annum and (b) twelve percent (12%) per annum, as adjusted for each Interest Period (as defined in the Mezzanine Promissory Note).

---

[3]    For the avoidance of doubt, the Debtor and Mr. Karp, among others, executed various other documents in connection with the Mezz Loan.

[4]    This summary is provided for convenience; the terms of the various loan documents govern.

3

*ACTIVE 64068366v4*

14.     The default rate is defined as the lesser of (a) the maximum legal rate, and (b) twenty-four percent (24%) per annum, and computed from the occurrence of an event of default under the loan documents.

15.     As of the Petition Date, the total amount of accrued and unpaid interest owing by the Debtor is $738,816.61.

c.   Fees and Expenses[5]

16.     Pursuant to the Mezz Loan Agreement and Mezz Promissory Note, the Debtor is obligated, among other things, to pay servicing fees and late fees and to reimburse the Lender for various costs and expenses in connection with exercise of remedies under the loan documents, including enforcement and related actions against the Debtor.

d.   Total Claim

17.     The total amount owed by the Debtor to Lender as of the Petition Date is no less than $4,651,176.44, plus additional fees and expenses (including legal fees) (the "Claim").

18.     This stated amount does not include continuing interest (including the default rate) or ongoing legal and other reimbursable costs and expenses. As such, the Claim includes the right to seek additional amounts accruing or otherwise payable under the Claim Support Documents and/or any other Mezz Loan document.

**General**

19.     Lender reserves the right to amend or supplement this Proof of Claim at any time, in any manner and for any reason or to file additional proofs of claim to include any claims or rights of action, including, without limitation, those in respect of any other amounts, liabilities,

---

[5]     This summary is provided for convenience; the terms of the various loan documents govern.

4

indemnities or obligations, whether as a result of the avoidance or unwinding of the repayment of a portion of the Claim.

20.     Lender may have claims or rights of action against the Debtor for any and all other amounts, liabilities, indemnities and obligations arising under and in connection with the Mezz Loan Agreement. Lender does not waive any claims or rights of action that Lender has or may have against the Debtor or any other person (including, without limitation, any non-Debtor party), including, without limitation, any that may arise under or in connection with the Mezz Loan Agreement.

21.     Without limiting the foregoing Lender does not waive any right to amounts due for any claim asserted herein by not stating a specific amount due for any such claim at this time, and Lender reserves the right to amend or supplement this Proof of Claim, if Lender should deem it necessary or appropriate, to assert and state an amount for any such claim.

## **Inquiry Notice**

22.     This Proof of Claim serves, and is intended to serve, as notice of a claim for all obligations under the Loan Agreement, and any other related documents and any amount due or to become due under the Loan Agreement, and any other related documents, the provisions of which are expressly incorporated herein by reference. All interested parties are on notice of, and advised to examine, the provisions of the Loan Agreement and any other related documents.

## **Reservation of Rights**

23.     The filing of this Proof of Claim does not constitute a concession or admission by Lender of liability, of any facts or as to whether all or a portion of their claims, if any, are prepetition or postpetition claims against the Debtor and its estate.

*ACTIVE 64068366v4*

24.     Lender reserves the right to amend, update and/or supplement this Proof of Claim at any time and in any respect, for whatever reason, and to assert any and all other claims of whatever kind or nature that Lender has, or may have, against the Debtor that comes to its attention or that arises after the filing of this Proof of Claim, including, without limitation, any claims incurred prior to and after the filing of the Debtor's bankruptcy case.

25.     The amounts claimed in this Proof of Claim are for the purposes of making a claim against the Debtor. Lender reserves all rights to seek relief against any non-Debtor.

26.     By filing this Proof of Claim, Lender does not waive, and hereby preserves: (a) any obligation owed to Lender; (b) any security held by Lender or for Lender's benefit; (c) any right or rights of action that Lender has or may have against the Debtor or any other person or persons, including, without limitation, guarantors; (d) any right to contest the validity, priority, or extent of any lien, security interest, or right purported to be equal, senior or inferior to any lien, security interest, or right of Lender; and (e) any and all rights and remedies at law or in equity available to Lender against the Debtor and any of its respective affiliates or subsidiaries, or any other person or entity.

27.     The filing of this Proof of Claim shall not be deemed or construed as: (a) a waiver, release or limitation of any rights, remedies, claims or interests or interests of Lender or against any persons, entities or property; (b) an election of remedy, or waiver of any past, present, or future defaults or events of default; (c) a concession or admission of the validity and/or amount of any claim against Lender, which claim, if any, Lender denies in all respects; (d) a waiver of the right to compel the Debtor to return property of the Lender currently in the possession of the Debtor; (e) a waiver or release of any liens or security interests that Lender may have with respect to the property of the Debtor or any affiliate of the Debtor; (f) a waiver or release of any right against

6

any affiliate of the Debtor or other entity or person liable for all or part of any Claim described herein; (g) a consent by Lender to the jurisdiction of the Bankruptcy Court or any other court with respect to the subject matter of the Claim, any objection or other proceedings commenced with respect thereto, or any other proceedings, commenced in the chapter 11 case or involving Lender; (h) a waiver or release of Lender's right to trial by jury in the Bankruptcy Court or any other court in any proceeding as to any and all matters so triable herein, whether or not designated legal or private rights or in any case, controversy, or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial right is pursuant to statute or the United States Constitution; (i) a consent by Lender to a jury trial in a Bankruptcy Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy, or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (j) a waiver or release of Lender's right to have any and all final orders in any and all non-core matters or proceedings entered only after *de novo* review by a United States District Court Judge; (k) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Proof of Claim, any objection thereto or other proceeding that may be commenced in this chapter 11 case or involving Lender; (l) a waiver of any administrative expense claims that Lender may have against the Debtor; (m) a waiver of any setoff or recoupment rights that Lender has with respect to any claims or causes of action asserted against it by the Debtor, including without limitation, the statutory treatment of such rights pursuant to the Bankruptcy Code; (n) a waiver of any right of subordination of indebtedness or liens held by other creditors of the Debtor; or (o) a waiver or limitation on the right to vote separately on any plan or plans of reorganization proposed in the Chapter 11 Case.

[Concluded on Following Page]

7

## Notices

28.    All notices and other pleadings related to this Proof of Claim should be addressed

as follows:

To Lender:

Nostrand Mezz Lender LLC
15 West 27th Street, 6th Floor
New York, New York 10001

With Copies to:

Alan J. Brody
Greenberg Traurig, LLP
500 Campus Drive, Suite 400
Florham Park, New Jersey 07932
Attn: Alan J. Brody

and

Greenberg Traurig, LLP
One Vanderbilt Avenue
New York, New York 10017
Attn: Nathan A. Haynes and Leo Muchnik

8

# EXHIBIT A

**(Calculation of Amounts)**

| Loan Type | Unpaid Principal Balance (1/31/21) | Loan Interest Rate | Default Interest Rate |
|---|---|---|---|
| Mezzanine | 2,900,000 | 12% | 24% |
| Total | $ 2,900,000 | | |

default date -->

| Interest Due Date | Unpaid Principal | Current Interest Rate | Interest Expense |
|---|---|---|---|
| 2/1/2021 | $ 2,900,000 | 12% | $ 29,967 |
| 2/5/2021 | $ 2,900,000 | 12% | $ 3,867 |
| 3/1/2021 | $ 2,900,000 | 24% | $ 46,400 |
| 4/1/2021 | $ 2,900,000 | 24% | $ 59,933 |
| 5/1/2021 | $ 2,900,000 | 24% | $ 58,000 |
| 6/1/2021 | $ 2,900,000 | 24% | $ 59,933 |
| 7/1/2021 | $ 2,900,000 | 24% | $ 58,000 |
| 8/1/2021 | $ 2,900,000 | 24% | $ 59,933 |
| 9/1/2021 | $ 3,805,419 | 24% | $ 78,645 |
| 10/1/2021 | $ 3,805,419 | 24% | $ 76,108 |
| 11/1/2021 | $ 3,805,419 | 24% | $ 78,645 |
| 12/1/2021 | $ 3,805,419 | 24% | $ 76,108 |
| 12/21/2021 | $ 3,805,419 | 24% | $ 53,276 |

| | | |
|---|---|---|
| Total Unpaid Principal | $ 3,805,419.00 | |
| Total Interest Due | $ 738,816.61 | |
| Servicing Fee | | |
| 10/2020 - 12/2020 | $ 5,000.00 | |
| 1/2021 - 12/2021 | $ 20,000.00 | |
| Late Fee | $ 36,940.83 | 5% |
| Legal Costs, Etc. | $ 45,000.00 | |
| **Total Due** | **$ 4,651,176.44** | |

# EXHIBIT B

**(Mezzanine Loan Agreement)**

# MEZZANINE LOAN AGREEMENT

**in the amount of up to $3,000,000.00**

**Between**

## HELLO LIVING DEVELOPER NOSTRAND LLC

**and**

## 1580 NOSTRAND MEZZ LLC

**Dated as of: August 28, 2020**

1

## MEZZANINE LOAN AGREEMENT

THIS MEZZANINE LOAN AGREEMENT ("**Agreement**") dated as of the 28th day of August, 2020, is made by and between **HELLO LIVING DEVELOPER NOSTRAND LLC**, a New York limited liability company, having an address at 33 35th Street, 6th Floor, Suite B-613, Brooklyn, NY 11232 ("**Borrower**"), and **1580 NOSTRAND MEZZ LLC**, a Delaware limited liability company, its successors and/or assigns, as their interests may appear, having offices at 520 Madison Avenue, Suite 3501, New York, NY 10022 ("**Lender**").

## W I T N E S E T H:

**WHEREAS,** on December 6, 2017, HELLO NOSTRAND LLC, a New York limited liability company (the "**Mortgage Borrower**"), gave an Amended, Restated and Consolidated Senior Loan Promissory Note (the "**First Land Mortgage Note**") to PROPHET MORTGAGE OPPORTUNITIES LP (the "**Original Mortgage Lender**"), in the principal sum of $17,730,000.00 (the "**First Land Mortgage Loan**");

**WHEREAS,** for the purposes of securing the Land Mortgage Note, on December 6, 2017, Mortgage Borrower executed and delivered a certain Consolidation, Extension and Modification of Senior Loan Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing in the principal sum of $17,730,000.00 (the "**First Land Mortgage**"), wherein Mortgage Borrower mortgaged in favor of Original Mortgage Lender the premises commonly known as 1580 Nostrand Avenue, Brooklyn, New York 11226 (the "**Property**"), as further described in the Land Mortgage, as well as certain other documents, including, without limitation, that certain Senior Loan Agreement dated as of December 6, 2017 (the "**First Senior Loan Agreement**"), executed by certain third parties as additional security for the repayment of the sums due under the Land Mortgage Note and Land Mortgage (collectively, including the Land Mortgage Note, the Land Mortgage, and the Senior Loan Agreement, the "**First Land Mortgage Loan Documents**"), which First Land Mortgage Loan Documents were thereafter assigned by an Assignment of Consolidation, Extension and Modification of Senior Loan Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing and Senior Loan Collateral Assignment of Leases and Rents dated June 7, 2019 by Original Mortgage Lender to **1580 NOSTRAND AVE LLC**, a Delaware limited liability company (collectively, together with its successors and/or assigns, the "**Mortgage Lender**");

**WHEREAS,** on December 6, 2017, Mortgage Borrower gave a Building Loan Promissory Note (the "**Building Mortgage Note**") to Original Mortgage Lender in the principal sum of up to $39,770,000.00 (the "**Building Mortgage Loan**");

**WHEREAS,** for the purposes of securing the Building Mortgage Note, on December 6, 2017, Mortgage Borrower executed and delivered a certain Building Loan Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing in the principal sum of up to

2

$39,770,000.00 (the **"Building Mortgage"**), wherein Mortgage Borrower mortgaged in favor of Original Mortgage Lender the Property, as well as certain other documents, including, but not limited to, that certain Building Loan Agreement (the **"Building Loan Agreement"**), executed by certain third parties as additional security for the repayment of the sums due under the Building Mortgage Note and the Building Mortgage (collectively, including the Building Mortgage Note, the Building Mortgage and the Building Loan Agreement, the **"Building Mortgage Loan Documents"**), which Building Mortgage Loan Documents were thereafter assigned by an Assignment of Building Loan Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing and Building Loan Collateral Assignment of Leases and Rents dated June 7, 2019 by Original Mortgage Lender to Mortgage Lender;

**WHEREAS,** on December 6, 2017, Mortgage Borrower gave a Project Loan Promissory Note (the **"Project Mortgage Note"**) to Original Mortgage Lender in the principal sum of up to $5,500,000.00 (the **"Project Mortgage Loan"**);

**WHEREAS,** for the purposes of securing the Project Mortgage Note, on December 6, 2017, Mortgage Borrower executed and delivered a certain Project Loan Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing in the principal sum of up to $5,500,000.00 (the **"Project Mortgage"**), wherein Mortgage Borrower mortgaged in favor of Original Mortgage Lender the Property, as well as certain other documents, including, but not limited to, that certain Project Loan Agreement (the **"Project Loan Agreement"** and, together with the First Land Loan Agreement and the Building Loan Agreement, the **"Mortgage Loan Agreement"**), executed by certain third parties as additional security for the repayment of the sums due under the Project Mortgage Note and Project Mortgage (collectively, including the Project Mortgage Note, the Project Mortgage and the Project Loan Agreement, the **"Project Mortgage Loan Documents"**), which Project Mortgage Loan Documents were thereafter assigned by an Assignment of Project Loan Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing and Project Loan Collateral Assignment of Leases and Rents dated June 7, 2019 by Original Mortgage Lender to Mortgage Lender;

**WHEREAS,** on the date hereof, Mortgage Borrower gave a Mortgage Loan Note (the **"Second Land Mortgage Note"**, and together with the First Land Mortgage Note, the Building Mortgage Note and the Project Mortgage Note, hereinafter, collectively, the **"Mortgage Note"**) to Mortgage Lender in the principal sum of up to $8,300,000.00 (the **"Second Land Mortgage Loan"**, and together with the First Land Mortgage Loan, the Building Mortgage Loan and the Project Mortgage Loan, hereinafter, collectively, the **"Mortgage Loan"**);

**WHEREAS,** for the purposes of securing the Second Land Mortgage Note, on the date hereof, Mortgage Borrower executed and delivered a certain Mortgage and Security Agreement in the principal sum of up to $8,300,000.00 (the **"Second Land Mortgage"**, and together with the First Land Mortgage, the Building Mortgage, and the Project Mortgage, hereinafter, collectively, the **"Mortgage"**), wherein Mortgage Borrower mortgaged in favor of Mortgage Lender the

3

Property, as well as certain other documents executed by certain third parties as additional security for the repayment of the sums due under the Second Land Mortgage Note and Second Land Mortgage (collectively, including the Second Land Mortgage Note and the Second Land Mortgage, the "**Second Land Mortgage Loan Documents**", and together with the First Land Mortgage Loan Documents, the Building Mortgage Loan Documents and the Project Mortgage Loan Documents, hereinafter, collectively, as amended by the Forbearance Agreement, the "**Mortgage Loan Documents**");

**WHEREAS**, as of the date hereof, Borrower, Lender, Mortgage Borrower, Mortgage Lender, and Guarantor entered into that certain Forbearance Agreement relating to certain defaults under the First Land Mortgage Loan, the Building Mortgage Loan, and the Project Mortgage Loan (the "**Forbearance Agreement**"); each and every reference to the First Land Mortgage Loan Documents, the Building Mortgage Loan Documents, and the Project Mortgage Loan Documents described in the foregoing recitals, as such references appear below in this Agreement and in the other Loan Documents, shall be interpreted to mean such First Land Mortgage Loan Documents, Building Mortgage Loan Documents, and Project Mortgage Loan Documents as amended by the Forbearance Agreement;

**WHEREAS**, Borrower is the direct beneficial owner of all of the membership interests in Mortgage Borrower (collectively, the "**Pledged Interests**");

**WHEREAS**, Borrower has requested Lender to make a loan to it in the principal amount of up to $3,000,000.00 (the "**Loan**"), which Loan is evidenced by that certain Mezzanine Promissory Note executed by Borrower in favor of Lender (the "**Note**");

**WHEREAS**, as a condition precedent to the obligation of Lender to make the Loan to Borrower, Borrower has entered into that certain Ownership Interests Pledge and Security Agreement, dated as of the date hereof, in favor of Lender (as amended, supplemented or otherwise modified from time to time, the "**Pledge Agreement**"), pursuant to which Borrower has granted to Lender a first priority security interest in the Collateral (as hereinafter defined) as collateral security for the Debt (as hereinafter defined) (the Pledge Agreement, together with the Note, this Agreement, and all other documents and guarantees executed by Borrower and Guarantor and any other party in favor of Lender in connection with the Loan, hereinafter, the "**Loan Documents**");

**WHEREAS**, Borrower desires to obtain the Loan from Lender; and

**WHEREAS**, Lender is willing to make the Loan to Borrower, subject to and in accordance with the terms of this Agreement and the other Loan Documents (as hereinafter defined).

Now, therefore, in consideration of the premises and mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

4

# ARTICLE I

## DEFINITIONS

Use of or reference to the following terms herein shall be construed as indicated below.  All other capitalized terms used but not otherwise defined in this Article I shall have the meanings ascribed to such terms in this Agreement, the Pledge Agreement or the Note:

1.1 <u>Advance</u>:  Any disbursement of a portion of the Loan by Lender pursuant to the terms hereof.

1.2 <u>Affiliate</u>:  As to any Person, any other Person that, (i) directly or indirectly, owns ten percent (10%) or more of the direct or indirect legal, beneficial or economic interests in such Person, (ii) directly or indirectly, is in Control of, is Controlled by or is under common Control with such Person, (iii) is a director or officer of such Person or of an Affiliate of such Person, or (iv) is the spouse, issue or parent of such Person or of an Affiliate of such Person.

1.3 <u>Architect</u>: Ryan Min, or such architect as approved by Lender in its sole but commercially reasonable discretion.

1.4 <u>Architect's Agreement</u>: That certain AIA Document B101-2007 Standard Form of Agreement between Owner and Architect dated as of _____, between Mortgage Borrower and the Architect, as the same may be amended, restated, extended or otherwise modified from time to time in accordance with this Agreement or as otherwise approved by Lender in its reasonable discretion.

1.5 <u>Budget</u>:  Borrower's estimate of the cost to construct the Improvements, which estimate has been delivered to Lender, as the same may be revised from time to time in accordance with the terms of this Agreement or with Lender's approval in its reasonable discretion.

1.6 <u>Budgeted Amount</u>:  The portion of the Loan that Borrower expects to be advanced for any particular line item of Costs, as set forth in the Budget.

1.7 <u>Business Day</u>:  Any day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close.

1.8 <u>Casualty</u>:  The occurrence of any casualty, damage or injury, by fire or otherwise, to the Property or any part thereof.

1.9 <u>Collateral</u>: The Pledged Interests, and all amounts on deposit in any reserve account established under the Loan Documents and any and all other property or collateral in

5

which Lender is granted a security interest under any of the Loan Documents, in each case whether existing on the date hereof or hereafter pledged or assigned to Lender.

1.10    Collateral Documents:  The Pledge Agreement; any Uniform Commercial Code financing statements filed in connection with the Pledge Agreement; the Guaranty; and any and all other loan documents executed by the Borrower for the benefit of Lender in connection with the Loan.

1.11    Condemnation:  A temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

1.12    Construction Manager:  Supreme Builders & Developers LLC, or such general contractor or construction manager as approved by Lender in its sole but commercially reasonable discretion.

1.13    Construction Work:  The construction of the Project, which is to be carried out by Mortgage Borrower using the proceeds of the Loan, Mortgage Borrower's funds and Borrower's funds, in compliance with the Budget.

1.14    Costs:  Hard Costs and/or Soft Costs, individually and collectively, as the case may be.

1.15    Debt: The outstanding principal amount set forth in, and evidenced by, this Agreement and the Note together with all interest accrued and unpaid thereon and all other sums due to Lender in respect of the Loan under the Note, this Agreement, the Pledge Agreement or any other Loan Document.

1.16    Environmental Laws:  This term has the meaning ascribed thereto in that certain Environmental Indemnity Agreement executed by Borrower and Guarantor of even date herewith, in favor of Lender.

1.17    Existing Mortgage Loan Documents:  Collectively, the First Land Mortgage Loan Documents, the Building Mortgage Loan Documents, and the Project Mortgage Loan Documents.

1.18    Funding Date:  The date on which an Advance is actually disbursed.

1.19    Governmental Authority:  Any court, board, agency, commission, office or other authority of any nature whatsoever for any governmental unit (foreign, federal, state, county,

6

district, municipal, city or otherwise) whether now or hereafter in existence.

1.20   <u>Guarantor</u>: Eli Karp, pursuant to the Guaranty.

1.21   <u>Guaranty</u>: Collectively, (a) the Conditional Guaranty, dated as of the date hereof, executed and delivered by Guarantor in connection with the Loan to and for the benefit of Lender, (b) the Completion and Cost Over-Run Guaranty dated as of December 6, 2017, from Guarantor for the benefit of Original Mortgage Lender, the terms of which are incorporated herein, as set forth in the Forbearance Agreement, such that Guarantor's has fully guaranteed the completion of the Construction Work, and (c) that certain Environmental Indemnity Agreement, dated as of the date hereof, executed by Borrower and Guarantor in connection with the Loan to and for the benefit of Lender, each as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

1.22   <u>Hard Costs</u>: The costs of labor, materials, equipment, as well as any other costs which are "costs of an improvement" (as such term is defined in Section 2(5) of the New York Lien Law), in connection with the completion of the Construction Work as set forth and itemized in the Budget.

1.23   <u>Improvements</u>: All structures, and buildings and all replacements thereof, now or hereafter located or erected upon the Property including all personal property owned by Mortgage Borrower or Borrower of every kind and nature whatsoever affixed to or forming part of said structures and/or buildings.

1.24   <u>Lender's Consultant</u>: The appointed designee, agent or contractor of Lender.

1.25   <u>Legal Requirements</u>: All laws, statutes, treaties, codes, permits, decrees, ordinances, orders, rules, regulations, determinations, or requirements of any governmental authority, arbiter or court, including, without limitation, any Environmental Laws, any building, use, zoning and land use laws or regulations (including set back requirements), and any applicable covenants and restrictions pursuant thereto.

1.26   <u>Liquidation Event</u>: shall have the meaning set forth in Section 7.1 hereof.

1.27   <u>Loan Amount</u>: Up to THREE MILLION AND 00/100 DOLLARS ($3,000,000.00) in the aggregate.

1.28   <u>Loan Party</u>: Individually and collectively, as the context requires, Borrower, Mortgage Borrower, and Guarantor.

1.29   <u>Mortgage Loan Default</u>: A failure of Borrower to timely provide Lender

7

with either (i) cancelled checks, (ii) bank statements, (iii) or any other proof, reasonably satisfactory to Lender, evidencing that Mortgage Borrower has made the monthly installment payment required pursuant to the terms of the Mortgage Loan (the "**Proof of Payment**"). If requested, Borrower shall be required to submit Proof of Payment no later than the fifteenth (15th) day of each calendar month commencing on October 1, 2020 and continuing the fifteenth (15th) of each month through the Maturity Date, as same may be extended; provided, however, that for any monthly installment payment under the Mortgage Loan processed in full by Lender and Mortgage Lender pursuant to Section 2.5(f) of this Agreement, Borrower shall not be required to submit proof of such payment.

      1.30   Net Liquidation Proceeds After Debt Service: With respect to any Liquidation Event, all amounts paid to or received by or on behalf of Mortgage Borrower in connection with such Liquidation Event, including, without limitation, proceeds of any refinancing described in Section 7.1 (iv) hereof, less (i) in the event of a Liquidation Event consisting of a Casualty or Condemnation, Mortgage Borrower's, Lender's and/or Mortgage Lender's costs incurred in connection with the recovery thereof, (ii) in the event of a Liquidation Event consisting of a Casualty or Condemnation, the costs incurred by Mortgage Borrower in connection with a restoration of all or any portion of the Property made in accordance with the Mortgage Loan Documents, (iii) in the event of a Liquidation Event consisting of a Casualty or Condemnation or a Transfer pursuant to Section 7.1(iii), amounts required or permitted to be deducted therefrom and amounts paid pursuant to the Mortgage Loan Documents to Mortgage Lender, (iv) in the event of a Liquidation Event consisting of a Casualty or Condemnation, those proceeds paid to Mortgage Borrower pursuant to the Mortgage that do not fall under subsection (ii) above; (v) in the case of a foreclosure sale, disposition or transfer of the Property in connection with realization thereon following an Event of Default under the Mortgage Loan, such customary costs and expenses of sale or other disposition (including reasonable attorneys' fees and brokerage commissions), (vi) in the case of a foreclosure sale, such reasonable costs and expenses incurred by Mortgage Lender under the Mortgage Loan Documents as Mortgage Lender shall be entitled to receive reimbursement for under the terms of the Mortgage Loan Documents, (vii) in the case of a refinancing of the Mortgage Loan, such costs and expenses (including reasonable attorneys' fees) of such refinancing, and (viii) the amount of any prepayments required pursuant to the Mortgage Loan Documents in connection with any such Liquidation Event.

      1.31   Net Loan: The aggregate of all Costs.

      1.32   New Loan Documents: Collectively, the Second Land Loan Documents and the Loan Documents.

      1.33   Project: The Property together with the Improvements.

      1.34   Requisition: A written certification and request for an Advance signed by Borrower substantially in the form of Schedule C attached hereto.

1.35    Restricted Party:  Individually or collectively, as the context may require, Borrower, any Guarantor and Mortgage Borrower.

1.36    Intentionally Omitted.

1.37    Scheduled Completion Date:  On or before the Maturity Date contained in the Note.

1.38    Soft Costs:  The costs relating to the Project or the Loan, which are not "costs of an improvement" (as such term is defined in Section 2(5) of the New York Lien Law), including but not limited to, Mortgage Borrower's legal fees and costs, marketing expenses, and leasing and brokerage commissions, as itemized in the Budget.

1.39    Title Company:  Kensington Vanguard National Land Services of NY, LLC, as agent for Stewart Title Insurance Company.

1.40    UCC Title Company:  Fidelity National Title Insurance Company.

1.41    UCC or Uniform Commercial Code:  The Uniform Commercial Code as in effect in the State in which the perfection of the security interest in the Collateral is made.

1.42    UCC Title Insurance Policy:  With respect to the Collateral, a UCC title insurance policy in a form acceptable to Lender issued with respect to the Collateral and insuring the first lien position of the Pledge Agreement encumbering the Collateral.

Unless otherwise specified, (i) all references to sections and schedules are to those in this Agreement, (ii) the words "herein" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular provision, (iii) all definitions are equally applicable to the singular and plural forms of the terms defined, and (iv) the word "including" means "including but not limited to".

# ARTICLE II

# LOAN ADVANCES

2.1    Agreement to Lend:  Subject to the terms and conditions of this Agreement and Borrower's compliance with all the provisions hereof, and relying on Borrower's representations set forth herein, Lender agrees to lend to Borrower, and Borrower agrees to borrow from Lender, an amount not to exceed the Loan Amount, to be disbursed in several advances at such times and in such amounts as Lender shall determine in accordance with the procedures set forth in this Agreement.  Lender and Mortgage Lender shall determine in their sole and absolute

discretion whether Advances are made first from the Mortgage Loan or the Loan.

    2.2    <u>Advances Generally</u>.

    (a)    Subject to the terms and conditions of this Agreement, each Advance shall be in an amount determined by Lender to be equal to the total Hard Costs and Soft Costs incurred or paid for by the Borrower (subject to Section 2.2(m)) and then due through the end of the period covered by the applicable Requisition <u>less</u> the aggregate amount of Advances previously made.

    (b)    <u>Intentionally Omitted</u>.

    (c)    Except as set forth in Section 2.5 below, Lender shall not be required to make an Advance more than once in any seven (7) day period, and no Advance shall be for an amount less than $50,000.00.

    (d)    <u>Intentionally Omitted</u>.

    (e)    <u>Intentionally Omitted</u>.

    (f)    Lender shall not be required to make Advances for building materials that have not been incorporated into the Improvements, unless: (i) the Lender's Consultant shall have inspected such materials and found them to be of acceptable quality and in conformance with the Budget; (ii) Borrower shall have delivered to Lender bills of sale or other evidence reasonably satisfactory to Lender of the cost of, and Borrower's title to, such materials; (iii) Borrower shall have delivered evidence reasonably satisfactory to Lender specifying (1) the security measures that have been taken to protect such materials from theft, casualty or deterioration, and (2) the steps that have been taken to identify and to segregate such materials so as adequately to give notice to all third parties of Borrower's title in and to such materials; (iv) Borrower shall have provided evidence reasonably satisfactory to Lender that such materials are insured against all risk of loss for their full replacement cost; (v) such materials shall be stored on the Property; and (vi) to the extent that Advances with respect to materials that have not been incorporated in the Improvements shall exceed Fifty Thousand Dollars ($50,000), Lender shall have received UCC-1 financing statements or other evidence reasonably satisfactory to Lender of Lender's perfected second (2nd) priority lien on and security interest in such materials.

    (g)    Regardless of whether Borrower has submitted a Requisition therefor, Lender, in its sole and absolute discretion, may, from time to time, advance amounts that become due for Hard Costs for which Borrower is responsible for payment provided that Borrower has not paid same within ten (10) days of receipt of notice from Lender.  Such advances may be made directly to (i) parties to whom such amounts are due, or (ii) Lender to reimburse Lender for sums due to it.  All such advances ("**Direct Advances**") shall be deemed Advances hereunder and

shall be secured by the Collateral Documents to the same extent as if they were made directly to Borrower.

(h)    All Advances, other than Direct Advances, shall be made to Borrower's account at an account established at a bank as shall be approved by Lender in its sole but commercially reasonable discretion (the "**Bank**").

(i)    If Lender, Lender's Consultant or Title Company shall so require, Borrower shall submit with its Requisitions estoppel certificates, lien waivers or other similar certifications in form satisfactory to Lender and Title Company showing amounts paid and amounts due to all persons or organizations furnishing labor or materials in connection with the completion of the Improvements.

(j)    The making of an Advance by Lender shall not constitute Lender's approval or acceptance of the construction theretofore completed.  Lender's inspection and approval of the Budget, the Construction Work, the Improvements, or the workmanship and materials used therein, shall impose no liability of any kind on Lender, the sole obligation of Lender as the result of such inspection and approval being to make the Advances if, and to the extent, required by this Agreement.  Any disbursement made by Lender without Lender having received each of the items to which it is entitled under this Agreement shall not constitute breach or modification of this Agreement, nor shall any written amendment to this Agreement be required as a result thereof.

(k)    Intentionally Omitted.

(l)    Intentionally Omitted.

(m)    Intentionally Omitted.

(n)    Lender shall have absolutely no obligation to make any Advances after the Scheduled Completion Date.  Borrower shall indemnify Lender, and hold Lender harmless from, any liability or claim of any nature whatsoever that arises from Lender's due right under this Agreement to discontinue Advances following the Scheduled Completion Date.

(o)    Advances of the Loan are to be applied solely to Costs in accordance with the Budget.  Lender shall have no obligation to permit use of proceeds of the Loan for any other purpose.

(p)    Lender shall not be required to make any Advances to fund any deposit due in connection with any construction contract for Costs, nor shall Lender be required to make Advances to reimburse Borrower for any funds previously expended by Borrower to fund any deposit due in connection with any construction contract for Costs.

11

    2.3    Certain Conditions Precedent to Lender's Obligation to Make Advances of the Loan: Lender shall not be obligated to make any Advance unless all of the following conditions shall be satisfied as of the proposed Funding Date of such Advance:

    (a)    Lender and Lender's Consultant shall have each received a Requisition from Borrower, at least two (2) Business Days prior to the proposed Funding Date, together with (i) paid receipts (including invoices, bills and copies of payments made in connection therewith) and lien waivers for all Costs that were included in any prior Advances and invoices for all Costs proposed to be included in the applicable Advance and (ii) an application and certificate for payment (AIA G702) signed by the Architect and Construction Manager, along with a completed continuation sheet (AIA G703).

    (b)    If payment or reimbursement is being requested for any Costs, or any fees of architects and engineers, or construction management fees, Lender shall have received a written statement from Lender's Consultant, at least two (2) Business Days prior to the proposed Funding Date, certifying to Lender (i) the amount of Costs (broken down by Line Item) and the amount of any fees of architects and engineers, or construction management fees, that have been incurred by Borrower, (ii) intentionally omitted, (iii) whether all municipal governmental agency inspections that should have occurred with respect to the completed construction have occurred, and (iv) whether the completed construction has been performed in a good and workman like manner and in accordance with the Budget.

    (c)    Lender shall have received evidence satisfactory to Lender that there are no conditional sales contracts, chattel mortgages, leases of personality, financing statements or title retention agreements affecting any of the Property.

    (d)    Each of the representations and warranties contained in this Agreement shall be true and correct, in all material respects, as of the proposed Funding Date, as verified by Lender.

    (e)    No Event of Default shall have occurred and be continuing and no event that with the passage of time or notice, or both, would constitute an Event of Default shall have occurred or be continuing.  For the avoidance of doubt, the Existing Default (as defined in the Forbearance Agreement) is not an "Event of Default" under this Agreement.

    (f)    Borrower shall have paid to Lender all fees and expenses required to be paid by Borrower under this Agreement.

    (g)    Intentionally Omitted.

    (h)    Borrower shall provide evidence to Lender that the proceeds of the

12

most recent previous Advance hereunder have been applied to Costs, and otherwise to construct the Improvements, subject to Lender's confirmation and approval in its sole discretion.

(i)     Mortgage Borrower shall have paid to Mortgage Lender all fees and expenses required to be paid by Mortgage Borrower under the Mortgage Loan Documents;

(j)     Borrower, Mortgage Borrower, and Guarantor shall have executed and delivered to Lender and Mortgage Lender the Forbearance Agreement, shall have performed all obligations set forth therein required to be satisfied as conditions precedent to the effectiveness thereof, and shall be in full compliance therewith.

(k)     Special Condition Precedent to Lender's Obligation to Make the first Advance: In addition to the terms and conditions set forth in above and elsewhere in this Agreement, prior to the first Advance hereunder, Borrower shall provide evidence to Lender that: (1) Mortgage Borrower has obtained all permits and approvals in accordance with applicable Legal Requirements from the applicable municipal authorities as are necessary to commence and complete the Construction Work, as confirmed by Lender in its sole but commercially reasonable discretion, and (2) the Property has been completely vacated from all tenants and occupancies in accordance with applicable Legal Requirements, as evidenced by written surrender agreements and inspection by Lender and/or Lender's Consultant, the sufficiency of such evidence being subject to Lender's approval in its sole but reasonable discretion.

2.4     Special Conditions Precedent to Lender's Obligation to Make the Final Advance: Without limiting the generality of the foregoing, Lender shall not be obligated to make the final Advance described in Section 2.5(b) below ("**Final Advance**"), unless, in addition to the terms and conditions set forth in Section 2.2 and 2.3 hereof and elsewhere in this Agreement, the additional following conditions shall be satisfied as of the proposed Funding Date for the Final Advance:

(a)     Intentionally Omitted.

(b)     Intentionally Omitted.

(c)     Intentionally Omitted.

(d)     No Event of Default shall have occurred under this Agreement.

(e)     Borrower has submitted all materials required by this Agreement to support the Requisition for the Final Advance.

(f)     Borrower acknowledges and agrees that as of the date hereof there are certain known outstanding mechanics' liens recorded against and burdening the Mortgaged

13

Property (together with any other mechanics' or materialmen's liens recorded against or burdening the Mortgaged Property, the "**Outstanding Mechanics' Liens**"). Borrower covenants and agrees to fully resolve such Outstanding Mechanics' Liens within thirty (30) days following the date hereof, and to deliver to Lender and Kensington Vanguard National Land Services ("**KV**") such documents and information that Lender and KV may require to issue a date-down to Lender's title insurance policy for the Mortgaged Property showing that title to the Mortgaged Property is free from such Outstanding Mechanics' Liens and otherwise in the condition required by the this Agreement, the other Loan Documents, and the Mortgage Loan Documents. Full resolution of the Outstanding Mechanics' Liens is a condition precedent to the Final Advance.

        2.5    <u>Contemplated Advances</u>:    Provided all other applicable conditions to Advances set forth in this Agreement have been fully satisfied, and provided there is no Event of Default hereunder, Borrower may request Advances of Loan proceeds for the following uses.

        (a)    On the date hereof, Borrower may request an Advance in the amount of up to Two Million and 00/100 Dollars ($2,000,000.00) to reimburse Borrower for eligible Costs under this Agreement.

        (b)    Once Borrower can exhibit spending One Million and 00/100 Dollars ($1,000,000.00) towards Hard Costs after the date hereof and has complied with the conditions set forth in this Section 2, Borrower shall be entitled to an Advance in the amount of up to One Million and 00/100 Dollars ($1,000,000.00) to reimburse Borrower for eligible Costs under this Agreement.

Notwithstanding anything to the contrary provided for herein, it is understood and agreed that any Advance made hereunder that is applied to any obligations of the Mortgage Borrower (including, without limitation, certain (i) monthly debt service payments of Mortgage Borrower, and (ii) closing costs of Mortgage Borrower, as the case may be), shall be deemed to have been contributed by Borrower as a capital contribution to Mortgage Borrower to be applied for such purposes.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

        3.1    <u>Representations and Warranties</u>:  Borrower represents and warrants to Lender, knowing that Lender will rely on such representations and warranties as an incentive to make the Loan, that:

        (a)    Borrower is a limited liability company duly organized and validly existing under the laws of the State of New York and has the authority to do business in the State of New York. Borrower has, and shall take, and has caused and shall cause Mortgage Borrower

to take, commercially reasonable efforts to continue to have, the full power and authority and legal rights to own its properties, to carry on its business as now conducted and to perform its obligations under this Agreement. Borrower conducts no business directly or indirectly except owning and operating the Collateral.

(b)    Borrower has the authority and legal right to execute and deliver this Agreement. No consent, approval, authorization, exemption, notice, report, registration, filing or declaration that has not been obtained or made is required to be obtained or made with respect to the execution and delivery by Borrower of this Agreement.

(c)    Borrower has furnished Lender with true, correct and complete copies of its organizational documents. A true, correct, and complete organizational chart of Mortgage Borrower, Borrower, and each of their constituent owners and controlling parties is attached hereto as <u>Schedule B</u> and incorporated herein by this reference.

(d)    Borrower, Mortgage Borrower, Guarantor, the Project, the Collateral and the Construction Work are in material compliance with all Legal Requirements applicable to Borrower, Mortgage Borrower, Guarantor, the Project, the Collateral or the Construction Work, and no written notice of noncompliance with any such Legal Requirements has been received Borrower, Mortgage Borrower, any Guarantor, or, to the best of Borrower's knowledge, by any other person or entity.

(e)    Neither Borrower, Mortgage Borrower nor Guarantor is in violation of any agreement the violation of which might reasonably be expected to have a material adverse effect on Borrower's, Mortgage Borrower's or any Guarantor's business or assets.

(f)    Neither this Agreement nor the performance, fulfillment of or compliance with the terms and provisions hereof, nor the consummation of the transactions contemplated hereby, conflicts or will conflict with, or will result in a breach of, the terms, conditions or provisions of, or otherwise constitute a default under, or result in the creation of any lien (other than the lien of any of the Collateral Documents) upon any of the properties or assets of Borrower, Mortgage Borrower or any Guarantor under any agreement, instrument, arbitration award, order, judgment, decree, statute, law, ordinance, franchise, certificate, permit, rule, regulation or the like to which Borrower, Mortgage Borrower or any Guarantor is subject, or by which properties or assets of Borrower, Mortgage Borrower or any Guarantor or the Construction Work are bound or affected.

(g)    This Agreement does not contain any untrue statement of a material fact.

(h)    No litigation, investigation or administrative proceeding of or before any court, arbitrator or governmental authority is pending or, to Borrower's knowledge, threatened

against Borrower, Mortgage Borrower, any Guarantor, or any assets thereof that (i) might have a material adverse effect on Borrower's ability to perform its obligations under this Agreement in accordance with the terms thereof, Mortgage Borrower's ability to perform its obligations under the Mortgage Loan Documents in accordance with the terms thereof or Guarantor's ability to perform their respective obligations under the Guaranty, (ii) might affect the financial condition of the Borrower, Mortgage Borrower or any Guarantor, (iii) might impair the value of the Project or the Collateral, (iv) seeks to enjoin or similarly prevent the Construction Work or the use of the Improvements, or (v) might question the validity of this Agreement, other than the following:

- Civil Case #1:19-cv-04530-RPK-SJB filed 8/6/19 by Ayelet Pottash vs. Eli Karp, et al
- Index #503266/2018 filed 2/15/18 by NAG Nostrand, LLC vs. Eli Karp, Hello Nostrand Holdings, LLC, et al
- UCC-1 Filing #201903208122257 filed 3/20/19 with Eli Karp and Hello Nostrand Investors LLC, as Debtors, and ICROSS Fund 4 LLC, as Secured Party
- Case #36078/2020e filed 2/11/20 by Sharestates Investments, LLC vs. Eli Karp, et al
- Case #0004439/2010 filed 7/13/09 by Supreme Heights, Inc. vs. Eli Karp
- Case #2018-024350-CA-01 filed 7/13/18 by Pedro J. Garcia, as Property Appraiser, vs. Eli Karp, et al

(i)    No condemnation or taking by eminent domain of any portion of the Property, or affecting any roadways or utilities abutting the Property, or access to the Property therefrom has commenced, or is threatened or contemplated by any governmental authority.

(j)    All management, leasing, marketing, engineering, architectural, construction and maintenance contracts, relating to the Project or the Construction Work to which Borrower, Mortgage Borrower or any affiliates of Borrower or Mortgage Borrower is a party are listed in the schedule of contracts most recently furnished to Mortgage Lender by Mortgage Borrower, and true and complete copies of all such contracts, including all amendments thereto, have been made available to Lender or Lender's Consultant. All contracts listed in such schedule are in full force and effect in accordance with their respective terms, and, except as described in such schedule, no party to any such contract has asserted any written claim of default or offset against Borrower, Mortgage Borrower or any affiliate of Borrower, with respect thereto, which claim, default or offset has not been cured or resolved.

(k)    Neither Borrower nor Mortgage Borrower has sold, conveyed, assigned or otherwise transferred, or agreed to sell, convey, assign or otherwise transfer the Collateral, or any development, air or floor-area-ratio rights with respect to the Property.

(l)    Borrower has no actual knowledge of any Hazardous Materials (as defined in the Environmental Indemnity) located or disposed of on the Project.

(m)    Mortgage Borrower's estate, rights, title and interest in, to and under

16

the Property are subject to no liens, charges or encumbrances other than as contained in the Title Policy, including the lien of the Mortgage (hereinafter collectively **"Permitted Exceptions"**), and the Mortgage is a valid lien on such estate, rights, title and interest.

(n)     Borrower is the sole record and beneficial owner of, and has good title to, the Collateral, free and clear of all Liens whatsoever, except the Liens created by the Loan Documents.  The Pledge Agreement, together with the UCC Financing Statements relating to the Collateral when properly filed in the appropriate records and Borrower's delivery to Lender of the certificates evidencing the Pledged Interests described in the Pledge Agreement, will create a valid, perfected first priority security interests in and to the Collateral.  Borrower's delivery to Lender of the certificates evidencing the Pledged Interests described in the Pledge Agreement perfects a first-priority security interest in that portion of the Collateral consisting of the Pledged Interests.  For so long as the Loan is outstanding, Borrower shall forever warrant, defend and preserve such title and the validity and priority of the Lien of the Pledge Agreement and shall forever warrant and defend such title, validity and priority to Lender against the claims of all persons whomsoever; provided, however, that Borrower shall have the right to contest in good faith and with diligence the validity of any such liens or claims upon furnishing to the Title Company of such security or indemnity as the latter may require to induce it to issue an endorsement to the UCC Title Insurance Policy insuring against or without exception for all such claims or liens.

(o)     The Budget sets forth all of the costs, expenses and fees (including costs, expenses and fees in connection with the making of the Loan and the Mortgage Loan) that Borrower expects to pay or anticipates becoming obligated to pay to complete the Construction Work.  Borrower is not aware of any permits required for the completion of the Project that should not be available as of right upon the submission of all required applications therefor.

(p)     Borrower has not dealt with any mortgage broker or other broker or finder in connection with the Loan other than the broker(s), if any, listed on that certain Loan Settlement Statement in connection with the Loan.

(q)     All financial statements of Borrower, Mortgage Borrower and Guarantor heretofore given and hereafter to be given to Lender, are and will be true and complete in all respects as of their respective dates, fairly represent the financial conditions of the businesses or persons to which they pertain, and no materially adverse change has occurred in the financial conditions reflected therein since the respective dates thereof.

(r)     All necessary action has been taken to permit the Construction Work according to the Budget and the full use of the Improvements for their intended purpose under all Legal Requirements.  When completed according to the Budget, the Improvements will comply with all Legal Requirements.

(s)     All utility services necessary for the Construction Work and the use

17

of the Improvements are available to the Property or will be available upon completion of the Construction Work.  All roads necessary for the full use of the Project for its intended purpose have been completed, or the necessary rights-of-way therefor have been acquired or dedicated, and all necessary steps to date have been taken to insure the completion thereof.

(t)     All documents furnished to Lender by or on behalf of Borrower and Mortgage Borrower, as part of or in support of the Loan application or pursuant to this Agreement or otherwise in connection with the Loan or the Collateral Documents, are true, correct, complete and accurately represent the matters to which they pertain.

(u)     Borrower, Mortgage Borrower and Guarantor are, and upon consummation of the Loan contemplated by this Agreement and the Collateral Documents and any other related documents, will be, solvent.

(v)     Borrower or Mortgage Borrower has advised the Title Company in writing about the current status of any survey, soils testing, site development, excavation or other work related to the construction of the Improvements that has been done prior to the recording of the Second Land Mortgage and subsequent to the recording of the First Land Mortgage, the Building Mortgage, and the Project Mortgage.

(w)     All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any Person under applicable Legal Requirements relating to Mortgage Borrower's interest in the Property or Borrower's interest in the Collateral have been paid or are being paid simultaneously herewith.  All stamp, intangible or other similar tax required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including, without limitation, the Pledge Agreement, have been paid or are being paid simultaneously herewith.

(x)     Borrower is the sole beneficial owner of the Pledged Interests and no Lien exists or will exist (except the Lien of the Loan Documents) upon such Pledged Interests at any time (and no right or option to acquire the same exists in favor of any other Person).  The Collateral is not and will not be subject to any contractual restriction upon the transfer thereof (except for any such restriction contained in the Pledge Agreement).

(y)     The Pledge Agreement creates a valid security interest in the Collateral, securing the payment of the Loan, and upon the filing in the appropriate filing offices of the financing statements to be delivered pursuant to this Agreement, such security interests will be perfected, first priority security interests, and all filings and other actions necessary to perfect such security interests will have been duly taken.  Upon the exercise of its rights and remedies under the Pledge Agreement, Lender will succeed to all of the rights, titles and interest of Borrower in Mortgage Borrower without the consent of any other Person and will, without the consent of

18

any other Person, be admitted as the sole member of Mortgage Borrower as and to the extent set forth in Section 9 of the Mortgage Borrower's operating agreement (and Section 3(b) of the First Amendment to the Operating Agreement of the Mortgage Borrower).

3.2  Continuing Effectiveness:  All representations and warranties contained herein shall be deemed continuing and in effect at all times while Borrower remains indebted to Lender and shall be deemed to be incorporated by reference in each requisition for advance by Borrower, unless Borrower specifically notifies Lender of any change therein.

## ARTICLE IV

## COVENANTS OF BORROWER

4.1  Covenants:  Borrower covenants and agrees as follows:

(a)  Borrower shall cause Mortgage Borrower to cause the Construction Work to be performed continuously and in a timely manner in accordance with the Budget approved by Lender and in compliance with all Legal Requirements, so that the Construction Work shall be complete by the Scheduled Completion Date, TIME BEING OF THE ESSENCE, unless extended by exercise of any option in the Note, if any exists, for such period, and as otherwise extended by Lender in its sole and absolute discretion.

(b)  Intentionally Omitted.

(c)  Other than as set forth herein, Borrower shall cause Mortgage Borrower to keep the Project free from liens and encumbrances (except for the Mortgage), pay promptly all persons or entities supplying work or materials with respect to the Construction Work and immediately discharge by bond, or otherwise, or make other arrangements acceptable to Lender with respect to, any mechanic's or other lien filed against the Project, the Mortgage Borrower or the Borrower.

(d)  Borrower shall cause Mortgage Borrower to pay promptly when due and before the accrual of penalties thereon all taxes incurred with respect to Borrower, Mortgage Borrower, the Collateral and/or the Project including all real and personal property taxes and assessments levied or assessed against Borrower, Mortgage Borrower, the Collateral or the Project and all utility fees and charges in connection with the Project, and to provide Lender with receipted bills therefor if requested by Lender.

(e)  Borrower shall cause Mortgage Borrower to maintain in effect at all times while Borrower is indebted to Lender the insurance policies required by the Mortgage and shall notify Lender of any change in the status of such insurance within five (5) days of Borrower's receipt of notice of any such change.  Borrower shall cause Mortgage Borrower to repair and

19

restore any casualty loss to the Improvements whether completed or under construction, except to the extent that Mortgage Lender does not make casualty insurance proceeds available to Mortgage Borrower for that purpose.

(f)     Borrower shall pay all commitment, loan, servicing, administrative and inspection fees of Lender, and all expenses involved in perfecting the lien status or priority provided by the Collateral Documents and all other out-of-pocket expenses of Lender directly related to the Loan, the protection and preservation of the Project and the Collateral or the enforcement of any provision of this Agreement or of the Collateral Documents, including, without limitation, recording fees and taxes, tax, title and lien search charges, title insurance charges, architects, engineers (including the Lender's Consultant's fees) and reasonable attorneys' fees (including fees for appellate proceedings), real property taxes, personal property taxes and insurance premiums, and shall indemnify and hold Lender harmless against all claims, losses, expenses and liabilities, including reasonable attorneys' fees, incurred by Lender on account of any claim by any party arising out of the Loan, the Mortgage Loan or Lender's interest in or lien upon the Collateral, the Property or Improvements.

(g)     <u>Intentionally Omitted</u>.

(h)     Borrower shall, or shall cause Mortgage Borrower to: (i) furnish promptly to Lender such information as Lender may reasonably require concerning: costs, progress of construction, marketing, and such other factors as Lender may specify; (ii) notify Lender promptly of (A) any litigation instituted or threatened against Borrower, Mortgage Borrower or any Guarantor, any deficiencies asserted or liens filed by the Internal Revenue Service against Borrower, Mortgage Borrower, any Guarantor, the Collateral, the Property or the Improvements, any audits of any Federal or State tax return of Borrower, Mortgage Borrower or any Guarantor, and the results of any such audit, (B) any condemnation or similar proceedings with respect to any of the Property or Improvements or any proceeding seeking to enjoin the Construction Work and/or the intended use of the Improvements, (C) all changes in governmental requirements pertaining to the Construction Work, the Collateral, the Project, utility availability, and Borrower's or Mortgage Borrower's anticipated cost of completion of the Construction Work, and (D) any other matters which could reasonably be expected to adversely affect Borrower's ability to perform its obligations under this Agreement or Mortgage Borrower's ability to perform its obligations under the Mortgage Loan Documents.

(i)     Borrower shall maintain, and shall cause Mortgage Borrower to maintain, complete and accurate account books and records with respect to the Loan, the Mortgage Loan, the Collateral, the Project, and the Construction Work, which books and records shall reflect the consistent application of accepted accounting principles, and to make such books and records available at reasonable times and upon reasonable notice for inspection and copying by Lender or its agent.

20

(j)     Borrower shall cause Mortgage Borrower to permit Lender and its agents to have access to the Project at reasonable times; shall permit Lender to maintain a sign on the Property and otherwise publicize Lender's role as mezzanine lender; and shall name Lender as mezzanine lender in Borrower's publicity and promotion, as appropriate.

(k)     <u>Intentionally Omitted</u>.

(l)     Promptly following Lender's written request, Borrower shall notify, or shall cause Mortgage Borrower to notify,  Lender promptly of the names and addresses of all contractors, subcontractors and materialmen who are employed in connection with the construction of the Improvements, and whose names and addresses were not heretofore supplied to Lender.

(m)     Promptly following Lender's written request, Borrower shall furnish to Lender, or cause Mortgage Borrower to furnish to Lender, if Lender so requests, the contracts, bills of sale, receipted vouchers and agreements, or any of them, under which Borrower or Mortgage Borrower claims title to the materials, articles, fixtures and other personal property used or to be used in the construction or operation of the Improvements.

(n)     Borrower shall not permit, and shall not cause Mortgage Borrower to permit, any materials, equipment, fixtures or any other part of the Improvements to be purchased or installed under any security agreement or other arrangement wherein the seller reserves or purports to reserve the right to remove or to repossess any such items or to consider them personal property after their incorporation in the Project, unless authorized in advance by Lender in writing.

(o)     Borrower shall, at Lender's request, execute and deliver to Lender all further documents and perform all other acts which Lender reasonably deems necessary or appropriate to perfect or protect its security for the Loan.

(p)     Borrower shall not enter into any agreement or take any action that would result in the occurrence of an Event of Default or would otherwise cause Borrower's representations and warranties contained herein to be incorrect or misleading.

(q)     Borrower shall not engage in any business other than acting as the sole member of Mortgage Borrower.

(r)     Promptly following Lender's written request, Borrower shall furnish, or cause Mortgage Borrower to furnish, to Lender's Consultant copies of all construction contracts, and any modifications thereto, when and as the same shall be executed and delivered. Each construction contract (and each agreement with respect to the Project and/or Construction Work between Mortgage Borrower and Architect or Construction Manager) shall contain provisions in form and substance reasonably satisfactory to Lender pursuant to which Lender shall

21

be entitled to notice and an opportunity to cure any defaults by Mortgage Borrower thereunder and to assume (at Lender's sole option) the rights and obligations of Mortgage Borrower thereunder following the occurrence and during the continuance of any Event of Default.

(s)    Borrower shall timely obtain, or cause Mortgage Borrower to timely obtain, all permits required for the completion of the Construction Work.

(t)    Borrower shall, or shall cause Mortgage Borrower to (i) permit and shall cause each contractor to permit Lender's Consultant and any other agent or representative of Lender, at Borrower's sole cost and expense, to enter upon the Project at all reasonable times during the Construction Work, upon reasonable notice and accompanied by Borrower or Borrower's agents, to inspect the Construction Work, the Improvements and all materials to be used in the Project, and (ii) permit Lender, Lender's Consultant and any other agent or representative of Lender, at reasonable times upon reasonable notice, to examine all information and documents, including books, contracts and records, relating to the Construction Work and/or the Project or Collateral, and shall cooperate and cause each contractor to cooperate with the Lender's Consultant to enable it to perform its functions hereunder.  At the time of each inspection by Lender's Consultant, Borrower shall make available, or cause Mortgage Borrower to make available, to Lender's Consultant daily log sheets, if available, covering substantially all of the period since the immediately preceding inspection, showing, for each day during such period, contractors and sub-contractors on the job, the number of workers employed by each, delays encountered and the status of construction.  Notwithstanding the foregoing, Lender shall not have any duty to make inspections or cause inspections to be made and shall not incur any liability or obligation as a result of making or not making any such inspection.

(u)    Borrower, upon written demand of Lender's Consultant, together with a reasonable explanation therefor, shall correct or cause Mortgage Borrower or the responsible contractor(s) to correct all defects in the Construction Work, or any part thereof, that may be noted by the Lender's Consultant.  The making of any Advance shall not constitute a waiver of the right of Lender to require compliance with this covenant with respect to any such defects.

(v)    Borrower shall not make, and shall not cause Mortgage Borrower to make, any payment to any contractor with respect to labor or materials relating to the Project unless Borrower shall simultaneously obtain a lien waiver from such contractor with respect to labor performed or materials furnished by such contractor.

(w)    Borrower shall duly perform and observe, or shall cause to be performed and observed, all of the covenants, agreements and conditions on its part to be performed and observed under the Note and the Collateral Documents, and by this reference all of such covenants, agreements and conditions are hereby made a part of this Agreement to the same extent as if fully set forth herein.

22

(x)    Borrower shall give notice to Lender within two (2) Business Days after Borrower becomes aware of any representation or warranty of Borrower contained herein is no longer true and correct.

(y)    All Construction Work shall be done in a manner that shall adequately protect tenants, if any, under any leases, if any, and their employees and invites, from personal injury and loss of property, and shall otherwise be consistent with the requirements of such leases with respect to the continued occupancy of such tenants during the Construction Work.

(z)    Borrower shall maintain its existence and shall be in good standing at all times.

(aa)    Borrower shall cause Mortgage Borrower to employ suitable means to protect from theft or vandalism all portions of the Improvements and all tools and building materials stored on the Property.

(bb)    <u>Transfers</u>:

(1)    Borrower acknowledges that Lender has examined and relied on the creditworthiness and experience of Borrower, Mortgage Borrower, and their members (and the creditworthiness and experience of the parties owning the direct and indirect interests in Borrower and Mortgage Borrower) and beneficial owners of the Collateral in agreeing to make the Loan, and will continue to rely on Borrower's ownership of the Collateral as a means of maintaining the value of the Collateral as security for repayment of the Debt and the performance of the other obligations of Borrower set forth in the Loan Documents. Borrower acknowledges that Lender has a valid interest in maintaining the value of the Collateral so as to ensure that, should Borrower default in the repayment of the Debt or the performance of the other obligations of Borrower set forth in the Loan Documents, Lender can recover the Debt by a sale of the Collateral. Borrower shall not, without the prior written consent of Lender, sell, convey, alienate, mortgage, encumber, pledge or otherwise transfer (collectively, "**Transfer**") the Collateral or any part thereof, or cause the Mortgage Borrower to Transfer the Property or any part thereof, or any direct or indirect interest therein or in Borrower or permit the Collateral or Property or any part thereof or any direct or indirect interest therein or in Borrower to be transferred.

(2)    A Transfer shall include, but not be limited to, (i) an installment sales agreement wherein Borrower agrees to sell the Collateral or any part thereof or Mortgage Borrower agrees to sell Property or any part thereof, in each case for a price to be paid in installments ; (ii) an agreement by Mortgage Borrower leasing all or a substantial part of the Property for other than actual occupancy by a tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Mortgage Borrower's right, title and interest in and to any Leases or any Rents (as defined in the Second Land Loan

23

Mortgage); (iii) a sale, pledge, encumbrance or assignment by Guarantor of any of Guarantor's direct or indirect interests in Borrower; (iv) if a Restricted Party is a corporation, any merger, consolidation or Sale or Pledge of such corporation's stock or the creation or issuance of new stock; (v) if a Restricted Party is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general partner or the Sale or Pledge of the partnership interest of any general partner or any profits or proceeds relating to such partnership interest, or the Sale or Pledge of limited partnership interests or any profits or proceeds relating to such limited partnership interest or the creation or issuance of new limited partnership interests; (vi) if a Restricted Party is a limited liability company, any merger or consolidation or the change, removal, resignation or addition of a managing member or non-member manager (or if no managing member, any member) or the Sale or Pledge of the membership interest of a managing member (or if no managing member, any member) or any profits or proceeds relating to such membership interest, or the Sale or Pledge of non-managing membership interest or the creation or issuance of new non-managing membership interest; (vii) if a Restricted Party is a trust or nominee trust, any merger, consolidation or the Sale or Pledge of the legal or beneficial interest in a Restricted Party or the creation or issuance of new legal or beneficial interests; or (viii) any Person claiming direct or indirect ownership interest in Mortgage Borrower through possession of a stock certificate issued by Mortgage Borrower prior to the date hereof, irrespective of when such Person acquired such interest. For purposes of clarification, no direct or indirect interest in Borrower may (except in accordance with the terms and conditions of <u>Section 4.1(aa)</u> hereof) be (i) transferred (including any transfer, issuance or participation of a profits interest or solely economic interest) or (ii) pledged or encumbered as collateral for any financing, including, without limitation, any preferred equity investment.

(3)     Lender's consent to one Transfer of the Collateral or shall not be deemed to be a waiver of Lender's right to require such consent to any future Transfer. Any Transfer of the Collateral made in contravention of this Section shall be null and void and of no force and effect. Acceptance of payments by Lender subsequent to any Transfer shall not be deemed a waiver of Lender's rights to thereafter accelerate payment of principal.

(4)     Borrower agrees to bear and shall pay or reimburse Lender on demand for all costs and expenses (including, without limitation, the cost of any required counsel opinions relating to any requests made under this Section, attorneys' fees and disbursements, title search costs and title insurance endorsement premiums) incurred by Lender in connection with the review, approval and documentation of any matters under this <u>Section 4.1(aa)</u>.

(cc)     <u>Books and Records</u>

24

(1)     Borrower and Guarantor shall keep or cause to be kept proper books, records and accounts with respect to the operation of the Property in accordance with GAAP and shall furnish to the Lender (i) within ninety (90) days after the end of each fiscal year of Borrower and at any other time upon Lender's request, financial statements for the operation of the Property, including a balance sheet, a statement of income and expenses of the Property and a statement of changes in financial position, each in reasonable detail and certified by Borrower (or a principal thereof) under penalty of perjury, to be true and complete, and, if Lender shall require audited by an independent certified public accountant; (ii) within thirty (30) days following the close of each calendar quarter, quarter-annual financial statements (including a certified rent roll) in form satisfactory to the Lender, which shall disclose in reasonable detail all earnings and expenses with respect to the operation of the Property certified by Borrower (or a principal thereof) under penalty of perjury, to be true and complete; (iii) together with the foregoing financial statements and at any other time upon Lender's request, a rent schedule for the Property in form acceptable to Lender, certified by Borrower (or a principal thereof) under penalty of perjury, to be true and complete, showing the name of each tenant, the space occupied, the Lease (as defined in the Second Land Loan Mortgage) expiration date, the rent payable, the rent paid and any other information requested by Lender; (iv) upon Lender's request, financial statements for any principal of Borrower and Guarantor in the form set forth above; (v) upon Lender's request, an accounting of all security deposits held in connection with any Lease of any part of the Property, including the name and identification number of the accounts in which such security deposits are held, name and address of the financial institutions in which such security deposits are held and the name of the person to contact at such financial institutions, along with any authority or release necessary for Lender to obtain information regarding such accounts directly from such financial institutions; (vi) within fifteen (15) days of filing same, the Federal Income Tax Return of each of Borrower and Guarantor; (vi) no later than the fifteenth (15th) day of each calendar month Borrower shall provide Proof of Payment of the Mortgage Loan to Lender and (viii) such other financial information as Lender may request.

(2)     Upon the death of any Guarantor who is an individual, Borrower shall give prompt written notice to Lender (i.e., at least within thirty (30) days following his or her death), setting forth the date of death, the state and county where the deceased Guarantor's estate is being administered, and, if then known, the name(s) and address(es) of the executor(s) or administrator(s) appointed to administer the estate of such deceased Guarantor.

(dd)     Borrower shall deliver any Advance made hereunder that is intended to be applied to any obligations of the Mortgage Borrower (including, without limitation, certain (1) monthly debt service payments of Mortgage Borrower, and (2) closing costs of Mortgage Borrower, as the case may be), to Mortgage Borrower as a capital contribution to Mortgage Borrower made in accordance with the terms of the Mortgage Borrower's operating

25

agreement.

(ee)     Borrower hereby covenants that for so long as this Agreement remains in effect or any amount due hereunder or under the Note remains outstanding and unpaid, it shall not nor shall it cause, suffer or permit Mortgage Borrower to, unless otherwise consented to in writing by Lender in Lender's sole discretion create, incur, assume or suffer to exist, any indebtedness (institutional or otherwise) except (i) indebtedness created pursuant to the Note; (ii) accounts payable, taxes payable and other payables (other than for borrowed money) incurred in the ordinary course of business and (iii) the Mortgage Loan.  Borrower shall not amend or modify any of the terms or conditions of the Mortgage Loan or any document evidencing or securing the Mortgage Loan without Mortgage Lender's consent. For so long as any sums shall be due under this Loan, Borrower shall not make any distribution to its members.  Any and all dividends, including capital dividends, stock or liquidating dividends, distributions of property, redemptions or other distributions made by Mortgage Borrower on or in respect of any interests in Mortgage Borrower, and any and all cash and other property received in payment of the principal of or in redemption of or in exchange for any such interests (individually and collectively, as the case may be, "**Distributions**"), shall become part of the Collateral.  If any Distributions shall be received by Borrower or any Affiliate of Borrower, Borrower shall hold, in trust for the benefit of Lender.  Any and all revenue derived from the Property paid directly by tenants, subtenants or occupants of the Property shall be held and applied in accordance with the terms of the Mortgage Loan Documents. Any breach of this Section 4.1(dd) shall constitute an Event of Default hereunder.

(ff)     Without the express prior written consent of Lender, Borrower shall not, and Borrower shall not cause, suffer or permit Mortgage Borrower to, enter into, execute, deliver, or consent to, as the case may be, any deed-in-lieu or consensual foreclosure with or for the benefit of Mortgage Lender or any of its Affiliates or designees.

(gg)     None of Borrower, Mortgage Borrower, Guarantor, or any Affiliate of any of the foregoing shall acquire or agree to acquire the Mortgage Loan, or any portion thereof or any interest therein, or any direct or indirect ownership interest in the holder of the Mortgage Loan, via purchase, transfer, exchange, or otherwise, and any breach or attempted breach of this Section 4.1(ff) shall constitute an immediate Event of Default hereunder.  If, solely by operation of applicable subrogation law, Borrower, Mortgage Borrower, Guarantor, or any Affiliate of any of the foregoing shall have failed to comply with the foregoing, then Borrower shall (i) immediately notify Lender of such failure, and (ii) cause any and all such prohibited parties acquiring any interest in the Mortgage Loan Documents (A) not to enforce the Mortgage Loan Documents, and (B) upon the request of Lender, to the extent any of such prohibited parties has or have the power or authority to do so, to promptly (a) cancel the promissory note evidencing the Mortgage Loan, (b) reconvey and release the Liens securing the Mortgage Loan and any other collateral under the Mortgage Loan Documents, and (c)

26

discontinue and terminate any enforcement proceeding(s) under the Mortgage Loan Documents.

(hh)    Borrower shall not permit Mortgage Borrower to avail itself of the condominium provisions set forth in Section 17 of the Building Mortgage Loan Agreement (or any similar provision of any of the Existing Mortgage Loan Document) without the prior written consent of the Lender.

(ii)    Notwithstanding anything to the contrary provided for herein, in the other Loan Documents, or in the Mortgage Loan Documents, in the event there is a conflict between the terms of any of the Loan Documents, on one hand, and the terms of the Existing Mortgage Loan Documents, on the other hand, including, without limitation, with respect to any provisions concerning (i) the procedures, requirements, or conditions for requesting or applying Advances, (ii) insurance requirements, (iii) representations, warranties, or covenants, (iv) Transfers (or any other transfers described or defined in the Existing Mortgage Loan Documents), (v) special purpose entity requirements applicable to the Borrower or the Mortgage Borrower, (vi) the provisions of Article VII below (Mortgage Loan Provisions), or (vii) any loan sale or restructuring provisions, the terms of this Agreement and the other Loan Documents shall control; provided, however, that in the event the Existing Mortgage Loan Documents shall grant to Lender any rights or remedies in addition to or more permissive than those set forth in the Loan Documents, then Lender and Mortgage Lender shall be entitled to avail themselves of all rights, remedies, privileges, and discretion afforded in either or both of the Loan Documents and/or the Mortgage Loan Documents, exercised in Lender's and Mortgage Lender's sole and absolute discretion, in all cases subject to the Forbearance Agreement and applicable Legal Requirements.

## ARTICLE V

## EVENTS OF DEFAULT

5.1  Events of Default:  The occurrence of any of the events listed in this Article shall constitute an event of default ("**Event of Default**") under this Agreement:

(a)    Any default or Event of Default (as defined in the Mortgage, the Mortgage Loan Agreement, or the other Mortgage Loan Documents) by the Mortgage Borrower under the Mortgage or the other Mortgage Loan Documents;

(b)    Failure to provide Proof of Payment for the Mortgage unless Lender remains an Affiliate of Mortgage Lender;

27

(c)      if (i) any portion of the Loan is not paid on or prior to the date on which such payment is due, (ii) any other payment under the Note, this Agreement or any other Loan Document is not paid within five (5) days after the same is due or (iii) if the entire Loan is not paid in full on the Maturity Date;

(d)      If any of the taxes or insurance obligations under the Mortgage Loan Documents are not paid when the same are due and payable;

(e)      If the Policies required by this Agreement are not kept in full force and effect, or if such Policies are not assigned and delivered to Lender upon request, subject to a five (5) day cure period;

(f)      If a Restricted Party shall make an assignment for the benefit of creditors or if Borrower shall admit in writing its inability to pay its debts as they become due;

(g)      If a receiver, liquidator or trustee of a Restricted Party shall be appointed or if a Restricted Party shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, a Restricted Party or if any proceeding for the dissolution or liquidation of a Restricted Party shall be instituted; however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by such Restricted Party, upon the same not being discharged, stayed or dismissed within thirty (30) days;

(h)      If Borrower shall be in default under any other security agreement covering any part of the Collateral whether it be superior or junior in lien to the Collateral Documents, beyond the expiration of any applicable notice, grace, or cure period provided thereunder;

(i)      If Borrower fails to cure, or to cause Mortgage Borrower to cure, any violations of laws or ordinances affecting or which would reasonably be interpreted to affect the Property or the Collateral, subject to a fifteen (15) day cure period but only if there is no hazardous condition on or affecting the Property;

(j)      If Borrower shall be in default under any other material term, covenant or condition of the Note, this Agreement or the other Collateral Documents;

(k)      If Borrower causes the Collateral or the Property and/or the ownership interests in Borrower (whether direct or indirect) to be used as collateral for any additional financing not set forth or otherwise permitted hereunder;

(l)      Except as permitted in this Agreement, in the Mortgage Loan

28

Documents or in the other Loan Documents, the actual or threatened (in writing) alteration, improvement, demolition or removal of any of the Improvements without the prior consent of Lender;

(m)     If (i) a condominium regime of ownership is established in regards to any portion of the Property, or (ii) an offering plan is submitted to the New York State Attorney General's Office with the purpose of establishing same, in each case in violation of the terms of the Loan Documents without the prior written consent of Lender;

(n)     If Borrower fails to maintain at least one (1) independent manager as required by that certain Operating Agreement for Borrower dated as of November 28, 2017, subject to a fifteen (15) day cure period;

(o)     Borrower consummates a transaction which would cause this Agreement or Lender's exercise of its rights under this Agreement, the Note or the other Loan Documents to constitute a nonexempt prohibited transaction under ERISA (as defined below) or result in a violation of a State statute regulating governmental plans, subjecting Lender to liability for a violation of ERISA, the Code, a State statute or other similar law and same is not unwound prior to subjecting Lender to liability for a violation of ERISA, the Code, such State statute or other similar law;

(p)     The assignment or attempted assignment by Borrower of this Agreement, any rights hereunder, or any Advance to be made hereunder, or the conveyance, lease, mortgage, pledge or any other alienation or encumbrance of the Project or Collateral or any part thereof, or any estate or right therein without the prior written consent of Lender, except as explicitly permitted herein or by the Collateral Documents;

(q)     If any certificate, statement, representation, warranty or audit heretofore or hereafter furnished by or on behalf of Borrower or Mortgage Borrower pursuant to or in connection with this Agreement or otherwise (including, without limitation, representations and warranties contained herein) or as an inducement to Lender to extend any credit to or to enter into this Agreement proves to have been false or misleading in any material respect at the time as of which the facts therein set forth were stated or certified or to have omitted a material fact or any substantial contingent or unliquidated liability or claim against any Restricted Party or if on the date of execution of this Agreement there shall have been any materially adverse changes in any of the facts previously disclosed by any such certificate, statement, representation, warranty or audit, which change shall not have been disclosed to Lender at or prior to the time of such execution; provided, however, that if such representation or warranty is, by its nature, capable of being cured and is not reasonably likely to have a material adverse effect on Borrower, Guarantor, the Mortgaged Property, and such representation or warranty was not intentionally false or misleading in any material respect when made, then the same shall not constitute an Event of Default hereunder *unless* Borrower does not cure the same within fifteen (15) days after Borrower

29

becomes aware that such representation or warranty was false or misleading when made (as such time may be extended for up to thirty (30) days to cure same so long as Borrower is engaged in ongoing, good faith efforts to cure same);

(r)     The failure by Borrower to satisfy the conditions to the Final Advance set forth in Section 2.4 of this Agreement on or before the Scheduled Completion Date;

(s)     The cessation of Construction Work for any period of thirty (30) consecutive business days;

(t)     If Borrower violates or does not comply with any of the provisions of Section 4.1(bb);

(u)     If Borrower violates or does not comply with any of the provisions of Section 4.1(cc), subject to a fifteen (15) day cure period;

(v)     Intentionally Omitted;

(w)     If an "*Event of Default*" (as such term is defined in the Pledge Agreement) shall occur under the Pledge Agreement, the Note or any of the Collateral Documents;

(x)     If any representation or warranty contained in this Agreement shall no longer be true and correct in all material respects; provided, however, that if such representation or warranty is, by its nature, capable of being cured and is not reasonably likely to have a material adverse effect on Borrower, Guarantor, the Mortgaged Property, and such representation or warranty was not intentionally false or misleading in any material respect when made, then the same shall not constitute an Event of Default hereunder *unless* Borrower does not cure the same within fifteen (15) days after Borrower becomes aware that such representation or warranty was false or misleading when made (as such time may be extended for up to thirty (30) days to cure same so long as Borrower is engaged in ongoing, good faith efforts to cure same);

(y)     The institution by any lienor of a foreclosure action against the Project or the Collateral or any part thereof that is not discharged or bonded over within ten (10) days;

(z)     The filing of any mechanic's lien against the Project that is not removed of record or adequately bonded (in Lender's sole discretion) within thirty (30) days after filing;

(aa)    The death of any guarantor or obligor of the obligations of Borrower under the Loan; or

(bb)    If a Termination Event (as defined in the Forbearance Agreement) shall occur under the Forbearance Agreement, or if Borrower shall use the Loan proceeds in contravention of the requirements of the Forbearance Agreement.

Notwithstanding the foregoing or any other provision of the Loan Documents, the terms of Section 7(h) of the Forbearance Agreement are hereby incorporated herein.

5.2    Event of Default "Continuing".  An Event of Default shall be deemed to be "continuing" for all purposes of this Agreement, notwithstanding any purported curing of such Event of Default, unless, prior to the receipt by Borrower of a notice from Lender stating that Lender shall have elected to accelerate the indebtedness evidenced by the Mortgage Note Borrower shall have cured such Event of Default and so notified Lender.

## ARTICLE VI

## REMEDIES UPON DEFAULT

6.1    Remedies:    (a) If any Event of Default shall have occurred and be continuing, all obligations of Lender under this Agreement shall, at the option of Lender, cease and terminate, and Lender may immediately exercise any or all rights, remedies and recourse available to it at law or in equity or under any of the Collateral Documents, including, without limitation, the right to accelerate the Loan and foreclose any and all liens and security interests securing the repayment of the Loan under any of the Collateral Documents including, without limitation, the Pledge Agreement.

(b)    Upon the occurrence and during the continuance of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Loan shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to all or any part of the Collateral.  Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singularly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth herein or in the other Loan Documents.  Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing (i) Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Collateral and the Collateral has been foreclosed, sold

31

and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full.

(c)    In addition to the foregoing, if any Event of Default shall have occurred and be continuing, all obligations of Lender under this Agreement, including, without limitation, the obligation to make Advances, shall, at the option of Lender, cease and terminate, and Lender may immediately exercise any or all rights, remedies and recourse available to it at law or in equity or under the Note or any of the Collateral Documents, including, without limitation, the right to accelerate the Loan and foreclose any and all interests securing the repayment of the Loan. In addition to, and without limiting the foregoing, if any Event of Default shall have occurred and be continuing, Lender may take immediate possession of the Collateral as well as all other property to which title is held by Borrower and in which Lender has a lien as is necessary to fully complete the Construction Work and do anything in its sole judgment to fulfill the obligations of Borrower hereunder. Without restricting the generality of the foregoing and for the purposes aforesaid, Borrower hereby appoints and constitutes Lender its lawful attorney-in-fact with full power of substitution in the premises to complete construction and equip the Improvements, to use unadvanced Loan funds or funds which Borrower may have deposited with Lender pursuant to this Agreement, or to advance funds in excess of the Loan Amount pursuant to this Agreement; to pay all taxes and assessments on the Collateral, Property or Improvements not paid by Borrower when due and to add the amounts of any such payments to the amount of indebtedness secured by the Collateral Documents; to make changes in the Budget which shall be necessary or desirable to complete the Construction Work in substantially the manner contemplated by the Budget; and to do any act which Borrower might do in its own behalf relating to the Construction Work, Collateral, Property or Improvements, it being understood and agreed that this power of attorney shall be a power coupled with an interest and cannot be revoked. All such costs and expenses incurred by Lender in remedying such Event of Default or such failed payment or act or in appearing in, defending, or bringing any action or proceeding shall bear interest at the Default Rate, for the period after such cost or expense was incurred to the date of payment to Lender. All such costs and expenses incurred by Lender together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Debt and be secured by the liens, claims and security interests provided to Lender under the Loan Documents and shall be immediately due and payable upon demand by Lender therefore. Notwithstanding anything to the contrary contained herein, Lender shall not be obligated to attempt to use, operate, occupy or manage the Project or any part thereof, perform the Construction Work, or perform any of the terms, conditions and agreements herein or in any construction contracts or in any other document on the part of Borrower to be performed, and Lender shall have no liability to any Restricted Party for failing, attempting to perform, or ceasing to perform the same, or for the manner of performing or attempting to perform the same, or any part thereof.

(d)    With respect to Borrower and the Collateral, nothing contained herein or in any other Loan Document shall be construed as requiring Lender to resort to any portion of the Collateral for the satisfaction of any of the Debt in any preference or priority, and Lender may seek satisfaction out of the Collateral, or any part thereof, in its absolute discretion in respect of

32

the Debt. In addition, during the continuance of an Event of Default, Lender shall have the right from time to time to partially foreclose the Collateral in any manner and for any amounts secured by the Pledge Agreement then due and payable as determined by Lender in its sole discretion including, without limitation, the following circumstances: (i) in the event Borrower defaults in the payment of one or more scheduled payments of principal and interest, Lender may foreclose the Collateral to recover such delinquent payments or (ii) in the event Lender elects to accelerate less than the entire outstanding principal balance of the Loan, Lender may foreclose the Collateral to recover so much of the principal balance of the Loan as Lender may accelerate and such other sums secured by the Pledge Agreement as Lender may elect. Notwithstanding one or more partial foreclosures, the remaining Collateral shall remain subject to the Pledge Agreement to secure payment of sums secured by the Pledge Agreement and not previously recovered

(e)     If following the occurrence and during the continuance of any Event of Default, Borrower shall tender payment of an amount sufficient to satisfy the Debt in whole or in part at any time prior to a foreclosure sale of the Collateral, and if at the time of such tender prepayment of the principal balance of the Note is not permitted by the Note, Borrower shall, in addition to the entire Debt, also pay to Lender a sum equal to the required Prepayment Premium, if then applicable, as and to the extent set forth in the Note. Notwithstanding anything to the contrary contained herein or in any other Loan Document, any amounts recovered from the Collateral or any other collateral for the Loan, the Guaranty and/or paid to or received by Lender may, after the occurrence and continuance of an Event of Default, be applied by Lender toward the Debt in such order, priority and proportions as Lender in its sole discretion shall determine.

(f)     Upon the occurrence and during the continuance of any Event of Default, Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder, make any payment or do or perform any act required of Borrower hereunder in such manner and to such extent as Lender may deem necessary to protect the security hereof. Subject to the terms of the Mortgage, Lender is authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Property and/or the Collateral for such purposes, and the cost and expense thereof (including reasonable attorneys' fees to the extent permitted by law), with interest as provided in this <u>Section 6.1</u>, shall constitute a portion of the Debt and shall be due and payable to Lender upon demand. All such costs and expenses incurred by Lender in remedying such Event of Default or such failed payment or act or in appearing in, defending, or bringing any action or proceeding shall bear interest at the Default Rate, for the period after such cost or expense was incurred until the date of payment to Lender and shall be deemed to constitute a portion of the Debt and be secured by the liens, claims and security interests provided to Lender under the Loan Documents and shall be immediately due and payable upon demand by Lender therefor.

(g)     Upon the occurrence and during the continuance of any Event of Default under the Mortgage, Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder, make any

33

payment or do or perform any act required of Borrower hereunder or Mortgage Borrower thereunder in such many and to such extent as Lender may deem necessary to protect the security hereof. All such costs and expenses incurred by Lender in remedying such Event of Default or such failed payment or act or in appearing in, defending, or bringing any action or proceeding shall bear interest at the Default Rate, for the period after such cost or expense was incurred until the date of payment to Lender and shall be deemed to constitute a portion of the Debt and be secured by the liens, claims and security interests provided to Lender under the Loan Documents and shall be immediately due and payable upon demand by Lender therefor. Notwithstanding anything in this Section or Agreement to the contrary, there shall still be an occurring and continuing Event of Default under this Agreement after such time that Lender cures an Event of Default under the Mortgage; Lender retains all rights and remedies against Borrower under this Agreement.

## ARTICLE VII

## MORTGAGE LOAN PROVISIONS

7.1 <u>Liquidation Events</u>: (a) In the event of (i) any Casualty to all or any portion of the Property, (ii) any Condemnation of all or any portion of the Property, (iii) a Transfer of the Property in connection with realization thereon by the Mortgage Lender following an Event of Default under the Mortgage Loan, including without limitation a foreclosure sale, (iv) any refinancing of the Property or the Mortgage Loan where the Loan is not prepaid simultaneously therewith, (v) the receipt by Mortgage Borrower of any excess proceeds realized under the Mortgage Borrower's owner's title insurance policies insuring Mortgage Borrower's title to the Property after application of such proceeds by Mortgage Borrower to cure any title defect (each, a "**Liquidation Event**"), Borrower shall, or shall cause the Mortgage Borrower, to cause the related Net Liquidation Proceeds After Debt Service to be deposited directly into an account designated by Lender. On each date on which Lender actually receives a distribution of Net Liquidation Proceeds After Debt Service, if such date is a Payment Date, such Net Liquidation Proceeds After Debt Service shall be applied to the outstanding principal balance of the Note in an amount equal to one hundred percent (100%) of such Net Liquidation Proceeds After Debt Service, together with interest that would have accrued on such amount through the next Payment Date and all other sums then due. In the event Lender receives a distribution of Net Liquidation Proceeds After Debt Service on a date other than a Payment Date, such amounts shall be held by Lender as collateral security for the Loan in an interest bearing account, with such interest accruing to the benefit of Borrower, and shall be applied by Lender on the next Payment Date; provided, however, that upon payment of the Debt in full, any excess amounts so on deposit with Lender shall be promptly released to Borrower.

(b)    Borrower shall immediately notify Lender of any Liquidation Event once Borrower has knowledge of such event. Borrower shall be deemed to have knowledge of (i) a sale (other than a foreclosure sale) of the Property on the date on which a contract of sale for such sale is entered into, and a foreclosure sale, on the date notice of such foreclosure sale is given, and (ii)

34

a refinancing of the Property, on the date on which a commitment for such refinancing is entered into. The provisions of this Section 4 shall not be construed to contravene in any manner the restrictions and other provisions regarding refinancing of the Mortgage Loan or Transfer of the Property set forth in this Agreement and the other Loan Documents.

7.2  Insurance: From the Closing Date until payment and performance in full of all obligations of Borrower under the Loan Documents or the earlier release of the Collateral in accordance with the terms of this Agreement and the other Loan Documents, Borrower shall cause Mortgage Borrower to maintain or cause to be maintained, the insurance required pursuant to the Mortgage. In the event the Mortgage Loan is repaid in full or otherwise satisfied, or for any reason Mortgage Borrower is not complying in full with the insurance requirements set forth in the Mortgage (whether as a result of a waiver by Mortgage Lender or otherwise), Borrower shall nonetheless comply, or cause Mortgage Borrower to comply, with each of the insurance requirements set forth in the Mortgage for the benefit of Lender.

7.3.  Reserve Funds / Cash Collateral.  Notwithstanding anything to the contrary contained in this Agreement, if at any time and for any reason any reserves required to be maintained pursuant to the Mortgage Loan Documents are no longer being maintained (including, without limitation, because the Mortgage Loan has been paid off or otherwise satisfied) and/or are reduced, waived or modified by Mortgage Lender in any material respect (in each case, including, without limitation, due to any waiver, amendment or refinance) (such Mortgage Loan reserve funds, the "**Waived Reserve Funds**"), Borrower shall promptly (i) notify Lender of the same and establish and maintain with Lender and for the benefit of Lender reserves in replacement and substitution thereof (the "**Substitute Reserves**"), which Substitute Reserves shall be subject to all of the same terms and conditions applicable under the Mortgage Loan Documents, (ii) execute any amendments to this Agreement and/or the Loan Documents relating to the Substitute Reserves required by Lender and shall cause Mortgage Borrower to acknowledge and agree to the same, and (iii) if and to the extent Mortgage Lender has returned any Mortgage Loan reserve funds to Mortgage Borrower, remit to Lender (and shall cause Mortgage Borrower to remit to Lender) any Mortgage Loan reserve funds remaining in the applicable Mortgage Loan reserve (or submit the Waived Reserve Funds to Lender, to the extent same is within Borrower or Mortgage Borrower's control).

7.4.  Mortgage Loan Defaults.

(a)  Without limiting the generality of the other provisions of this Agreement, and without waiving or releasing Borrower from any of its obligations hereunder, if there shall occur any Mortgage Loan Default or if Mortgage Lender asserts in writing that Mortgage Borrower has defaulted in the performance or observance of any term, covenant or condition of the Mortgage Loan Documents which default shall have continued beyond any applicable notice or grace periods (subject to the terms of the Forbearance Agreement), Borrower hereby expressly agrees that Lender shall have the immediate right, without notice to or demand on Borrower or Mortgage Borrower, but shall be under no obligation: (i) to pay all or any part of the Mortgage Loan, and

35

any other sums, that are then due and payable and to perform any act or take any action on behalf of Mortgage Borrower, as may be appropriate, to cause all of the terms, covenants and conditions of the Mortgage Loan Documents on the part of Mortgage Borrower to be performed or observed thereunder to be promptly performed or observed; and (ii) to pay any other amounts and take any other action as Lender, in its sole and absolute discretion, shall deem advisable to protect or preserve the rights and interests of Lender in the Loan and/or the Collateral. Lender shall have no obligation to complete any cure or attempted cure undertaken or commenced by Lender. All sums so paid and the costs and expenses incurred by Lender in exercising rights under this Section 7.4 (including, without limitation, reasonable attorneys' and other professional fees), with interest at the Default Rate, for the period from the date of written demand by Lender to Borrower for such payments to the date of payment to Lender, shall constitute a portion of the Debt, shall be secured by the Pledge Agreement and shall be due and payable to Lender immediately following demand therefor.

(b)     Borrower hereby grants, and shall cause Mortgage Borrower to grant, Lender and any Person designated by Lender the right to enter upon the Property at any time for the purpose of carrying out the rights granted to Lender under this Section 7.4.  Borrower shall not, and shall not cause or permit Mortgage Borrower or any other Person to impede, interfere with, hinder or delay, any effort or action on the part of Lender to cure any Mortgage Loan Default or asserted Mortgage Loan Default, or to otherwise protect or preserve Lender's interests in the Loan and the Collateral in accordance with the provisions of this Agreement and the other Loan Documents.

(c)     Borrower hereby indemnifies Lender from and against all liabilities, obligations, losses, damages, penalties, assessments, actions, or causes of action, judgments, suits, claims, demands, costs, expenses (including, without limitation, reasonable attorneys' and other professional fees, whether or not suit is brought, and settlement costs), and disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against Lender as a result of the foregoing actions, except to the extent arising from the fraud, illegal acts, gross negligence or willful misconduct of Lender or its agents.  Lender shall have no obligation to Borrower, Mortgage Borrower or any other party to make any such payment or performance.  Borrower shall not impede, interfere with, hinder or delay, and shall cause Mortgage Borrower to not impede, interfere with, hinder or delay, any effort or action on the part of Lender to cure any Mortgage Loan Default or asserted Mortgage Loan Default, or to otherwise protect or preserve Lender's interests in the Loan and the Collateral.

(d)     If Lender shall receive a copy of any notice of a Mortgage Loan Default sent by Mortgage Lender to Mortgage Borrower, such notice shall constitute full protection to Lender for any action taken or omitted to be taken by Lender, in good faith, in reliance thereon.  As a material inducement to Lender's making the Loan, Borrower hereby absolutely and unconditionally releases and waives all claims against Lender arising out of Lender's exercise of its rights and remedies provided in this Section.  In the event that Lender makes any payment in respect of the Mortgage Loan, Lender shall be subrogated to all of the rights of Mortgage Lender under the

36

Mortgage Loan Documents against the Property and Mortgage Borrower, in addition to all other rights Lender may have under the Loan Documents or applicable law.

(e)     Any Mortgage Loan Default which is cured by Lender, after the expiration of any applicable grace, notice or cure period under the Mortgage Loan Documents (subject to the terms of the Forbearance Agreement), shall constitute an immediate Event of Default under this Agreement without any notice, grace or cure period otherwise applicable under this Agreement.

## ARTICLE VIII

## SPE PROVISIONS

(a)     Borrower, in its capacity as sole member of Mortgage Borrower has not owned, does not own and will not own any asset or property other than (i) the Collateral, and (ii) incidental personal property necessary for the ownership, management or operation of the Collateral.

(b)     Borrower has not engaged, does not engage, and will not engage in any business other than the ownership, management and operation of the Collateral and Borrower, in its capacity as sole member of Mortgage Borrower, will conduct and operate its business as presently conducted and operated and as otherwise permitted by the Loan Documents.

(c)     Borrower has not entered and is not a party to and will not enter into or be a party to any contract or agreement with any affiliate of Borrower, any constituent party of Borrower or any affiliate of any constituent party, except in the ordinary course of business and on terms and conditions that are disclosed to Lender in advance and that are intrinsically fair, commercially reasonable and substantially similar to those that would be available on an arms-length basis with third parties other than any such party.

(d)     Except as contemplated by the Loan Documents, Borrower has not incurred and will not incur any indebtedness other than (i) the Loan and (ii) unsecured trade payables and operational debt not evidenced by a note and in an aggregate amount not exceeding one percent (1%) of the original principal amount of the Loan at any one time; provided that any indebtedness incurred pursuant to sub-clause (ii) shall be (x) not more than sixty (60) days past due and (y) incurred in the ordinary course of business (the indebtedness described in the foregoing clauses (i) and (ii) is referred to herein, collectively, as **"Permitted Indebtedness"**). No indebtedness other than the Loan may be secured (subordinate or pari passu) by the Collateral.

(e)     Borrower has not made and will not make any loans or advances to any individual, sole proprietorship, partnership, limited liability partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, entity, party or government (whether territorial, national, federal, state, county, city, municipal or

otherwise, including, without limitation, any instrumentality, division, agency, body or department thereof) (including any affiliate or constituent party) (a "**Person**"), and has not acquired and shall not acquire obligations or securities of its affiliates.

(f)     Borrower is and will remain solvent and Borrower has paid and will pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due.

(g)     Borrower has done or caused to be done and will do all things necessary to observe organizational formalities and preserve its existence, and Borrower will not (i) terminate or fail to comply with the provisions of its organizational documents, or (ii) unless Lender has consented, amend, modify or otherwise change its operating agreement or other organizational documents.

(h)     Borrower has maintained and will maintain all of its accounts, books, records, financial statements and bank accounts separate from those of its affiliates and any other Person. Borrower's assets have not been and will not be listed as assets on the financial statement of any other Person. Borrower has and will file its own tax returns (to the extent Borrower is required to file any such tax returns) and will not file a consolidated federal income tax return with any other Person. Borrower has maintained and shall maintain its books, records, resolutions and agreements as official records

(i)     Borrower has been and will be, and has held and at all times will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any affiliate of Borrower or any constituent party of Borrower), has corrected and shall correct any known misunderstanding regarding its status as a separate entity, has conducted and shall conduct business in its own name, has not identified and shall not identify itself or any of its affiliates as a division or part of the other, and has maintained and shall maintain and utilize separate stationery, invoices and checks bearing its own name.

(j)     Borrower has maintained and will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations.

(k)     Neither Borrower nor any constituent party has sought or will seek or effect the liquidation, dissolution, winding up, consolidation or merger, in whole or in part, of Borrower.

(l)     Except as expressly permitted in the Loan Documents, Borrower has not commingled and will not commingle the funds and other assets of Borrower with those of any affiliate or constituent party or any other Person and has held and will hold all of its assets in its own name.

(m)     Borrower has maintained and will maintain its assets in such a manner that

38

it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any affiliate or constituent party or any other Person.

(n)     Borrower has not assumed or guaranteed or become obligated for the debts of any other Person and has not held itself out to be responsible for or have its credit available to satisfy the debts or obligations of any other Person, and Borrower will not assume or guarantee or become obligated for the debts of any other Person and does not and will not hold itself out to be responsible for or have its credit available to satisfy the debts or obligations of any other Person.

(o)     Borrower, in its capacity as sole member of Mortgage Borrower and its own capacity, hereby covenants and agrees that it will comply with or cause the compliance with all the organizational documents of Borrower.

(p)     Borrower has not permitted and will not permit any affiliate or constituent party independent access to its bank accounts.

(q)     Borrower has paid and shall pay the salaries of its own employees (if any) from its own funds and has and shall maintain a sufficient number of employees (if any) in light of its contemplated business operations.

(r)     Borrower has compensated and shall compensate each of its consultants and agents from its funds for services provided to it and pay from its own assets all obligations of any kind incurred.

(s)     Borrower has not, and without the unanimous consent of all of its members or managers/managing members will not, take any action that would reasonably be expected to cause Borrower to become insolvent.

(t)     Borrower has allocated and will allocate fairly and reasonably any shared expenses, including shared office space.

(u)     Notwithstanding any provision of the Operating Agreement, except in connection with the Loan or any prior financing that has been fully paid and discharged in full prior to the date hereof, Borrower has not pledged and will not pledge its assets for the benefit of any other Person.

(v)     Borrower either (i) has no, and will have no, obligation to indemnify its officers, directors, managers, members, shareholders or partners, as the case may be, or (ii) if it has any such obligation, such obligation is fully subordinated to the Loan and will not constitute a claim against Borrower if cash flow in excess of the amount required to pay the Loan is insufficient to pay such obligation.

(w)     Borrower will consider the interests of Borrower's creditors in connection

39

with all limited liability company actions.

        (x)     Except as provided in the Loan documents, Borrower has not and will not have any of its obligations guaranteed by any affiliate.

        (y)     Mortgagor shall not be divided into one (1) or more than one (1) entity

        In addition to the foregoing, until such time as the Debt and the Mortgage Loan are paid in full, Borrower shall cause Mortgage Borrower to comply with each of the Mortgage Borrower's single purposes entity requirements as set forth in Mortgage Borrower's organizational documents and the Mortgage.

## ARTICLE IX

## MISCELLANEOUS

        9.1     <u>Entire Agreement; Modification, Etc.</u>:  This Agreement (together with the Collateral Documents and any certificates delivered simultaneously herewith) embody and constitute the entire understanding between the parties with respect to the transaction contemplated by this Agreement, and all prior agreements, understandings, representations and statements, oral and written, with respect to the transaction that is the subject of this Agreement are merged into this Agreement.  Neither this Agreement nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument signed by the party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

        9.2     <u>Exclusiveness</u>:  ALL CONDITIONS TO THE OBLIGATIONS OF LENDER TO MAKE ADVANCES HEREUNDER ARE IMPOSED SOLELY AND EXCLUSIVELY FOR THE BENEFIT OF LENDER AND LENDER'S SUCCESSORS AND ASSIGNS AND NO OTHER PERSON OR ENTITY SHALL HAVE STANDING TO REQUIRE SATISFACTION OF SUCH CONDITIONS IN ACCORDANCE WITH THEIR TERMS OR BE ENTITLED TO ASSUME THAT LENDER WILL REFUSE TO MAKE ADVANCES IN THE ABSENCE OF STRICT COMPLIANCE WITH ANY OR ALL THEREOF AND NO OTHER PERSON OR ENTITY SHALL, UNDER ANY CIRCUMSTANCES, BE DEEMED TO BE BENEFICIARY OF SUCH CONDITIONS, ANY OR ALL OF WHICH MAY BE FREELY WAIVED IN WHOLE OR IN PART BY LENDER ANY TIME IF IN ITS SOLE DISCRETION IT DEEMS IT ADVISABLE TO DO SO.

        9.3     <u>Notices</u>:  Except as may otherwise be expressly provided in this Agreement, any notice, request, demand, instruction or other communication pursuant to this Agreement shall be in writing and shall be given in the manner provided in the Collateral Documents.

9.4     Governing Law; Jurisdiction:  This Agreement, the Note, the Collateral Documents and all other documents or instruments relating to the Loan, and the rights and obligations of the parties thereto, shall be construed and interpreted in accordance with the laws of the State of New York.  Lender and Borrower each hereby waives and renounces any right to a jury trial in any action, suit or proceeding in connection with this Agreement, the Note or any other Collateral Document.

9.5     Headings:     All descriptive headings of articles and sections in this Agreement are inserted for convenience only and shall not affect the construction or interpretation hereof.

9.6     Severability:  If any provision of this Agreement shall be held to be invalid, illegal, void or unenforceable in any respect, (a) such provision shall be given force to the fullest possible extent that it is valid, legal and enforceable, (b) such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement, and (c) this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained in this Agreement.

9.7     No Agency, Partnership or Joint Venture:  Lender is not the agent or representative of Borrower, and Borrower is not the agent or representative of Lender.  Borrower and Lender intend and agree that the relationship between them shall be solely that of creditor and debtor.  Neither any provision in any of this Agreement nor any act or omission of Lender or Borrower shall be construed to create a partnership or joint venture between Borrower and Lender. This Agreement shall not make Lender liable to materialmen, contractors, craftsmen, laborers or others for goods delivered to or services performed by them upon the Project, or for debts or claims accruing to such parties against Borrower and there is no contractual relationship, either expressed or implied, between Lender and any materialmen, subcontractors, craftsmen, laborers, or any other person supplying any work, labor or materials for the Construction Work.

9.8     Waiver; Successive Remedies:  Any failure (or series of failures) by Lender to insist (or election, or series of elections, by Lender not to insist) upon the strict performance of any of the terms, provisions and conditions of this Agreement or any of the other Loan Documents shall not be deemed to be a waiver of the same or any other term, provision or condition hereof or thereof and Lender shall have the right at any time thereafter to insist upon strict performance of any and all of the same.  If Lender makes any Advance in the absence of strict compliance with any or all of the conditions of Lender's obligations to make such Advance, the same shall be deemed to have been made in pursuance of this Agreement and not in modification hereof.  No course of dealing and no delay or omission by Lender in exercising any right or remedy hereunder or with respect to any indebtedness of Borrower to Lender shall operate as a waiver thereof or of any other right or remedy and no single or partial exercise thereof shall preclude any other or further exercise thereof or the exercise of any other right or remedy.  Lender may remedy any

41

default by Borrower to Lender or any other person, firm or corporation in any reasonable manner without waiving the default remedied and without waiving any other prior or subsequent default by Borrower and shall be reimbursed for any and all of its expenses in so remedying such default. All rights and remedies of Lender hereunder are cumulative.

9.9    Assignability:    Neither this Agreement nor any right or obligation hereunder, nor any Advance to be made hereunder is assignable by Borrower. The rights of Lender under this Agreement are assignable in part or wholly and any assignee of Lender shall succeed to and be possessed of the rights of Lender hereunder to the extent of the assignment made, including the right to make advances to Borrower or any approved assignee of Borrower in accordance with this Agreement.

9.10    Inconsistencies with Other Loan Documents:    In the event of any conflict between this Agreement and the provisions of any of the Collateral Documents, the provisions of this Agreement shall control; provided, however, that any provision of any Collateral Document that imposes additional burdens on Borrower or restricts the rights of Borrower or gives Lender additional rights or remedies shall not be deemed to be in conflict or inconsistent with this Agreement and shall be given full force and effect.

9.11    Survival:    This Agreement shall be binding upon the parties hereto and their respective permitted successors and assigns. All of the representations, warranties, terms, covenants, agreements and conditions contained in this Agreement shall specifically survive the execution and delivery of this Agreement and the making of all Advances and shall, unless otherwise expressly provided, continue in full force and effect until the indebtedness evidenced by the Note and any other amounts payable to Lender hereunder, or under any of the Collateral Documents, shall have been paid in full.

9.12    Negotiated Document:    Borrower acknowledges that the provisions and the language of this Agreement and the Collateral Documents have been negotiated, and are reasonable in light of all circumstances attendant to the execution hereof and thereof, and agrees that no provision of this Agreement or any Collateral Document shall be construed against either Lender or Borrower by reason of either Lender or Borrower having drafted such provision, this Agreement or any Collateral Document.

9.13    Exhibits:    All exhibits referred to herein are by such reference incorporated into this Agreement as if fully set forth herein.

9.14    Note; Pledge Agreement.    The Loan shall be evidenced by and repaid in accordance with the Note. The performance of Borrower's obligations under the Note and this Agreement shall be secured by the Pledge Agreement and the other Collateral Documents.

9.15    Set off.    Borrower agrees that, in addition to (and without limitation of) any

42

right of setoff, bankers' lien or counterclaim Lender may otherwise have, Lender shall be entitled, at its option, to offset balances (general or special, time or demand, provisional or final)held by it for the account of Borrower at any of Lender's offices against any amount payable by Borrower to Lender hereunder or under any other Collateral Document which is not paid when due (regardless of whether such balances are then due to Borrower), in which case it shall promptly notify Borrower thereof; provided that Lender's failure to give such notice shall not affect the validity thereof. Payments by Borrower hereunder or under the other Collateral Documents shall be made without setoff or counterclaim.

       9.16   <u>Intentionally Omitted</u>.

       9.17   <u>Indemnification</u>. Borrower agrees to indemnify Lender and hold Lender harmless from and against all claims, actions, suits, proceedings, costs, expenses, brokerage or other fees, losses, damages and liabilities of any kind including in tort, penalties and interest, which Lender may incur in any manner other than Lender's own active negligence or willful misconduct, by reason of any matter relating, directly or indirectly, to the Loan, the Construction Work, or the Pledge Agreement. This indemnification shall continue in effect whether or not the Loan is partially or fully advanced and shall survive the repayment of the Loan.

       9.18   BORROWER CONFIRMS AND ACKNOWLEDGES THAT WHILE THE MAXIMUM AMOUNT OF THE LOAN IS UP TO $3,000,000.00, THE TOTAL AMOUNT OF THE BUDGET, IN LENDER'S DETERMINATION, MAY BE GREATER THAN SUCH AMOUNT. BORROWER FURTHER CONFIRMS AND ACKNOWLEDGES THAT IT SHALL BE SOLELY OBLIGATED TO FUND THE DIFFERENCE BETWEEN THE LOAN AND THE BUDGET FROM ITS OWN EQUITY, IF AND AS NECESSARY.

       9.19   <u>Counterparts</u>. To facilitate execution, this Agreement may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature and acknowledgment of each party, or that the signature and acknowledgment of all persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute single instrument. It shall not be necessary in making proof of this Agreement to produce or account for more than a single instrument. It shall not be necessary in making proof of this Agreement to produce or account for more than a single counterpart containing the respective signatures and acknowledgment of, or on behalf of, each of the parties hereto. Further, facsimile or electronic (e.g., .pdf format) copies of signatures shall be considered originals for purposes of binding the parties hereto.

       9.20   <u>Discussions with Mortgage Lender</u>. In connection with the exercise of its rights set forth in the Loan Documents, Lender shall have the right at any time to discuss the Property, the Mortgage Loan, the Loan or any other matter directly with Mortgage Lender or Mortgage Lender's consultants, agents or representatives without notice to or permission from Borrower or any other Loan Party, nor shall Lender have any obligation to disclose such

43

discussions or the contents thereof with Borrower or any other Loan Party.

9.21    Independent Approval Rights.  If any action, proposed action or other decision is consented to or approved by Mortgage Lender, such consent or approval shall not be binding or controlling on Lender.  Borrower hereby acknowledges and agrees that (i) the risks of Mortgage Lender in making the Mortgage Loan are different from the risks of Lender in making the Loan, (ii) in determining whether to grant, deny, withhold or condition any requested consent or approval Mortgage Lender and Lender may reasonably reach different conclusions, and (iii) Lender has an absolute independent right to grant, deny, withhold or condition any requested consent or approval based on its own point of view.  Further, the denial by Lender of a requested consent or approval shall not create any liability or other obligation of Lender if the denial of such consent or approval results directly or indirectly in a default under the Mortgage Loan, and Borrower hereby waives any claim of liability against Lender arising from any such denial.

9.22    Participation/Assignment of Interest/Severance of the Loan.

i.      Lender shall have the right from time to time to take action to recover any sum or sums as the same become due, without regard to whether or not the balance of the Debt (as defined in the Note) shall be due, and without prejudice to the right of Lender thereafter to bring an action for a default or defaults by Borrower existing at the time such earlier action was commenced.

ii.      Borrower acknowledges that Lender may sell and assign participation interests or other types of interests in this Agreement to one or more domestic or foreign banks, insurance companies, pension funds, trusts or other institutional lenders or other persons, parties or investors (including, but not limited to, grantor trusts, owner trusts, special purpose corporations, real estate investment trusts or other similar or comparable investment vehicles as may be selected by Lender in its sole and absolute discretion) on terms and conditions satisfactory to Lender in its sole and absolute discretion.  Borrower grants to Lender, and shall cause each Guarantor and other person or party associated or connected with the Mortgage or the Pledged Interests therefore to grant to Lender the right to distribute on a confidential basis financial and other information concerning Borrower, each such Guarantor and other person or party and the property related to this Agreement and any other pertinent information with respect to this Agreement to any party who has purchased a participation interest in this Agreement who has expressed an interest in purchasing any such interest in this Agreement.

iii.      Lender, without in any way limiting Lender's other rights under the Loan Documents, in its sole and absolute discretion, shall have the right, at any time, with respect to all or any portion of the Loan, to modify, split and/or sever all or any portion of the Loan as hereinafter provided.  Without limiting the foregoing, Lender may (1) cause the Note and the Mortgage to be split into a first and second mezzanine loan, (2) create one or more

44

senior and subordinate notes (i.e., an A/B or A/B/C structure), (3) create multiple components of the Note or Notes (and allocate or reallocate the principal balance of the Loan among such components), (4) otherwise sever the Loan into two (2) or more loans secured by a pledge of partnership or membership interest (directly or indirectly) in Borrower, in each such case described in clauses (1) through (4) above, in whatever proportion and whatever priority Lender determines, and (5) modify the Loan Documents with respect to the newly created Notes or components of the Note or Notes. Notwithstanding the foregoing, no such amendment described above shall (A) modify or amend any material term of the Loan, or (B) increase the obligations, or decrease the rights, of Borrower under the Loan Documents; provided, however, in each such instance the outstanding principal balance of all the Notes evidencing the Loan (or components of such Notes) immediately after the effective date of such modification equals the outstanding principal balance of the Loan immediately prior to such modification and the weighted average of the interest rates for all such Notes (or components of such Notes) immediately after the effective date of such modification equals the interest rate of the original Note immediately prior to such modification. If requested by Lender, Borrower (and Borrower's constituent members, if applicable, and Guarantors) shall execute within five (5) Business Days after such request, such documentation as Lender may reasonably request to evidence and/or effectuate any such modification or severance. At Lender's election, each note comprising the Loan may be subject to one or more securitizations. Lender shall have the right to modify the Note and/or Notes and any components in accordance herewith, provided that such modification shall comply with the terms hereof, it shall become immediately effective.

iv.  Lender may provide to any actual or potential purchaser, transferee, assignee, servicer, participant or investor or any rating agency, all documents and information which Lender now has or may hereafter acquire relating to the Loan, Borrower, Guarantor any other party to the Loan or the Pledge Agreement which shall have been furnished by or on behalf of Borrower, Guarantor or any other party to the Loan, as Lender in its discretion determines is desirable. Borrower shall cooperate with Lender with the same, including providing such information and documents as Lender may reasonably request.

v.  Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, pledges and other security documents (the "**Severed Loan Documents**") in such denominations as Lender shall determine in its sole discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder. Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall reasonably request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender. Borrower absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its

45

name and stead to make and execute all documents necessary or desirable to effect the aforesaid severance, Borrower ratifying all that its said attorney shall do by virtue thereof. Borrower shall be obligated to pay any costs or expenses incurred in connection with the preparation, execution, recording or filing of the Severed Loan Documents and the Severed Loan Documents shall not contain any representations, warranties or covenants not contained in the Loan Documents and any such representations and warranties contained in the Severed Loan Documents will be given by Borrower only as of the Closing Date. Notwithstanding the foregoing, Borrower shall not be required to execute any Severed Loan Document if such Severed Loan Document would change the interest rate, the stated maturity or the amortization of principal set forth in the Note or herein, except in connection with Severed Loan Documents which may result in varying interest rates and amortization schedules, but which weighted average interest rate of such Severed Loan Documents shall initially equal the Interest Rate and the cumulative amortization required under such Severed Loan Documents shall not exceed the cumulative amortization required under the Loan; provided, except as described herein, such Severed Loan Documents shall not (1) otherwise increase the obligations, or decrease the rights, of Borrower or Guarantor under the Loan Documents, (2) impose any personal liability on Borrower, Guarantor or its Affiliates, or (3) have a materially adverse tax consequence on Borrower, Guarantor or its Affiliates.

vi.    Lender may, at any time, sell, transfer or assign the Loan, the Note, this Agreement and the other Loan Documents, and any or all servicing rights with respect to the Loan, grant participations in the Loan, and may forward to each purchaser, transferee, assignee, servicer or participant all documents and information Lender has with respect to the Loan as Lender deems necessary or desirable. Borrower and Guarantor shall furnish and consent to Lender furnishing to such parties all information concerning the Loan, the Collateral, and the financial condition of Borrower, any Guarantor, and the Collateral in such form, substance and detail as Lender or such party may request. Upon any such transfer, Borrower and Guarantor shall provide an estoppel certificate to the purchaser, transferee, assignee, servicer or participant or any prospective purchaser, transferee, assignee, servicer or participant in form and content reasonably satisfactory to Lender or such party together with such other documents as Lender may reasonably require

9.23    Costs of Collection. Borrower shall pay all reasonable costs of collection, including reasonable attorneys' fees in the event that the principal under the Note or any payment of interest or any other payment due under the Note is not paid when due or in the case it becomes necessary to enforce any provision of the Note. Upon the occurrence of any Event of Default, or if Borrower fails to make any payment or to do any act as herein provided, Lender may, but without any obligation hereunder, make or do the same in such manner and to such extent as Lender may deem necessary to protect the security hereof. Lender is authorized to appear in, defend, or bring any action or proceeding to protect its interests and the cost and expense thereof (including reasonable attorneys' fees to the extent permitted by law), with interest, shall constitute a portion

of the Debt (as defined in the Note) and shall be due and payable to Lender upon demand. All such costs and expenses incurred by Lender in remedying such Event of Default or in appearing in, defending, or bringing any such action or proceeding shall bear interest at the Default Rate, for the period from the date that such cost or expense was incurred by Lender to the date of payment to Lender. All such costs and expenses incurred by Lender together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Debt (as defined in the Note) and shall be immediately due and payable upon demand by Lender therefor. If any amounts due hereunder are not paid when due, Borrower shall pay to Lender upon demand an amount equal to ten percent (10%) of such unpaid portion of the amount due, to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment.

9.24 <u>Indemnity and Expenses.</u> Borrower agrees to indemnify Lender and each of its directors, officers, employees, agents and affiliates from and against any and all claims, losses, damages, liabilities and reasonable expenses growing out of or resulting from any of the Loan Documents or the transactions contemplated by any of the Loan Documents, including enforcement of each Loan Document, except claims, losses or liabilities resulting from the gross negligence or willful misconduct of the person or entity to be indemnified. Within five (5) after requested by Lender, Borrower will pay to Lender the amount of any and all costs and expenses, including the reasonable fees and out of pocket disbursements of its counsel and of any experts and agents, which Lender incurs in connection with the Loan Documents. The obligations of Borrower under this Section shall survive the repayment of all amounts due under the Note and the Loan Documents.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK
[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement.

**BORROWER:**

**HELLO LIVING DEVELOPER
NOSTRAND LLC,**
a New York limited liability company

By: _____
Name: Eli Karp
Title:   Authorized Signatory

**LENDER:**

**1580 NOSTRAND MEZZ LLC,**
a Delaware limited liability company

By: _____
Name:
Title:

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement.

BORROWER:

**HELLO LIVING DEVELOPER
NOSTRAND LLC,**
a New York limited liability company

By: _____
Name: Eli Karp
Title:   Authorized Signatory


LENDER:

**1580 NOSTRAND MEZZ LLC,**
a Delaware limited liability company

By: _____
Name:   Joshua Zegen
Title:   Authorized Signatory

STATE OF NEW YORK            )
                            } ss:
COUNTY OF ~~NEW YORK~~ Rockland )

On the 11 day of August, in the year 2020, before me, the undersigned, a Notary Public in and for said State, personally appeared **Eli Karp**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed this instrument.

_____
Notary Public

YEHOSHUA AARON ROTHMAN
Notary Public, State of New York
Reg. No. 01RO6391270
Qualified in Rockland County
Commission Expires 04/29/2023

STATE OF NEW YORK            )
                            ) ss:
COUNTY OF NEW YORK           )

On the ___ day of August, in the year 2020, before me, the undersigned, a Notary Public in and for said State, personally appeared, _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed this instrument.

_____
Notary Public

51

STATE OF NEW YORK          )
                           ) ss:
COUNTY OF NEW YORK         )

On the ___ day of _____, in the year 2020, before me, the undersigned, a Notary Public in and for said State, personally appeared **Eli Karp**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed this instrument.

_____
          Notary Public


STATE OF   New York        )
                           ) ss:
COUNTY OF   New York       )

On the 7th day of _____August_____, in the year 2020, before me, the undersigned, a Notary Public in and for said State, personally appeared, _Joch Leger_, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed this instrument.

_____
          Notary Public

TOM KORDENBROCK
Notary Public, State of New York
No. 01KO6371148
Qualified in New York County
Commission Expires February 20, 2022

## SCHEDULE A

## Premises

ALL that certain plot, piece or parcel of land situate, lying and being in the Borough of Brooklyn, County of Kings, State of New York bounded and described as follows:

BEGINNING at the corner formed by the intersection of the southerly side of Albermarie Road and the westerly side of Nostrand Avenue;

RUNNING THENCE in a southerly direction 271 feet and 3 1/2 inches to a point;

THENCE westerly 100 feet 1 inch to a point;

THENCE southerly parallel with East 29th Street, 25 feet to a point;

THENCE westerly 100 feet to a point on the easterly side of East 29th Street;

THENCE northerly 295 feet 4 1/2 inches to a point;

THENCE easterly parallel with Albermarie Road, 75 feet;

THENCE southerly parallel with East 29th, 100 feet;

THENCE easterly parallel with Albermarie Road, 25 feet;

THENCE northerly parallel with East 29th, 100 feet;

THENCE easterly 100 feet 1 inch to point or place of BEGINNING.

## SCHEDULE B

## Organizational Chart



## SCHEDULE C

### [Letterhead of Borrower]

_____
_____
_____

Re:    Re:    Mezzanine Loan Agreement ("**Mezzanine Loan Agreement**") between **HELLO LIVING DEVELOPER NOSTRAND LLC** (the "**Borrower**") and **1580 NOSTRAND MEZZ LLC** ("**Lender**") dated as of August 28, 2020

Requisition #_____        Date: _____, 20__

Gentlemen:

       Pursuant to the Mezzanine Loan Agreement, Borrower hereby requests that Lender advance to [applicable contractor] [$_____] with respect to Costs. Attached hereto is the affidavit of _____ dated the date hereof and Borrower certifies that all statements in that affidavit are true and correct.

       Attached hereto are lien waivers for all Hard Costs included in any prior Advances and invoices for all Costs to be included in this Advance. Additionally, attached hereto are completed AIA Forms G702 and G703 or such forms as reasonably required by Lender signed and certified by the Architect and Construction Manager. All capitalized terms used herein shall have the meaning given thereto in the Mezzanine Loan Agreement.

**HELLO LIVING DEVELOPER
NOSTRAND LLC,**
a New York limited liability company

By: _____
Name: Eli Karp
Title:   Authorized Signatory

## AFFIDAVIT TO BE ANNEXED
## TO EACH REQUISITION

STATE OF            )
                         ) ss.:

COUNTY OF         )

_____, being duly sworn, deposes and says:

        1.      I am the _____ of **HELLO LIVING DEVELOPER NOSTRAND LLC** (the "**Borrower**"), and have made due investigation as to the matters hereinafter set forth and am making this affidavit to induce **1580 NOSTRAND MEZZ LLC** ("**Lender**") to consider making an advance of $_____ as hereby requested by Borrower to be remitted directly to certain contractors and material suppliers of the Construction Work, pursuant to the terms of a Mezzanine Loan Agreement (the "**Loan Agreement**"), dated as of August 28, 2020 between Borrower and Lender and pursuant to the requisition to which this affidavit is attached ("**Current Requisition**").

        2.      All representations and warranties contained in the Loan Agreement are true and accurate in all material respects as of the date hereof.

        3.      No Event of Default exists under the Loan Agreement and no event or condition has occurred and is continuing or existing that, with the lapse of time or the giving of notice, or both, would constitute such an Event of Default.

        4.      The Improvements have not been materially damaged by fire or other casualty, and no part of the Property has been taken by eminent domain and no proceedings or negotiations therefor are pending or threatened.

        5.      The Construction Work is progressing in such manner so as to insure completion thereof in accordance with the Budget on or before the Scheduled Completion Date.

        6.      All funds received from the Lender previously under the Loan Agreement have been expended for the sole purpose of paying for the costs set forth in the previous requisitions; and no part of said funds have been used for any other purpose. No item of costs previously certified to the Lender in a requisition remains unpaid as of the date of this Affidavit (other than for the Retainage).

        7.      All of the statements and information set forth in the Current Requisition, and all documents attached thereto, are true and correct in every material respect as of the date hereof, and all costs certified to the Lender in the Current Requisition accurately reflect the precise amounts billed to Borrower with respect thereto. All the funds to be received pursuant to the Current Requisition shall be used solely for the purposes of paying the items of cost specified therein or for reimbursing the Borrower for such items previously paid by the Borrower.

8.    Nothing has occurred subsequent to the date of the Loan Agreement that has or may result in the creation of any lien, charge or encumbrance upon the Property or the Improvements or any part thereof, or anything affixed to or used in connection therewith or which has or is reasonably likely to substantially and adversely impair the ability of the Borrower to make all payments of principal and interest on the Note or any other note from Borrower to Lender, the ability of the Borrower to meet its obligations under the Loan Agreement or the ability of the Guarantors to meet their respective obligations under the Guaranty.

9.    None of the labor, materials, overhead or other items of expenses specified in the Current Requisition submitted herewith have previously been made the basis of any prior requisition by the Borrower which resulted in an Advance by Lender or of any prior payment by the Lender.

10.   The estimated aggregate cost of completing the Construction Work, including Hard Costs and Soft Costs does not exceed $_____.

11.   The conditions to the Advance requested pursuant to the Current Requisition have been met in accordance with the terms of the Loan Agreement (including, without limitation, Section 2.2 and 2.3 thereof).

12.   As of the date hereof, there are no defenses or offsets in connection with the Loan or the Collateral Documents, and Lender has complied with all requirements and obligations in connection with the Loan and the Collateral Documents.

The capitalized terms used herein have the meaning given thereto in the Loan Agreement.

**HELLO LIVING DEVELOPER
NOSTRAND LLC,**
a New York limited liability company

By:    _____
Name:  Eli Karp
Title: Authorized Signatory

Sworn to before me this
____ day of _____, 20___

_____
Notary Public

**EXHIBIT C**

**(Mezzanine Promissory Note)**

# MEZZANINE PROMISSORY NOTE

up to $3,000,000.00

Dated: As of August 28, 2020
New York, New York

**MEZZANINE PROMISSORY NOTE** (hereinafter, this "**Note**") made as of the 28th day of August, 2020, by **HELLO LIVING DEVELOPER NOSTRAND LLC**, a New York limited liability company, having an address at 33 35th Street, 6th Floor, Suite B-613, Brooklyn, NY 11232 (hereinafter, the "**Maker**"), for the benefit of **1580 NOSTRAND MEZZ LLC**, a Delaware limited liability company, its successors and/or assigns, as their interests may appear, having offices at 520 Madison Avenue, Suite 3501, New York, New York 10022 (hereinafter, the "**Payee**").

**FOR VALUE RECEIVED**, Maker promises to pay to the order of Payee, at 520 Madison Avenue, Suite 3501, New York, New York 10022, or at such other place as Payee may designate to Maker in writing from time to time, the principal sum of up to THREE MILLION AND 00/100 DOLLARS ($3,000,000.00), or so much as has been advanced pursuant to the terms of that certain Mezzanine Loan Agreement, dated the date hereof, between Maker and Payee (the "**Loan Agreement**"), together with interest thereon at the Interest Rate (as defined below) (or the Default Rate, as defined below, if applicable), calculated in accordance with the terms and conditions set forth in this Note, from and including the date of this Note to the date this Note is paid in full, as follows:

A.      On the date hereof (the "**Closing Date**"), interest on the principal sum of this Note from (and including) the Closing Date to August 31, 2020 at the Interest Rate.

B.      Thereafter, interest only at the Interest Rate on the outstanding Principal Balance (as defined below) shall be due monthly and shall be paid monthly in arrears, commencing on October 1, 2020, and monthly thereafter on the first (1st) day of each month (the "**Payment Date**") until the Maturity Date (as defined below) (each such monthly payment, a "**Monthly Payment**").

C.      Thereafter, on the Maturity Date, the entire outstanding principal balance of this Note, together with all accrued and unpaid interest through the Maturity Date at the Interest Rate, and all other sums payable to the holder of this Note (whether pursuant to this Note or the Loan Agreement or Other Security Documents (as such terms are hereinafter defined)) shall become due and payable.

1.      For the purposes of this Note, these terms shall be defined as follows:

a.      The term "**Alternative Rate**" shall mean, in the event LIBOR is no longer available or charging of interest that is calculated based upon LIBOR would violate applicable law or regulation, then in Payee's sole discretion, the Alternative Rate shall be used instead of the LIBOR Based Rate, which shall mean either the Prime Based Rate (as hereinafter defined) or the ARRC Based Rate, as hereinafter defined (in Payee's sole discretion as to whether Prime Based Rate or the ARRC Based Rate shall be used).

b.  The term **"ARRC Based Rate"** shall mean the sum of (i) Eleven and 00/100 Percent (11.00%) per annum plus (ii) the ARRC Rate (as hereinafter defined).

c.  The term **"ARRC Rate"** shall mean such replacement of LIBOR as may be approved by the Alternative Reference Rates Committee (ARRC) (or comparable organization) and approved and/or published by the Federal Reserve; provided, however, in no event shall the ARRC Rate be less than One and 00/100 Percent (1.00%).

d.  The term **"Business Day"** shall mean a weekday, Monday through Friday, except a legal holiday or a day on which banking institutions in New York, New York are authorized by law to be closed.

e.  The term **"Debt"** shall mean all principal, interest and other sums of any nature whatsoever, which may or shall become due to Payee in accordance with the provisions of this Note, the Loan Agreement or Other Security Documents.

f.  The term **"Interest Period"** shall mean, initially, the period commencing on (and including) the Closing Date and ending on (and including) the last day of the calendar month in which the Closing Date occurs. Thereafter, each Interest Period shall commence on (and include) the first day of each calendar month immediately following the last day of the previous Interest Period and end on (and include) the last day of such calendar month.

g.  The term **"Interest Rate"** as used in this Note shall mean interest at the annual rate equal to the greater of (i) Eleven and 00/100 Percent (11.00%) per annum plus LIBOR (collectively, the **"LIBOR Based Rate"**) (or the Alternative Rate, as applicable), and (ii) Twelve and 00/100 Percent (12.00%) per annum (the **"Fixed Base Rate"**), adjusted for each Interest Period based upon the greater of the Prime Based Rate, the LIBOR Based Rate (or the Alternative Rate, as applicable) and the Fixed Base Rate at 11:00 a.m. (E.S.T.) two (2) Business Days prior to the Reset Date (as defined below) applicable to such Interest Period (or the date hereof with respect to the first Interest Period hereunder), which Interest Rate shall be applicable from the date of this Note to the Maturity Date, except as otherwise expressly provided herein.

h.  The term **"LIBOR"** shall mean the London Interbank Offered Rate (as defined below) for U.S. dollar deposits being delivered in the London interbank eurodollar market of one (1) month maturity (One Month LIBOR) as reported in the Money Rates Section of the Wall Street Journal (or such other commercially available source providing quotations of such London Interbank Offered Rate as may be designated by Payee from time to time) as of 11:00 a.m., E.S.T., on a Business Day (or if not so reported, then as determined by Payee from another recognized source of interbank quotation), rounded up to the nearest one-eighth of one percent (1/8%). A certificate made by an officer of Payee stating the LIBOR in effect on any given day, for the purposes hereof, shall be conclusive evidence of the LIBOR in effect on such day. The LIBOR is a base reference rate of interest adopted by Payee as a

- 2 -

general benchmark from which Payee determines the floating interest rates chargeable on various loans to borrowers with varying degrees of creditworthiness, and Maker acknowledges and agrees that Payee has made no representations whatsoever that the LIBOR is the interest rate actually offered by Payee to borrowers of any particular creditworthiness.

i.   The term **"Loan Documents"** shall mean this Note, the Loan Agreement and all and any of the documents now or hereafter executed by Maker and/or others and by or in favor of Payee, which evidences, secures or guarantees all or any portion of the payments due under this Note or otherwise is executed and/or delivered in connection with this Note, the Loan Agreement, guarantees and agreements, including, without limitation, that certain Completion and Cost Over-Run Guaranty executed in connection with the Building Loan, and incorporated herein and made applicable to the Loan pursuant to this reference and the terms of the Forbearance Agreement and that certain Ownership Interests Pledge and Security Agreement executed by the Maker in favor of Payee simultaneously herewith (the **"Pledge Agreement"**).

j.   The term **"London Interbank Offered Rate"** shall mean the London interbank offered rate administered by ICE Benchmark Administration Limited (or any other Person which takes over the administration of such rate).

k.   The term **"Maturity Date"** shall mean the earlier of (i) March 1, 2021, as the same may be extended pursuant to the terms hereof, or (ii) such sooner date, by acceleration or otherwise, as may be applicable pursuant to the terms hereof, at which time the entire Debt shall become due and payable.

l.   The term **"Other Security Documents"** shall mean any of the documents other than this Note or the Loan Agreement, now or hereafter executed by the Maker or others, and by or in favor of Payee, which wholly or partially secure or guarantee payment of this Note, or which otherwise pertain to the loan evidenced by this Note (the **"Loan"**), including, without limitation, the Pledge Agreement.

m.   The term **"Person"** shall mean an individual, a corporation, a partnership, a limited liability company, an association, a trust or any other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

n.   The term **"Prime Based Rate"** shall mean the sum of (i) Eight and 75/100 Percent (8.75%) per annum plus (ii) the Prime Rate (as hereinafter defined).

o.   The term **"Prime Rate"** shall mean the annual rate of interest which is the highest prime lending rate of interest most recently in effect (as published in the Money Rates Section in The Wall Street Journal or if The Wall Street Journal fails to publish such rate, such other publication as Payee shall designate in its sole discretion). A certificate made by an officer of Payee stating the Prime Rate in effect on any given day, for the purposes hereof, shall be conclusive evidence of

- 3 -

the Prime Rate in effect on such day. The Prime Rate is a base reference rate of interest adopted by Payee as a general benchmark from which Payee determines the floating interest rates chargeable on various loans to borrowers with varying degrees of creditworthiness and Maker acknowledges and agrees that Payee has made no representations whatsoever that the Prime Rate is the interest rate actually offered by Payee to borrowers of any particular creditworthiness. In the event that the concept of the Prime Rate shall no longer exist, then the Prime Rate shall be deemed to be the Prime Rate as last reported in The Wall Street Journal.

p.      The term **"Principal Balance"** shall mean the outstanding principal balance of this Note from time to time.

q.      The term **"Reset Date"** shall mean the first day of each Interest Period.

2.      Any capitalized terms used herein but not defined shall have the meanings ascribed to them in the Loan Agreement or Other Security Documents.

3.      Interest shall be computed on the basis of a year of 360 days and actual days elapsed.

4.      The failure to make any payment required under this Note or the occurrence of any Event of Default (as such term is defined in the Loan Agreement or the Other Security Documents) shall constitute an Event of Default under this Note.

5.      Upon the occurrence of an Event of Default: (a) interest shall accrue hereunder at the Default Rate prior to and subsequent to the entry of a Judgment of Foreclosure and Sale, (b) Payee may, at its option, without any written notice given to the Maker (such notice being expressly waived), DECLARE AND DEMAND this Note and the Debt immediately due and payable and (c) Payee may pursue all rights and remedies available hereunder or under the Loan Agreement and the Other Security Documents. Payee's rights, remedies and powers, as provided in this Note, the Loan Agreement or the Other Security Documents are cumulative and concurrent, and may be pursued singlely, successively or together against Maker, any Guarantor of the indebtedness evidenced hereby or against any collateral granted or pledged by Maker under any of the Loan Documents or any other collateral security given at any time to secure the payment hereof, all at the sole discretion of Payee. Additionally, Payee may resort to every other right or remedy available at law or in equity without first exhausting the rights and remedies contained herein, all in Payee's sole discretion. Failure of Payee, for any period of time or on more than one occasion, to DECLARE AND DEMAND this Note and the Debt immediately due and payable shall not constitute a waiver of the right to exercise the same at any time from and after any Event of Default.

6.      A payment shall not be deemed to have been made on any day unless such payment has been received by Payee, at the required place of payment, in U.S. dollars by no later than 1:00 p.m. (New York time) on such day. Whenever any payment to Payee hereunder would otherwise be due (except by reason of acceleration) on a day that is not a Business Day, such payment shall instead be due on the next succeeding Business Day. If any installment of principal, interest or other sums due hereunder or under the Loan Agreement or any Other Security Document are not paid on the date on which same are due, the Maker shall pay to the Payee a late charge of five percent (5.00%) of such unpaid installment as a late payment charge, such late charge to be

- 4 -

immediately due and payable without demand by the Payee. Notwithstanding anything to the contrary, all payments due under this Note, the Loan Agreement and the Loan Documents shall be made by means of wire transfer to the order of Payee, as directed by Payee, and Payee shall have the absolute right to reject any payment not made by wire transfer. In addition, Maker shall pay to Payee the sum of $2,500.00 for any payment which is returned for any reason by Maker's bank unpaid.

7.      Subject to Payee's due diligence review and completion of a credit check, satisfactory to Payee in its sole discretion, and provided that: (a) this Note and the Other Security Documents are in full force and effect and there exists no Event of Default at the time of the giving of Maker's notice to extend, (b) Maker has made all Monthly Payments in accordance with the terms and conditions hereof, and (c) with respect to the Second Extended Term (as defined below) only, Maker shall have prepaid to Lender a sum equal to the greater of Thirteen Million and 00/100 Dollars ($13,000,000.00) or the Minimum Release Remittance (as defined in the Forbearance Agreement, which is defined in the Loan Agreement), which Lender shall apply to the Loan, the First Land Loan, the Second Land Loan, the Building Loan, or the Project Loan, in such order and priority as Lender shall determine in its sole discretion, then Maker shall have the option, upon providing written notice to Payee (in the manner provided in the Loan Agreement) to extend the term of this Note for two (2) additional periods of three (3) months each (respectively, the "**First Extended Term**," and the "**Second Extended Term**," and, individually or collectively, as the context may require, the "**Extended Term**"). Maker's notice must be received by Payee no later than fifteen (15) days prior to the then-applicable Maturity Date, *time being of the essence with respect thereto in each and every instance*. Any extension of the term as set forth herein shall be on the same terms and conditions of this Note and the Other Security Documents, except as otherwise provided in this Note and the Other Security Documents. Notwithstanding anything herein to the contrary, the term of this Note may not be extended unless, simultaneously with such extension, the Termination Date (as defined in the Forbearance Agreement) with respect to the First Land Loan, the Building Loan, the Project Loan, the Land Note, the Building Note, and the Project Note, and the Maturity Date with respect to the Second Land Loan and the Second Land Loan Note (as such terms are hereinafter defined) are also extended in accordance with terms of the Forbearance Agreement and the Second Land Loan Documents, respectively, such that the Termination Date of the Forbearance Period (as defined in the Forbearance Agreement) applicable to the First Land Loan, the Building Loan, and the Project Loan, and the Maturity Date of the Second Land Loan and the Second Land Note, shall be coterminous with the Loan.

8.      Maker acknowledges and agrees that Mortgage Borrower is required to pay the Exit Fee, Funding Losses, and all other fees, costs, and expenses set forth in the First Land Loan Documents, the Building Loan Documents, and the Project Loan Documents (as such terms are defined therein).

9.      Notwithstanding anything to the contrary contained herein, except for the prepayment described in Section 7(c) above, the Principal Balance of this Note may not be prepaid by Maker unless, simultaneously with such prepayment, the following is also prepaid in full: (a) that certain loan originated as of December 6, 2017 (the "**First Land Loan**") in the principal amount of $17,730,000.00 from **PROPHET MORTGAGE OPPORTUNITIES LP** (the "**Original Mortgage Lender**"), to **HELLO NOSTRAND LLC**, a New York limited liability company (the

- 5 -

"**Mortgage Borrower**"), as evidenced by that certain Amended, Restated and Consolidated Senior Loan Promissory Note dated as of December 6, 2017 (the "**First Land Note**") in the principal amount of $17,730,000.00 executed by Mortgage Borrower in favor of Original Mortgage Lender, and as secured by that certain Consolidation, Extension and Modification of Senior Loan Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing executed by Mortgage Borrower in favor of Original Mortgage Lender in the principal amount of $17,730,000.00 and encumbering the property owned by Mortgage Borrower located at 1580 Nostrand Avenue, Brooklyn, New York 11226 (the "**Property**"), as well as all guarantees, pledges, and other documents executed in connection therewith (the "**First Land Loan Documents**"), which First Land Loan was assigned by an Assignment of Consolidation, Extension and Modification of Senior Loan Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing and Senior Loan Collateral Assignment of Leases and Rents dated June 7, 2019 by Original Mortgage Lender to **1580 NOSTRAND AVE LLC**, a Delaware limited liability company (collectively, together with its successors and/or assigns, the "**Mortgage Lender**"); (b) that certain building loan originated as of December 6, 2017 (the "**Building Loan**") in the principal amount of $39,770,000.00 from Original Mortgage Lender to the Mortgage Borrower, as evidenced by that certain Building Loan Promissory Note dated as of December 6, 2017 (the "**Building Note**") in the principal amount of $39,770,000.00 executed by Mortgage Borrower in favor of Original Mortgage Lender, and as secured by that certain Building Loan Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing executed by Mortgage Borrower in favor of Original Mortgage Lender in the principal amount of $39,770,000.00 and encumbering the Property, as well as all guarantees, pledges, and other documents executed in connection therewith (the "**Building Loan Documents**"), which Building Loan was assigned by an Assignment of Building Loan Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing and Senior Loan Collateral Assignment of Leases and Rents dated June 7, 2019 by Original Mortgage Lender to Mortgage Lender; (c) that certain project loan originated as of December 6, 2017 (the "**Project Loan**") in the principal amount of $5,500,000.00 from Original Mortgage Lender to the Mortgage Borrower, as evidenced by that certain Project Loan Promissory Note dated as of December 6, 2017 (the "**Project Note**") in the principal amount of $5,500,000.00 executed by Mortgage Borrower in favor of Original Mortgage Lender, and as secured by that certain Project Loan Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing executed by Mortgage Borrower in favor of Original Mortgage Lender in the principal amount of $5,500,000.00 and encumbering the Property, as well as all guarantees, pledges, and other documents executed in connection therewith (the "**Project Loan Documents**"), which Project Loan was assigned by an Assignment of Project Loan Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing and Senior Loan Collateral Assignment of Leases and Rents dated June 7, 2019 by Original Mortgage Lender to Mortgage Lender; and (d) that certain loan originated as of the date hereof (the "**Second Land Loan**") in the principal amount of up to $8,300,000.00 from Mortgage Lender to the Mortgage Borrower, as evidenced by that certain Mortgage Note dated as of the date hereof (the "**Second Land Note**") in the principal amount of up to $8,300,000.00 executed by Mortgage Borrower in favor of Mortgage Lender, and as secured by that certain Mortgage and Security Agreement executed by Mortgage Borrower in favor of Mortgage Lender in the principal amount of up to $8,300,000.00 and encumbering the Property, as well as all guarantees, pledges, and other documents executed in connection therewith (the "**Second Land Loan Documents**" and, together with the First Land Loan Documents, the Building Loan Documents, and the Project Loan Documents, collectively, the "**Mortgage Loan**

- 6 -

**Documents"**). The First Land Loan Documents, the Building Loan Documents, and the Project Loan Documents are subject to the terms of the Forbearance Agreement (as defined in the Loan Agreement).

10.    Separate and in addition to all other payment obligations of Maker contained herein, Maker shall be required to pay a yearly servicing fee equal to Twenty Thousand and 00/100 Dollars ($20,000.00) payable in monthly installments (the "**Servicing Fee**"). The Maker acknowledges and agrees that the obligation to pay the Servicing Fee shall be secured by the Loan Agreement. For the avoidance of doubt, the Servicing Fee required hereunder shall not be in duplication of the Servicing Fee defined in and required under the Mortgage Loan Documents.

11.    Maker acknowledges that this Note and Maker's obligations under this Note are and shall at all times continue to be absolute and unconditional in all respects. This Note, the Loan Agreement and the Other Security Documents set forth the entire agreement and understanding of Payee and Maker.

12.    Maker agrees to pay all costs and expenses of collection incurred by Payee, in addition to principal and interest (including, without limitation, reasonable attorneys' fees and disbursements), and including all costs and expenses incurred in connection with the pursuit by Payee of any of its rights or remedies hereunder or under the Loan Agreement and/or the Other Security Documents or the protection of or realization of collateral or in connection with any of Payee's collection efforts, whether or not any action or proceeding on this Note, on the Loan Agreement and/or the Other Security Documents or any foreclosure proceeding is filed, all such costs and expenses being payable on demand, together with interest at the Default Rate thereon and being secured by the Loan Agreement and the Other Security Documents.

13.    The indebtedness herein evidenced by this Note is secured by the Loan Agreement and the Other Security Documents.

14.    THIS NOTE HAS BEEN EXECUTED AND DELIVERED AT AND SHALL BE DEEMED TO HAVE BEEN MADE AND PERFORMED IN THE STATE OF NEW YORK AND THIS NOTE, THE LOAN AGREEMENT AND EACH OF THE OTHER SECURITY DOCUMENTS SHALL IN ALL RESPECTS BE GOVERNED, CONSTRUED, APPLIED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

15.    Maker does hereby agree that upon the occurrence of an Event of Default, or upon the failure of Maker to pay the Debt in full on the Maturity Date, Payee shall be entitled to receive and Maker shall pay interest on the entire Debt at the rate of twenty-four percent (24%) per annum or at the maximum rate of interest which Maker may by law pay, whichever is lower (the "**Default Rate**"), to be computed from the occurrence of the Event of Default until the actual receipt and collection of the Debt, including all periods prior to or subsequent to the entry of a Judgment of Foreclosure and Sale. This charge shall be added to the Debt and shall be deemed secured by the Loan Agreement. This clause, however, shall not be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Payee by reason of the occurrence of any Event of Default.

- 7 -

16.     This Note is subject to the express condition that at no time shall Maker be obligated or required to pay interest on the Principal Balance at a rate which could subject Payee to either civil or criminal liability as a result of being in excess of the maximum rate which Maker is permitted by law to contract or agree to pay.  For the purposes of calculating the actual amount of interest paid and or payable, in respect of laws pertaining to usury or such other laws, all sums paid or agreed to be paid to Payee for the use, forbearance or detention of the indebtedness evidenced hereby shall, to the extent permitted by applicable law, be amortized, allocated and spread from the date of disbursement of the proceeds thereof until payment in full of the Loan obligations, so that the actual rate of interest on account thereof is uniform throughout the term hereof.  If, by the terms of this Note, Maker is at any time required or obligated to pay interest on the Principal Balance at a rate in excess of such maximum rate, the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate, and interest payable hereunder shall be computed at such maximum rate and the portion of all prior interest payments in excess of such maximum rate shall be applied and shall be deemed to have been payments in reduction of the Principal Balance.

17.     In the event LIBOR is no longer available or charging of interest that is calculated based upon LIBOR would violate applicable law or regulation, then in Payee's sole discretion, the Alternative Rate shall replace the LIBOR Based Rate, which Alternative Rate shall mean either the Prime Based Rate or the ARRC Based Rate, (in Payee's sole discretion as to whether the Prime Based Rate or the ARRC Based Rate shall be used).

18.     No delay on the part of Payee in exercising any right or remedy under this Note, the Loan Agreement or the Other Security Documents or failure to exercise the same shall operate as a waiver in whole or in part of any such right or remedy.  No notice to or demand on Maker shall be deemed to be a waiver of the obligation of Maker or of the right of Payee to take further action without further notice or demand as provided in this Note, the Loan Agreement and the Other Security Documents.

19.     Each of Payee's rights and remedies under this Note shall be in addition to all of its other rights and remedies under the Loan Agreement, Other Security Documents and applicable law.

20.     **TIME IS OF THE ESSENCE** with regard to Maker's performance of all the terms, covenants and conditions of this Note.

21.     Any provision of this Note, the Loan Agreement or the Other Security Documents that is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof or affecting the validity or enforceability of such provision.

22.     All of the provisions of this Note shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

23.     Maker hereby warrants, represents and covenants that no funds disbursed hereunder shall be used for personal family or household purposes.

24.     Maker (and the undersigned representative of Maker, if any) represents that Maker has full power, authority and legal right to execute and deliver this Note and that the Debt hereunder

- 8 -

constitutes a valid and binding obligation of Maker.

25.    All notices to be given under this Note shall be given in the same manner as provided in the Loan Agreement.

26.    This Note, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Maker or Payee, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

27.    Without limiting any other provisions of the Loan Agreement or the Loan Documents, Maker, for itself and all endorsers, guarantors and sureties of this Note, and their heirs, legal representatives, successors and assigns, hereby waives valuation, appraisement, presentment for payment, demand, notice of nonpayment, notice of dishonor, protest of any dishonor, notice of protest and protest of this Note, lack of diligence, delays in collection or enforcement of this Note, notice of the intention to accelerate, the benefit of all applicable law affording any right or redemption or cure and all other notices in connection with the delivery, acceptance, performance, default or enforcement of the payment of this Note, except as expressly provided herein or in the Loan Agreement or any of the Other Security Documents, and in connection with any suit, action or proceeding brought by Payee on this Note, any and every right it may have to (a) a trial by jury, (b) interpose any counterclaim therein (other than a counterclaim which can only be asserted in a suit, action or proceeding brought by Payee on this Note and cannot be maintained in a separate action), and (c) have the same consolidated with any other or separate suit, action or proceeding, and agrees that their respective liability shall be unconditional and without regard to the liability of any other party and shall not be in any manner affected by any indulgence, extension of time, renewal, waiver or modification granted or consented to by Payee. Maker, for itself and all endorsers, guarantors and sureties of this Note, and their heirs, legal representatives, successors and assigns, hereby consents to every extension of time, renewal, waiver or modification that may be granted by Payee with respect to the payment or other provisions of this Note, and to the release of any makers, endorsers, guarantors or sureties, and their heirs, legal representatives, successors and assigns, and of any collateral given to secure the payment hereof, or any part hereof, with or without substitution, and agrees that additional makers, endorsers, guarantors or sureties and their heirs, legal representatives, successors and assigns, may become parties hereto without notice to Maker or to any endorser, guarantor or surety and without affecting the liability of any of them.

28.    FOR ANY CLAIM, ACTION, OR DISPUTE ARISING UNDER, OR TO INTERPRET OR APPLY, THIS NOTE OR ANY OTHER SECURITY DOCUMENT, OR TO RESOLVE ANY DISPUTE ARISING UNDER THE FOREGOING OR THE RELATIONSHIP BETWEEN THE PARTIES, MAKER IRREVOCABLY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK AND THE UNITED STATES DISTRICT COURT LOCATED IN THE BOROUGH OF MANHATTAN IN NEW YORK CITY, NEW YORK, AND APPELLATE COURTS FROM ANY OF SUCH COURTS. MAKER IRREVOCABLY WAIVES ANY OBJECTION THAT IT MAY HAVE AT ANY TIME TO VENUE OF ANY SUCH SUIT, ACTION, OR PROCEEDING BROUGHT IN ANY SUCH COURT, INCLUDING ANY CLAIM THAT ANY SUCH SUIT, ACTION, OR PROCEEDING SO BROUGHT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. NOTHING IN THE LOAN AGREEMENT OR OTHER SECURITY DOCUMENTS SHALL BE DEEMED TO

PRECLUDE PAYEE FROM BRINGING ANY SUIT, ACTION, OR PROCEEDING RELATING TO ANY OTHER SECURITY DOCUMENT OR THE DEBT IN ANY OTHER JURISDICTION WHERE PAYEE COULD OTHERWISE PROPERLY BRING SUCH SUIT, ACTION, OR PROCEEDING. MAKER FURTHER CONSENTS AND AGREES TO SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER LEGAL PROCESS IN ANY SUCH SUIT, ACTION OR PROCEEDING BY REGISTERED OR CERTIFIED U.S. MAIL, POSTAGE PREPAID, TO MAKER AT THE ADDRESS SET FORTH ON PAGE 1 HEREOF, AND CONSENTS AND AGREES THAT SUCH SERVICE SHALL CONSTITUTE IN EVERY RESPECT VALID AND EFFECTIVE SERVICE (BUT NOTHING HEREIN SHALL AFFECT THE VALIDITY OR EFFECTIVENESS OF PROCESS SERVED IN ANY OTHER MANNER PERMITTED BY LAW).

29.     To the extent applicable, in an action commenced in the Commercial Division, New York State Supreme Court, the parties hereby agree, subject to the requirements for a case to be heard in the Commercial Division, to apply the Court's accelerated adjudication procedures set forth in Rule 9 of the Rules of Practice for the Commercial Division, in connection with any dispute, claim or controversy arising out of or relating to this Note or any of the Loan Documents, or the breach, termination, enforcement or validity thereof.

30.     The parties intend that each of the Makers (if more than one) shall be fully liable, jointly and severally, for all of the Debt.  Nonetheless, in case a court finds that any Maker is not such a primary obligor with respect to all or any part of such obligations, the Makers expressly waive the benefit of any and all defenses and discharges available to a guarantor, surety, endorser or accommodation party dependent on an obligor's character as such.  Without limiting the generality of the foregoing, the liability of the Makers hereunder shall not be affected or impaired in any way by any of the following acts or things (which the Payee is hereby expressly authorized to do, omit or suffer from time to time without notice to or consent of anyone): (a) any acceptance of collateral security, guarantors, accommodation parties or sureties for any or all indebtedness arising under this Note, the Loan Agreement or the Other Security Documents; (b) any extension or renewal of any such indebtedness (whether or not for longer than the original period) or any modification of the interest rate, maturity or other terms of any such indebtedness; (c) any waiver or indulgence granted to either Maker, and any delay or lack of diligence in the enforcement of the indebtedness arising under this Note, the Loan Agreement or the Other Security Documents; (d) any full or partial release of, compromise or settlement with, or agreement not to sue, either Maker or any guarantor or other person liable on any such indebtedness; (e) any release, surrender, cancellation or other discharge of any indebtedness arising under this Note, the Loan Agreement or the Other Security Documents, or the acceptance of any instrument in renewal or substitution for any instrument evidencing any such indebtedness; (f) any failure to obtain collateral security (including rights of setoff) for any indebtedness arising under this Note, the Loan Agreement or the Other Security Documents, or to see to the proper or sufficient creation and perfection thereof, or to establish the priority thereof, or to preserve, protect, insure, care for, exercise or enforce any collateral security for any such indebtedness; (g) any modification, alteration, substitution, exchange, surrender, cancellation, termination, release or other change, impairment, limitation, loss or discharge of any collateral security for any such indebtedness; (h) any assignment, sale, pledge or other transfer of any of the indebtedness arising under this Note, the Loan Agreement or the Other Security Documents; or (i) any manner, order or method of application of any payments or credits on any indebtedness arising under this Note, the Loan Agreement or the Other Security

- 10 -

Documents. Each Maker also hereby waives any right of contribution, subrogation, indemnification or other right arising as a result of any payment made toward the Debt of the other Maker.

31.     Each of the Makers (if more than one) hereby waives, for the benefit of the Payee: (a) any right the Payee, as a condition of payment or performance by either Maker, to (i) proceed against the other Maker or any other person or entity, (ii) proceed against or exhaust any collateral for the Debt held from the other Maker or any other person or entity, (iii) proceed against or have resort to any balance of any deposit account, securities account, or credit on the books of the Payee in favor of the other Maker or any other person or entity, or (iv) pursue any other remedy in the power of the Payee whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the other Maker, including any defense based on or arising out of the lack of validity or the unenforceability of the Debt or any agreement or instrument relating thereto or by reason of the cessation of the liability of the other Maker from any cause other than payment in full of the Debt; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon the Payee's errors or omissions in the administration of the Debt; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of its obligations hereunder, (ii) the benefit of any statute of limitations affecting its liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that the Payee protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default thereunder or under this Note, the Mortgage or the Other Security Documents, any agreement or instrument related thereto, notices of any renewal, extension or modification of the Debt or any agreement related thereto, notices of any extension of credit to the other Maker and notices of any matters referred to in any guaranty securing this Note and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate sureties, or which may conflict with the terms hereof.

32.     Intentionally Omitted.

33.     Except as set forth in Section 7(c) above, Maker shall have the right to prepay the Principal Balance in whole only, along with interest, additional interest, and any other sums due under this Note or the Other Security Documents upon prior irrevocable written notice sent by Maker (a "**Prepayment Notice**"), setting forth the intended prepayment date ("**Prepayment Date**"), which Prepayment Notice must be received by Payee not more than thirty (30) days prior to the Prepayment Date and not less than fifteen (15) days prior to the Prepayment Date and on the Prepayment Date, Maker shall make prepayment as herein above provided, failure of which to timely prepay shall result in a $1,000 prepayment cancellation fee to compensate Payee for expenses associated with Maker's failure to comply with its request and is not a penalty.

**[Remainder of Page Intentionally Left Blank]**

- 11 -

IN WITNESS WHEREOF, Maker has duly executed this Note the day and year first above written.

HELLO LIVING DEVELOPER
NOSTRAND LLC,
a New York limited liability company

By: _____
Name:  Eli Karp
Title:   Authorized Signatory

STATE OF NEW YORK         )
                                               ) ss.:
COUNTY OF ~~NEW YORK~~         )

On the _____ day of August, in the year 2020, before me, the undersigned, a Notary Public in and for said State, personally appeared Eli Karp, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

YEHOSHUA AARON ROTHMAN
Notary Public, State of New York
Reg. No. 01RO6391270
Qualified in Rockland County
Commission Expires 04/29/2023

## EXHIBIT D

**(Ownership Interests Pledge and Security Agreement)**

## OWNERSHIP INTERESTS PLEDGE AND SECURITY AGREEMENT

THIS OWNERSHIP INTERESTS PLEDGE AND SECURITY AGREEMENT (this "Agreement") is made as of the 28th day of August, 2020, by and between HELLO LIVING DEVELOPER NOSTRAND LLC, a New York limited liability company, having an address at 33 35th Street, 6th Floor, Suite B-613, Brooklyn, NY 11232 (the "Pledgor"), and 1580 NOSTRAND MEZZ LLC, a Delaware limited liability company, having offices at 520 Madison Avenue, Suite 3501, New York, NY 10022 ("Lender").

WHEREAS, pursuant to the terms of the Mezzanine Promissory Note (the "Note"), the Mezzanine Loan Agreement (the "Mezzanine Loan Agreement"), and any and all other security documents and guarantees securing the note (collectively herein, the "Loan Documents") dated of even date herewith between Pledgor and Lender, Lender has agreed to make that certain mezzanine loan to the Pledgor in the principal amount of up to $3,000,000.00 (the "Loan"), as evidenced and secured by all of the obligations under and in connection with the Loan Documents (the "Obligations"); and

WHEREAS, the Pledgor is the sole member of HELLO NOSTRAND LLC, a New York limited liability company (the "Issuer"); and

WHEREAS, in order to induce Lender to make the Loan, it is a condition precedent under the Loan Documents that Pledgor shall have (a) granted to Lender the security interests, and undertaken the obligations, set forth in this Agreement, and (b) executed and delivered to Lender this Agreement.

NOW, THEREFORE, in consideration of the promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Pledge of Collateral. Pledgor hereby irrevocably and unconditionally pledges and assigns to Lender, and irrevocably and unconditionally grants to Lender a security interest in, all of Pledgor's right, title, and interest in and to the following (the "Collateral"):

    (a)     the Pledged Interests (hereinafter defined) together with all rights to Distributions (hereinafter defined) or other payments arising therefrom or relating thereto, and all options, rights, instruments, and other property or proceeds from time to time received, receivable, or otherwise distributable in respect of or in exchange for any or all of the Pledged Interests;

    (b)     to the extent not covered by subparagraph (a), all rights to receive all income, gain, profit, loss, or other items allocated, allocable, distributed, or distributable to Pledgor under the Organizational Documents (hereinafter defined) of the Issuer, and all general intangibles, accounts, investment property, payment intangibles, supporting obligations, other contract rights or rights to the payment of money, and all proceeds, as each of the foregoing terms is defined in the UCC (hereinafter defined), arising out of, or in connection with, the membership interest in Issuer;

    (c)     all of Pledgor's ownership interest in any capital accounts in the Issuer;

(d)    all of Pledgor's voting, consent, management, management removal and replacement, and approval rights, and/or rights to control or direct the affairs of the Issuer, inclusive of the management rights of the Pledgor in the Issuer, as set forth in the Operating Agreement of the Issuer dated November 28, 2017, and any amendments thereto, as the same may be amended or amended and restated from time to time (collectively, the "Operating Agreement");

(e)    any additional ownership interests of, and any ownership interests exchangeable for or convertible into and warrants, options, and other rights to purchase or otherwise acquire shares of ownership interests of, the Issuer, or entity which is the successor of the Issuer, from time to time acquired by Pledgor in any manner (all of which interests shall be deemed to be part of the Pledged Interests), and any certificates or other instruments representing such additional interests, warrants, options, and other rights, and all Distributions and other property or proceeds from time to time received, receivable, or otherwise distributed or distributable in respect of or in exchange for any or all of such additional shares, warrants, options, or other rights.  Pledgor agrees that Lender may from time to time attach as Schedule A hereto an updated list of the Collateral at the time pledged to Lender hereunder (although the failure to so update Schedule A shall not limit the pledge of such additional interests to Lender); and

(f)    to the extent not covered by clauses (a) through (e) above, all proceeds of any or all of the foregoing Collateral.  For purposes of this Agreement, the term "proceeds" includes whatever is receivable or received when Collateral or proceeds are sold, exchanged, collected, or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes, without limitation, proceeds of any indemnity or guaranty payable to Pledgor from time to time with respect to any of the Collateral.

2.    Certain Definitions.  Capitalized terms used herein without definition shall have the respective meanings provided therefor in the Loan Documents.  Terms (whether or not capitalized) used herein and not defined in the Loan Documents or otherwise defined herein that are defined in the Uniform Commercial Code as in effect in the State of New York or other applicable jurisdiction (the "UCC") have such defined meanings herein, unless the context otherwise indicates or requires.  In addition, the following terms used herein shall have the following meanings:

(a)    "Article 8 Matter" means any action, decision, determination or election by the Issuer or its members that the membership interest in the Issuer be, or cease to be, a "security" as defined in and governed by Article 8 of the UCC, and all other matters related to any such action, decision, determination or election.

(b)    "Business Day" means a weekday, Monday through Friday, except a legal holiday or a day on which banking institutions in New York, New York are authorized by law to be closed.

(c)    "Contractual Obligation" means, as to any Person, any contract, agreement, or undertaking, regardless of how characterized, oral or written, to which such Person

is a party, or by which such Person or such Person's property is bound, or to which such Person or such Person's property is subject.

(d)     "Distributions" means any distribution of property (including cash) (regardless of whether from cash flow, capital transactions, or otherwise) on account of a Pledged Interest, or any other distribution or payment on or in respect of any membership interest or the redemption or repurchase thereof.

(e)     "Governmental Authority" means any national, state, or local government, any political subdivision thereof, or any other governmental, quasi-governmental, judicial, public, or statutory instrumentality, authority, body, agency, bureau, or entity or any arbitrator with authority to bind a Person at law, and any agency, authority, department, commission, board, bureau, or instrumentality of any of them.

(f)     "Legal Requirements" means all applicable federal, state, county and local laws, by-laws, rules, regulations, codes and ordinances, and the requirements of any Governmental Authority having or claiming jurisdiction with respect thereto, including, but not limited to, all orders and directives of any Governmental Authority having or claiming jurisdiction with respect thereto.

(g)     "Lien" means any lien, encumbrance, security interest, mortgage, restriction, charge or encumbrance of any kind.

(h)     "Loan Collateral" means the "Collateral" as defined in the Mezzanine Loan Agreement and includes the Collateral hereunder.

(i)     "Organizational Documents" means for any corporation, partnership, trust, limited liability company, limited liability partnership, unincorporated association, business or other legal entity, the agreements pursuant to which such entity has been established or organized, its affairs are to be governed, and its business is to be conducted, as such documents may be amended from time to time.

(j)     "Person" means any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, State, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

(k)     "Pledged Interests" means the ownership interests or membership interest now or hereafter listed on Schedule A hereto or which would be listed on an updated Schedule A at any time of reference, together with all related rights of the holder thereof pursuant to the Organizational Documents of the Issuer.

3.     Security for the Secured Obligations. This Agreement secures, and the Collateral is collateral security for, the payment and performance in full when due, whether at stated maturity, by required prepayment, declaration, acceleration, demand, or otherwise (including the payment of amounts that would become due but for the operation of the

automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)), of the following (the "<u>Secured Obligations</u>"):

(a)    the Obligations, including all obligations and liabilities of every nature of the Issuer now or hereafter existing under or arising out of or in connection with the Loan Documents and all renewals or extensions thereof, whether for principal, interest, fees, expenses, indemnities, or otherwise, whether voluntary or involuntary, direct or indirect, absolute or contingent, liquidated or unliquidated, whether or not jointly owed with others, and whether or not from time to time decreased or extinguished and later increased, created, or incurred, and all or any portion of such obligations or liabilities that are paid, to the extent all or any part of such payment is avoided or recovered directly or indirectly from Lender as a preference, fraudulent transfer, or otherwise, and all obligations of every nature of the Pledgor now or hereafter existing under this Agreement; and

(b)    the obligations of Pledgor hereunder.

4.    <u>Delivery of Collateral</u>.

(a)    If at any time the Pledged Interests are evidenced by one or more certificates, Pledgor shall deliver to Lender any original certificate evidencing the Pledged Interests (the "<u>Certificate</u>"), in suitable form for transfer by delivery or, as applicable, accompanied by any necessary endorsement or duly executed instruments of transfer or assignment, in blank, all in form and substance satisfactory to Lender.

(b)    Lender shall have the right, at any time after the occurrence of an Event of Default, in its discretion and without notice to Pledgor, to transfer to or to register (if not already so registered) in the name of Lender or any of its nominees any or all of the Collateral.  In addition, Lender shall have the right at any time to exchange certificates or instruments representing or evidencing Collateral for certificates or instruments of smaller or larger denominations.

5.    <u>Representations and Warranties</u>.  Pledgor hereby represents and warrants as follows:

(a)    <u>Organization; Address of Pledgor</u>.  Pledgor is the type of entity, organized in the jurisdiction, and has the address set forth with respect to Pledgor in the introductory paragraph to this Agreement.

(b)    <u>No Conflict</u>.  The execution, delivery, and performance by Pledgor of this Agreement will not (i) violate any provision of any Legal Requirement applicable to Pledgor, or any order, judgment, or decree of any Governmental Authority binding on Pledgor, (ii) result in a breach of, or constitute with due notice or lapse of time or both, a default under any Contractual Obligation of Pledgor, (iii) result in or require the creation or imposition of any Lien upon any of Pledgor's properties or assets, except pursuant to this Agreement, (iv) require the approval or consent of any Person under any Contractual Obligation of Pledgor, except for the approvals or consents described on <u>Schedule B</u> hereto, which approvals or consents have been

obtained, and true and complete copies of which have been furnished to Lender, or (v) conflict with any provision of Pledgor's Organizational Documents.

(c)     Binding Obligation. The execution, delivery and performance of this Agreement and the transactions contemplated hereby is within the authority of Pledgor, has been duly authorized by all necessary proceedings, and is the legally valid and binding obligation of Pledgor, enforceable against Pledgor in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or similar laws or equitable principles generally.

(d)     Description of Collateral. The Pledged Interests are being certificated pursuant to this Agreement and are fully paid and non-assessable. The Pledged Interests constitute all of the issued and outstanding ownership interests of the Issuer owned beneficially or of record by Pledgor. Neither Pledgor nor any other Person holds, or has any right to the issuance of, any options or other rights to purchase, and is not party to any other agreement with respect to and does not hold or have the right to any property that is now or hereafter convertible into, or that requires the issuance or sale of, any ownership interests of the Issuer. No Person other than Pledgor owns any ownership interests of any type in the Issuer. Other than the Certificate delivered to Lender pursuant to this Agreement, there currently exist no certificates, instruments or writings representing the Pledged Interests. However, to the extent that in the future there exist any such certificates, instruments or writings, Pledgor shall deliver all such certificates, instruments or writings to Lender.

(e)     Ownership of Collateral. (i) Pledgor is the legal and beneficial owner of, and has good and marketable title to, the Collateral, and is the record owner of the Pledged Interests, free and clear of, and subject to no, pledges, Liens, security interests, charges, options, restrictions or other encumbrances, except the pledge and security interest created by this Agreement; (ii) Pledgor has the legal capacity to execute, deliver and perform Pledgor's obligations under this Agreement and to pledge and grant a security interest in all of the Collateral of which it is the legal or beneficial owner pursuant to this Agreement; (iii) except for authorizations and consents which have already been obtained, no authorization, consent of or notice to any party that has not been obtained is required in connection with the execution, delivery, performance, validity or enforcement of this Agreement, including, without limitation, the assignment and transfer by Pledgor of any of the Collateral to Lender or the subsequent transfer by Lender pursuant to the terms hereof; and (iv) Lender's filing of UCC-1 financing statements with the Secretary of State of the State of New York results in the perfection of Lender's security interest in the Pledged Interests, and such portion of the other Collateral in which a security interest may be perfected by filing such UCC-1 form or financing statement.

(f)     Governmental Authorizations. No authorization, approval, or other action by, and no notice to or filing with, any Governmental Authority is required for either (i) the pledge by Pledgor of the Collateral pursuant to this Agreement and the grant by Pledgor of the security interest granted hereby, (ii) the execution, delivery, or performance of this Agreement by Pledgor, or (iii) the exercise by Lender of the

voting or other rights in respect of the Collateral provided for in this Agreement (except as may be required in connection with a disposition of Collateral by laws affecting the offering and sale of securities generally).

(g)    <u>Article 8</u>.  Pledgor acknowledges and agrees that the terms of the Pledged Interests and the Organizational Documents of the Issuer do and will provide that the Pledged Interests shall constitute a "security" within the meaning of Article 8 of the UCC (including Section 8-102(a)(15) thereof), as in effect from time to time in the State of New York, and Article 8 of the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995. Pledgor acknowledges and agrees that the Pledged Interests, and any and all Certificates which have been delivered to Lender on the date hereof, constitute and each will constitute a "certificated security" (as defined in the UCC). Pledgor therefor covenants and agrees that Pledgor shall not, directly or indirectly, without the prior written consent of Lender, alter, amend modify, supplement or change in any way, the Operating Agreement as in effect on the date hereof. However, the Pledged Interests are not and will not be investment company securities within the meaning of Section 8-103 of the UCC.  The Pledged Interests (i) will not become "financial assets" (within the meaning of Section 8-102(a)(9) of the UCC) and (ii) will not be credited to a "securities account" (within the meaning of Section 8-501(a) of the UCC).

(h)    <u>Creation, Perfection and Priority of Security Interest</u>.  This Agreement constitutes an authenticated record, and Lender is authorized at any time and from time to time to file any and all UCC financing statements and take such other actions determined by Lender to be necessary or desirable to perfect its security interest in the Collateral.

(i)    <u>No Other Financing Statements</u>.  Other than the UCC financing statements filed by Lender describing the Collateral, there is no financing statement (or similar statement or registration under the laws of any jurisdiction) now on file or registered in any public office covering any interest of Pledgor or any other Person in the Collateral.

(j)    <u>Other Information</u>.  All information heretofore, herein or hereafter supplied to Lender by Pledgor with respect to the Collateral in writing is accurate and complete in all material respects.

6.    <u>Assurances and Covenants of Pledgor</u>.

(a)    <u>Transfers and Other Liens</u>.  Pledgor shall not:

(i)    sell, assign (by operation of law or otherwise), pledge, or hypothecate or otherwise dispose of, or grant any option with respect to, any of the Collateral, except to Lender pursuant to this Agreement; or

(ii)    create or suffer to exist any Lien upon or with respect to any of the Collateral, except for the Lien created hereunder.

(b)    <u>Covenants of Pledgor</u>.  Pledgor covenants and agrees, with respect to itself and the Pledged Interests, that so long as any Secured Obligation is outstanding:

(i)    Pledgor shall not vote for, or agree or consent to, the sale, transfer, pledge or encumbrance of the Pledged Interests while the Loan is outstanding.

(ii)    Pledgor shall not vote for, or agree or consent to, the discontinuance of the business or the dissolution or liquidation of the Issuer.

(iii)    Pledgor shall not vote for, or agree or consent to, any material modifications to the Organizational Documents of the Issuer.

(iv)    Pledgor shall provide Lender with copies of any modifications made to the Organizational Documents of the Issuer within thirty (30) days after the date such modifications are made.

(v)    Pledgor shall not enter into any agreements which restrict, limit or otherwise impair the transferability of the Pledged Interests.

(vi)    Pledgor shall be the sole member of the Issuer and the sole holder of membership interest in the Issuer and shall not resign or withdraw as a member or vote for, agree or consent to, or permit the admission of any new members to the Issuer or any change in the management of the Issuer.

(c)    <u>Additional Collateral</u>.  Pledgor shall pledge hereunder, immediately upon Pledgor's acquisition (directly or indirectly) thereof, any and all additional ownership interests of Pledgor in the Issuer.

(d)    <u>Pledge Amendments</u>.  Pledgor shall, upon obtaining any additional ownership interests or other securities required to be pledged hereunder promptly (and in any event within five (5) Business Days) deliver to Lender such documents as Lender may require to confirm the pledge hereunder of such additional collateral; provided that the failure of Pledgor to execute any such additional documents with respect to any additional Pledged Interests pledged pursuant to this Agreement shall not impair the security interest of Lender therein or otherwise adversely affect the rights and remedies of Lender hereunder with respect thereto.

(e)    <u>Taxes and Assessments</u>.  Pledgor shall pay promptly when due all taxes, assessments, and governmental charges or levies imposed upon, and all claims against, the Collateral, except to the extent the validity thereof is being contested in good faith and by appropriate proceedings and in which reserves or other appropriate provisions have been made or provided therefor; provided that Pledgor shall in any event pay such taxes, assessments, charges, levies, or claims not later than five (5) days prior to the date of any proposed sale under any judgment, writ,

or warrant of attachment entered or filed against Pledgor or any of the Collateral as a result of the failure to make such payment.

(f)    <u>Further Assurances</u>. Pledgor shall from time to time, at the expense of Pledgor, promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary and that Lender may request, in order to give full effect to this Agreement and to perfect and protect any security interest granted or purported to be granted hereby or to enable Lender to exercise and enforce its rights and remedies hereunder with respect to any Collateral, provided that such further instruments, documents and action are consistent with this Agreement.

(g)    <u>Warranty of Title to Collateral</u>. Pledgor covenants that Pledgor will defend its rights and title in the Collateral against the claims and demands of all Persons whomsoever. Pledgor further covenants that Pledgor will have title to and right to pledge and grant a security interest in the Collateral hereafter pledged or in which a security interest is granted to Lender hereunder and will likewise defend its rights therein.

(h)    <u>Good Standing</u>. Pledgor will at all times be duly formed and is, and will at all times be, validly existing, in good standing and qualified to do business in each jurisdiction where required. Pledgor will at all times have all requisite power to own its property and conduct its business as now conducted and as presently contemplated.

7.    <u>Voting Rights, Dividends, Etc.</u>

(a)    So long as no Event of Default shall have occurred:

   (i)    Pledgor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Collateral or any part thereof for any purpose not inconsistent with the terms of this Agreement and the Loan Documents; provided, however, that any and all such rights shall remain subject to the provisions of <u>Section 7(b)</u> hereof;

   (ii)    Subject to the terms and conditions of this Agreement and the Loan Documents, Pledgor shall be entitled to receive and retain, and to utilize free and clear of the Lien of this Agreement, any and all Distributions, paid in respect of the Collateral; provided, however, if any such property is distributed in the form of shares of membership interest in the Issuer, such membership interest shall be pledged, and any certificates representing such membership interest delivered, to Lender (collectively, "<u>Collateral Payments and Distributions</u>").

(b)    After the occurrence of an Event of Default beyond all applicable notice, grace, or cure periods:

   (i)    all rights of Pledgor to exercise the voting, management, and other consensual rights which it would otherwise be entitled to exercise pursuant

to Section 7(a)(i) shall cease, and all such rights shall thereupon become vested in Lender who shall thereupon have the sole right to exercise such voting, management, and other consensual rights;

(ii)     all rights of Pledgor to receive the Collateral Payments and Distributions which Pledgor would otherwise be authorized to receive and retain pursuant to Section 7(a)(ii) shall cease, and all such rights shall thereupon become vested in Lender who shall thereupon have the sole right to receive and hold as Collateral such Collateral Payments and Distributions; and

(iii)     all Collateral Payments and Distributions which are received by Pledgor contrary to the provisions of paragraph (ii) of this Section 7(b) shall be received in trust for the benefit of Lender, shall be segregated from other funds of Pledgor, and shall forthwith be paid over to Lender as Collateral in the same form as so received (with any necessary endorsements).

(c)     In order to permit Lender to exercise the voting and other consensual rights which it may be entitled to exercise pursuant to Section 7(b)(i) and to receive all Collateral Payments and Distributions which it may be entitled to receive under Section 7(a)(ii) or Section 7(b)(ii), (i) Pledgor shall promptly execute and deliver (or cause to be executed and delivered) to Lender all such proxies, dividend payment orders, and other instruments as Lender may from time to time request, and (ii) without limiting the effect of the immediately preceding clause (i), Pledgor hereby grants to Lender an irrevocable proxy to vote the Pledged Interests and to exercise all other rights, powers, privileges, and remedies to which a holder of the Pledged Interests would be entitled (including, without limitation, giving or withholding written consents of members, calling special meetings of members, and voting at such meetings), which proxy shall be effective, automatically and without the necessity of any action (including any transfer of any Pledged Interests on the record books of the Issuer) by any other Person (including the Issuer or any officer or agent thereof), provided, however, Lender shall not exercise any rights granted under such proxy except upon the occurrence of an Event of Default.

(d)     Notwithstanding any of the foregoing, Pledgor agrees that this Agreement shall not in any way be deemed to obligate Lender to assume any of Pledgor's obligations, duties, expenses, or liabilities unless Lender otherwise expressly agrees to assume any or all of said obligations, duties, expenses, or liabilities in writing.

8.     Lender Appointed Attorney-in-Fact.    Pledgor hereby irrevocably appoints Lender as Pledgor's attorney-in-fact, with full authority in the place and stead of Pledgor and in the name of Pledgor, exercisable after the occurrence of an Event of Default, beyond all applicable notice, grace, or cure periods, from time to time in Lender's reasonable discretion to take any action and to execute any instrument that Lender may in good faith deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation:

(a) to ask, demand, collect, sue for, recover, compound, receive, and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral;

(b) to receive, endorse, and collect any instruments made payable to Pledgor representing any dividend or other distribution in respect of the Collateral or any part thereof and to give full discharge for the same; and

(c) to file any claims or take any action or institute any proceedings that Lender may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of Lender with respect to any of the Collateral.

9. <u>Standard of Care</u>. The powers conferred on Lender hereunder are solely to protect its interest in the Collateral and except as specifically set forth herein shall not impose any duty upon it to exercise any such powers. Except for the exercise of reasonable care in the custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, Lender shall have no duty as to any Collateral, it being understood that Lender shall have no responsibility for (a) ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders, or other matters relating to any Collateral, whether or not Lender has or is deemed to have knowledge of such matters, (b) taking any necessary steps (other than steps taken in accordance with the standard of care set forth above to maintain possession of the Collateral) to preserve rights against any parties with respect to any Collateral, (c) taking any necessary steps to collect or realize upon the Secured Obligations or any guaranty therefor, or any part thereof, or any of the Collateral, or (d) initiating any action to protect the Collateral against the possibility of a decline in market value. In no event shall the standard of care imposed upon Lender hereunder exceed the minimum applicable standard of care imposed under Section 9-207 of the UCC.

10. <u>Waiver of Defenses; Secured Obligations Not Affected</u>.

(a) Pledgor hereby waives and agrees not to assert or take advantage of any defense based on: (i) except for a breach of the standard of care set forth in <u>Section 9</u>, any lack of diligence by Lender in collection, protection or realization upon any Loan Collateral; (ii) the failure to make or give notice of presentment and demand for payment, or failure to make or give protest and notice of dishonor or of default to Pledgor or to any other party with respect to the Secured Obligations; (iii) any exculpation of liability of any party contained in the Loan Documents; (iv) the failure of Lender to perfect any security or to extend or renew the perfection of any security; (v) any valuation, stay, moratorium law or other similar law now or hereafter in effect or any right to require the marshalling of assets of Pledgor; (vi) any fraudulent, illegal or improper act by the Issuer or Pledgor; (vii) all rights and remedies, including, but not limited to, any rights of subrogation, contribution, reimbursement, exoneration or indemnification pursuant to any agreement, express or implied, or now or hereafter accorded by applicable law to any party; (viii) the right to a trial by jury in any manner related to this Agreement; and (ix) to the fullest extent permitted by law, any other legal, equitable or suretyship defenses

- 10 -

whatsoever to which Pledgor might otherwise be entitled, it being the intention that the obligations of Pledgor hereunder shall be absolute, unconditional and irrevocable.

(b)  All rights and remedies of Lender hereunder, and all obligations of Pledgor hereunder, shall be absolute and unconditional irrespective of, shall remain in full force and effect without regard to, and shall not be impaired by, any of the following, whether or not Pledgor shall have notice or knowledge thereof:

(i)  any lack of validity or enforceability of this Agreement or the Loan Documents or any other agreement or instrument relating to any of the foregoing;

(ii)  Pledgor has or had no legal existence or legal capacity or is under no legal obligation to discharge any of the Obligations, or if any of the Obligations have become irrecoverable from Pledgor by operation of law or for any other reason;

(iii)  the acceleration of the time for payment of any of the Obligations is stayed upon the insolvency, bankruptcy or reorganization of Pledgor, or for any other reason;

(iv)  any exercise or nonexercise, or any waiver, by Lender of any right, remedy, power or privilege under or in respect of any of the Obligations or any security therefor (including this Agreement);

(v)  any change in the time, manner, or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment, waiver, or modification of or any consent to any departure from the Loan Documents or any provision thereof;

(vi)  any exchange, release, or nonperfection of any interest in any Collateral, or any release or amendment or waiver of or consent to any departure from any guaranty, for all or any of the Obligations, or the taking of additional security for, or any other assurances of payment of, any of the Obligations; or

(vii)  any other circumstances (other than payment in full of the Secured Obligations) that might otherwise constitute a defense available to, or a discharge of, Issuer.

11.  <u>Events of Default</u>. An "<u>Event of Default</u>" shall exist if any of the following occurs:

(a)  The occurrence of an "*Event of Default*", as such term is defined in the Note and the other Loan Documents;

(b)  if any representation or warranty of Pledgor made herein, or in any certificate, report, financial statement or other instrument or document furnished to Lender shall have been false or misleading in any material respect when made; <u>provided</u>, <u>however</u>, that if such representation or warranty is, by its nature, capable of being

- 11 -

cured and is not reasonably likely to have a material adverse effect on Borrower, Guarantor, or the Mortgaged Property, and such representation or warranty was not intentionally false or misleading in any material respect when made, then the same shall not constitute an Event of Default hereunder *unless* Borrower does not cure the same within fifteen (15) days after Borrower becomes aware that such representation or warranty was false or misleading when made (as such time may be extended for up to thirty (30) days to cure same so long as Borrower is engaged in ongoing, good faith efforts to cure same);

(c)    Pledgor's failure to pay any fees, costs or other amounts as and when required to be paid under this Agreement within five (5) days after demand by Lender;

(d)    Except with respect to (i) the payment of money and (ii) the matters herein before and hereafter specified in this Section 11, if Pledgor shall default in the observance or performance of any covenant or agreement contained in this Agreement for fifteen (15) days after the giving by the Lender to Pledgor of notice thereof (provided, however, if such default cannot reasonably be cured within such fifteen (15) day period, then Pledgor shall have such additional time as is reasonable under the circumstances, so long as Pledgor commences such cure within the initial fifteen (15) day period and diligently and in good faith pursues such cure to completion, provided that in no event shall such additional time period exceed sixty (60) days); or

(e)    Any transfer made by Pledgor in violation of the provisions of this Agreement or any breach or violation by Pledgor of the provisions of Sections 4(a) or 6 (b)(iii), either of which shall be an immediate Event of Default hereunder without notice or opportunity to cure.

12.    <u>Remedies.</u>

(a)    If any Event of Default shall have occurred, then Lender may exercise in respect of the Collateral, in addition to all other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party on default under the UCC (whether or not the UCC applies to the affected Collateral), inclusive of the management rights of the Pledgor in the Issuer, as set forth in the Operating Agreement, and Lender may also in its sole discretion, without notice except as specified below, sell the Collateral or any part thereof in one or more parts at public or private sale, at any recognized exchange or broker's board or at any of Lender's offices or elsewhere, for cash, on credit, or for future delivery, at such time or times and at such price or prices and upon such other terms as Lender may deem commercially reasonable.  Lender may be the purchaser of any or all of the Collateral at any such sale, and Lender shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Secured Obligations as a credit on account of the purchase price for any Collateral payable by Lender at such sale.  Notwithstanding anything herein to the contrary, Pledgor shall have a right of redemption prior to a UCC sale of the Collateral in accordance

- 12 -

herewith. Each purchaser at any such sale shall hold the property sold absolutely free from any claim or right on the part of Pledgor, and Pledgor hereby waives all rights of redemption which such Pledgor now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted which might otherwise have been applicable subsequent to a UCC sale of the Collateral in accordance herewith. In addition, Pledgor hereby waives all rights of stay, and/or appraisal which Pledgor now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted. Lender shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. Pledgor hereby waives any claims against Lender arising by reason of the fact that the price at which any Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale, even if Lender accepts the first offer received and does not offer such Collateral to more than one offeree.

(b)     Pledgor recognizes that, by reason of certain prohibitions contained in the Securities Act of 1933, as from time to time amended (the "Securities Act"), and applicable state securities laws, Lender may be compelled, with respect to any sale of all or any part of the Collateral conducted without prior registration or qualification of such Collateral under the Securities Act and/or such state securities laws, to limit purchasers to those who will agree, among other things, to acquire the Collateral for their own account, for investment and not with a view to the distribution or resale thereof. Pledgor acknowledges that any such private sales may be at prices and on terms less favorable than those obtainable through a public sale without such restrictions (including, without limitation, a public offering made pursuant to a registration statement under the Securities Act) and, notwithstanding such circumstances, Pledgor agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner and that Lender shall have no obligation to engage in public sales and no obligation to delay the sale of any Collateral for the period of time necessary to permit the issuer thereof to register it for a form of public sale requiring registration under the Securities Act or under applicable state securities laws, even if such issuer would, or should, agree to so register it.

(c)     If Lender determines to exercise its right to sell any or all of the Collateral, then, upon Lender's written request, Pledgor shall, and Pledgor shall cause the Issuer to, furnish to Lender such information as Lender may request of Pledgor concerning Pledgor and the Collateral.

(d)     Without in any way limiting Lender's right to conduct a foreclosure sale in any manner which is considered commercially reasonable, Pledgor hereby agrees that any foreclosure sale conducted in accordance with the following provisions shall be considered a commercially reasonable sale and hereby irrevocably waives any right to contest any such sale:

- 13 -

(i)       Lender conducts the foreclosure sale in the State of New York,

(ii)      The foreclosure sale is conducted in accordance with the laws of the State of New York,

(iii)     Not less than five (5) days in advance of the foreclosure sale, Lender notifies Pledgor at the address set forth herein of the time and place of such foreclosure sale,

(iv)      The foreclosure sale is conducted by an auctioneer licensed in the State of New York and is conducted either (A) online via a teleconference or videoconference platform reasonably acceptable to Lender, or (B) in front of the New York Supreme Court located in New York City, such other New York State Court having jurisdiction over the Collateral, Lender's office (located in New York City), or Lender's agent's office (including Lender's attorney) (located in New York City), in each case on any Business Day between the hours of 9 a.m. and 5 p.m.  Further Borrower hereby waives any offsets, counterclaims or defenses to the commercial reasonableness of a foreclosure sale arising directly or indirectly from the existence and/or spread of the Coronavirus Disease (COVID-19) or any related strain or mutation thereof,

(v)       The notice of the date, time and location of the foreclosure sale is published in a widely circulated newspaper in New York once a week for four (4) consecutive weeks prior to the date of the foreclosure sale, and

(vi)      Lender sends notification of the foreclosure sale to all secured parties against Pledgor identified as a result of a search of the UCC financings statements in the filing offices located in the State of New York conducted not earlier than thirty (30) days before such notification date.

Notwithstanding Pledgor's agreement that any foreclosure sale conducted in accordance with the foregoing provisions shall be considered a commercially reasonable sale, the foregoing description of potential foreclosure sale procedures and the agreement of Pledgor that such procedures are commercially reasonable shall create no implication that a foreclosure sale conducted using different procedures is commercially unreasonable.  As used herein the term "foreclosure sale" shall be deemed to include a public auction as such term is used in the UCC.

13.    Application of Proceeds.  Except as expressly provided elsewhere in this Agreement, all proceeds received by Lender in respect of any sale of, collection from, or other realization upon all or any part of the Collateral may, in the discretion of Lender, be held by Lender as Collateral for, and/or then, or at any time thereafter, applied in full or in part by Lender against, the Secured Obligations in the following order of priority:

FIRST: To the payment of all costs and expenses of such sale, collection, or other realization, including compensation to Lender and its agents, the fees and expenses and disbursements of Lender's counsel, and all other expenses, liabilities, and advances made or incurred by Lender in connection therewith, and all amounts for which Lender is entitled

- 14 -

to indemnification hereunder and all advances made by Lender hereunder for the account of the Pledgor, and to the payment of all costs and expenses paid or incurred by Lender in connection with the exercise of any right or remedy hereunder, all in accordance with Section 14;

SECOND:  To the payment in full of the Secured Obligations, in the manner provided for in the Loan Documents; and

THIRD: To the payment to or upon the order of Pledgor, or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct, of any surplus then remaining from such proceeds.

14.   Indemnity and Expenses.

(a)   Pledgor agrees to indemnify Lender from and against any and all claims, losses, and liabilities in any way relating to, growing out of, or resulting from this Agreement and the transactions contemplated hereby (including, without limitation, enforcement of this Agreement), except to the extent such claims, losses, or liabilities result from Lender's gross negligence or willful misconduct, as finally determined by a court of competent jurisdiction.

(b)   Pledgor shall pay to Lender upon demand the amount of any and all costs and expenses, including the fees and expenses of its counsel and of any experts and agents, that Lender may incur in connection with (i) the sale of, collection from, or other realization upon, any of the Collateral, (ii) the exercise or enforcement of any of the rights of Lender hereunder, or (iii) the failure by Pledgor to perform or observe any of the provisions hereof.

15.   Continuing Security Interest.  This Agreement shall create a continuing security interest in the Collateral and shall (a) remain in full force and effect until the payment in full of all Secured Obligations and the Issuer has no further obligations under the Loan Documents, (b) be binding upon Pledgor and Pledgor's legal representatives, successors and assigns, and (c) inure, together with the rights and remedies of Lender hereunder, to the benefit of Lender and its successors, transferees and assigns.  Upon the payment in full of all Secured Obligations and the cancellation or termination of the Loan Documents, the security interest granted hereby shall terminate and all rights to the Collateral shall revert to Pledgor. Upon any such termination Lender will, at Pledgor's expense, execute and deliver to Pledgor such documents as Pledgor shall reasonably request to evidence such termination, and Pledgor shall be entitled to the return, upon Pledgor's request and at Pledgor's expense, against receipt and without recourse to Lender, of such of the Collateral as shall not have been sold or otherwise applied pursuant to the terms hereof.

16.   Amendments, Etc.  No amendment, modification, termination, or waiver of any provision of this Agreement, and no consent to any departure by Pledgor from the terms and conditions hereof, shall in any event be effective as to Pledgor unless the same shall be in writing and signed by Lender and, in the case of any such amendment or modification, by

- 15 -

Pledgor. Any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.

17. <u>Failure or Indulgence Not Waiver; Remedies Cumulative</u>. No failure or delay on the part of Lender in the exercise of any power, right, or privilege hereunder shall impair such power, right, or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right, or privilege preclude any other or further exercise thereof or of any other power, right, or privilege. All rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available.

18. <u>Severability</u>. In case any provision in or obligation under this Agreement shall be invalid, illegal, or unenforceable in any jurisdiction, the validity, legality, and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

19. <u>Headings</u>. Section and subsection headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

20. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document. Further, facsimile or electronic (e.g., .pdf format) copies of signatures shall be considered originals for purposes of binding the parties hereto.

21. <u>Marshalling</u>. Lender shall not be required to marshal any present or future security for (including, but not limited to, this Agreement and the Collateral), or other assurances of payment of, the Secured Obligations or any of them, or to resort to such security or other assurances of payment in any particular order. All of Lender's rights hereunder and in respect of such security and other assurances of payment shall be cumulative and in addition to all other rights, however existing or arising. To the extent lawfully permissible, Pledgor hereby agrees that Pledgor will not invoke any law, doctrine, or principle relating to the marshalling of collateral that might cause delay in or impede the enforcement of Lender's rights under this Agreement or under any other instrument evidencing any of the Secured Obligations or under which any of the Secured Obligations is outstanding or by which any of the Secured Obligations is secured or payment thereof is otherwise assured, and, to the extent that Pledgor lawfully may, Pledgor hereby irrevocably waives the benefits of all such laws.

22. <u>Notices, Etc</u>. All notices, requests and other communications to any party hereunder shall be in writing (including facsimile transmission followed by telephonic confirmation or similar writing) and shall be given to such party as follows: (i) to Lender, to the address set forth in the Loan Documents, and (ii) to Pledgor, to the following address:

Hello Living Developer Nostrand LLC

- 16 -

33 35th Street, 6th Floor, Suite B-613
Brooklyn, NY 11232
Attn: Eli Karp

with a copy in like manner to:

Jeffrey Zwick & Associates, P.C.
266 Broadway, Suite 403
Brooklyn, New York 11211
Attention: Jeffrey Zwick, Esq.

Any such addressee may change its address for such notices to any other address in the United States as such addressee shall have specified by written notice given as set forth above.

Each such notice, request or other communication shall be effective (i) if given by facsimile transmission, when such facsimile is transmitted to the facsimile number specified in this Section and the appropriate facsimile confirmation is received, (ii) if given by mail, on the earlier of actual receipt or three (3) Business Days after such communication is deposited in the mail with first class certified or registered mail, postage prepaid, addressed as aforesaid, (iii) if given by a nationally recognized overnight carrier, one (1) Business Day after such communication is deposited with such carrier with delivery charges prepaid, or (iv) if given by any other means, when delivered at the address specified in this Section.

23.  Delay Not Waiver.  No delay on Lender's part in exercising any right, power or privilege hereunder or under any of the Loan Documents shall operate as a waiver of any such privilege, power or right.  No waiver by Lender in any instance shall constitute a waiver in any other instance.

24.  Irrevocable Proxy.  With respect to Article 8 Matters and all other matters, including without limitation, the rights, remedies and powers granted by this Agreement, and to the extent applicable, Pledgor hereby irrevocably grants and appoints Lender, from the date of this Agreement until the payment in full of the Secured Obligations and the termination of all obligations of the Issuer under the Loan Documents, exercisable whether or not there has been an Event of Default hereunder or under the Loan Documents, as Pledgor's true and lawful proxy, for and in Pledgor's name, place and stead, to vote the Pledged Interests, whether directly or indirectly, beneficially or of record, now owned or hereafter acquired, with respect to such Article 8 Matters.  The proxy granted and appointed in this Section 24 shall include the right to sign Pledgor's name (as the holder of a membership interest in the Issuer) to any consent, certificate or other document relating to an Article 8 Matter and the related Pledged Interests that applicable law may permit or require and to cause the Pledged Interests to be voted in accordance with the preceding sentence.  Pledgor hereby represents and warrants that there are no other proxies and powers of attorney with respect to an Article 8 Matter.  Pledgor will not give a subsequent proxy or power of attorney or enter into any other voting agreement with respect to the Pledged Interests with respect to any Article 8 Matter and any attempt to do so with respect to an Article 8 Matter shall be void and of no effect.

- 17 -

THE PROXIES AND POWERS GRANTED BY PLEDGOR PURSUANT TO THIS AGREEMENT ARE COUPLED WITH AN INTEREST AND ARE GIVEN TO SECURE THE PERFORMANCE OF PLEDGOR'S OBLIGATIONS UNDER THIS AGREEMENT.

25.    Miscellaneous.

(a)    Any waiver, express or implied, of any provision hereunder and any delay or failure by Lender to enforce any provision shall not preclude Lender from enforcing any such provision thereafter.

(b)    Pledgor hereby authorizes Lender to file one or more financing statements describing all or part of the Collateral, and continuation statements, or amendments thereto, relative to all or part of the Collateral as authorized by applicable law. Such financing statements, continuation statements and amendments will contain any other information required by the UCC for the sufficiency or filing office acceptance of any financing statement, continuation statement or amendment, including whether Pledgor is an organization, the type of organization and any organizational identification number issued to Pledgor. Pledgor agrees to furnish any such information to Lender promptly upon request.

(c)    This Agreement shall be governed by and construed according to the internal laws of the State of New York, without regard to the conflict of law provisions thereof other than Sections 5-1401 and 5-1402 of the New York General Obligations Law. Pledgor and Lender hereby irrevocably (i) submit to the non-exclusive jurisdiction of any United States Federal or State court sitting in New York County, New York, in any action or proceeding arising out of or relating to this Agreement, and (ii) waive to the fullest extent permitted by law any defense asserting an inconvenient forum in connection therewith. Service of process by Lender in connection with such action or proceeding shall be binding on Pledgor if sent to Pledgor by registered or certified mail at its address specified above.

26.    WAIVER OF JURY TRIAL.  TO THE EXTENT ALLOWED BY APPLICABLE LAW, PLEDGOR AND LENDER EACH WAIVE TRIAL BY JURY WITH RESPECT TO ANY ACTION, CLAIM, SUIT OR PROCEEDING ON OR ARISING OUT OF THIS AGREEMENT.

[Remainder of page intentionally left blank; signature pages follow]

- 18 -

IN WITNESS WHEREOF, intending to be legally bound, Pledgor and Lender have caused this Agreement to be executed as of the date first above written.

**PLEDGOR:**

HELLO LIVING DEVELOPER NOSTRAND LLC,
a New York limited liability company

By: _____
Name: Eli Karp
Title:   Authorized Signatory

**LENDER:**

1580 NOSTRAND MEZZ LLC,
a Delaware limited liability company

By: _____
Name:
Title:

[Signature page to Ownership Interests Pledge and Security Agreement]

IN WITNESS WHEREOF, intending to be legally bound, Pledgor and Lender have caused this Agreement to be executed as of the date first above written.

**PLEDGOR:**

HELLO LIVING DEVELOPER NOSTRAND LLC,
a New York limited liability company

By: _____
Name: Eli Karp
Title:  Authorized Signatory

**LENDER:**

1580 NOSTRAND MEZZ LLC,
a Delaware limited liability company

By: _____
Name:  Joshua Zegen
Title:  Authorized Signatory

[Signature page to Ownership Interests Pledge and Security Agreement]

## JOINDER AND CONSENT OF THE ISSUER

The undersigned hereby (a) joins in the above Agreement for the sole purpose of consenting to the terms thereof; (b) agrees to cooperate fully and in good faith with the Lender and Pledgor in carrying out this Agreement (including, without limitation, by admitting Lender or its transferee (including from a secured party's sale) as a substituted member); (c) waives any transfer or other restrictions existing pursuant to Contractual Obligations, Organizational Documents, or otherwise (other than under any applicable securities laws), which otherwise might apply to the granting of the pledges and security interests hereunder, or to the exercise by the Lender of the rights and remedies provided in this Agreement or applicable law, at law or in equity, so as to, among other things, permit (x) Pledgor to enter into and perform Pledgor's obligations under this Agreement, and (y) the Lender's exercise of the Lender's rights and remedies hereunder and under applicable law, at law or in equity; (d) represents and warrants that the (i) Issuer has elected to have its membership interest deemed to be "securities" for the purposes of Articles 8 and 9 of the UCC, and any and all Certificates being delivered to Lender pursuant to the Agreement are each a "certificated security" (as defined by the UCC), (ii) Lender is duly noted in the Issuer's books and records as the sole pledgee of the Collateral, and (iii) Issuer will not recognize any transferee or pledgee of the Collateral other than Lender or pursuant to the exercise of Lender's rights and remedies under this Agreement; and (e) agrees to comply with any "instructions" (as defined in Section 8-102(a)(12) of the UCC) originated by the Lender in conformity with this Agreement without further consent of the Pledgor, including, without limitation, instructions regarding the transfer, redemption or other disposition of the Collateral or the proceeds thereof, including any Distributions with respect thereto (this clause (e) shall not be construed as expanding the rights of Lender to give instructions with respect to the Collateral beyond such rights set forth in the above Agreement).

Capitalized terms used and not otherwise defined herein shall have the meanings assigned to them in the Agreement.

IN WITNESS WHEREOF, intending to be legally bound, the undersigned has caused this Joinder and Consent to be executed as an instrument under seal of the date first above written.

**ISSUER:**

HELLO NOSTRAND LLC,
a New York limited liability company

By: _____
Name: Eli Karp
Title:  Authorized Signatory

[Signature page to Joinder and Consent of Issuer to Ownership Interests Pledge and Security Agreement]

## SCHEDULE A

### Pledged Interests

| PLEDGOR | ISSUER | INTERESTS PLEDGED |
|---------|--------|-------------------|
| **HELLO LIVING DEVELOPER NOSTRAND LLC**, a New York limited liability company | **HELLO NOSTRAND LLC**, a New York limited liability company | 100% membership interest |

# SCHEDULE B

## Consents

**<u>EXHIBIT E</u>**

**(Share Certificate)**

## SHARE CERTIFICATE
### THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY STATE. THE HOLDER OF THIS CERTIFICATE, BY ITS ACCEPTANCE HEREOF, REPRESENTS THAT IT IS ACQUIRING THIS SECURITY FOR INVESTMENT AND NOT WITH A VIEW TO ANY SALE OR DISTRIBUTION HEREOF. ANY TRANSFER OF THIS CERTIFICATE OR ANY MEMBERSHIP INTEREST REPRESENTED HEREBY IS SUBJECT TO THE TERMS AND CONDITIONS OF THE OPERATING AGREEMENT (AS DEFINED BELOW).

Certificate Number 1                                              100% Membership interest

        **HELLO NOSTRAND LLC**, a New York limited liability company (the "Company"), hereby certifies that **HELLO LIVING DEVELOPER NOSTRAND LLC**, a New York limited liability company (together with any assignee of this Certificate, the "Holder") is the registered owner of 100% of the Membership interest in the Company (the "Interests"). The rights, powers, preferences, restrictions and limitations of the Interests are set forth in, and this Share Certificate and the Interests represented hereby are issued and shall in all respects be subject to the terms and provisions of, the Operating Agreement of the Company dated as of November 28, 2017, as amended by a First Amendment to the Operating Agreement dated August 28, 2020, as the same may be amended or restated from time to time (collectively, the "Operating Agreement"). By acceptance of this Share Certificate, and as a condition to being entitled to any rights and/or benefits with respect to the Interests evidenced hereby, the Holder is deemed to have agreed to comply with and be bound by all the terms and conditions of the Operating Agreement. The Company will furnish a copy of the Operating Agreement to the Holder without charge upon written request to the Company at its principal place of business. Each Interest shall constitute a "security" within the meaning of (i) Section 8-102(a)(15) of the Uniform Commercial Code as in effect from time to time in the State of New York, and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995.

        This Share Certificate shall be governed by and construed in accordance with the laws of the State of New York, without regard to principles of conflicts of laws.

Dated as of: August 28, 2020

Share Certificate

IN WITNESS WHEREOF, the Company has caused this Certificate to be executed as of the date set forth above.

**HELLO NOSTRAND LLC,**
a New York limited liability company

By: _____
Name: Eli Karp
Title:   Authorized Signatory

**(REVERSE SIDE OF CERTIFICATE)**
**ASSIGNMENT OF INTERESTS**

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto _____, a 100% membership interest in **HELLO NOSTRAND LLC**, a New York limited liability company, effective as of the date specified in the Application for Transfer of Interests below, and irrevocably constitutes and appoints _____ and its authorized officers, as attorney-in-fact, to transfer the same on the books and records of the Company, with full power of substitution in the premises.

Dated:                     **HELLO LIVING DEVELOPER NOSTRAND LLC,**
a New York limited liability company

By: _____
Name: Eli Karp
Title: Authorized Signatory

**APPLICATION FOR TRANSFER OF INTERESTS**

The undersigned applicant (the "Applicant") hereby (a) applies for a transfer of the percentage of membership interest in the Company described above (the "Transfer") and applies to be admitted to the Company as a substitute member of the Company, (b) agrees to comply with and be bound by all of the terms and provisions of the Operating Agreement, (c) represents that the Transfer complies with the terms and conditions of the Operating Agreement, (d) represents that the Transfer does not violate any applicable laws and regulations, and (e) agrees to execute and acknowledge such instruments (including, without limitation, a counterpart of the Operating Agreement), in form and substance satisfactory to the Company, as the Company reasonably deems necessary or desirable to effect the Applicant's admission to the Company as a substitute member of the Company and to confirm the agreement of the Applicant to be bound by all the terms and provisions of the Operating Agreement with respect to the membership interest in the Company described above. Initially capitalized terms used herein and not otherwise defined herein are used as defined in the Operating Agreement.

The Applicant directs that the foregoing Transfer and the Applicant's admission to the Company as a Substitute Member shall be effective as of _____.

Name of Transferee: _____

Signature: _____
                        (Transferee)

Dated:                Address:

The Company has determined (a) that the Transfer described above is permitted by the Operating Agreement, (b) hereby agrees to effect such Transfer and the admission of the Applicant as a substitute member of the Company effective as of the date and time directed above, and (c) agrees to record, as promptly as possible, in the books and records of the Company the admission of the Applicant as a substitute member.

**HELLO NOSTRAND LLC,**
a New York limited liability company

By: _____

Name: Eli Karp

Title: Authorized Signatory

# EXHIBIT F

**(Instruction to Register Pledge)**

# INSTRUCTION TO REGISTER PLEDGE

As of August 28, 2020

To:   **HELLO NOSTRAND LLC ("Issuer")**

In accordance with the requirements of that certain **OWNERSHIP INTERESTS PLEDGE AND SECURITY AGREEMENT** dated as the date hereof (as it may be amended, supplemented or otherwise modified from time to time, the "**Pledge Agreement**"; capitalized terms used but not defined herein shall have the meanings given to them in the Pledge Agreement), granted by **HELLO LIVING DEVELOPER NOSTRAND LLC**, a New York limited liability company (the "**Pledgor**"), to and for the benefit of **1580 NOSTRAND MEZZ LLC**, a Delaware limited liability company (collectively with its successors and assigns, "**Pledgee**") you are hereby instructed to register the pledge of the following interests as follows:

All right, title and interest now owned or hereafter acquired by Pledgor in the following:

(a)      the Pledged Interests together with all rights to Distributions or other payments arising therefrom or relating thereto, and all options, rights, instruments, and other property or proceeds from time to time received, receivable, or otherwise distributable in respect of or in exchange for any or all of the Pledged Interests;

(b)      to the extent not covered by subparagraph (a), all rights to receive all income, gain, profit, loss, or other items allocated, allocable, distributed, or distributable to Pledgor under the Organizational Documents of the Issuer, and all general intangibles, accounts, investment property, payment intangibles, supporting obligations, other contract rights or rights to the payment of money, and all proceeds, as each of the foregoing terms is defined in the UCC, arising out of, or in connection with, the membership interest in Issuer;

(c)      all of Pledgor's ownership interest in any capital accounts in the Issuer;

(d)      all of Pledgor's voting, consent, management, management removal and replacement, and approval rights, and/or rights to control or direct the affairs of the Issuer, inclusive of the management rights of the Pledgor of the Issuer, as set forth in the Operating Agreement of the Issuer, dated November 28, 2017;

(e)      any additional ownership interests of, and any membership, partnership, or other ownership interests exchangeable for or convertible into and warrants, options, and other rights to purchase or otherwise acquire shares of ownership interests of, the Issuer, or entity which is the successor of the Issuer, from time to time acquired by Pledgor in any manner (all of which interests shall be deemed to be part of the Pledged Interests), and any certificates or other instruments representing such additional interests, warrants, options, and other rights, and all Distributions and other property or proceeds from time to time received, receivable, or otherwise distributed or distributable in respect of or in exchange for any or all of such additional shares, warrants, options, or other rights; and

(f)    to the extent not covered by clauses (a) through (e) above, all proceeds of any or all of the foregoing Collateral.  For purposes of this Instruction to Register Pledge, the term "proceeds" includes whatever is receivable or received when Collateral or proceeds are sold, exchanged, collected, or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes, without limitation, proceeds of any indemnity or guaranty payable to Pledgor from time to time with respect to any of the Collateral (collectively, the "**Collateral**");

(g)    all right, title and interest of the Pledgor in, to and under any policy of insurance payable by reason of loss or damage to the Pledged Interests and any other Collateral;

(h)    all "accounts", "general intangibles", "instruments" and "investment property" (in each case as defined in the UCC) constituting or relating to the foregoing; and

(i)    to the extent not otherwise part of the Collateral, all Proceeds, income and profits thereof and all property received in exchange or substitution thereof, of any of the foregoing property of Pledgor.

You are hereby further authorized and instructed to execute and deliver to Pledgee a Confirmation Statement and Instruction Agreement, substantially in the form of Exhibit A attached hereto and, to the extent provided more fully therein, to comply with the instructions of Pledgee in respect of the Collateral without further consent of, or notice to, Pledgor. Notwithstanding anything in this paragraph to the contrary, this instruction shall not be construed as expanding the rights of Pledgee to give instructions with respect to the Collateral beyond such rights set forth in the Pledge Agreement.

This Instruction to Register Pledge may be executed in one or more counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document.  Further, facsimile or electronic (e.g., .pdf format) copies of signatures shall be considered originals for purposes of binding the parties hereto.

**[NO FURTHER TEXT ON THIS PAGE]**

**SIGNATURES TO INSTRUCTION TO REGISTER PLEDGE**

PLEDGOR:

**HELLO LIVING**
**DEVELOPER NOSTRAND LLC,**
a New York limited liability company

By: _____
Name: Eli Karp
Title:   Authorized Signatory

ISSUER:

**HELLO NOSTRAND LLC,**
a New York limited liability company

By: _____
Name: Eli Karp
Title:   Authorized Signatory

PLEDGEE:

**1580 NOSTRAND MEZZ LLC,**
a Delaware limited liability company

By: _____
Name:
Title:

## SIGNATURES TO INSTRUCTION TO REGISTER PLEDGE

**PLEDGOR:**

**HELLO LIVING
DEVELOPER NOSTRAND LLC,**
a New York limited liability company

By: _____
Name: Eli Karp
Title: Authorized Signatory

**ISSUER:**

**HELLO NOSTRAND LLC,**
a New York limited liability company

By: _____
Name: Eli Karp
Title: Authorized Signatory

**PLEDGEE:**

**1580 NOSTRAND MEZZ LLC,**
a Delaware limited liability company

By: _____
Name: Joshua Zegen
Title: Authorized Signatory

## **EXHIBIT G**

**(Confirmation Statement and Instruction Agreement)**

## CONFIRMATION STATEMENT AND INSTRUCTION AGREEMENT

As of August 28, 2020

To:    **1580 NOSTRAND MEZZ LLC**

Pursuant to the requirements of that certain **OWNERSHIP INTERESTS PLEDGE AND SECURITY AGREEMENT** dated as the date hereof (as it may be amended, supplemented or otherwise modified from time to time, the "**Pledge Agreement**"; capitalized terms used but not defined herein shall have the meanings given to them in the Pledge Agreement), granted by **HELLO LIVING DEVELOPER NOSTRAND LLC**, a New York limited liability company (the "**Pledgor**"), to and for the benefit of **1580 NOSTRAND MEZZ LLC** (collectively with its successors and assigns, "**Pledgee**"), this Confirmation Statement and Instruction Agreement relates to those ownership interests owned by Pledgor (the "**Pledged Interests**", as defined in the Pledge Agreement), issued by **HELLO NOSTRAND LLC**, a New York limited liability company ("**Issuer**"). For purposes of perfecting the security interest of Pledgee therein, Issuer agrees as follows:

On the date hereof, the registered owner of the Pledged Interests is Pledgor.

The registered pledgee of the Pledged Interests is:

**1580 NOSTRAND MEZZ LLC**

There are no liens of Issuer on the Collateral or any adverse claims thereto for which Issuer has a duty under Section 8-403 of the UCC. Issuer has by book-entry registered the Collateral in the name of the registered pledgee on or before the date hereof. No other pledge is currently registered on the books and records of Issuer with respect to the Collateral.

Until the Loan is paid in full (exclusive of provisions which shall survive full payment), Issuer agrees to: (i) comply with the instructions of Pledgee sent in accordance with the Pledge Agreement, without any further consent from Pledgor or any other Person, in respect of the Collateral; and (ii) disregard any request made by Pledgor or any other Person which contravenes the instructions of Pledgee with respect to the Collateral. Notwithstanding anything in this paragraph, this Confirmation Statement and Instruction Agreement shall not be construed as expanding the rights of Pledgee to give instructions with respect to the Collateral beyond such rights set forth in the Pledge Agreement.

This instrument may be executed in one or more counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document. Further, facsimile or electronic (e.g., .pdf format) copies of signatures shall be considered originals for purposes of binding the parties hereto.

## SIGNATURES TO
## CONFIRMATION STATEMENT AND INSTRUCTION AGREEMENT

**PLEDGOR:**

**HELLO LIVING**
**DEVELOPER NOSTRAND LLC,**
a New York limited liability company

By: _____
Name: Eli Karp
Title:   Authorized Signatory

**ISSUER:**

**HELLO NOSTRAND LLC,**
a New York limited liability company

By: _____
Name: Eli Karp
Title:   Authorized Signatory

**PLEDGEE:**

**1580 NOSTRAND MEZZ LLC,**
a Delaware limited liability company

By: _____
Name:
Title:

## SIGNATURES TO
## CONFIRMATION STATEMENT AND INSTRUCTION AGREEMENT

**PLEDGOR:**

**HELLO LIVING
DEVELOPER NOSTRAND LLC,**
a New York limited liability company

By: _____
Name: Eli Karp
Title: Authorized Signatory


**ISSUER:**

**HELLO NOSTRAND LLC,**
a New York limited liability company

By: _____
Name: Eli Karp
Title: Authorized Signatory


**PLEDGEE:**

**1580 NOSTRAND MEZZ LLC,**
a Delaware limited liability company

By: _____
Name: Joshua Zegen
Title: Authorized Signatory

# EXHIBIT H

**(Omnibus Assignment of Loan Documents (Mezzanine Loan))**

## OMNIBUS ASSIGNMENT OF LOAN DOCUMENTS
## (MEZZANINE LOAN)

This OMNIBUS ASSIGNMENT OF LOAN DOCUMENTS (MEZZANINE LOAN) (this "**Assignment**") is made as of March 8 , 2022 by **1580 NOSTRAND MEZZ LLC**, a Delaware limited liability company, whose address is c/o Madison Realty Capital, 520 Madison Avenue, Suite 3501, New York, New York 10022 ("**Assignor**"), to **NOSTRAND MEZZ LENDER LLC**, a New York limited liability company, having offices at c/o Arch Companies, 15 West 27th Street, 6th Floor, New York, New York 10001 (together with its successors and/or assigns, as their interests may appear, the "**Assignee**").

### BACKGROUND FACTS

A.      Assignor is the holder of a certain loan in the original principal amount of up to THREE MILION AND 00/100 DOLLARS ($3,000,000.00) (as such loan has been and may be further amended, modified, extended, renewed, consolidated, reduced, spread or recast from time to time, the "**Loan**").

B.      The Loan is evidenced, described, governed, insured, and secured by, without limitation, a loan agreement, and various assignments, guaranties, financing statements, opinion letters, instruments, documents, and agreements including, without limitation, the promissory note fully described in Exhibit A (the "**Note**"); the pledge agreement as more specifically described in Exhibit A (the "**Pledge**"), the UCC Financing Statements listed on Exhibit A, the guarantees and all other documents listed on Exhibit A (as any of the foregoing from time to time may be modified, amended, assigned, continued, renewed, extended, superseded, exchanged, supplemented or restated, collectively, the "**Loan Documents**"). The Pledge affects the ownership interests in Hello Nostrand LLC, a New York limited liability company, the owner of the property commonly known as 1580 Nostrand Avenue, Brooklyn, New York, as more particularly described in Exhibit B attached hereto and made a part hereof.

C.      Assignor desires by this Assignment to sell, assign, transfer and convey to Assignee all of Assignor's right, title and interest in, to, and under the Loan Documents, and all related property and rights, as set forth herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      Background Facts. The Background Facts set forth above are agreed to be true and correct and incorporated herein by this reference.

2.      Assignment. Assignor does hereby grant, bargain, sell, assign, transfer and set over unto Assignee all of Assignor's right, title, interest, claim and demand in and to the Loan, the Note, the Pledge, and the other Loan Documents, together with all moneys, principal, interest, fees, and indemnities, due and to become due thereon, and including all rights, remedies and incidents thereunto belonging, and any collateral, security, demands, causes of action, certificates, bank accounts, operating accounts, reserve accounts, escrow accounts and other accounts, financial statements of the borrower under the Pledge and any guarantors and any other collateral arising out of and/or executed and/or delivered in or to or with respect to the Loan, all rights and benefits of Assignor related to the Loan Documents and such other documents, and all of Assignor's rights, title and interest in, to and

1

under all claims and choses in action related to the Loan and/or the Loan Documents, TO HAVE AND TO HOLD unto Assignee, its successors, and assigns forever.

3.    <u>Intentionally Omitted</u>.

4.    <u>Successors and Assigns</u>.  This Assignment shall be binding upon and shall inure to the benefit of the parties hereto, their respective legal representatives, successors and assigns.

5.    <u>Severability</u>.  In the event any provision of this Assignment is held to be invalid or unenforceable, such invalidity or unenforceability shall not affect the validity or enforceability of any other provision hereof.

6.    <u>Further Assurances</u>.  Assignor hereby agrees that it will execute such further documents and perform such further acts as may be reasonably necessary to properly consummate the transactions contemplated hereunder.

7.    <u>Governing Law</u>.  This Assignment shall be governed by the laws of the State of New York, without giving effect to the conflict of laws principles thereof (other than Section 5-1401 of the New York General Obligations Law).

8.    <u>Execution in Counterparts</u>.  This Assignment may be executed by one or more parties to this Assignment in any number of counterparts and all said counterparts taken together shall be deemed to constitute one and the same instrument.

*[The balance of this page is intentionally left blank]*

2

IN WITNESS WHEREOF, the Assignor has duly executed this Assignment as of the date first above written.

ASSIGNOR:

**1580 NOSTRAND MEZZ LLC,**
a Delaware limited liability company

By: _____
Name: Brian Shatz
Title:   Authorized Signatory

| | | |
|---|---|---|
| STATE OF NEW YORK | ) | |
| | ) | ss.: |
| COUNTY OF NEW YORK | ) | |

On the 1st day of March, in the year 2022, before me, the undersigned, a Notary Public in and for said State, personally appeared _____Brian Shatz_____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

MINELA MARKOVIC
QUALIFIED IN QUEENS COUNTY
STATE OF NEW YORK
No. 01MA6304001
COMM. EXP. 7/6/2025
NOTARY PUBLIC

## EXHIBIT A

Loan Documents

**Mezzanine Loan (each dated as of August 28, 2020, unless otherwise indicated):**

a.      *Mezzanine Promissory Note* in the principal amount of $3,000,000.00 made by Hello Living Developer Nostrand LLC, a New York limited liability company (the "Underlying Mezzanine Borrower") in favor of 1580 Nostrand Mezz LLC, a Delaware limited liability company (the "Underlying Mezzanine Lender").

b.      *Mezzanine Loan Agreement* by and between Underlying Mezzanine Borrower and Underlying Mezzanine Lender.

c.      *Conditional Guaranty* made by Eli Karp, an individual (the "Underlying Guarantor") in favor of Underlying Mezzanine Lender.

d.      *Environmental Indemnity Agreement* made by Underlying Mezzanine Borrower and Underlying Guarantor (collectively, "Indemnitor") in favor of Underlying Mezzanine Lender.

e.      *Subordination of Construction Contract* by and between Underlying Mezzanine Borrower and Supreme Builders & Developers, LLC, for the benefit of Underlying Mezzanine Lender.

f.      *Consent* made by manager, Eli Karp, of Underlying Mezzanine Borrower.

g.      *Designation of Independent Manager Agreement (*CT Corporation Staffing, Inc.).

h.      *Certification of Fee Owner.*

i.      *Share Certificate #1 with Endorsement* (in blank).

j.      *Ownership Interests Pledge and Security Agreement* ("Pledge Agreement") by and between Underlying Mezzanine Borrower and Underlying Mezzanine Lender.

k.      *Instruction to Register Pledge with Confirmation Statement.*

l.      *UCC-1 Financing Statement* in connection with Pledge Agreement.

m.      *Statement of Undertaking* made by Underlying Mezzanine Borrower and Underlying Guarantor for the benefit of Underlying Mezzanine Lender.

n.      *Owner's Policy with Mezzanine Financing Endorsement* issued by First American Title Insurance Company.

o.      Any and all other instruments, documents and agreements related to or executed in connection with the Mezzanine Loan affecting the ownership interests in Hello Nostrand LLC.

## EXHIBIT B

### Legal Description

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Brooklyn, County of Kings, State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the southerly side of Albermarle Road and the westerly side of Nostrand Avenue;

RUNNING THENCE in a southerly direction 271 feet and 3-1/2 inches to a point;

THENCE westerly 100 feet 1 inch to a point;

THENCE southerly parallel with East 29th Street, 25 feet to a point;

THENCE westerly 100 feet to a point on the easterly side of East 29th Street;

THENCE northerly 295 feet 4-1/2 inches to a point;

THENCE easterly parallel with Albermarle Road, 75 feet;

THENCE southerly parallel with East 29th Street, 100 feet;

THENCE easterly parallel with Albermarle Road, 25 feet;

THENCE northerly parallel with East 29th Street, 100 feet;

THENCE easterly 100 feet 1 inch to the point or place of BEGINNING.

FOR INFORMATION ONLY: Premises also known as 1580 Nostrand Avenue, Brooklyn, NY

Block 5131 Lot 1

**EXHIBIT I**

**(Conditional Guaranty)**

## CONDITIONAL GUARANTY

  **THIS CONDITIONAL GUARANTY** (this "**Guaranty**"), made as of August 28, 2020, by **ELI KARP**, an individual residing at 17 Tokay Lane, Monsey, New York 10952 (the "**Guarantor**"), in favor of **1580 NOSTRAND MEZZ LLC**, a Delaware limited liability company having offices at 520 Madison Avenue, Suite 3501, New York, NY 10022 (together with its successors and assigns, hereinafter, collectively, the "**Lender**").

## W I T N E S S E T H :

  A. WHEREAS, **HELLO LIVING DEVELOPER NOSTRAND LLC**, a New York limited liability company (the "**Borrower**"), has obtained a mezzanine loan in the principal amount of up to $3,000,000.00 (the "**Loan**") from Lender;

  B. WHEREAS, the Loan is evidenced by that certain Mezzanine Promissory Note dated as of the date hereof (the "**Note**"), executed by Borrower and payable to the order of Lender in the stated principal amount of up to $3,000,000.00, and secured by, *inter alia*, that certain Mezzanine Loan Agreement dated as of the date hereof, between Borrower and Lender (the "**Loan Agreement**") and that certain Ownership Interests Pledge and Security Agreement executed by Borrower in favor of Lender simultaneously herewith (the "**Pledge Agreement**"), affecting Borrower's membership interest (the "**Interests**") in HELLO NOSTRAND LLC, a New York limited liability company (the "**Property Owner**"), as more particularly described in the Loan Agreement;

  C. WHEREAS, on December 6, 2017 PROPHET MORTGAGE OPPORTUNITIES LP (the "**Original Mortgage Lender**"), originated those certain mortgage loans in the aggregate principal sum of up to $63,000,000.00 (collectively, the "**Original Mortgage Loans**") secured by those certain mortgages dated as of December 6, 2017 made by Property Owner to the Original Mortgage Lender, encumbering certain real property owned by the Property Owner situated in Kings County, New York State, and commonly known as 1580 Nostrand Avenue, Brooklyn, New York 11226, as more particularly described on <u>Exhibit A</u> attached hereto and incorporated herein by this reference, together with the buildings, structures and other improvements now or hereafter located thereon (said real property, buildings, structures and other improvements being hereinafter collectively referred to as the "**Property**"), and by other documents and instruments, which Original Mortgage Loans were thereafter assigned on June 7, 2019 by the Original Mortgage Lender to 1580 NOSTRAND AVE LLC, a Delaware limited liability company (collectively, together with its successors and/or assigns, the "**Mortgage Lender**");

  D. WHEREAS, on the date hereof Mortgage Lender originated that certain loan in the principal sum of up to $8,300,000.00 (the "**Second Land Mortgage Loan**", and together with the Original Mortgage Loans, collectively, the "**Mortgage Loans**") secured by that certain Mortgage and Security Agreement of even date herewith made by Property Owner to the Mortgage Lender, encumbering the Property, and by other documents and instruments;

  E. WHEREAS, for purposes herein, the Note, the Loan Agreement, the Pledge Agreement, this Guaranty and such other documents and instruments related to the Loan, as the

same may be from time to time amended, consolidated, renewed or replaced, being collectively referred to herein as the "**Loan Documents**";

F.     WHEREAS, initially capitalized terms not otherwise defined herein shall have the meanings given to such terms in the Loan Agreement; and

G.     WHEREAS, Guarantor is an owner, either directly or indirectly, of a beneficial interest in Borrower, the extension of the Loan to Borrower is of substantial benefit to Guarantor, and, therefore, Guarantor desires to enter into this Guaranty in favor of Lender.

NOW, THEREFORE, to induce Lender to extend the Loan to Borrower, and in consideration of the foregoing promises and for other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, Guarantor hereby covenants and agrees for the benefit of Lender, as follows:

1.     **Indemnity and Guarantee.**  Guarantor hereby assumes liability as a primary obligor for, hereby unconditionally guarantees payment to Lender of, hereby agrees to pay, protect, defend and save Lender harmless from and against, and hereby indemnifies Lender from and against any and all liabilities, obligations, losses, damages (including punitive damages and those resulting from the diminution in value of the Property), costs and expenses (including, without limitation, attorneys' fees), causes of action, suits, claims, demands and judgments of any nature or description whatsoever (collectively, "**Costs**") which may at any time be imposed upon, incurred by or awarded against Lender as a result of:

(a)     fraud or misrepresentation or failure to disclose a material fact by Borrower, Guarantor, any of Borrower's officers, agents, attorneys, principals, general partners, managing members or employees, or other person authorized or apparently authorized to make statements, representations or disclosures on behalf of Borrower or guarantor or indemnitor in connection with the Loan, including without limitation, the origination of the Loan and the performance of Borrower's obligations under the Loan Documents;

(b)     the gross negligence or willful misconduct of Borrower, Guarantor, or any of their respective principals, officers, general partners, members, authorized agents or authorized employees;

(c)     waste committed on the Property or Improvements (as such term is used in that certain Mortgage and Security Agreement dated as of as of the date hereof made by Property Owner to Mortgage Lender in the principal sum of up to $8,300,000.00 (the "**Second Land Mortgage**")), or damage to the Property or Improvements as a result of the misconduct or gross negligence of the Property Owner, the Borrower or any of its principals, officers, general partners or members, any guarantor, any indemnitor, or any agent or employee of any such persons;

(d)     the breach of any representation, warranty, covenant or indemnification provision in that certain Environmental Indemnity Agreement dated as of the date hereof by and among Borrower and Guarantor in favor of Lender;

(e) the removal or disposal of any portion of the Interests and/or the Property (or Improvements) in violation of the terms of the Loan Documents, to the full extent of the losses or damages incurred by Lender on account of such occurrence;

(f) the misapplication, misappropriation or conversion by Borrower or Property Owner of (i) any insurance proceeds paid by reason of any loss, damage or destruction to the Property, (ii) any awards or other amounts received in connection with the condemnation of all or a portion of the Property, (iii) Rents (as such term is defined in that certain Assignment of Leases and Rents dated as of the date hereof made by Property Owner to Mortgage Lender (the "**Second Land ALR**")) received by Borrower or applicable to a period after the occurrence of an Event of Default or any event which with notice or the passage of time, or both, would constitute an Event of Default, which are not either applied to the ordinary and necessary expenses of owning and operating the Property or paid to Lender, or (iv) any Rents paid more than one month in advance;

(g) if the Property becomes subject to any mechanic's, materialman's liens or other lien other than a lien for local real estate taxes and assessments not then due and payable and such lien shall remain undischarged of record (by payment, bonding or otherwise) within thirty (30) days, or if the Outstanding Mechanics' Liens (as defined in the Forbearance Agreement) are not fully resolved and removed as encumbrances upon the Property within thirty (30) days following the date hereof (which time period shall not be subject to any notice, grace, or cure periods, notwithstanding anything to the contrary set forth in the Loan Documents or the Forbearance Agreement);

(h) all tenant security deposits or other refundable deposits paid to or held by Borrower or any other person or entity in connection with the Leases (as defined in the Mortgage) which are not applied in accordance with the terms of the applicable Leases;

(i) the failure to obtain and maintain or cause to be maintained the fully paid for Policies (as such term is defined in that certain Second Land Mortgage dated as of the date hereof made by and between Property Owner and the Mortgage Lender in accordance with Section 4 of the Second Land Mortgage, or to pay or provide or cause to be provided the amount of any insurance deductible, to the extent of the applicable deductible, following a casualty event or other insured event;

(j) unauthorized transfer of or other voluntary encumbrance on the Interests and/or the Property that is prohibited under the Loan Documents;

(k) Borrower fails to maintain its status as a single asset entity, as required by and in accordance with the terms and provisions of, the Loan Agreement;

(l) Borrower's inability to furnish to Lender cancelled share certificates representing Interests in Property Owner, and any resulting adverse impact upon the Pledge Agreement or the Interests, or upon Lender's pursuit of remedial actions under the Pledge Agreement or the other Loan Documents in connection with the Interests;

(m)     the simultaneous organization of Hello Nostrand Holdings LLC in New York and Delaware, it being acknowledged by Lender that Borrower has agreed to terminate the New York filing in connection with the closing of the Loan;

(n)     Borrower fails or fails to cause Property Owner to obtain Lender's prior written consent: (x) to any alteration, modification, or change to an existing lease or (y) prior to entering into a new lease, or any other breach or default by Property Owner of the terms of the Second Land ALR; and

(p)     Borrower fails or fails to cause Property Owner to obtain Lender's prior written consent to any assignment, transfer, or conveyance of the Property or any interest therein as required by the Loan Agreement, or any breach or default by Borrower of <u>Section 9.6</u> of the Loan Agreement.

Notwithstanding anything to the contrary in the Note, the Loan Agreement or any of the Loan Documents, (A) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the Debt (as defined below) or to require that all collateral shall continue to secure all of the Debt owing to Lender in accordance with the Note, the Loan Agreement and the Loan Documents, and (B) the Guarantor shall liable for the full amount of the Debt in the event that: (i) <u>Intentionally Omitted</u>; (ii) Borrower fails to obtain Lender's prior written consent to any subordinate financing or other voluntary lien encumbering the Property; (iii) <u>Intentionally Omitted</u>, or (iv) a receiver, liquidator or trustee of Borrower or of Guarantor shall be appointed or if Borrower, the Property Owner or Guarantor shall be adjudicated a bankrupt or insolvent, or if any petition for Borrower's or Guarantor's bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by, consented to, or acquiesced in by, Borrower, Property Owner or Guarantor or if any proceeding for the dissolution or liquidation of Borrower, Property Owner or of Guarantor shall be instituted by Borrower or Guarantor, or (v) Borrower, Property Owner or Guarantor (or any person comprising such Guarantor) or any Related Party (as hereinafter defined) of any of the foregoing shall, in connection with any enforcement action or exercise or assertion of any right or remedy by or on behalf of Lender under or in connection with the Note, the Loan Agreement or any of the Loan Documents, asserts a defense, seeks judicial intervention or injunctive or other equitable relief of any kind or asserts in a pleading filed in connection with a judicial proceeding any defense against Lender or any right in connection with any security for the Loan which the court in such action or proceeding determines is without merit (in respect of a defense) or unwarranted (in respect of a request for judicial intervention or injunctive or other equitable relief), (vi) a claim is made by any party that the Loan Documents were not properly authorized or otherwise consented to upon the origination of the Loan or at any other time; and/or (vii) Borrower fails to maintain its status as a single asset entity, as required by, and in accordance with the terms and provisions of, the Loan Agreement; and/or (viii) if Borrower opts out of Article 8 of the appliable Uniform Commercial Code in contravention of its organizational documents in effect as of the date hereof. **"Related Party"** shall mean any person or entity which owns a direct or indirect interest in Borrower, Property Owner or Guarantor (or any person comprising such Guarantor), or which is owned or controlled by or under common ownership or control with Borrower or any such Guarantor.

4

The term **"Debt"** as used in this Guaranty shall mean the principal sum evidenced by the Note and secured by the Loan Agreement, or so much thereof as may be outstanding from time to time, together with interest thereon at the rate of interest specified in the Note and all other sums other than principal or interest which may or shall become due and payable pursuant to the provisions of the Note, the Loan Agreement or the other Loan Documents.

The Guarantor also agrees to pay any and all costs and expenses (including, without limitation, all fees and disbursements of counsel) which may be paid or incurred by Lender in connection with the enforcement of this Guaranty. The foregoing shall not in any manner impair or release the Debt evidenced by the Note or the other Loan Documents or otherwise impair or derogate from the Lender's ability to enforce its rights under the Loan Documents.

The term **"Guaranteed Recourse Obligations of Borrower"** means all obligations and liabilities of Guarantor set forth in this Paragraph 1 for which Borrower shall be personally liable pursuant to the Note.

2.   **Guarantee Absolute.**   The Guarantor guarantees that, to the extent of the Guaranteed Recourse Obligations of Borrower, the Debt will be paid strictly in accordance with the terms of the Note or any requirement of law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of Lender with respect thereto. The liability of the Guarantor hereunder shall be absolute and unconditional irrespective of:

(a)   any lack of validity or enforceability of the Note, the Loan Agreement the other Loan Documents or any other agreement between Lender and the Borrower relating thereto;

(b)   any change in the time, manner, place of payment of the indebtedness under, or in any other term of, or any other amendment or waiver of, or any consent to, departure from, or any agreement between the Borrower and Lender, including, without limitation, the Note, the Loan Agreement or the other Loan Documents;

(c)   the insolvency of, or voluntary or involuntary bankruptcy, assignment for the benefit of creditors, reorganization or other similar proceedings affecting, the Borrower or any of its assets; or

(d)   any other circumstance which might otherwise constitute a defense available to, or a discharge of, the Borrower in respect of the Debt or of the Guarantor in respect of this Guaranty.

No payment made by the Guarantor, any other guarantor or any other person or entity, or received or collected by the Lender from the Guarantor, any other guarantor or any other person or entity by virtue of any action or proceeding or set off or application at any time in reduction of or in payment of the Debt shall be deemed to modify, release or otherwise affect the liability of Guarantor under this Guaranty. Notwithstanding any such payments received or collected by the Lender in connection with the Debt, Guarantor shall remain liable for the balance of the Guaranteed Recourse Obligations of the Borrower until the Debt is paid in full. This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of the Debt or any portion thereof is rescinded or must otherwise be returned by the

5

Lender upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, all as though such payment had not been made.

Lender shall not be required to inquire into the powers of the Borrower or any of its members, partners, managers or other agents acting or purporting to act on its behalf, and monies, advances, renewals or credits described in the Loan Documents in fact borrowed or obtained from Lender in professed exercise of such powers shall be deemed to form part of the debts and liabilities hereby guaranteed, notwithstanding that such borrowing or obtaining of monies, advances, renewals, or credits shall be in excess of the powers of the Borrower, or of its members, partners, managers or other agents aforesaid, or be in any way irregular, defective or informal.

3.      **Dealing with the Borrower and Others.**

(a)      The Guaranteed Recourse Obligations of Borrower shall not be released, discharged, limited or in any way affected by anything done, suffered or permitted by Lender in connection with any monies or credit advanced by Lender to the Borrower or any security therefor, including any loss of or in respect of any security received by Lender from the Borrower or others. It is agreed that Lender, without releasing, discharging, limiting or otherwise affecting in whole or in part the Guaranteed Recourse Obligations of Borrower and liabilities hereunder, may, without limiting the generality of the foregoing:

i.      grant time, renewals, extensions, indulgences, releases and discharges to the Borrower and any other person or entity guaranteeing payment of or otherwise liable with respect to the Debt (each such person and entity, an "**Obligor**");

ii.      take or abstain from taking security or collateral from the Borrower or any Obligor or from perfecting security or collateral of the Borrower or any Obligor;

iii.      accept compromises from the Borrower or any Obligor;

iv.      apply all monies at any time received from the Borrower or any Obligor upon such part of the obligations as Lender may see fit; or

v.      otherwise deal with the Borrower or any Obligor as Lender may see fit.

(b)      Lender shall not be bound or obliged to exhaust recourse against the Borrower or any other Obligor or any security, guarantee, indemnity, loan agreement or collateral it may hold or take any other action (other than make demand pursuant to this Guaranty) before being entitled to payment from the Guarantor hereunder; and

(c)      Any account settled by or between Lender and the Borrower shall be accepted by the Guarantor as conclusive evidence that the balance or amount thereby appearing due to Lender is so due.

4.      **Reinstatement of Obligations**. If at any time all or any part of any payment made by Guarantor or received by Lender from Guarantor under or with respect to this Guaranty is or must be rescinded or returned for any reason whatsoever (including, but not limited to, the

insolvency, bankruptcy or reorganization of Borrower or Guarantor), then the obligations of Guarantor hereunder shall, to the extent of the payment rescinded or returned, be deemed to have continued in existence, notwithstanding such previous payment made by Guarantor, or receipt of payment by Lender, and the obligations of Guarantor hereunder shall continue to be effective or be reinstated, as the case may be, as to such payment, all as though such previous payment by Guarantor had never been made.

     5.    **Waivers by Guarantor**. To the extent permitted by law, Guarantor hereby waives and agrees not to assert or take advantage of (as a defense or otherwise):

     (a)    Any right to require Lender to proceed against Borrower or any other Person or to proceed against or exhaust any security held by Lender at any time or to pursue any other remedy in Lender's power or under any other agreement before proceeding against Guarantor hereunder;

     (b)    The defense of the statute of limitations in any action hereunder;

     (c)    Any defense that may arise by reason of the incapacity, lack of authority, death or disability of any other person or persons or the failure of Lender to file or enforce a claim against the estate (in administration, bankruptcy or any other proceeding) of any other Person or Persons;

     (d)    Any failure on the part of Lender to ascertain the extent or nature of any property (whether real or personal), rights, estates and interests now or at any time hereafter securing the payment of the Note and/or the other obligations of Borrower under the Loan Documents whether held by Lender or by any person or entity on Lender's behalf or for Lender's account (the "**Collateral**") or any insurance or other rights with respect thereto, or the liability of any party liable for the Loan Documents or the obligations evidenced or secured thereby;

     (e)    Demand, presentment for payment, notice of nonpayment, protest, notice of protest and all other notices of any kind, or the lack of any thereof, including, without limiting the generality of the foregoing, notice of the existence, creation or incurring of any new or additional indebtedness or obligation or of any action or non-action on the part of Borrower, Lender, any endorser or creditor of Borrower or of Guarantor or on the part of any other person whomsoever under this or any other instrument in connection with any obligation or evidence of indebtedness held by Lender;

     (f)    Any defense based upon an election of remedies by Lender;

     (g)    Any right or claim of right to cause a marshalling of the assets of Guarantor;

     (h)    Any principle or provision of law, statutory or otherwise, which is or might be in conflict with the terms and provisions of this Guaranty;

     (i)    Any duty on the part of Lender to disclose to Guarantor any facts Lender may now or hereafter know about Borrower or the Property or the Collateral (as such term is defined in the Pledge Agreement), regardless of whether Lender has reason to believe that any such facts materially increase the risk beyond that which Guarantor intends to assume or has reason to believe that such facts are unknown to Guarantor or has a reasonable opportunity to

communicate such facts to Guarantor, it being understood and agreed that Guarantor is fully responsible for being and keeping informed of the financial condition of Borrower, of the condition of the Property and Interests and of any and all circumstances bearing on the risk that liability may be incurred by Guarantor hereunder;

(j)     Any lack of notice of disposition or of manner of disposition of any Collateral;

(k)     Failure to properly record any document or any other lack of due diligence by Lender in creating or perfecting a security interest in or collection, protection or realization upon any Collateral or in obtaining reimbursement or performance from any person or entity now or hereafter liable for the Loan Documents or any obligation secured thereby;

(l)     The inaccuracy of any representation or other provision contained in any Loan Document;

(m)     Any sale or assignment of the Loan Documents, or any interest therein;

(n)     Any sale or assignment by Borrower of any Collateral, or any portion thereof or interest therein, whether or not consented to by Lender;

(o)     Any invalidity, irregularity or unenforceability, in whole or in part, of any one or more of the Loan Documents;

(p)     Any lack of commercial reasonableness in dealing with any Collateral;

(q)     Any deficiencies in any Collateral or any deficiency in the ability of Lender to collect or to obtain performance from any persons or entities now or hereafter liable for the payment and performance of any obligation hereby guaranteed;

(r)     An assertion or claim that the automatic stay provided by 11 U.S.C. § 362 (arising upon the voluntary or involuntary bankruptcy proceeding of Borrower) or any other stay provided under any other debtor relief law (whether statutory, common law, case law or otherwise) of any jurisdiction whatsoever, now or hereafter in effect, which may be or become applicable, shall operate or be interpreted to stay, interdict, condition, reduce or inhibit the ability of Lender to enforce any of its rights, whether now or hereafter acquired, which Lender may have against Guarantor or any Collateral;

(s)     Any modifications of the Loan Documents or any obligation of Borrower relating to each Loan by operation of law or by action of any court, whether pursuant to the Bankruptcy Reform Act of 1978, as amended, or any other debtor relief law (whether statutory, common law, case law or otherwise) of any jurisdiction whatsoever, now or hereafter in effect, or otherwise;

(t)     Any change in the composition of Borrower, including, without limitation, the withdrawal or removal of Guarantor from any current or future position of ownership, management or control of Borrower;

(u)     The release of Borrower or of any other person or entity from performance

8

or observance of any of the agreements, covenants, terms or conditions contained in any of the Loan Documents by operation of law, Lender's voluntary act or otherwise; and

        (v)    Any action, occurrence, event or matter consented to by Guarantor under Section 10(h) hereof, under any other provision hereof, or otherwise.

6.    **Additional Waivers**.

        (a)    In addition to all the other waivers agreed to and made by Guarantor as set forth in this Guaranty, Guarantor hereby waives all rights and defenses that Guarantor may have because Borrower's debt is secured by real property. This means, among other things:

        i.    Lender may collect from Guarantor without first foreclosing on any real or personal property collateral pledged by Borrower.

        ii.    If Lender forecloses on any real property collateral pledged by Borrower:

        1)    The amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price, except as provided in Section 1371 of the New York Real Property Actions and Proceedings Law; and

        2)    Lender may collect from Guarantor even if Lender, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Borrower.

        (b)    This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because Borrower's debt is secured by real property. Guarantor further hereby waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantor's rights of subrogation and reimbursement against the principal.

        (c)    Without limiting the generality of any of the waivers contained in this Guaranty, Guarantor also waives i. any defense based upon Lender's election to waive its lien as to all or any security for the Loan pursuant to any applicable law, and ii. any and all benefits which might otherwise be available to Guarantor.

        (d)    Without limiting the generality of any of the waivers contained in this Guaranty, Guarantor also waives any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in any other respects more burdensome than that of a principal. In this regard, Guarantor acknowledges that Lender's recourse against Borrower for any of the obligations guaranteed hereby may be restricted impaired or prohibited by reason of Lender's election of remedies or other protections afforded debtors under New York law and agrees that no such restriction, impairment or prohibition shall have any effect on Guarantor's obligations to pay and perform the obligations guaranteed hereby under this Guaranty.

7. **Suretyship Waivers**. Guarantor understands and acknowledges that if Lender forecloses judicially or nonjudicially against any real property security for the Note, that foreclosure could impair or destroy any ability that Guarantor may have to seek reimbursement, contribution or indemnification from Borrower or others based on any right Guarantor may have of subrogation, reimbursement, contribution or indemnification for any amounts paid by Guarantor under this Guaranty. Guarantor further understands and acknowledges that in the absence of this provision, the potential impairment or destruction of Guarantor's rights, if any, may entitle Guarantor to assert a defense to this Guaranty. By executing this Guaranty, Guarantor freely, irrevocably and unconditionally: (i) waives and relinquishes that defense, and agrees that Guarantor will be fully liable under this Guaranty, even though Lender may foreclose judicially or nonjudicially against any real property security for the Note; (ii) agree that Guarantor will not assert that defense in any action or proceeding that Lender may commence to enforce this Guaranty; (iii) acknowledge and agree that the rights and defenses waived by Guarantor under this Guaranty include any right or defense that Guarantor may have or be entitled to assert; and (iv) acknowledges and agrees that Lender is relying on this waiver in making the Loan, and that this waiver is a material part of the consideration that Lender is receiving for making the Loan.

8. **Remedies**. A separate action may be brought to enforce the provisions hereof, which shall in no way be deemed to be an action on the Note, whether or not any Loan has been repaid and whether or not Lender would be entitled to a deficiency judgment following a judicial foreclosure, trustee's sale or sale under the applicable Uniform Commercial Code.

9. **Representations and Warranties.** The Guarantor hereby represents and warrants to Lender that:

(a) the Guarantor is not insolvent (as such term is defined in the debtor/creditor laws of the State of New York);

(b) the execution, delivery and performance of this Guaranty will not (i) make Guarantor insolvent (as such term is defined in the debtor/creditor laws of the State of New York), or (ii) violate any provision of any requirement of law or contractual obligation of Guarantor and will not result in or require the creation or imposition of any lien on any of the properties or revenues of Guarantor pursuant to any requirement of law or contractual obligation of Guarantor;

(c) the Guarantor has all requisite power and authority to execute, deliver and perform his obligations under this Guaranty;

(d) the execution, delivery of this Guaranty and the performance by the Guarantor of his obligations hereunder does not and will not contravene, violate or conflict with any requirement of law, and does not and will not contravene, violate or conflict with, or result in a breach of or default under, the operating agreement of Borrower, or any contractual obligation to which Guarantor or his assets is or are subject, and does not require or result in the creation or imposition of any lien in favor of any person or entity other than Lender;

(e) the execution and delivery hereof and the performance by the Guarantor of his obligations hereunder does not and will not contravene, violate or conflict with, or result in a breach of or default under, any indenture, security instrument, deed of trust, ground lease, contract,

assignment, agreement or other instrument to which the Borrower or the assets of the Borrower are subject;

(f)     no consent of any other party (including, without limitation, any partner, or any creditor of the Guarantor or Borrower) is required that has not been obtained by the Guarantor; and

(g)     this Guaranty has been duly executed and delivered by Guarantor and is the legal, valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, moratorium, insolvency, reorganization or similar laws affecting creditors' rights generally.

Guarantor warrants and represents that Guarantor is fully aware of the financial condition of Borrower and is executing and delivering this Guaranty based solely upon Guarantor's own independent investigation of all matters pertinent hereto, and that Guarantor is not relying in any manner upon any representation or statement of Lender. Guarantor warrants, represent and agree that Guarantor is in a position to obtain, and Guarantor hereby assumes full responsibility for obtaining, any additional information concerning the financial condition of Borrower and any other matter pertinent hereto, and that Guarantor is not relying upon Lender to furnish, and shall have no right to require Lender to obtain or disclose, any information with respect to the indebtedness or obligations guaranteed hereby, the financial condition or character of Borrower or the ability of Borrower to pay the indebtedness or perform the obligations guaranteed hereby, the existence of any collateral or security for any or all of such indebtedness or obligations, the existence or nonexistence of any other guaranties of all or any part of such indebtedness or obligations, any actions or non-action on the part of Lender, Borrower or any other person or entity, or any other matter, fact or occurrence whatsoever. By executing this Guaranty, Guarantor acknowledges and knowingly accepts the full range of risks encompassed within a contract of indemnity or guaranty.

10.     **General Provisions**.

(a)     Intentionally Omitted.

(b)     Unsecured Obligations. Guarantor hereby acknowledges that Lender's appraisal of the Property is such that Lender is not willing to accept the consequences of the inclusion of Guarantor's guaranty set forth herein among the obligations secured by the Pledge Agreement and the other Loan Documents and that Lender would not make the Loan but for the unsecured personal liability undertaken by Guarantor herein.

(c)     Survival. This Guaranty shall be deemed to be continuing in nature and shall remain in full force and effect and shall survive the payment of the indebtedness evidenced and secured by the Loan Documents and the exercise of any remedy by Lender under the Loan Agreement or any of the other Loan Documents, including, without limitation, any foreclosure or deed in lieu thereof, even if, as a part of such remedy, the Loan are paid or satisfied in full.

(d)     No Subrogation; No Recourse Against Lender. Notwithstanding the satisfaction by Guarantor of any liability hereunder, no Guarantor shall have any right of

subrogation, contribution, reimbursement or indemnity whatsoever or any right of recourse to or with respect to the assets or property of Borrower or to any Collateral until the expiration of ninety-one (91) days following payment of the Loan in full. In connection with the foregoing, Guarantor expressly waives, until the expiration of ninety-one (91) days following payment of the Loan in full, any and all rights of subrogation to Lender against Borrower, and Guarantor hereby waives any rights to enforce any remedy which Lender may have against Borrower and any right to participate in any Collateral. In addition to and without in any way limiting the foregoing, Guarantor hereby subordinates any and all indebtedness of Borrower now or hereafter owed to Guarantor to all indebtedness of Borrower to Lender, and agrees with Lender that Guarantor shall not demand or accept any payment of principal or interest from Borrower, shall not claim any offset or other reduction of Guarantor's obligations hereunder because of any such indebtedness and shall not take any action to obtain any of the Collateral. Further, no Guarantor shall have any right of recourse against Lender by reason of any action Lender may take or omit to take under the provisions of this Guaranty or under the provisions of any of the Loan Documents.

(e)     Reservation of Rights. Nothing contained in this Guaranty shall prevent or in any way diminish or interfere with any rights or remedies, including, without limitation, the right to contribution, which Lender may have against Borrower, Guarantor or any other party under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (codified at Title 42 U.S.C. § 9601 et seq.), as it may be amended from time to time, or any other applicable federal, state or local laws, all such rights being hereby expressly reserved.

(f)     Financial Statements; Compliance Certificate. Guarantor hereby agrees, as a material inducement to Lender to make the Loan to Borrower, to furnish to Lender promptly upon demand by Lender current and dated financial statements detailing the assets and liabilities of Guarantor as required by the Loan Agreement, certified by Guarantor, in form and substance acceptable to Lender. Guarantor hereby warrants and represents unto Lender that any and all balance sheets, net worth statements and other financial data which have heretofore been given or may hereafter be given to Lender with respect to Guarantor did or will at the time of such delivery fairly and accurately present the financial condition of Guarantor in all material respects.

(g)     Rights Cumulative; Payments. Lender's rights under this Guaranty shall be in addition to all rights of Lender under the Note, the Loan Agreement, the Pledge Agreement, and the other Loan Documents. Further, payments made by Guarantor under this Guaranty shall not reduce in any respect Borrower's obligations and liabilities under the Note, the Loan Agreement, the Pledge Agreement and the other Loan Documents.

(h)     No Limitation on Liability. Guarantor hereby consents and agrees that Lender may at any time, and from time to time, without further consent from Guarantor, do, make, grant, consent or agree to any of the following, and the liability of Guarantor under this Guaranty shall be unconditional and absolute and shall in no way be impaired or limited by any of the following, whether with or without notice to Borrower or Guarantor or with or without consideration: (i) release and surrender the Collateral or any portion thereof; (ii) substitute for any Collateral held by or on behalf of Lender other collateral of like kind, or of any kind; (iii) make overadvances or increase the amount of the Loan; (iv) extend the time for performance required by any of the Loan Documents or extend or renew the Note; (v) sue upon or foreclose the Note, the Loan Agreement, the Pledge Agreement, or any of the other Loan Documents; (vi) sell or transfer the Property or the Collateral (as such term is defined in the Pledge Agreement) subsequent

12

to foreclosure; (vii) release Borrower, Guarantor or any other person or entity from performance or observance of any of the agreements, covenants, terms or conditions contained in any of the other Loan Documents by operation of law, Lender's voluntary act or otherwise; (viii) agree to modify the terms of any one or more of the Loan Documents; (ix) sell, assign or otherwise transfer the Note, the Loan Agreement, the Pledge Agreement and/or any other Loan Documents or any interest therein; or (x) take or fail to take any action of any type whatsoever. No such action which Lender shall take or fail to take in connection with the Loan Documents or any Collateral, nor any course of dealing with Borrower or any other person, shall limit, impair or release any of Guarantor's obligations hereunder, affect this Guaranty in any way or afford Guarantor any recourse against Lender. Nothing contained in this section shall be construed to require Lender to take or refrain from taking any action referred to herein.

(i)     Entire Agreement; Amendment; Severability. This Guaranty contains the entire agreement between the parties respecting the matters herein set forth and supersedes all prior agreements, whether written or oral, between the parties respecting such matters; and Guarantor and Lender acknowledge that there are no contemporaneous oral agreements with respect to the subject matter hereof. This Guaranty may not be changed, modified or amended, except by a writing executed by the parties hereto; and no obligation of Guarantor can be released or waived by Lender or any agent of Lender, except by a writing duly executed by Lender. A determination that any provision of this Guaranty is unenforceable or invalid shall not affect the enforceability or validity of any other provision, and any determination that the application of any provision of this Guaranty to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to any other persons or circumstances.

(j)     Governing Law; Binding Effect; Waiver of Acceptance. This Guaranty shall be governed by and construed in accordance with the substantive laws of the State of New York without giving effect to its principles of choice of law or conflicts of law, except to the extent that the applicability of any of such laws may now or hereafter be preempted by Federal law, in which case such Federal law shall so govern and be controlling. This Guaranty shall bind Guarantor and the heirs, executors, legal representatives, successors and assigns of Guarantor and shall inure to the benefit of Lender and the officers, directors, shareholders, agents and employees of Lender and their respective heirs, successors and assigns. This Guaranty shall in no event be impaired by any change which may arise by reason of the death of Borrower or Guarantor, if individuals, or by reason of the dissolution of Borrower or Guarantor, if Borrower or Guarantor is a corporation, partnership, limited liability company or similar entity. Guarantor has executed this Guaranty individually and not as a partner of Borrower or any other Guarantor or guarantor. This Guaranty is assignable by Lender, and any full or partial assignment hereof by Lender shall operate to vest in the assignee all rights and powers herein conferred upon and granted to Lender and so assigned by Lender. Guarantor expressly waives notice of transfer or assignment of this Guaranty and acknowledge that the failure by Lender to give any such notice shall not affect the liabilities of Guarantor hereunder. Notwithstanding the foregoing, Guarantor shall not assign any of its rights or obligations under this Guaranty. Guarantor hereby waives any acceptance of this Guaranty by Lender, and this Guaranty shall immediately be binding upon Guarantor.

(k)     Notices. All notices given pursuant to this Guaranty shall be sufficient if mailed either by i. postage prepaid, certified or registered mail, return receipt requested, ii. by delivery to a nationally recognized overnight delivery service, or iii. telecopy to:

**If to Guarantor:**     Eli Karp
17 Tokay Lane
Monsey, New York 10952

**with a copy to:**     Jeffrey Zwick & Associates, P.C.
266 Broadway, Suite 403
Brooklyn, New York 11211

Attention: Jeffrey Zwick, Esq.

**If to Lender:**     1580 Nostrand Mezz LLC
520 Madison Avenue, Suite 3501
New York, New York 10022
Attn.: Brian Shatz & Joshua Zegen

**with a copy to:**     Kriss & Feuerstein LLP
360 Lexington Avenue, Suite 1200
New York, New York 10017
Attn: Jerold C. Feuerstein, Esq.

Notices shall be deemed given: (w) if served in person, when served; (x) if telecopied, on the date of transmission if before 3:00 p.m. (New York time) on a Business Day and after such time on the next Business Day; provided, however, that in both instances a hard copy of such notice also is sent pursuant to (y) or (z) below; (y) if by overnight courier, on the first (1st) Business Day after delivery to the courier; or (z) if by U.S. Mail, certified or registered mail, return receipt requested on the fourth (4th) day after deposit in the mail postage prepaid. Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address(es).

(l)    <u>No Waiver; Time of Essence; Business Day</u>. The failure of any party hereto to enforce any right or remedy hereunder, or to promptly enforce any such right or remedy, shall not constitute a waiver thereof nor give rise to any estoppel against such party nor excuse any of the parties hereto from their respective obligations hereunder. Any waiver of such right or remedy must be in writing and signed by the party to be bound. This Guaranty is subject to enforcement at law or in equity, including actions for damages or specific performance. Time is of the essence hereof. The term **"business day"** as used herein shall mean a weekday, Monday through Friday, except a legal holiday or a day on which banking institutions in New York are authorized by law to be closed.

(m)    <u>Captions for Convenience; Pronouns</u>. The captions and headings of the sections and paragraphs of this Guaranty are for convenience of reference only and shall not be construed in interpreting the provisions hereof. All personal pronouns used herein, whether used in the masculine, feminine or neuter gender, shall include all other genders; and the singular shall include the plural and vice versa.

14

        (n)    <u>Attorneys' Fees</u>. In the event it is necessary for Lender to retain the services of an attorney or any other consultants in order to enforce this Guaranty, or any portion thereof, Guarantor agrees to pay to Lender any and all costs and expenses, including, without limitation, attorneys' fees, incurred by Lender as a result thereof and such costs, fees and expenses shall be included in the Guaranteed Recourse Obligations of Borrower.

        (o)    <u>Successive Actions</u>. A separate right of action hereunder shall arise each time Lender acquires knowledge of any matter indemnified or guaranteed by Guarantor under this Guaranty. Separate and successive actions may be brought hereunder to enforce any of the provisions hereof at any time and from time to time. No action hereunder shall preclude any subsequent action, and Guarantor hereby waives and covenants not to assert any defense in the nature of splitting of causes of action or merger of judgments.

        (p)    <u>Intentionally Omitted</u>.

        (q)    <u>Reliance</u>. Lender would not make the Loan to Borrower without this Guaranty. Accordingly, Guarantor intentionally and unconditionally enters into the covenants and agreements as set forth above and understands that, in reliance upon and in consideration of such covenants and agreements, the Loan shall be made and, as part and parcel thereof, specific monetary and other obligations have been, are being and shall be entered into which would not be made or entered into but for such reliance.

        (r)    **WAIVER OF JURY TRIAL. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, GUARANTOR AND LENDER (BY ITS ACCEPTANCE HEREOF) EACH HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, OR RELATED TO, THE SUBJECT MATTER OF THIS GUARANTY OR THE RELATIONSHIP THAT IS BEING ESTABLISHED, IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY OF THE PARTIES AGAINST ANY OTHER PARTY OR PARTIES, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, GUARANTOR AND LENDER (BY ITS ACCEPTANCE HEREOF) EACH AGREE THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY. THIS WAIVER IS KNOWINGLY, INTENTIONALLY AND VOLUNTARILY MADE BY GUARANTOR, AND GUARANTOR ACKNOWLEDGES THAT NEITHER LENDER NOR ANY PERSON ACTING ON BEHALF OF LENDER HAS MADE ANY REPRESENTATIONS OF FACT TO INCLUDE THIS WAIVER OF TRIAL BY JURY OR HAS TAKEN ANY ACTIONS WHICH IN ANY WAY MODIFY OR NULLIFY ITS EFFECT. GUARANTOR ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT LENDER HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS GUARANTY AND THAT LENDER WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS WITH GUARANTOR. GUARANTOR FURTHER ACKNOWLEDGES THAT IT HAS BEEN REPRESENTED, OR HAS HAD THE OPPORTUNITY TO BE REPRESENTED, IN THE SIGNING OF THIS GUARANTY AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF**

THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS GUARANTY, OR ANY PROVISION HEREOF. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS GUARANTY.

(s) <u>VENUE</u>. THE GUARANTOR HEREBY IRREVOCABLY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF ANY NEW YORK STATE OR FEDERAL COURT OR IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTY, THE NOTE, THE LOAN AGREEMENT OR ANY OTHER DOCUMENT DELIVERED IN CONNECTION HEREWITH OR THEREWITH AND THE GUARANTOR HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT, OR TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT. THE GUARANTOR HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT HE MAY EFFECTIVELY DO SO, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING. TO THE EXTENT PERMITTED BY LAW, THE GUARANTOR ALSO IRREVOCABLY CONSENTS TO THE SERVICE OF ANY AND ALL PROCESS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES (CERTIFIED MAIL, RETURN RECEIPT REQUESTED AND POSTAGE PREPAID) OF SUCH PROCESS TO HIM AT HIS ADDRESS SPECIFIED IN SECTION 10 HEREOF OR IN THE MANNER SET FORTH IN SECTION 9.3 OF THE LOAN AGREEMENT FOR THE GIVING OF NOTICE. THE GUARANTOR AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

(t) <u>Litigation</u>. In the event of any litigation over this Guaranty: (a) if that litigation is heard in the Commercial Division, New York State Supreme Court, then the parties consent and agree to application of the Court's accelerated procedures, Uniform Rules for the Supreme and County Courts (Rules of Practice for the Commercial Division, Section 202.70(g), Rule 9); and (b) the parties shall promptly enter into and submit to the court (with a request to be "**so-ordered**") a Stipulation and Order for the Production and Exchange of Confidential Information in the form promulgated by the New York City Bar Association Committee on State Courts of Superior Jurisdiction.

(u) <u>Waiver by Guarantor</u>. Guarantor covenants and agrees that, upon the commencement of a voluntary or involuntary bankruptcy proceeding by or against Borrower, neither Guarantor shall seek or cause Borrower or any other person or entity to seek a supplemental stay or other relief, whether injunctive or otherwise, pursuant to 11 U.S.C. § 105 or any other provision of the Bankruptcy Reform Act of 1978, as amended, or any other debtor relief law, (whether statutory, common law, case law or otherwise) of any jurisdiction whatsoever, now or hereafter in effect, which may be or become applicable, to stay, interdict, condition, reduce or inhibit the ability of Lender to enforce any rights of Lender against Guarantor or any Collateral by virtue of this Guaranty or otherwise.

(v)     Counterparts. This Guaranty may be executed in any number of counterparts, each of which shall be effective only upon delivery and thereafter shall be deemed an original, and all of which shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page. Any signature page of this Guaranty may be detached from any counterpart of this Guaranty without impairing the legal effect of any signatures thereon and may be attached to another counterpart of this Guaranty identical in form hereto but having attached to it one or more additional signature pages.

(w)     Secondary Market Transactions. The terms and provisions of Section 9.22 of the Loan Agreement are hereby incorporated herein by this reference.

(x)     Intentionally Omitted.

(y)     Payment of Money Only. Guarantor acknowledges that this Guaranty is an **"instrument for the payment of money only,"** within the meaning of New York Civil Practice Law and Rules Section 3213. Thus, Lender is entitled to move for summary judgment in lieu of complaint when enforcing this Guaranty.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

[SIGNATURES ON FOLLOWING PAGE]

**IN WITNESS WHEREOF**, Guarantor has executed this Guaranty as of the day and year first above written.

GUARANTOR:

ELI KARP

STATE OF NEW YORK )
                                        ) ss:
COUNTY OF ~~NEW YORK~~ Rockland )

On the 11 day of August, in the year 2020, before me, the undersigned, a Notary Public in and for said State, personally appeared, ELI KARP, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed this instrument.

Notary Public

YEHOSHUA AARON ROTHMAN
Notary Public, State of New York
Reg. No. 01RO6391270
Qualified in Rockland County
Commission Expires 04/29/2023

S - 1

# EXHIBIT A

## LEGAL DESCRIPTION

ALL that certain plot, piece or parcel of land situate, lying and being in the Borough of Brooklyn, County of Kings, State of New York bounded and described as follows:

BEGINNING at the corner formed by the intersection of the southerly side of Albermarle Road and the westerly side of Nostrand Avenue;

RUNNING THENCE in a southerly direction 271 feet and 3 1/2 inches to a point;

THENCE westerly 100 feet 1 inch to a point;

THENCE southerly parallel with East 29th Street, 25 feet to a point;

THENCE westerly 100 feet to a point on the easterly side of East 29th Street;

THENCE northerly 295 feet 4 1/2 inches to a point;

THENCE easterly parallel with Albermarle Road, 75 feet;

THENCE southerly parallel with East 29th, 100 feet;

THENCE easterly parallel with Albermarle Road, 25 feet;

THENCE northerly parallel with East 29th, 100 feet;

THENCE easterly 100 feet 1 inch to point or place of BEGINNING.

**<u>EXHIBIT 2</u>**

**(Dismissal Order)**

FILED: KINGS COUNTY CLERK 11/15/2021 03:10 PM
NYSCEF DOC. NO. 74

INDEX NO. 513756/2021
RECEIVED NYSCEF: 11/15/2021

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS : CIVIL TERM: COMMERCIAL 8
------------------------------------------x
ELI KARP, HELLO NOSTRAND LLC, 271 LENOX LLC
AND HELLO FLATBUSH LLC,

                       Plaintiffs,       Decision and order

       - against -          Index No. 513756/21

MADISON REALTY CAPITAL, L.P.,
JOSHUA B. ZEGEN, MARK GORMLEY,
1580 NOSTRAND AVENUE LLC,
1357 FLATBUSH AVENUE 1 LLC,
BROOKLYN THREE LLC,
MRC RE HOLDINS II LLC,
271 LENOX LENDER LLC, and
FULTON STREET LENDER LLC,

                  Defendants,     November 15, 2021
------------------------------------------x
PRESENT: HON. LEON RUCHELSMAN

    The defendants have moved pursuant to CPLR §3211 seeking to
dismiss the complaint on the grounds it fails to state any cause
of action.  The plaintiffs filed an amended complaint and also
opposed the motion.  Papers were submitted by the parties and
after reviewing all the arguments this court now makes the
following determination.

    On December 6, 2017 the plaintiff Hello Nostrand entered
into a loan agreement with non-party Prophet Mortgage
Opportunities LP whereby Hello Nostrand borrowed $63,000,000 for
a construction project located at 1580 Nostrand Avenue in Kings
County.  To secure the notes underlying such loan the plaintiff
executed mortgages and security agreements.  On June 7, 2019
defendant Madison Realty Capital LP purchased the loan documents
from Prophet.  The first complaint provides great detail
explaining how the defendants essentially engaged in predatory

FILED: KINGS COUNTY CLERK 11/15/2021 03:10 PM
NYSCEF DOC. NO. 74

INDEX NO. 513756/2021
RECEIVED NYSCEF: 11/15/2021

lending practices and manufactured defaults against the
plaintiffs.  That complaint alleged causes of action for fraud,
breach of contract and a breach of the covenant of good faith and
fair dealing.  On August 10, 2021 the defendants filed a motion
to dismiss.  On September 15, 2021 the plaintiff filed a
stipulation adjourning the return date of the motion to October
18, 2021 and required opposition papers by October 1, 2021.  On
October 5, 2021 defendant's counsel notified plaintiff's counsel
that no opposition had yet been filed.  The plaintiff's counsel
responded that they were under the belief the opposition papers
were due on October 8.  Plaintiff's counsel indicated he would
file them within a few days and afford defendant's counsel ample
time in which to file a reply.  Plaintiff's counsel did not file
opposition within a few days.  However, on October 15, 2021 filed
an amended complaint as well as a cross-motion seeking to
disqualify defendant's counsel.  Further, on October 18, 2021 the
plaintiff opposed the motion to dismiss.  The court afforded
defendants counsel an opportunity to reply to the opposition to
the motion to dismiss.

### Conclusions of Law
It is well settled that upon a motion to dismiss the court
must determine, accepting the allegations of the counterclaim as
true, whether the party can succeed upon any reasonable view of
those facts (<u>Davids v. State</u>, 159 AD3d 987, 74 NYS3d 288 [2d

2

FILED: KINGS COUNTY CLERK 11/15/2021 03:10 PM

NYSCEF DOC. NO. 74

INDEX NO. 513756/2021

RECEIVED NYSCEF: 11/15/2021

Dept., 2018]).  Further, the allegations of the counterclaim are deemed true and all reasonable inferences may be drawn in favor of the plaintiff (Dunleavy v. Hilton Hall Apartments Co., LLC, 14 AD3d 479, 789 NYS2d 164 [2d Dept., 2005]).  Whether the counterclaim will later survive a motion for summary judgment, or whether the party will ultimately be able to prove its claims, of course, plays no part in the determination of a pre-discovery CPLR §3211 motion to dismiss (see, EBC I, Inc. v. Goldman Sachs & Co., 5 NY3d 11, 799 NYS2d 170 [2005]).

It is further well settled that to succeed upon a claim of breach of contract the plaintiff must establish the existence of a contract, the plaintiff's performance, the defendant's breach and resulting damages (Harris v. Seward Park Housing Corp., 79 AD3d 425, 913 NYS2d 161 [1ˢᵗ Dept., 2010]).

First, the amended complaint was filed late and without court approval.  Thus, it need not be considered. Notwithstanding the lateness of the opposition to the motion to dismiss the court will address the merits of the arguments contained in the motion to dismiss and the opposition.

The plaintiff executed a forbearance agreement which governs the claims asserted in this case.  Paragraph 4 of the agreement states that "the Borrower and Guarantor hereby acknowledge and agree that they have no offsets, defenses, claims, or counterclaims against the Lender, its predecessors in interest,

3

FILED: KINGS COUNTY CLERK 11/15/2021 03:10 PM

NYSCEF DOC. NO. 74

INDEX NO. 513756/2021

RECEIVED NYSCEF: 11/15/2021

or any of their respective parents, subsidiaries, affiliates, members, managers, partners, agents, officers, principals, directors, shareholders, employees, attorneys, representatives, servicers, participants, predecessors, successors, assigns, or any person holding an interest in the Existing Loan...with respect to the Existing Loan, the Existing Loan Documents, or the Existing Loan Obligations, including, without limitation, the Existing Default, or otherwise, and that if the Borrower or the Guarantor now have, or ever did have, any offsets, defenses, claims, or counterclaims whatsoever against the Lender Parties, whether known or unknown, foreseen or unforeseen (regardless of by whom raised), at law or in equity (or mixed), from the beginning of the world through the Effective Date and through the time of execution of this Agreement, all of them are hereby expressly WAIVED, and the Borrower and Guarantor each hereby remises, RELEASES, acquits, and discharges the Lender Parties from any liability therefor" (Id).

The plaintiffs do not really argue the above clause bars the breach of contract and breach of good faith and fair dealing causes of action. Instead the plaintiff assert the amended complaint addresses claims that are not governed by such waiver and release clauses and that the amended complaint validly asserts such claims. However, the amended complaint required prior court approval. A motion to dismiss that is addressed to

4

FILED: KINGS COUNTY CLERK 11/15/2021 03:10 PM
NYSCEF DOC. NO. 74

INDEX NO. 513756/2021
RECEIVED NYSCEF: 11/15/2021

the merits of a case requires opposition to the motion and such opposition cannot take the form of an amended pleading (Livadiotakis v. Tzitzikalokis, 302 AD2d 369, 753 NYS2d 898 [2d Dept., 2003]).  The arguments presented in the opposition that plaintiff's counsel failed to inform them of such waiver and release clauses and failed to explain to them the consequences of such clauses does not undermine their applicability since a party that signs and agrees to a contract is generally presumed to know the contents of the contract and to have assented to its terms (Choung v. Allstate Insurance Co., 283 AD2d 468, 724 NYS2d 882 [2d Dept., 2001]).  The plaintiffs might have malpractice claims against their counsel if all the allegations in this regard prove true, however, as noted, there is no basis upon which to impugn the waiver and release clauses themselves.  Therefore, the motion seeking to dismiss the breach of contract and breach of good faith and fair dealing causes of action are granted.

Turning to the fraud claim, it is well settled that to successfully plead fraud the claims must be plead with particularity (Lee Dodge Inc., v. Sovereign Bank, N.A., 148 AD3d 1007, 51 NYS3d 531 [2d Dept., 2017]).  Thus, to successfully plead fraud the pleadings must contain allegations of a representation of a material fact, falsity, scienter, reliance and injury (Moore v. Liberty Power Corp., LLC, 72 AD3d 660, 897 NYS2d 723 [2d Dept., 2010]).  Further, the allegations must be

5

FILED: KINGS COUNTY CLERK 11/15/2021 03:10 PM

NYSCEF DOC. NO. 74

INDEX NO. 513756/2021

RECEIVED NYSCEF: 11/15/2021

"stated in detail" (CPLR §3016(b)) and must include dates,
details and items to the extent relevant (see, Orchid
Construction Corp., v. Gottbetter, 89 AD3d 708, 932 NYS2d 100 [2d
Dept., 2011]).

In this case, essentially, the plaintiff argue the
defendants made various promises to the plaintiff and failed to
fulfill those promises. As noted, specifically, the complaint
alleges that "on July 1, 2019, during a meeting at defendant
Madison Capital offices, defendants Madison Capital, Zegen, and
Gormley represented to plaintiff Karp that they would assist him
to complete the Nostrand Project, would work with him to upsize
the Loan, and would provide him with requested loan advances"
(see, Complaint ¶ 335). Further the complaint asserts that
"Instead, defendants Zegen and Gormley intended to engage in a
fraudulent scheme of delaying the funding of the Nostrand Project
to prevent its timely completion to manufacture an alleged
default by plaintiff Hello Nostrand on the Loan; to trigger
millions of dollars in default interests at the default interest
rate of 24%; and ultimately to obtain ownership of the building
with the commencement of a foreclosure proceeding (see,
Complaint ¶ 337). However, it is well settled that "although
fraud may exist in the inducement of a contract, where, as here,
it is based solely on the failure to perform a promised future
act, plaintiff's remedy lies in an action on the contract" (see,

6

FILED: KINGS COUNTY CLERK 11/15/2021 03:10 PM
NYSCEF DOC. NO. 74

INDEX NO. 513756/2021
RECEIVED NYSCEF: 11/15/2021

Locascio v. James V. Acquavella M.D. P.C., 185 AD2d 689, 586
NYS2d 78 [4th Dept., 1992]).  Thus, to assert a
misrepresentation, the misrepresentation must concern a present
fact, not a future promise (see, Scialdone v. Stepping Stones
Associates L.P., 148 AD3d 953, 50 NYS2d 413 [2d Dept., 2017]).
The complaint in this case does not allege any misrepresentation
of any present fact.  Rather, it solely concerns itself with
promises made to the plaintiffs that were not kept.  Therefore,
the motion seeking to dismiss the fraud claim is granted.

Consequently, the motion seeking to dismiss the complaint is
granted and the cross-motion seeking to disqualify defendant's
counsel is now moot.

So ordered.

ENTER

DATED: November 15, 2021
       Brooklyn N.Y.      Hon. Leon Ruchelsman
                          JSC

7

**EXHIBIT 3**

**(Sale Order)**

FILED: ROCKLAND COUNTY CLERK 10/25/2021 10:02 AM
NYSCEF DOC. NO. 58

INDEX NO. 034885/2021
RECEIVED NYSCEF: 10/25/2021

At the Supreme Court of the State of New
York, held in and for the County of Rockland,
at the Courthouse located at 1 South Main
Street, New City, New York, on the **25**
day of October _October_ , 2021.

**PRESENT:**

**HON. PAUL I. MARX, J.S.C.**

_____X

HELLO LIVING DEVELOPER NOSTRAND LLC and
HELLO NOSTRAND LLC,                                         Index No.: 034885/2021

                                          Plaintiffs,

          -against-

1580 NOSTRAND MEZZ, LLC,
MADISON REALTY CAPITAL, L.P.,

                                          Defendants.

_____X

**UPON** the motion of HELLO LIVING DEVELOPER NOSTRAND LLC ("Mezz

Borrower") and HELLO NOSTRAND LLC ("Hello Nostrand", and together with the Mezz

Borrower, collectively, the Plaintiffs") the Plaintiffs herein, brought on by an Order to Show

Cause, for the entry of an Order: (a) for a temporary restraining order and preliminary injunction

enjoining defendants 1580 NOSTRAND MEZZ, LLC ("Mezz Lender") and MADISON REALTY

CAPITAL, L.P. ("MRC", and together with the Mezz Lender, collectively, the "Defendants") and

anyone acting on the Defendants' behalf, during the pendency of this action, from holding the an

auction sale of plaintiff Mezz Borrower's 100% membership interests in plaintiff Hello Nostrand

(the "Collateral"); (b) granting Plaintiff any further relief that the Court deems just and proper (the

"Motion"); and upon the Court signing the Order to Show Cause on August 24, 2021 ("Signed

4894-3996-7232, v. 1

1 of 3

FILED: ROCKLAND COUNTY CLERK 10/25/2021 10:02 AM          INDEX NO. 034885/2021
NYSCEF DOC. NO. 58                                        RECEIVED NYSCEF: 10/25/2021

OSC") temporarily restraining and enjoining the Defendants and anyone acting on their behalf from

conducting the UCC sale of the Collateral scheduled for September 2, 2021 ("Stay"); and upon the

Signed OSC conditioning the Stay upon the Plaintiffs posting a bond in the amount of $100,000.00

("Bond") to offset expenses and damages which Defendants may suffer in the event Plaintiffs do not

prevail on the Motion; and all the papers filed herein and after and the Motion having come on

regularly to be heard by this Court on October 18, 2021 ("Hearing"), and after due deliberation

having been held thereon and the Plaintiffs having failed to show (i) a likelihood of success on the

merits; (ii) no irreparable harm due to the Plaintiffs' claims being all economic claims

compensable by monetary damages, and therefore not irreparable, it is hereby

**NOW**, upon Motion of Marcus and Zelman, LLC and the Law Offices of Victor A. Worms,

attorneys for the Plaintiffs, it is hereby

**ORDERED**, that Plaintiffs' Motion is denied in its entirety; and it is further

**ORDERED**, that the Stay imposed by the Signed OSC with Temporary Restraining Order

was lifted and vacated by the Court at the Hearing on October 18, 2021, and the Mezz Lender may

conduct a UCC sale of the Collateral ("Sale"); and it is further

**ORDERED**, that any dispute(s) regarding the sale of the Collateral scheduled for

September 2, 2021, including, but not limited to, publication and commercial reasonableness, are

moot; and it is further

**ORDERED**, that any future Sale of the Collateral shall be subject to the following

conditions: (i) at least sixty (60) days' notice of the Sale shall be provided; (ii) publication of the

Sale shall be advertised four (4) times prior to the Sale in the New York Times and in The Real

Deal online website, but if advertised in The Real Deal monthly magazine, only one (1) advertised

Sale is required; (iii) any qualifying bid deposit at a future Sale must be in the amount of

4894-3996-7232, v. 1

FILED: ROCKLAND COUNTY CLERK 10/25/2021 10:02 AM    INDEX NO. 034885/2021
NYSCEF DOC. NO. 58                                          RECEIVED NYSCEF: 10/25/2021

$450,000.00; and (iv) all remaining aspects of the Sale must be in accordance with the terms and

provisions of the Ownership Interests Pledge and Security Agreement by and between the Mezz

Borrower and Mezz Lender, and shall be commercially reasonable in accordance with the Uniform

Commercial Code; and it is further

**ORDERED**, that this Court shall retain jurisdiction to adjudicate and determine any further

disputes with respect to commercial reasonableness of the Sale; and it is further

**ORDERED**, that any publication costs and expenses associated with advertising the Sale

shall be drawn down from the Bond posted by the Plaintiffs.


E N T E R:


HON. PAUL I. MARX, J.S.C.

# EXHIBIT 4

**(Operating Agreement and First Amendment to Operating Agreement)**

## CERTIFICATION OF HELLO LIVING DEVELOPER NOSTRAND LLC

The undersigned, being the Authorized Signatory of **HELLO LIVING DEVELOPER NOSTRAND LLC**, a New York limited liability company (the "**Company**"), which is the sole member of **HELLO NOSTRAND LLC**, a New York limited liability company (the "**Property Owner**"), hereby certifies to **1580 NOSTRAND MEZZ LLC**, its successors and/or assigns, as their interests may appear ("**Lender**"), on behalf of the Company as follows:

1.       Attached hereto and made a part hereof as Exhibit A is a true, complete and accurate copy of the Articles of Organization (and all amendments thereto) for the Company, duly filed with the Secretary of State of the State of New York (the "**Articles**"). The Articles are in full force and effect on the date hereof, and have not been amended, modified or withdrawn;

2.       Attached hereto and made a part hereof as Exhibit B is a true, complete and accurate copy of the operating agreement of the Company (and all amendments thereto) (the "**Operating Agreement**");

3.       Attached hereto and made a part hereof as Exhibit C is a true, complete and accurate copy of the consent of the Company (the "**Consent**");

4.       Attached hereto and made a part hereof as Exhibit D is a true, complete and accurate copy of the Certificate of Good Standing of the Company (the "**Certificate of Good Standing**").

This Certification is made to induce Lender to make a certain mezzanine loan in the principal sum of $3,000,000.00 (the "**Loan**") to the Company, which Loan is secured by, among other things, a Mezzanine Loan Agreement and an Ownership Interests Pledge and Security Agreement affecting the membership interest of the Company in the Property Owner, knowing Lender will place reliance hereon.

Dated: As of August 28, 2020

[SIGNATURE PAGE TO FOLLOW]

The undersigned has executed this Certification as of the day and year first written above.

ELI KARP

**Exhibit B**

## FIRST AMENDMENT TO THE OPERATING AGREEMENT OF
## HELLO LIVING DEVELOPER NOSTRAND LLC

This First Amendment (this "**Amendment**") to the Operating Agreement of HELLO LIVING DEVELOPER NOSTRAND LLC, a New York limited liability company (the "**Company**"), dated as of August 28, 2020, is made by and among the individuals/entities signing it below.

**WHEREAS**, the parties signing this Amendment desire to amend that certain Operating Agreement ("**Operating Agreement**") of the Company dated as of November 28, 2017 which governs the Company, pursuant to the New York Limited Liability Company Law;

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are acknowledged, the individuals/entities signing this Amendment below agree to amend the Operating Agreement as follows by adding the following provisions, which terms shall modify, supersede and replace the terms of the Operating Agreement:

Notwithstanding any other provision of the Operating Agreement, any other organizational documents or any provisions of law that empowers the Company, the following provisions shall be operative and controlling so long as that certain mezzanine loan in the principal sum of up to $3,000,000.00 (the "**Loan**"), by 1580 NOSTRAND MEZZ LLC, or its successors and/or assigns ("**Lender**"), to the Company, is outstanding:

1.       **Single Purpose Entity Provisions**

(a) Company, in its capacity as sole member of HELLO NOSTRAND LLC, a New York limited liability company (the "**Property Owner**"), has not owned, does not own and will not own any asset or property other than (i) 100% of the Membership Interest in Property Owner (collectively, the "**Company Property**"), and (ii) incidental personal property necessary for the ownership, management or operation of the Company Property.

(b) Company has not engaged, does not engage, and will not engage in any business other than the ownership, management and operation of the Company Property and Company, in its capacity as sole member of Property Owner, will conduct and operate its business as presently conducted and operated.

(c) Company has not entered and is not a party to and will not enter into or be a party to any contract or agreement with any affiliate of Company, any constituent party of Company or any affiliate of any constituent party, except in the ordinary course of business and on terms and conditions that are disclosed to Lender in advance and that are intrinsically fair, commercially reasonable and substantially similar to those that would be available on an arms-length basis with third parties other than any such party.

1

(d) Company has not incurred and will not incur any indebtedness other than (i) the Loan and (ii) unsecured trade payables and operational debt not evidenced by a note and in an aggregate amount not exceeding one percent (1%) of the original principal amount of the Loan at any one time; provided that any indebtedness incurred pursuant to sub-clause (ii) shall be (x) not more than sixty (60) days past due and (y) incurred in the ordinary course of business (the indebtedness described in the foregoing clauses (i) and (ii) is referred to herein, collectively, as "**Permitted Indebtedness**"). No indebtedness other than the Loan may be secured (subordinate or pari passu) by the Company Property.

(e) Company has not made and will not make any loans or advances to any individual, sole proprietorship, partnership, limited liability partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, entity, party or government (whether territorial, national, federal, state, county, city, municipal or otherwise, including, without limitation, any instrumentality, division, agency, body or department thereof) (including any affiliate or constituent party) (a "**Person**"), and has not acquired and shall not acquire obligations or securities of its affiliates.

(f) Company is and will remain solvent and Company has paid and will pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due.

(g) Company has done or caused to be done and will do all things necessary to observe organizational formalities and preserve its existence, and Company will not (i) terminate or fail to comply with the provisions of its organizational documents, or (ii) unless Lender has consented, amend, modify or otherwise change its Operating Agreement or other organizational documents.

(h) Company has maintained and will maintain all of its accounts, books, records, financial statements and bank accounts separate from those of its affiliates and any other Person. Company's assets have not been and will not be listed as assets on the financial statement of any other Person; provided, however, that Company's assets may be included in a consolidated financial statement of its affiliates if (i) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of Company and such affiliates and to indicate that Company's assets and credit are not available to satisfy the debts and other obligations of such affiliates or any other Person, and (ii) such assets shall be listed on Company's own separate balance sheet. Company has and will file its own tax returns (to the extent Company is required to file any such tax returns) and will not file a consolidated federal income tax return with any other Person. Company has maintained and shall maintain its books, records, resolutions and agreements as official records.

(i) Company has been and will be, and has held and at all times will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any affiliate of Company or any constituent party of Company), has corrected and shall correct any known misunderstanding regarding its status as a separate entity, has conducted and shall conduct

2

business in its own name, has not identified and shall not identify itself or any of its affiliates as a division or part of the other, and has maintained and shall maintain and utilize separate stationery, invoices and checks bearing its own name.

(j) Company has maintained and will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations.

(k) Neither Company nor any constituent party has sought or will seek or effect the liquidation, dissolution, winding up, consolidation or merger, in whole or in part, of Company.

(l) Company has not commingled and will not commingle the funds and other assets of Company with those of any affiliate or constituent party or any other Person and has held and will hold all of its assets in its own name.

(m) Company has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any affiliate or constituent party or any other Person.

(n) Company has not assumed or guaranteed or become obligated for the debts of any other Person and has not held itself out to be responsible for or have its credit available to satisfy the debts or obligations of any other Person, and Company will not assume or guarantee or become obligated for the debts of any other Person and does not and will not hold itself out to be responsible for or have its credit available to satisfy the debts or obligations of any other Person.

(o) Company, in its capacity as sole member of Property Owner and its own capacity, hereby covenants and agrees that it will comply with or cause the compliance with, (i) all the representations, warranties and covenants contained within the Loan documents, and (ii) all the organizational documents of Company.

(p) Company has not permitted and will not permit any affiliate or constituent party independent access to its bank accounts.

(q) Company has paid and shall pay the salaries of its own employees (if any) from its own funds and has and shall maintain a sufficient number of employees (if any) in light of its contemplated business operations.

(r) Company has compensated and shall compensate each of its consultants and agents from its funds for services provided to it and pay from its own assets all obligations of any kind incurred.

(s) Company has not, and without the unanimous consent of all of its members or managers/managing members will not, take any action that might reasonably be expected to cause Company to become insolvent.

(t) Company has allocated and will allocate fairly and reasonably any shared expenses, including shared office space.

(u) Notwithstanding any provision of the Operating Agreement or this Amendment, except in connection with the Loan or any prior mortgage financing that has been fully paid and discharged in full prior to the date hereof, Company has not pledged and will not pledge its assets for the benefit of any other Person.

(v) Company either (i) has no, and will have no, obligation to indemnify its officers, directors, managers, members, shareholders or partners, as the case may be, or (ii) if it has any such obligation, such obligation is fully subordinated to the Loan and will not constitute a claim against Company if cash flow in excess of the amount required to pay the Loan is insufficient to pay such obligation.

(w) Company will consider the interests of Company's creditors in connection with all limited liability company actions.

(x) Except as provided in the Loan documents, Company has not and will not have any of its obligations guaranteed by any affiliate.

(y) The Company shall not be divided into one (1) or more than one (1) entity.

(z) Company's organizational documents shall provide that there shall at all times be (and Company shall at all times cause there to be) at least one (1) duly appointed manager or member of the board of managers (each, an "**Independent Manager**") of Company:

(i) who shall be a natural person who is provided by a nationally recognized professional service company;

(ii) who shall have at least three (3) years prior employment experience as an independent manager; and

(iii) who shall not have been at the time of such individual's appointment or at any time while serving as an Independent Manager, and shall not have ever been (A) a stockholder, member, director or manager (other than as an Independent Manager), officer, employee, partner, attorney or counsel of Company or any affiliate of Company or any direct or indirect equity holder of any of them, (B) a creditor, customer, supplier, service provider or other Person who derives any of its purchases or revenues from its activities with Company or any affiliate of Company, (C) a member of the immediate family of any such stockholder, member, director, manager, officer, employee, partner, attorney, counsel, creditor, customer, supplier, service provider or other Person, (D) a Person who is otherwise affiliated with Company or any affiliate of Company or any direct or indirect equity holder of any of them or any such stockholder, member, director,

4

manager, officer, employee, partner, attorney, counsel, creditor, customer, supplier, service provider or other Person, or (E) a Person controlling, controlled by or under common control with any of (A), (B), (C) or (D) above.

As used in this subsection (z), "nationally recognized professional service company" includes Corporation Services Company, CT Corporation, National Registered Agents, Inc., Stewart Management Company, Wilmington Trust Company and Lord Securities Corporation or, if none of those companies is then providing professional Independent Managers, another nationally-recognized company reasonably approved by Lender, in each case that is not an affiliate of Company and that provides professional Independent Managers and other corporate services in the ordinary course of business. As used in this subsection (z), the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise and the term "controlled" and "controlling" shall have a correlative meaning.

(aa) As long as any portion of the Loan remains outstanding:

(i) Except with respect to Lender's rights and remedies in connection with the Loan, the directors or managers of Company shall not take any action which, under Company's certificate of formation or operating agreement, requires the unanimous affirmative vote of Company's directors or managers unless at the time of such action there are at least one (1) Independent Manager then serving in such capacity and each Independent Manager has participated in such vote;

(ii) no resignation or removal of an Independent Manager, and no appointment of a successor Independent Manager, shall be effective until such successor shall have executed a counterpart to Company's operating agreement; provided, however, that no Independent Manager shall resign or be removed, and no successor Independent Manager shall be appointed unless Company provides Lender with at least fifteen (15) days prior written notice of any such proposed resignation or removal and the identity of any such successor Independent Manager, together with a certification that such successor satisfies the requirements for an Independent Manager as required by Lender in its sole but commercially reasonable discretion;

(iii) in the event of a vacancy in the position of Independent Manager, the member of Company shall, subject to the preceding clause (ii), appoint a successor Independent Manager as soon as practicable;

(iv) to the fullest extent permitted by law and notwithstanding any duty existing at law or equity, the Independent Manager shall consider only the interests of the Company, including Lender and its other creditors, in acting or otherwise voting on the matters referred to in clauses (aa)(vii)(C) or (aa)(vii)(D) below of this Amendment;

5

(v) except for duties to Company as set forth in the immediately preceding clause (iv) (including duties to the member(s) of Company and Company's creditors solely to the extent of their respective economic interests in Company but excluding (A) all other interests of the member(s) of Company, (B) the interests of other affiliates of Company, and (C) the interests of any group of affiliates of which Company is a part), the Independent Managers shall not have any fiduciary duties to the member(s) of Company or any other Person bound by Company's operating agreement; provided, however, the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing;

(vi) in exercising their rights and performing their duties under Company's operating agreement, each Independent Manager shall have a fiduciary duty of loyalty and care similar to that of a director of a business corporation organized under the Limited Liability Company Law of the State of New York; and

(vii) Company will not:

> (A) dissolve, merge, liquidate or consolidate, except as provided in clause (aa)(viii) below;

> (B) except in connection with a sale or other transfer permitted under the Loan documents, sell all or substantially all of its assets;

> (C) amend its organizational documents with respect to the matters set forth in this Amendment, without the consent of Lender and without the affirmative vote of its Independent Manager; or

> (D) without the affirmative vote of its Independent Manager and of all other directors or managers of Company, take any Material Action with respect to itself or to any other entity in which it has a direct or indirect legal or beneficial ownership interest. For purposes herein, a "**Material Action**" shall mean: to institute proceedings to have the Company be adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against the Company or file a petition seeking, or consent to, reorganization or relief with respect to the Company under any applicable federal or state law relating to bankruptcy, or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Company or a substantial part of its property, or make any assignment for the benefit of creditors of the Company, or admit in writing the Company's inability to pay its debts generally as they become due, or take action in furtherance of any such action, or, to the fullest extent permitted by law, dissolve or liquidate the Company.

(viii) Company shall be dissolved, and its affairs shall be wound up, only upon the first to occur of the following: (A) the termination of the legal existence of the last remaining

6

member of Company or the occurrence of any other event which terminates the continued membership of the last remaining member of Company in Company unless the business of Company is continued in a manner permitted by its Operating Agreement or the New York Limited Liability Company Act (the "Act"), or (B) the entry of a decree of judicial dissolution under Section 18-802 of the Act;

(ix) upon the occurrence of any event that causes the last remaining member of Company or the sole member of Company (in each case, the "**Final Member**") to cease to be a member of Company (other than (A) upon an assignment by Final Member of all of its limited liability company interest in Company and the admission of the transferee, if permitted pursuant to the organizational documents of Company and the Loan documents, or (B) the resignation of Final Member and the admission of an additional member of Company, if permitted pursuant to the organizational documents of Company and the Loan documents), to the fullest extent permitted by law, the personal representative of such last remaining member shall be authorized to, and shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of such member in Company, agree in writing (1) to continue the existence of Company and (2) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of Company, effective as of the occurrence of the event that terminated the continued membership of such member in Company;

(x) the bankruptcy of Final Member or a special member of Company shall not cause Final Member or such special member, respectively, to cease to be a member of Company and upon the occurrence of such an event, the business of Company shall continue without dissolution;

(xi) in the event of the dissolution of Company, Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of Company in an orderly manner), and the assets of Company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act; and

(xii) to the fullest extent permitted by law, each of Final Member and the special members of Company shall irrevocably waive any right or power that they might have to cause Company or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of Company, to compel any sale of all or any portion of the assets of Company pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of Company.

**2.    Additional Provisions**

7

(a)     The Company shall not, without the prior written consent of the Lender, issue, and shall not permit the issuance of any additional Membership Interest in the Company other than its initial issuance of Membership Interest issued on or prior to the date of this Amendment.

(b)     For so long as the Loan is outstanding, HELLO NOSTRAND INVESTORS LLC, a New York limited liability company, shall be the sole member of the Company.

(c)     The members/managers as of the date hereof shall remain as members/managers of the Company and may not resign, or appoint a successor member/manager for Company, without prior written consent from Lender, in addition to observing all other resignation requirements of this Amendment.

(d)     The members/managers shall not, and cause the Company to not, amend, alter, change or repeal any Section or Schedule of the Operating Agreement if such change would adversely impact (i) any of the Lender's collateral, or (ii) Lender's ability to enforce its remedies under the Loan documents or (iii) amend any of the terms in this Amendment.

(e)     Notwithstanding anything to the contrary contained in the Operating Agreement, the Company may not take any action which breaches or violates the provisions of this Section 2 unless, with respect to each such act(s), the Independent Manager consents to such action(s) in writing, and further provided that the failure to obtain the Independent Managers consent shall cause such act to be void ab initio and shall be deemed ultra vires.

(f)     All parties signing this Amendment agree to the terms of the Loan.

This Amendment may be executed in any number of counterparts, and each such counterpart shall for all purposes be deemed to be an original, and all such counterparts together constitute but one and the same agreement. Further, facsimile or electronic (e.g., .pdf format) copies of signatures shall be considered originals for purposes of binding the parties hereto.

[SIGNATURE PAGE TO FOLLOW]

8

IN WITNESS WHEREOF, the individuals and entities signing this Amendment below conclusively evidence their agreement to the terms and conditions of this Amendment by so signing this Amendment.

**MEMBER:**

HELLO NOSTRAND INVESTORS LLC, a New York limited liability company

By: _____

Name: Eli Karp

Title: Authorized Signatory

**INDEPENDENT MANAGER:**

_____

Steven P. Zimmer

## OPERATING AGREEMENT OF
## Hello Living Developer Nostrand LLC

**DECLARATION** of Operating Agreement Hello Living Developer Nostrand LLC is made November 28, 2017 by Hello Nostrand Investors LLC (hereinafter the "Member") with an address of 33 35th Unit 25, Brooklyn NY, 11232.

The Member hereby form a limited liability company pursuant to and in accordance with the Limited Liability Company Law of the State of New York, as amended from time to time (the "LLCL"), and hereby agree as follows:

1.      **Name.**

The name of the limited liability company formed hereby is Hello Living Developer Nostrand LLC

2.      **Term.**

The term of the company shall continue until such time as it is dissolved in accordance with the LLCL.

3.      **Purpose.**

Notwithstanding any provision hereof or of any other document governing the formation, management or operation of the Company to the contrary, the following shall govern: The nature of the business and of the purposes to be conducted and promoted by the Company, is to engage solely in the following activities:

A.     To own, hold, sell, assign, transfer, operate, lease, manage, mortgage, develop, improve, pledge and otherwise deal with that certain parcel of real property, together with all improvements located thereon, located 1580 Nostrand Avenue, Brooklyn, New York (the "Property"), to incur indebtedness, secured and unsecured; to construct improvements on the Property; to mortgage, finance, refinance, encumber, lease, sell, exchange, convey, transfer or otherwise deal with or dispose of the Property; to enter into and perform contracts and agreements of any kind necessary to, in connection with or incidental to the business of the Limited Liability Company; and to carry on any other activities necessary to, in connection with or incidental to the foregoing, as the Managing Member in his discretion may deem desirable.

B.     To exercise all powers enumerated in the New York Limited Liability Company Act (the "Act") incidental, necessary or appropriate to the conduct, promotion or attainment of the business or purposes otherwise set forth herein.

4.      **Member(s).**

The name and the business, residence, or mailing address of the Member(s) is as follows:    Name                        Address:                    Percentage Ownership:

| Name | Address: | Percentage |
|------|----------|------------|
| Hello Nostrand Investors LLC | 33 35th St Unit 25, Brooklyn, NY 11232 | 100% |

5.      **Bank Accounts.**

All funds of the Limited Liability Company shall be deposited in the Limited Liability Company's name in such bank account or accounts as shall be designated by the Managing Member. Withdrawals from any such bank accounts shall be made only in the regular course of business of the Limited Liability Company and shall be made upon such signature or signatures as the Managing Member from time to time may designate.

6.      **Management of the Limited Liability Company**

The Member hereby designate Eli Karp having an address at 33 35th Street Unit 25, Brooklyn, NY, 11232 to serve as Manager for the Limited Liability Company.

The business and affairs of the Limited Liability Company shall be conducted and managed by the Manager of the Limited Liability Company in accordance with this Agreement and the laws of New York.

The Manager shall have responsibility for the day-to-day management of the business and affairs of the Limited Liability Company and shall devote such time and attention as the Manager deems necessary to the conduct and management of the business and affairs of the Limited Liability Company.

The Manager hereby is given sole power and authority to execute instruments on behalf of the Limited Liability Company and to otherwise bind the Limited Liability Company. Unless authorized by the Manager, no other person shall have the power or authority to execute instruments on behalf of the Limited Liability Company and to otherwise bind the Limited Liability Company. No person, firm or corporation dealing with the Limited Liability Company shall be required to investigate the authority of the Manager or to secure the approval of or confirmation by the Member of any act of the Manager in connection with the business or affairs of the Limited Liability Company.

No Member, other than the Manager or his designees, shall have the authority, or shall take any action as a Member, to bind the Limited Liability Company.

Notwithstanding any other provision of this Agreement, the Manager shall not, without the prior written consent of the unanimous vote or consent of the Member, sell, exchange, lease, assign or otherwise transfer all or substantially all of the assets of the Limited Liability Company; sell, exchange, lease (other than space leases in the ordinary course of business), assign or transfer the Property; mortgage, pledge or encumber the Property other than as expressly authorized by this Agreement; prepay, refinance, modify, extend or consolidate any existing mortgages or encumbrances; confess a judgment against the Limited Liability Company; approve a merger or consolidation of the Limited Liability Company with or into any other limited liability company, corporation, partnership or other entity: or change the nature or character of the business of the Limited Liability Company.

The Manager shall purchase insurance against loss or damage to the Property by fire or other risks embraced by extended coverage, in amounts sufficient to prevent the Limited Liability Company from becoming a co-insurer, and shall maintain such other hazard and liability insurance against such risks and in such amounts as the Manager shall deem advisable

2

but at least against such risks and in such amounts as customarily is maintained for similar properties in the vicinity of the Property.

The Manager shall be reimbursed by the Limited Liability Company for all direct out-of-pocket expenses incurred by the Manager on behalf of the Limited Liability Company in connection with the performance of his duties hereunder, including without limitation amounts payable by the Manager for office, accounting, bookkeeping and other services, materials, facilities and professional and legal services rendered or furnished to the Limited Liability Company, and reasonable fees and other expenses incurred in connection with any sale or refinancing of the Property.

A Managing Member's duty of care in the discharge of the Manager's duties to the Limited Liability Company and the Member is limited to refraining from engaging in grossly negligent conduct, intentional misconduct, or a knowing violation of law. In discharging the duties of a Manager, the Manager shall be fully protected in relying in good faith upon the records of the Limited Liability Company and upon such information, opinions, reports or statements by other Managers, Members, agents or other persons as to matters the Manager reasonably believes are within such person's professional or expert competence, including without limitation information, opinions, reports or statements as to the value or amount of the assets, liabilities, profits or losses of the Limited Liability Company or any other facts pertinent to the existence and amount of assets from which distributions to The Member might properly be paid.

To the extent of the Limited Liability Company's assets, and to the extent permitted by law, the Limited Liability Company shall indemnify and hold the Manager harmless from and against all liability, claim, loss, damage or expense, including reasonable attorneys' fees, incurred by the Manager by reason of any act or omission of the Manager made in good faith on behalf of the Limited Liability Company.

Except as expressly provided elsewhere in this Agreement, any decisions which are to be made by the Member, rather than the Manager, shall be made by the unanimous vote or consent of the Member.

7.    **Meetings of Member(s)**

The annual meeting of the Member(s) shall be held on the first Tuesday in the month of January, at 2:00PM, at the principal office of the Limited Liability Company, for the purpose of transacting such business as may come before the meeting. If the day fixed for the annual meeting shall be a legal holiday, such meeting shall be held on the next succeeding business day.

The Member may by resolution prescribe the time and place for the holding of regular meetings and may provide that the adoption of such resolution shall constitute notice of such regular meetings.

Special meetings of the Member(s), for any purpose or purposes, may be called by the Manager or by any two Members (or such other number of Members as the Members from time to time may specify).

Written or telephonic notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose for which the meeting is called, shall be delivered not less than

3

three days before the date of the meeting, either personally or by mail, by or at the direction of the Manager, to each Member of record entitled to vote at such meeting. When all the Members of the Limited Liability Company are present at any meeting, or if those not present sign a written waiver of notice of such meeting, or subsequently ratify all the proceedings thereof, the transactions of such meeting shall be valid as if a meeting had been formally called and notice had been given.

At any meeting of the Members, the presence of all of the Members, as determined from the books of the Limited Liability Company, represented in person or by proxy, shall constitute a quorum for the conduct of the general business of the Limited Liability Company. However, if any particular action by the Limited Liability Company shall require the vote or consent of some other number or percentage of Members pursuant to this Agreement, a quorum for the purpose of taking such action shall require such other number or percentage of Members. If a quorum is not present, the meeting may be adjourned from time to time without further notice, and if a quorum is present at the adjourned meeting any business may be transacted which might have been transacted at the meeting as originally notified. The Members present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough Members to leave less than a quorum.

At all meetings of the Members, a Member may vote by proxy executed in writing by the Member or by a duly authorized attorney-in-fact of the Member. Such proxy shall be filed with the Manager of the Limited Liability Company before or at the time of the meeting. No proxy shall be valid after three months from the date of execution, unless otherwise provided in the proxy.

If at any time a Member is a corporation, partnership or limited liability company, the interest of such Member may be voted by such officer, partner, agent or proxy of such Member as the bylaws, board directors, or other organization documents of such entity may duly authorize.

The Manager or his designee shall preside at meetings of the Members. A record of the meetings shall be maintained by a secretary of the meetings designated by the Manager. The Members may adopt their own rules of procedure, which shall not be inconsistent with this Operating Agreement.

A Member of the Limited Liability Company who is present at a meeting of the Members at which action on any matter is taken shall be presumed to have assented to the action taken, unless the dissent of such Member shall be entered in the minutes of the meeting or unless such Member shall file a written dissent to such action with the person acting as the secretary of the meeting before the adjournment thereof or shall forward such dissent by certified mail to the Limited Liability Company within fifteen days after the adjournment of meeting. Such right to dissent shall not apply to a Member who voted in favor of such action.

Unless otherwise provided by law, any action required to be taken at a meeting of the Members, or any other action which may be taken at a meeting of the Members, may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by all of the Members entitled to vote with respect to the subject thereof.

Members of the Limited Liability Company may participate in any meeting of the Members by means of conference telephone or similar communication if all persons participating in such meeting can hear one another for the entire discussion of the matters to be voted upon.

4

Participation in a meeting pursuant to this paragraph shall constitute presence in person at such meeting.

## 8.   Assignment of Interests

Except as otherwise provided in this Agreement, no Member or other person holding any interest in the Limited Liability Company may assign, pledge, hypothecate, transfer or otherwise dispose of all or any part of his interest in the Limited Liability Company, including without limitation the capital, profits or distributions of the Limited Liability Company without the prior written consent of the Manager.

An assignment, pledge, hypothecation, transfer or other disposition of all or any part of the interest of a Member in the Limited Liability Company or other person holding any interest in the Limited Liability Company in violation of the provisions hereof shall be null and void for all purposes.

No assignment, transfer or other disposition of all or any part of the interest of any Member permitted under this Agreement shall be binding upon the Limited Liability Company unless and until a duly executed and acknowledged counterpart of such assignment or instrument of transfer, in form and substance satisfactory to the Manager, has been delivered to the Limited Liability Company.

No assignment or other disposition of any interest of any Member may be made if such assignment or disposition, alone or when combined with other transactions, would result in the termination of the Limited Liability Company within the meaning of Section 708 of the Internal Revenue Code or under any other relevant section of the Code or any successor statute. No assignment or other disposition of any interest of any Member may be made without an opinion of counsel satisfactory to the Manager that such assignment or disposition is subject to an effective registration under, or exempt from the registration requirements of, the applicable federal and state securities laws. No interest in the Limited Liability Company may be assigned or given to any person below the age of 21 years or to a person who has been adjudged to be insane or incompetent.

Anything herein contained to the contrary, the Manager and the Limited Liability Company shall be entitled to treat the record holder of the interest of a Member as the absolute owner thereof, and shall incur no liability by reason of distributions made in good faith to such record holder, unless and until there has been delivered to the Manager the assignment or other instrument of transfer and such other evidence as may be reasonably required by the Manager to establish to the satisfaction of the Manager that an interest has been assigned or transferred in accordance with this Agreement.

## 9.   Admission of New Members

The Member(s) may admit new Members (or transferees of any interests of existing Members) into the Limited Liability upon the consent of the Manager.

As a condition to the admission of a new Member, such Member shall execute and acknowledge such instruments, in form and substance satisfactory to the Manager, as the Manager may deem necessary or desirable to effectuate such admission and to confirm the agreement of such Member to be bound by all of the terms, covenants and conditions of this

Agreement, as the same may have been amended. Such new Member shall pay all reasonable expenses in connection with such admission and any required capital contribution.

In no event shall a new Member be admitted to the Limited Liability Company if such admission would be in violation of applicable federal or state securities laws or would adversely affect the treatment of the Limited Liability Company as a partnership for income tax purposes.

## 10.   Dissolution and Liquidation

The Limited Liability Company shall terminate upon the occurrence of any of the following: the election by the Member(s) to dissolve the Limited Liability Company made by the unanimous vote or consent of the Member(s); or any other event which pursuant to this Agreement, as the same may hereafter be amended, shall cause a termination of the Limited Liability Company.

The liquidation of the Limited Liability Company shall be conducted and supervised by the Manager or, if there be none then by a person designated for such purposes by the unanimous vote or consent of the Member(s) (the "Liquidating Agent"). The Liquidating Agent hereby is authorized and empowered to execute any and all documents and to take any and all actions necessary or desirable to effectuate the dissolution and liquidation of the Limited Liability Company in accordance with this Agreement.

Promptly after the termination of the Limited Liability Company, the Liquidating Agent shall cause to be prepared and furnished to the Member(s) a statement setting forth the assets and liabilities of the Limited Liability Company as of the date of termination. The Liquidating Agent, to the extent practicable, shall liquidate the assets of the Limited Liability Company as promptly as possible, but in an orderly and businesslike manner so as not to involve undue sacrifice.

Notwithstanding any provision hereof or of any other document governing the formation, management or operation of the Company to the contrary, the following shall govern: The vote of a majority-in-interest of the remaining Member(s) is sufficient to continue the life of the Company. If such vote is not obtained, for so long as the Loan is outstanding, the Company shall not liquidate the Property without first obtaining approval of the Lender. Lender may continue to exercise all of its rights under the existing security agreements or mortgages until the debt underlying the mortgage liens has been paid in full or otherwise completely discharged.

## 11.   Representations of Member(s)

Each of the Member(s) represents, warrants and agrees that the Member is acquiring the interest in the Limited Liability Company for the Member's own account for investment purposes only and not with a view to the sale or distribution thereof; the Member, if an individual, is over the age of 21; if the Member is an organization, such organization is duly organized, validly existing and in good standing under the laws of its state of organization and that it has full power and authority to execute this Agreement and perform its obligations hereunder; the execution and performance of this Agreement by the Member does not conflict with, and will not result in any breach of, any law or any order, writ, injunction or decree of any court or governmental authority against or which binds the Member, or of any agreement or instrument to which the Member is a party; and the Member shall not dispose of such interest or any part thereof in any manner which would constitute a violation of the Securities Act of 1933, the Rules and Regulations of the Securities and Exchange Commission, or any applicable laws, rules or regulations of any state or other governmental authorities, as the same may be amended.

6

11. **Notices**

All notices, demands, requests or other communications which any of the parties to this Agreement may desire or be required to give hereunder shall be in writing and shall be deemed to have been properly given if sent by Federal Express courier or by registered or certified mail, return receipt requested, with postage prepaid, addressed as follows: (a) if to the Limited Liability Company, to the Limited Liability Company c/o the Manager at his address first above written or to such other address or addresses as may ,be designated by the Limited Liability Company or the Manager by notice to the Member(s) pursuant to this Article 18; (b) if to the Manager, to the Manager at his address first above-written or to such other address or addresses as may be designated by the Manager by notice to the Limited Liability Company and the Member(s) pursuant to this Article 18; and (c) if to any Member, to the address of said Member first above written, or to such other address as may be designated by said Member by notice to the Limited Liability Company and the other Member(s) pursuant to this Article 18. Each Member shall keep the Limited Liability Company and the other Member(s) informed of such Member's current address.

12. **Arbitration**

Any dispute, controversy or claim arising out of or in connection with this Agreement or any breach or alleged breach hereof shall, upon the request of any party involved, be submitted to, and settled by, arbitration in the city in which the principal place of business of the Limited Liability Company is then located, pursuant to the commercial arbitration rules then in effect of the American Arbitration Association (or at any other time or place or under any other form of arbitration mutually acceptable to the parties involved). Any award rendered shall be final and conclusive upon the parties and a judgment thereon may be entered in a court of competent jurisdiction. The expenses of the arbitration shall be borne equally by the parties to the arbitration, provided that each party shall pay for and bear the cost of its own experts, evidence and attorneys' fees, except that in the discretion of the arbitrator any award may include the attorneys' fees of a party if the arbitrator expressly determines that the party against whom such award is entered has caused the dispute, controversy or claim to be submitted to arbitration as a dilatory tactic or in bad faith.

13. **Amendments**

This Agreement may not be altered, amended, changed, supplemented, waived or modified in any respect or particular unless the same shall be in writing and agreed upon by the Managing Member.

14. **Certain Prohibited Activities**

Notwithstanding any provision hereof or of any other document governing the formation, management or operation of the Company to the contrary, the following shall govern: For so long as the mortgage loan (the "Loan") made by Endeavor Real Estate Group, or its successors and/or assigns, as their interests may appear ("Lender") to the Company, is outstanding, the Company shall not: (i) incur, assume, or guaranty any other indebtedness, except for trade payables in the ordinary course of its business of owning and operating the Property; (ii) engage in, seek or consent to any dissolution, winding up, liquidation, consolidation, merger, asset sale or transfer of membership interest; (iii) file or consent to the filing of any bankruptcy, insolvency or reorganization case or proceeding; (iv) institute any proceedings under any applicable insolvency

7

law or otherwise seek any relief under any laws relating to the relief from debts or the protection of debtors generally; (v) seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for itself or any other entity, (vi) make an assignment of its assets for the benefit of its creditors or an assignment of the assets of another entity for the benefit of such entity's creditors; (vii) take any action in furtherance of the foregoing or (viii) amend this Operating Agreement without first obtaining approval of Lender.

15. **Indemnification**

Notwithstanding any provision hereof or of any other document governing the formation, management or operation of the Company to the contrary, the following shall govern:  Any indemnification shall be fully subordinated to any obligations respecting the Property and shall not constitute a claim against the Company in the event that cash flow is insufficient to pay such obligations.

16. **Separateness Covenants**

Notwithstanding any provision hereof or of any other document governing the formation, management or operation of the Company to the contrary, the following shall govern: for so long as the Loan is outstanding, in order to preserve and ensure its separate and distinct identity, in addition to the other provisions set forth in this Operating Agreement, the Company shall not, without the prior written consent of Lender:

A.    fail to establish and maintain an office through which its business shall be conducted separate and apart from that of any of its Affiliates;

B.    fail to allocate fairly and reasonably any overhead for shared office space;

C.    fail to maintain separate records, books and accounts from those of any Affiliate or any other Person;

D.    commingle funds or assets with those of any Affiliate or any other Person;

E.    fail to conduct its business and hold its assets in its own name;

F.    fail to maintain financial statements, accounting statements and prepare tax returns separate from any Affiliate or any other Person;

G.    fail to pay any liabilities out of its own funds, including salaries of any employees, rather than out of the funds of any Affiliate; or maintain a sufficient number of employees in light of its contemplated business operations;

H.    fail to maintain adequate capital in light of its contemplated business operations;

I.    fail to maintain an arm's length relationship with any Affiliate;

J.    assume or guarantee or become obligated for the debts of any other entity, including any Affiliate, or hold out its credit as being available to satisfy the obligations of others;

8

K.      have any of its obligations guaranteed by any partners, members or shareholders or Affiliates, except the Guarantor;

L.      pledge its assets for the benefit of any other Person or entity (other than Lenders) or make an advance or loan to any Person or entity, including any Affiliate;

M.      acquire obligations or securities of its partners, members or shareholders or any Affiliate;

N.      fail to use stationery, invoices and checks separate from any Affiliate or any other Person;

O.      fail to hold itself out as an entity separate and distinct from any Affiliate and not as a division, department or part of any other Person or entity;

P.      identify its members or any Affiliates as a division or part of it;

Q.      fail to correct any known misunderstanding regarding its separate identity;

R.      fail to maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other entity;

S.      share a common logo with any Affiliate or any other Person;

T.      acquire or own any material assets other than the Collateral;

U.      fail to maintain its books, records, resolutions and agreements as official records;

V.      fail to hold regular meetings, as appropriate, to conduct its business and observe all organizational formalities (including, without limitation, failing to preserve its existence as an entity duly organized, validly existing and in good standing under the applicable law of the State of New York) and record keeping;

W.      convert Borrower into a partnership, limited partnership, corporation or other form of entity; or

X.      merge into or consolidate with any other person or entity, or, to the fullest extent permitted by law, dissolve, terminate, liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure.

For purpose of **Section 16**, the following terms shall have the following meanings:

"Affiliate" means any Person controlling or controlled by or under common control with the Company including, without limitation (i) any Person who has a familial relationship, by blood, marriage or otherwise with any partner or employee of the Company, or any affiliate thereof and (ii) any Person which receives compensation for administrative, legal or accounting services from the Company, or any affiliate. For purposes of this definition, "control" when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization, or government or any agency or political subdivision thereof.

## 17.    Voting

Notwithstanding any provision hereof or of any other document governing the formation, management or operation of the Company to the contrary, the following shall govern: When acting on matters subject to the vote of the members, notwithstanding that the Company is not then insolvent, all of the members shall take into account the interest of the Company's creditors, as well as those of the members.

## 18.    UCC Article 8

Each limited liability membership interest in the Company shall constitute a "security" within the meaning of, and governed by, (i) Article 8 of the Uniform Commercial Code (including Section 8 102(a)(15) thereof) as in effect from time to time in the State of New York, and (ii) Article 8 of the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995.

## 19.    Miscellaneous

This Agreement and the rights and liabilities of the parties hereunder shall be governed by and determined in accordance with the laws of the State of New York. Every provision of this Agreement is intended to be severable. If any provision of this Agreement shall be invalid or unenforceable, such invalidity or unenforceability shall not affect the other provisions of this Agreement, which shall remain in full force and effect.

The captions in this Agreement are for convenience only and are not to be considered in construing this Agreement. All pronouns shall be deemed to be the masculine, feminine, neuter, singular or plural as the identity of the person or persons may require. References to a person or persons shall include partnerships, corporations, limited liability companies, unincorporated associations, trusts, estates and other types of entities. The Managing Member and the Member(s)

10

collectively are referred to herein as the Member(s). Any one of the Member(s) is referred to herein as a Member. References to the Internal Revenue Code shall mean the Internal Revenue Code of 1986, as amended, and any successor or superseding federal revenue statute.

This Agreement, and any amendments hereto may be executed in counterparts all of which taken together shall constitute one agreement.

This Agreement sets forth the entire agreement of the parties hereto with respect to the subject matter hereof. It is the intention of the Member(s) that this Agreement shall be the sole source of agreement of the parties, and, except to the extent a provision of this Agreement provides for the incorporation of federal income tax rules or is expressly prohibited or ineffective under the New York Limited Liability Company Act, this Agreement shall govern even when inconsistent with, or different from, the provisions of any applicable law or rule. To the extent any provision of this Agreement is prohibited or otherwise ineffective under the New York Limited Liability Company Act, such provision shall be considered to be ineffective to the smallest degree possible in order to make this Agreement effective under the New York Limited Liability Company Act. If the New York Limited Liability Company Act is subsequently amended or interpreted in such a way to make any provision of this Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

Subject to the limitations on transferability contained herein, this Agreement shall be binding upon and inure to the benefit of the parties hereto and to their respective heirs, executors, administrators, successors and assigns.

No provision of this Agreement is intended to be for the benefit of or enforceable by any third party.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement on the date first above written.

Hello Nostrand Investors LLC By: Eli Karp, Managing Member

## **EXHIBIT 5**

**(Designation of Independent Manager)**

## DESIGNATION OF INDEPENDENT MANAGER AGREEMENT

This Agreement dated as of this 28th day of August, 2020, is made by and between **HELLO LIVING DEVELOPER NOSTRAND LLC** (the "LLC"), a New York limited liability company, with its address at 33 35th Street, 6th Floor, Suite B-613, Brooklyn, NY 11232, and **CT CORPORATION STAFFING, INC.** ("CTCS"), a Delaware corporation, with offices at 1209 Orange Street Wilmington, DE 19801.

The parties hereby agree as follows:

## I. **CTCS Obligations.**

On its part CTCS, agrees to the following:

A. To forward all communications received on behalf of the LLC in accordance with instructions received from the LLC or from its counsel,

B. To furnish the following employee or employees of CTCS:

Steven P. Zimmer

to act as the "Independent Manager" of the LLC, as such term is defined in Exhibit A hereto, and to participate only in matters set forth on Exhibit B hereto.

C. In the event the above individual(s) referred by CTCS is at any time unable to serve, including if such individual(s) shall have ceased to be an employee of CTCS for any reason, CTCS shall identify and refer a substitute individual(s) subject to the terms and conditions of this Agreement. It is expressly understood by the LLC that neither the individual(s) (nor any other employee of CTCS) will serve as an officer of the LLC and that individual(s) identified and referred by CTCS will at all times constitute only a minority of the Board.

## II. **LLC Obligations.**

On its part the LLC agrees to the following:

A. To indemnify, hold harmless and defend CTCS, its affiliated companies and its employees and agents, including specifically the individual(s) designated to act as the Independent Manager, from and against any and all claims, damages, liabilities and causes of action (including attorney fees and costs) imposed upon or incurred by or asserted against CTCS, its affiliated companies and employees and agents, including specifically the individual(s)

designated to act as the Independent Manager, directly or indirectly, relating to or arising out of the Agreement, and from and against any and all claims, damages, liabilities and causes of action (including attorney fees and costs) imposed upon or incurred by or asserted against CTCS, its affiliated companies and employees and agents, including specifically the individual(s) designated to act as the Independent Manager, directly or indirectly, that might have taken place prior to appointment of the Independent Manager or, the date of this Agreement should it follow the effective date of such appointment; provided, however, that the indemnification shall not extend to willful misconduct or gross negligence by CTCS, its affiliated companies and employees and agents, including specifically the individual(s) designated to act as the Independent Manager.

B.  That in the event the LLC has existing Managers insurance for its other managers, to name the Independent Manager furnished by CTCS as insured(s) under such policy.

C.  That in the event the LLC maintains, either on its own behalf or as a named insured on an insurance policy of a parent or affiliated entity, Errors and Omissions ("**E & O**") or other type of insurance sufficient in coverage to administer and properly execute the indemnifications made in Paragraphs "A" above, to provide annually to CTCS evidence in the form of a Certificate of Insurance or an Insurance Binder that shows such coverage.

D.  To pay CTCS (in addition to any registered agent service fee for the LLC) a non-refundable annual fee of $1,350.00, such fee to be reviewed annually and adjusted, where applicable, based upon prior year activity of the Independent Manager, with the initial fee being due and payable in full upon the signing of this Agreement, and each subsequent annual fee being due and payable in full upon each anniversary of this Agreement.

E.  That in the event the majority of the non-independent managers of the LLC deem it is in the best interests of the LLC to file a petition in bankruptcy, to pay the reasonable expenses for an independent legal opinion for the Independent Manager as to the advisability of such action,

F.  That the provisions of this Section II will survive the expiration or termination of this Agreement.

III.  **Miscellaneous:**

A.  This Agreement shall be in full force and effect upon its execution and shall remain valid until terminated in writing by either party with thirty (30) day notice presented and acknowledged by an authorized party of the receiving entity.

B. This Agreement and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of Delaware, without giving effect to principles of conflict of law.

C. Any notice, demand or request required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered personally or sent by fax or 48 hours after being sent by nationally-recognized courier or deposited in the U.S. mail, as certified or registered mail, with postage prepaid, and addressed to the party to be notified at such party's address or fax number as set forth above or as subsequently modified by written notice.

**AGREED:**

| HELLO LIVING DEVELOPER NOSTRAND LLC | CT CORPORATION STAFFING, INC. |
|---|---|
| By: _____ | By: _____ |
| Name: Eli Karp | Steven P. Zimmer |
| Title: Authorized Signatory | Secretary |
| | |
| Date: _____ | Date: _____ |

List:

1580 Nostrand Mezz LLC
Attn.: Brian Shatz or Joshua Zegen
520 Madison Avenue, Suite 3501
New York, NY 10022

Suggested Language

## EXHIBIT A

"Independent Manager" means a Manager of the LLC who is not at the time of the initial appointment and has not been at any time during the preceding five (5) years: (A) a stockholder, director, officer, member, employee or partner of the LLC; (B) a customer, supplier or other person who derives more than 10% of its purchases or revenues from its activities with the LLC; (C) a person or other entity controlling or under common control with any such stockholder, partner, customer, supplier or other person; or (D) a member of the immediate family of any such stockholder, director, officer, member, employee, partner, customer, supplier or other person. (As used herein, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of management, policies, or activities of a person or entity, whether through ownership of voting securities, by contract or otherwise.)

Suggested Language

## EXHIBIT B

Filing a bankruptcy or insolvency petition or otherwise instituting insolvency proceedings with respect to the LLC itself or to any other entity in which it has a direct or indirect legal or beneficial ownership interest, dissolving, liquidating, consolidating, merging, or selling all or substantially all of the LLC's assets or any other entity in which it has a direct or indirect legal or beneficial ownership interest, engaging in any other business activity, or amending its organizational documents.

## EXHIBIT 6

**(Disclosure Statement)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

In re:                                                                Chapter 11

HELLO LIVING DEVELOPER NOSTRAND, LLC,                                 Case No.   21-22696 (SHL)

                                                   Debtor.

-------------------------------------------------------------------X

## DEBTOR'S DISCLOSURE STATEMENT UNDER
## CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED BY THE DEBTOR

Leo Fox, Esq.
630 Third Avenue – 18th Floor
New York, New York 10017
(212) 867-9595 - Telephone
(212)   949-1857 - Facsimile
leo@leofoxlaw.com

*ATTORNEY FOR THE DEBTOR
AND DEBTOR-IN-POSSESSION*

Leo\Clients\Nostrand Properties\Hello Living Developer Nostrand LLC\Disclosure Statement\Disclosure Statement V6\3-23-2022

## DEBTOR'S DISCLOSURE STATEMENT
### DATED MARCH 23, 2022

### INTRODUCTION

1.      The above-captioned Debtor[1] submit this Disclosure Statement pursuant to § 1125 of the Bankruptcy Code to its known creditors in order to disclose that information deemed by the Debtor to be material, important, and necessary for the Creditors and holders of equity interest to arrive at a reasonably informed decision in exercising their right to vote for acceptance or rejection of the Plan (hereafter the "Plan"), on file with the Bankruptcy Court.   Only "impaired" Creditors, as that term is defined in the Bankruptcy Code, are entitled to vote for the Plan or to reject the Plan.   A full definition of what constitutes impairment is contained in § 1124 of the Bankruptcy Code.   Approval of the adequacy of the information contained in this Disclosure Statement does not constitute any recommendation by the Court as to the merits of the Plan, whether the Creditors should vote for the Plan, or if the Plan should be confirmed.

2.      A copy of the Plan (*Exhibit A*) accompanies this Disclosure Statement, proposed Order approving the Disclosure Statement and Scheduling a Hearing on Confirmation, as well as a Ballot Form for the acceptance or the rejection of the Plan.   The Debtor has set _____, 2022 at __:00  .m. for a hearing on and final approval of the Disclosure Statement.

3.      As a Creditor, your vote is important.   In order for the Plan to be deemed accepted, members of each impaired Class designated in the Plan that hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Claims of the Class that vote must vote for the Plan. A claim or interest is impaired unless the Plan: (1) leaves unaltered the legal, equitable, and

---

[1] Capitalized terms used herein, if not otherwise defined, shall have the same meaning as defined in the Plan.

2

contractual rights to which such claim or interest entitles the holder of such claim or interest; or

(2) notwithstanding any contractual provision or applicable law that entitles the holder of such

claim or interest to demand or receive accelerated payment of such claim or interest after the

occurrence of a default; (A) cures or provides for a cure subject to Court approval of any such

default that occurred before or after the commencement of the case under this title, other than a

default of a kind specified in § 365 (b)(2) of this title; (B) reinstates the maturity of such claim or

interest as such maturity existed before such default; (C) compensates the holder of such claim or

interest for any damages incurred as a result of any reasonable reliance by such holder on such

contractual provision or such applicable law; and (D) does not otherwise alter the legal, equitable,

or contractual rights to which such claim or interest entitles the holder of such claim or interest.

**NO REPRESENTATIONS CONCERNING THE DEBTOR ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE WHICH IS OTHER THAN AS CONTAINED IN THIS STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR, WHO IN TURN SHALL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS MAY BE DEEMED APPROPRIATE.**

**THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY, ALTHOUGH GREAT EFFORT HAS BEEN MADE TO BE ACCURATE.**

**APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT BY THE COURT DOES NOT CONSTITUTE A RECOMMENDATION BY THE COURT AS TO THE MERITS OF THE PLAN. THE COURT DOES NOT RENDER ANY OPINION AS TO**

3

**WHETHER THE PLAN SHOULD BE ACCEPTED OR
REJECTED BY CREDITORS.**

**CREDITORS ARE URGED TO READ THE PLAN IN FULL.
THE PLAN REPRESENTS A PROPOSED LEGALLY
BINDING AGREEMENT BETWEEN THE DEBTOR AND
ITS CREDITORS AND SHAREHOLDERS AND
INTERESTED PARTIES, AND IT SHOULD BE READ
TOGETHER WITH THIS DISCLOSURE STATEMENT SO
THAT AN INTELLIGENT AND INFORMED JUDGMENT
CONCERNING THE PLAN CAN BE MADE.**

4.    The following summarizes the Classes, the treatment of the Classes and the

expected recovery.

| Class | Claim | Claim Amount/ Classification | Treatment | Projected Recovery | Status | Voting Rights |
|---|---|---|---|---|---|---|
| 1 | Secured Claim of 1580 Nostrand Mezz LLC | Asserted $3,00,000 in unpaid principal which is alleged to be $4,500,000 presently (Secured) (Disputed) | This Creditor shall receive monthly principal and interest payments amortized over 30 years at the interest rate of 3.5% annual rate commencing on the Effective Date for four (4) years and then paid a balloon payment of the balance in full satisfaction and settlement of the claim. | 100% of the Allowed Secured claim | Impaired | Entitled to vote |
| 2 | Any Allowed Unsecured claims | Undetermined | Such claims shall be paid, pro rata, in full, with monthly principal payments of $15,000 plus interest at 3.5% interest commencing on or about the Effective Date for nine (9) years in | 100% of the Allowed Unsecured claims | Impaired | Entitled to vote |

4

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | full satisfaction and settlement of claims. | | | |
| | | | | | | |
| 3 | Equity Interests | | The equity holders shall be paid their investments upon the development project under the means provided for in the investment documents with the equity holders. | | | |

## THE REAL PROPERTY

5.      The Debtor owns 100% of the shares of stock of Hello Nostrand LLC ("*Hello Nostrand*").  Hello Nostrand owns and operates real property located at 1580 Nostrand Avenue, Brooklyn, New York (the "*Real Property*").   The shares are secured by a security interest held by 1580 Hello Nostrand Mezz LLC with a secured debt of $3,000,000 principal.   The Real Property is the only asset of the Hello Nostrand.   The Real Property has a disputed Mortgage held by 1580 Nostrand Ave LLC, a first Mortgagee and an affiliate of 1580 Nostrand Mezz LLC (the "*Mortgagee*"), by a number of assignments, asserting a secured claim in the approximate amount of $70,000,000 inclusive of interest (including the $3,000,000 debt owed by the Debtor).

6.      The Debtor has been recently made aware of the fact that the Mortgagee, 1580 Nostrand Ave LLC, transferred its mortgage interest to Nostrand Senior Lender LLC.

## EVENTS LEADING UP TO THE CHAPTER 11 FILING

7.      The Debtor owns 100% of the equity of Hello Nostrand LLC (see *Exhibit B* for a chart of the corpore structure).    The equity interest was scheduled to be foreclosed if a foreclosure sale proceeded as scheduled in December 2021 and the Chapter 11 petition was not filed.    Hello Nostrand purchased the Real Property in 2014 for the purpose of constructing a multi-unit housing

5

development.    Hello Nostrand started construction in March 2018 and completed the existing

building construction in June 2021.    The building presently has a Temporary Certificate of

Occupancy.    Hello Nostrand recently entered into a Lease with 1580 Nostrand Management LLC

under a ten (10) year Lease at a beginning annual rental of $3,200,000 with annual increases.

There exists a parcel of vacant land on the Real Property which adjoins the completed building

which, it is anticipated, will be constructed with another multi-unit development.

8.    The events leading up to this Chapter 11 filing arise from the following. As was

noted in the filing papers, Hello Nostrand had a long and unsatisfactory relationship with the

secured lender, Madison Realty ("*Madison Realty*").

9.    On December 19, 2017, Prophet Capital Asset Management ("*Prophet*"), entered

into a commitment with the Hello Nostrand for $63,000,000 construction loan (the "*Loan*")

secured by the real property and any improvements.    On June 7, 2019, at a time that the loan was

not in default, Prophet assigned the Loan to Madison Realty.    On December 2, 2019, Hello

Nostrand requested a payoff from Madison Realty.    For ten (10) weeks, until February 14, 2020,

Madison Realty failed to fund the Loan or give a payoff letter.    On February 14, 2020, Madison

Realty delivered a payoff letter reflecting a balance due of $47,392,000.    Total borrowings,

including interest reserve up until December 2019 of $7,000,000 reflected a balance due of

$41,322,000.

10.    On February 14, 2020, Madison Realty also declared the Loan to be in default,

retroactively, since July 2019 claiming $6,000,000 in penalties running from July 2019 despite the

$1,500,000 in interest reserves which would have kept the Loan current up until mid-November

2019.    Hello Nostrand was not aware of any default where Madison Realty never declared a

default prior to February 14, 2020.    In the February 14, 2022 notification, Madison Realty

6

declared that the Hello Nostrand had been in default from July 2019 up until November 1, 2019 and therefore interest had been running at 24% per annum since July 2019. Madison Realty claimed the default was due to failure to pay interest and treated the interest reserve as cash collateral, thereby accruing default interest at the full default rate then applying the $1,500,000 interest reserve as a credit against the total default interest. This resulted in depriving Hello Nostrand of credit for the payment of interest as part of the interest reserve which were on deposit which accrued interest and was readily available to Madison Realty. Madison Realty's calculation of interest defeated the whole purpose of the interest reserve. This method added $6,000,000 to the "balance". Hello Nostrand lost an opportunity to refinance the Madison Realty loan as a consequence of this added interest.

11.    On March 2, 2020, Madison Realty sent a corrected letter to Hello Nostrand, reversing Madison Realty's earlier default notice and instead declaring the default as of November 1, 2020 and running default interest from November 1, 2019 up until April 30, 2020 in advance of the March 2020 notice for a total of six (6) months of default. This left Hello Nostrand with the same sum of $6,000,000 of default interest as before added to the loan now having a balance of $47,352,000.

12.    As a consequence of Madison Realty's refusal to fund a real estate construction loan, no monies were advanced, the project stalled, insurance lapsed, contractor's liens arose and the entire project was endangered.

13.    Hello Nostrand requested a payoff and Madison Realty stated the amount due was $56,000,000. In June 2021, Hello Nostrand provided a TCO to Madison Realty demonstrating that the building construction was complete. Thereafter, in August 2021, Madison Realty "repackaged" the loan by (a) granting an additional "Mezzanine Loan" by a Madison Realty

7

affiliate to the Debtor here as owner of the equity interest of Hello Nostrand of $3,000,000 (which

was, in any event, part of Madison Realty's commitment obligation under the $63,000,000 Loan)

and recalculating the loan default rate, by among other things, capitalizing default interest of

$4,350,000 plus charging additional miscellaneous charges such as a $252,000 forbearance fee,

which released all of the Debtor's and Hello Nostrand's claims against Madison Realty.   The

$3,000,000 balance on the loan to the Debtor went to $4,500,000.

14.     The $3,000,000 loan to the Debtor was scheduled to be foreclosed pursuant to a

UCC Auction Sale in December 2021.   On December 21, 2021, the Debtor filed this Chapter 11

case to stay the foreclosure sale.

## SOURCE OF FUNDS FOR PLAN FEASIBILITY

15.     All plan payments shall come from the assets of Hello Nostrand.   Hello Nostrand

will then be able to make their payment based on its Lease Income commencing in March 2023 of

over $3,200,000 per year.   The monthly payment of $20,207 to Class 1 (see Class 1 treatment)

and $7,297 to Class 2 (see Class 2 treatment) can be easily met from Hello Nostrand's cash flow.

The following are the amounts of the funds necessary for confirmation of the Plan.

| | |
|---|---|
| Leo Fox, Esq., Counsel to the Debtor (§507(a)(1) (net after prior payments) (Administration – Priority) | $100,000 Approximately |

(See *infra* "Implementation of Plan").

16.     The Lease schedule reflecting the rent payable each year to Hello Nostrand by the

Tenant (*Exhibit C*) demonstrates that such distributions are feasible.   Although Hello Nostrand

does not have any other significant expenditure being paid at this point, Hello Nostrand will be

able to make these payments even if there arises contingencies to make payments on the entire

Loan owed to the Lender.   These payments represent a minor amount of the cash flow.   The

8

payments being made by this Debtor are being made to the same Lender as the Lender to Hello Nostrand. These payments benefit the creditors of the Debtor as well as the creditors of Hello Nostrand since these payments enable the consistency and stability of the existing management with expertise to continue and complete the development of the vacant lot project.

## IMPLEMENTATION OF PLAN

17.   The Debtor shall continue with the litigation against the Secured Creditor (Class 1).

18.   The Debtor shall act as Distributing Agent.

19.   The Debtor shall monitor the operation of the Hello Nostrand Real Property.

20.   The litigation with the Secured Creditor will continue until there is a Final Court Order determining the allowability of the Secured Creditor's claims and priority.

21.   The Plan is self-executing. Except as expressly set forth in the Plan, the Debtor shall not be required to execute any newly created documents to evidence the Claims, liens or terms of repayment to the holder of any Allowed Claim. The terms of this Plan will exclusively govern payments to creditors and any other rights of creditors as against the Debtor and their property. Furthermore, upon the completion of the payments required under this Plan to the holders of Allowed Claims, such Claims, and any liens that may support such Claims, shall be deemed released and discharged. The Debtor shall be responsible to effect all transactions to consummate the provisions.

## DISTRIBUTION PROCEDURES

22.   The distribution should take place to undisputed creditors by the Effective Date. Distributions shall be made to the Mortgagee upon a Final Order allowing the Mortgagee's claims. Reserves shall be set for disputed claims.

9

## SUMMARY OF PLAN

23.     The Plan is composed of a total of three (3) classes consisting of Creditor Classes and an equity holder Class.

24.     ***Class 1***:     The Allowed Secured Claims of 1580 Nostrand Mezz LLC holding a claim alleged to be in the amount of approximately $3,000,000 in unpaid principal which is alleged to be $4,500,000 presently which claim includes prepayment fees, forbearance fees, exit fees, servicing fees and any other charges charged by this creditor (the attorney of Secured Creditor refused to provide a payoff amount for these claims) are the holders of the Allowed Class 1 Claim.

25.     This creditor shall receive monthly principal and interest payments amortized over 30 years at the interest rate of a 3.5% annual rate commencing on the Effective Date in full satisfaction and settlement of the claim. The monthly payments shall continue until paid on or before four (4) years following the Effective Date (the "***Final Installment Date***").     Payments shall come from Lease Income of Hello Nostrand.   The Debtor estimates the monthly payment to be $20,207.   The Debtor shall arrange for a balloon payment of the balance either through Hello Nostrand or investors.

26.     The Debtor shall have the right to prepay the Allowed Class 1 Claim in whole, or in part, at any time following Confirmation, without penalty.   In the event of such prepayment, any and all unearned interest shall be deemed waived.   Upon Confirmation, any and all prepayment premiums and any fees, exit fees or such other requirements set forth in the underlying loan shall also be waived and released.   The Debtor shall pay all of its operating obligations.   The terms of the Plan shall be the exclusive terms relating to the repayment of the Allowed Class 1 Claim. The pre-petition loan documents shall have no force or effect after Confirmation. Upon completion of the payments to the holder for the Allowed Class 1 Claim as required by the Plan

10

and resolution of the disputed claims, Class 1 shall be deemed to have released any and all liens on the Debtor' assets. To the extent required by the Debtor, upon full payment of its Allowed Class 1 Claim, Class 1 holder shall immediately prepare and file any document necessary to effect a release of its liens on the Debtor's assets.

27.    This Class is impaired and is entitled to vote.

28.    ***Class 2:***    Any Allowed unsecured claims.

29.    Such claims shall be paid, pro rata, in full, with monthly principal payments of $15,000 plus interest at 3.5% interest commencing on or about the Effective Date in full satisfaction and settlement of the claims. The Debtor estimates the monthly payment to be $7,297 and the repayment period to be 108 months or over nine (9) years. These payments made be prepaid at the Debtor's option.

30.    This Class is impaired and is entitled to vote.

31.    ***Class 3:***    Equity Interests – shall be the holders of the equity interest of the parent Debtor.

32.    The equity holders shall be paid their investments upon the development project under the means provided for in the investment documents with the equity holders.

33.    This Class is unimpaired and is not entitled to vote.

## UNITED STATES TRUSTEES FEES UNDER 28 U.S.C. § 1930

34.    The Debtor will undertake and be responsible for all payments due to the United States Trustee's office up through Confirmation, and thereafter up through any conversion of the case to Chapter 7 or the dismissal of the case or closing of the case. These payments shall be paid timely. All United States Trustees fees accrued prior to Confirmation shall be paid at or prior to confirmation. All subsequent United States Trustee fees shall be timely paid by the Debtor.

11

All reports required by the United States Trustee shall be properly and timely filed.

## **ADMINISTRATION EXPENSES AND UNCLASSIFIED CLAIMS**

35.    All operating unpaid administrative expenses of the Chapter 11 Case fees, the Court appointed professionals for the Debtor who have rendered services and who are entitled to compensation under §§ 327 and 503(b) of the Bankruptcy Code for services rendered prior to the Confirmation Date subject to a Fee Application on Notice and Court Order and the fees payable to the Office of the United States Trustee under 28 U.S.C. § 1930, are not classified and shall be paid in full on the Effective Date.   The United States Trustee Fees and the professional fees, incurred after confirmation at the same hourly rates and terms shall continue to be paid up through the Closing Date of this Chapter 11 Case.   A reserve may be estimated on the Confirmation Date and instituted for the payment of these fees.   The within professional claims for post-confirmation services may be paid under a different agreement reached with the Debtor prior to Confirmation and may be paid without any Court Order.

## **PROCEDURES FOR RESOLVING DISPUTED CLAIMS**

36.    **Time Limit for Objections to Claims**        Objections to Claims shall be filed by the Debtor with the Court and served upon each holder of each of the Claims to which objections are made not later than sixty (60) days subsequent to the Confirmation Date or within such other time period as may be fixed by the Court.   Unless otherwise extended by Order of this Court, the Debtor may file an objection to the allowance of any Claim filed resulting from the rejection of an executory contract on the latter of sixty (60) days following the Confirmation Date or within thirty (30) days after the filing of such Claim and service a copy of such Claim upon the Debtor as provided for in the Plan.

12

37. **Resolution of Disputed Claims**    Unless otherwise ordered by this Court, the Debtor shall litigate to judgment, settle or withdraw objections to Disputed Claims, in its sole discretion, without notice to any party in interest, other than notice of not less than ten (10) days' notice, as between the Debtor and the Creditor of the Claim, who is being objected to.

38.    Payments and distributions to each holder of a Disputed Claim that ultimately becomes an Allowed Claim shall be made in accordance with the provisions of the Plan with respect to the Class of creditors to which the respective holder of an Allowed Claim belongs. Reserves may be maintained.    Such payments and distributions shall be made as soon as practicable after the date that this Court enters a Final Order allowing such Claim, but not later than thirty (30) days thereafter.    Payments shall be made as and when a Disputed Claim has become, in whole or in part, an Allowed Claim or a Disallowed Claim, pursuant to a Final Order or agreement between the Debtor and such Claimant or as allowed by this Plan.

## THE REORGANIZED DEBTOR

39.    The Debtor shall continue with its corporate status and operate the Debtor's businesses.

40.    The Debtor shall reserve all distributions from disputed claims pending determination that claims become Allowed claims.

41.    The case may be closed after initial payments are made to creditors on the Effective Date and may be re-opened, without any fees, as necessary, to implement the Plan.

## OFFICERS, DIRECTORS, AND MEMBERS

42.    On Confirmation, Eli Karp shall continue to act as Member/Manager and conduct the Debtor's financial and other affairs.    This person is not paid a salary for his work prior to the Chapter 11 filing or subsequently.

13

## THE LIQUIDATION ANALYSIS

43.    The Debtor believes that the only alternative to confirming this Chapter 11 Plan is a conversion of this case to a case under Chapter 7 of the Bankruptcy Code.

44.    The liquidation analysis (*Exhibit D*) assumes that a liquidation sale of the Debtor's assets would result in there being insufficient funds to pay the Secured creditor even if the Secure creditor's claims were allowed much less other junior claims.

45.    The Debtor believes that the Debtor will be able to establish, under the terms of the Plan, that it has met one of the requirements to confirm a Plan, which is that the treatment under the Plan provides creditors with better treatment than such creditors would receive in liquidation or treatment that is no worse than what the creditors would receive in the liquidation.

## EXECUTORY CONTRACTS

46.    There are no executory contracts between the Debtor and any third party.

## TAX IMPLICATIONS

47.    There are no transactions for which a transfer tax is due.

## PREFERENCE AND FRAUDULENT CONVEYANCE ACTIONS

48.    The Debtor has reviewed its books and records and has investigated whether there are any valid causes of action, including proceedings to avoid transfers including, but not limited to, proceedings under 11 U.S.C. §§ 544(b), 547, 548, 549, 550 of the Bankruptcy Code or applicable State Law.    After analyzing the risks and expenses related to the prosecution of and the limited recovery, if any, which would inure to the benefit of the creditors in the event that the Debtor would be successful, and the ability to collect on any judgments obtained, the Debtor determined that it does not intend to institute any causes of action (excluding, however, the making of objections to claims) for preference or fraudulent conveyance, other than as identified herein.

14

## EVENT OF DEFAULT

49.    The occurrence of any of the following shall constitute a default by the Debtor under the Plan with respect to creditors.

a.    If (i) the Debtor default in making payments due under the Plan (and a grace period of ten (10) days after written notice of such default is given by a majority of the holders of the Class in default shall have passed, and unless such default (hereinafter referred to as an "*Event of Default*") has been waived in accordance with the term herein; (ii) the Debtor breaches any of the covenants contained herein after ten (10) days written notice by a creditor to the Debtor prior to payment due under the Plan; (iii) the Debtor seeks relief under any Federal or State Statute (other than the Debtor' present Chapter 11 Case); (iv) or a receiver; liquidator, custodian or trustee is appointed for substantially all of the property of the Debtor prior to completion of the payment due.

b.    Upon the occurrence of an Event of Default, any creditor shall notify the Debtor, and with the exception of any monetary default on account of payment, the Debtor shall have ten (10) business days from the date of the sending of such notice to cure such breach.   With respect to a breach for non-payment, the Debtor shall have a cure period of twenty-five (25) business days.   In the event the Debtor fails to cure such breach within the prescribed periods, the Debtor shall be deemed to have defaulted on the terms of the Plan and the creditors shall have all rights available to them under State Law or the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, or under this Plan.

## RETENTION OF JURISDICTION BY THE COURT

50.    The Plan provides that the Court shall retain jurisdiction for specified purposes, including, without limitation, the determination of all controversies arising under or in regard to

15

the Plan, objections to claims, hearing, and determining applications for allowances of compensation and reimbursement of expenses, and the enforcement or continuation of orders entered in this case, until substantial Consummation, and closing of the case.

## EFFECTS OF COURT'S CONFIRMATION
## AND FEASIBILITY OF THE PLAN

51.    Pursuant to § 1141 of the Bankruptcy Code, the Confirmation Order shall discharge claims against the Debtor which are being treated under the Plan.   Except as expressly provided herein, the rights afforded in the Plan and the treatment of all Creditors and holders of equity interest provided herein shall be in exchange for, and in complete satisfaction, discharge, and release of all Claims, against the officers and directors of the Debtor, and the professionals representing the Debtor (arising out of services in connection with this Chapter 11 Case) in this Chapter 11 Case (excluding negligent acts of willful misconduct, *ultra vires* acts, and breaches of fiduciary duty by such professionals). Except as otherwise provided in the Plan, upon the Confirmation Date, all Claims against the above referred to professionals will be satisfied, discharged, and released (except for those obligations identified in the Plan) in full exchange for the consideration provided for hereunder.    Nothing herein shall discharge any claim for fraud or gross negligence against a professional.

52.    The effects of Confirmation of the Plan are set forth in the Bankruptcy Code. The following is a brief summary of the effect of Confirmation upon the Debtor, its creditors, and other interested parties. Upon Confirmation, the provisions of the Plan will bind the Debtor, its equity holders and creditors, whether or not they have accepted the Plan.

16

## ANTICIPATED CONFIRMATION DATE

53.    It is anticipated the Plan will be confirmed by the Bankruptcy Court within forty

(40) days, assuming the following events take place:

    A.    The Plan is duly accepted by creditors; and

    B.    The Bankruptcy Court finds that the Plan is feasible and in the best interest
of creditors; and

    C.    The Court finds that the Plan is fair and equitable and does not
discriminate unfairly; and

    D.    The Debtor has made arrangement with the professionals for
the payment of professional fees.

## WHERE TO FILE BALLOTS ON THE PLAN

54.    Pursuant to a Court Order approving this Disclosure Statement, ballots on the

Debtor's Plan must be received by _____, 2022.   All ballots should be properly completed and

forwarded to:   Leo Fox, Esq., 630 Third Avenue, 18th Floor, New York, New York 10017.

Dated: New York, New York
      March 23, 2022

                    **HELLO LIVING DEVELOPER NOSTRAND LLC**

                    By:    */s/ Eli Karp*
                            Eli Karp
                            Manager

*/s/ Leo Fox, Esq.*
Leo Fox, Esq.
Attorney for Debtor
630 Third Avenue, 18th Floor
New York, New York 10017
(212) 867-9595
leo@leofoxlaw.com

17

# *EXHIBIT A*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
In re:                                                                    Chapter 11

HELLO LIVING DEVELOPER NOSTRAND, LLC,                Case No.  21-22696 (SHL)

                                        Debtor.
-------------------------------------------------------------------X

## DEBTOR'S PLAN OF REORGANIZATION UNDER
## CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED BY THE DEBTOR

Leo Fox, Esq.
630 Third Avenue – 18th Floor
New York, New York 10017
(212) 867-9595 - Telephone
(212)  949-1857 - Facsimile
leo@leofoxlaw.com

***ATTORNEY FOR THE DEBTOR***
***AND DEBTOR-IN-POSSESSION***

Nothing contained herein shall constitute an offer, an acceptance, or a legally binding obligation of the Debtor or any other party in interest. This Plan is subject to approval of the Bankruptcy Court and other customary conditions. This Plan is not an offer with respect to any securities. This is not a solicitation of acceptances or rejections of the Plan. Acceptances or rejections with respect to this Plan may not be solicited until a disclosure statement has been approved by the United States Bankruptcy Court for the Southern District of New York in accordance with § 1125 of the Bankruptcy Code. Such a solicitation will only be made in compliance with applicable provisions of securities and bankruptcy laws.

**YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS PLAN FOR ANY PURPOSE (INCLUDING IN CONNECTION WITH THE PURCHASE OR SALE OF THE DEBTOR' SECURITIES) PRIOR TO THE CONFIRMATION OF THIS PLAN BY THE BANKRUPTCY COURT.**

Leo Fox, Esq.
*Attorney for the Debtor and
Debtor-In-Possession*
630 Third Avenue – 18th Floor
New York, New York 10017
(212) 867-9595 (Phone)
(212) 949-1857 (Facsimile)
leo@leofoxlaw.com

2

## PLAN OF REORGANIZATION
### DATED MARCH 21, 2022

The above-captioned Debtor and Debtor-in-Possession proposed this Plan of Reorganization (the "*Plan*") pursuant to § 1121 of the Bankruptcy Code. The Plan proposes to pay the Secured Creditor's Allowed claim of $3,000,000 of principle secured by the value of the Debtor's shareholders interest in Hello Nostrand LLC over four (4) years with a balloon payment at the end of the fourth (4th) year and for unsecured creditors to be paid their claims.

The Debtor is the proponent of the Plan. The Plan provides for distributions to the holders of Allowed Claims from funds realized by the Debtor from Lease income of its subsidiary, Hello Nostrand LLC. Hello Nostrand LLC has agreed to provide the Lease Income amounts from its Tenant necessary to pay the above Plan. For a further discussion of the Plan, the reader's attention is directed to the Disclosure Statement being filed by the Debtor in connection with this Plan.

### ARTICLE I

### DEFINITIONS

1.1     All terms in this Plan, unless the context otherwise requires, are as defined in Title 11 of the United States Code. The following terms have the meaning set forth in this Article.

| | |
|---|---|
| *Administrative Claim* | Allowed claims or requests for payment under § 503(b) entitled to Administrative priority under § 507(a)(2) of the Bankruptcy Code and United States Trustee fees under 28 U.S.C. § 1930 (United States Trustee fees are not required to have been filed as a request for payment) |
| *Allowed Claim* | A "Claim (as defined below) (i) proof of which has been filed with the Bankruptcy Court within the time fixed by the Bankruptcy Court or applicable rules or statutes, and with respect to which no objection has been timely filed by any party in interest, or (ii) that has been, or hereafter is, listed by the Debtor as liquidated in |

3

| | |
|---|---|
| | amount and not disputed or contingent in the Debtor's bankruptcy schedules filed in these Chapter 11 cases, or (iii) that has been allowed by a "Final Order" (as defined below) by the Bankruptcy Court, or (iv) that is allowed by the permission of this Plan. |
| *Allowed Interest* | An "Interest" (as defined below) (i) proof of which has been filed within the time fixed by the Bankruptcy Rules or within the time fixed by the Bankruptcy Court; or (ii) that has been scheduled in the list of equity security holders identified in the Debtor's bankruptcy schedules which have been filed with the Bankruptcy Court in these Chapter 11 cases; and (iii) in the event of either (i) or (ii) as to which no objection to the allowance thereof has been filed within any applicable period of time fixed by an Order of the Bankruptcy Court, or as to which any such objection has been determined by a Final Order of the Bankruptcy Court. |
| *Bankruptcy Code* | Title 11 of the United States Code, § 101, *et. seq.* or as amended thereafter in effect as of the Filing Date. |
| *Carveout* | Any amounts which are payable under § 506(c) of the Bankruptcy Code, including insurance and other amounts necessary for the preservation of the Real Property collateral. |
| *Chapter 11 Case* | The Chapter 11 Case No. 21-22696 (SHL) commenced by the Debtor on the Filing Date. |
| *Claim* | A Claim, as defined in § 101(5) of the Bankruptcy Code, against the Debtor including, without limitation, secured claims under § 506 of the Bankruptcy Code, claims allowable under § 502 of the Bankruptcy Code or requests for payment of administrative expenses allowed under § 503 of the Bankruptcy Code. |

| | |
|---|---|
| *Claimant or Creditor* | The holder of a Claim, including the holder of a claim for damages resulting from the rejection of an unexpired executory contract or lease. |
| *Confirmation Date* | The date on which an Order confirming this Plan is entered by the Court, provided that such Order has not been stayed. |
| *Court* | The United States Bankruptcy Court for the Southern District of New Yor, or such other Court as may, from time to time, have original jurisdiction over this Chapter 11 proceeding. |
| *Debtor* | Hello Living Developer Nostrand LLC |
| *Disallowed Claim* | Any Claim or portion thereof that is determined in a Final Order of the Court not to be allowed pursuant to §§ 502 and 503 of the Bankruptcy Code. |
| *Disclosure Statement* | Any disclosure statement required by § 1125 of the Bankruptcy Code and approved by the Court. |
| *Disputed Claim* | The whole or portion of any Claim against the Debtor to which an objection is timely filed as to which a Final Order has not been entered allowing or disallowing such Claim or any portion thereof. For any Disputed Claim which is or was asserted as a Secured Claim, the corresponding Lien shall be deemed subject to dispute. |
| *Distribution* | A distribution of cash or cash equivalents to the holders of Allowed Claims under the Plan. |
| *Effective Date* | Shall be a date that the Debtor begins to receive Lease payments after the first (1st) year of Lease Tenant improvements concessions or approximately March 15, 2023. |
| *Estate* | The Estate created in this case pursuant to § 541 of the Bankruptcy Code. |
| *Filing Date* | December 21, 2021 |

5

| | |
|---|---|
| *Final Distribution* | The date on which all Distributions provided for under this Plan have been mailed or otherwise issued to holders of all Allowed Claims. |
| *Final Order* | An Order of a Court from which no Appeal or review can be taken, or as to which all Appeals and reviews have been withdrawn or dismissed or granted with prejudice. |
| *Lease* | The Master Lease Agreement dated as of March 15, 2022 between Hello Nostrand LLC and 1580 Nostrand Management LLC providing for Lease rental to be paid commencing March 15, 2023 under schedules including any obligations of the Debtor under this Plan. |
| *Lease Income* | The Lease Income shall be determined in any year that the Lease in effect. Gross receipts of Lease income less all necessary and operating obligations of the Landlord, including, but not limited to, any roof repair or replacement, and any obligations deemed to be Landlord obligations. |
| *Plan* | The Debtor's Plan of Reorganization or as modified in accordance with the Bankruptcy Code. |
| *Real Property or Property* | Hello Nostrand's Real Estate and associated rights located at 1580 Nostrand Avenue, Brooklyn, New York |
| *Secured Claim* | Any Claim held by a person against the Debtor secured by Collateral but only to the extent of the value of the collateral as set forth in the Plan pursuant to § 506(a) of the Bankruptcy Code, provided, however, that Secured Claim shall not include any portion of a Claim to the extent that the value of such person's interest in the Collateral is less than the amount of such Claim. |

6

| | |
|---|---|
| *Unimpaired* | A Claim or Equity Interest that is unimpaired within the meaning of § 1124 of the Bankruptcy Code, in that the Plan does not otherwise alter any legal, equitable or contractual rights to which such Claim entitles the holders of such Claim. |
| *Unsecured Claim* | Any Claim or right as defined in § 101 of the Bankruptcy Code whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, which is not a Secured Claim a Priority Claim or an Administration Claim. |

## ARTICLE II

## DESIGNATION OF CLAIMS AND INTEREST

2.1    The following classifies claims and equity interests required to be designated in Classes pursuant to §§ 1122 and 1123 (a)(1) of the Bankruptcy Code. In accordance with § 1123(a)(1) of the Bankruptcy Code, the Administrative Claims have not been classified and their treatment is set forth herein. Classification of Claim and equity interests in this Plan is for all purposes, including voting, confirmation and distribution pursuant to the Plan. Claims shall be deemed classified in a particular Class only to the extent that such claim qualifies within the description of that Class and shall be deemed different and classified in a different Class only to the extent that any portion of such claim qualifies within the description of such different Class. Distribution, on account of any Claim, in any Class, is not required or permitted unless, and, until such Claim or Equity Interest becomes an Allowed Claim or Allowed Equity Interest, as the case may be, which might not occur, if at all, until after the Effective Date. Claims shall be paid based on a "waterfall" manner, where claim of junior priority shall only be paid after prior claims are paid or reserved on prior claims for which there are final orders further distributions can be made

7

to the junior creditors or equity interests.  All payments to groups of creditors or equity holders are paid.  The following summarizes all creditors and equity classes, their amount and whether they are impaired.

## ARTICLE III

## CLASSIFICATION

3.1    The Plan provides that all Allowed Claims will be paid under either a cash payment or a deferred four (4) year payment secured by a security on the hares of Hello Nostrand LLC with a balloon payment at the end of the fourth (4th) year.

**Class 1**

3.2    The Allowed Secured Claims of 1580 Nostrand Mezz LLC holding a claim alleged to be in the amount of approximately $3,000,000 in unpaid principal which is alleged to be $4,500,000 presently which claim includes any prepayment fees, forbearance fees, exit fees, servicing fees and any other charges charged by this creditor (the attorney of Secured Creditor refused to provide a payoff amount for these claims) are the holders of the Allowed Class 1 Claim.

**Class 2**

3.3    Any Allowed unsecured claims.

**Class 3**

3.4    Equity Interests – shall be the holders of the equity interest of the parent Debtor.

## ARTICLE IV

## TREATMENT OF CLAIMS THAT ARE IMPAIRED
## AND WHO WILL VOTE ON THE PLAN

The following claims will be treated as follows:

**Class 1**

4.1    This creditor shall receive monthly principal and interest payments amortized over

8

30 years at the interest rate of a 3.5% annual rate commencing on the Effective Date in full satisfaction and settlement of the claim. The monthly payments shall continue until paid on or before four (4) years following the Effective Date (the "*Final Installment Date*"). Payments shall come from Lease Income of Hello Nostrand LLC.

     4.2    The Debtor shall have the right to prepay the Allowed Class 1 Claim in whole, or in part, at any time following Confirmation, without penalty.   In the event of such prepayment, any and all unearned interest shall be deemed waived.  Upon Confirmation, any and all prepayment premiums and any fees, exit fees or such other requirements set forth in the underlying loan shall also be waived and released.  The Debtor shall pay all of its operating obligations.  The terms of the Plan shall be the exclusive terms relating to the repayment of the Allowed Class 1 Claim. The pre-petition loan documents shall have no force or effect after Confirmation. Upon completion of the payments to the holder for the Allowed Class 1 Claim as required by the Plan and resolution of the disputed claims, Class 1 shall be deemed to have released any and all liens on the Debtor' assets.  To the extent required by the Debtor, upon full payment of its Allowed Class 1 Claim, Class 1 holder shall immediately prepare and file any document necessary to effect a release of its liens on the Debtor's assets.

### Class 2

     4.4    Such claims shall be paid, pro rata, in full, with monthly principal payments of $15,000 plus interest at 3.5% interest commencing on or about the Effective Date in full satisfaction and settlement of the claims.

9

## ARTICLE V

## NONIMPAIRED

**Class 3**

5.1     The equity holders shall be paid their investments upon the development project under the means provided for in the investment documents with the equity holders.

## ARTICLE VI

## ADMINISTRATION EXPENSES AND UNCLASSIFIED CLAIMS

6.1     All operating unpaid administrative expenses of the Chapter 11 Case fees, the Court appointed professionals for the Debtor who have rendered services and who are entitled to compensation under §§ 327 and 503(b) of the Bankruptcy Code for services rendered prior to the Confirmation Date subject to a Fee Application on Notice and Court Order and the fees payable to the Office of the United States Trustee under 28 U.S.C. § 1930, are not classified and shall be paid in full on the Effective Date.  The United States Trustee Fees and the professional fees, incurred after confirmation at the same hourly rates and terms shall continue to be paid up through the Closing Date of this Chapter 11 Case.  A reserve may be estimated on the Confirmation Date and instituted for the payment of these fees.  The within professional claims for post-confirmation services may be paid under a different agreement reached with the Debtor prior to Confirmation and may be paid without any Court Order.

## ARTICLE VII

## IMPLEMENTATION OF PLAN

7.1     The Debtor shall continue with the litigation against the Secured Creditor (Class 1).

7.2     The Debtor shall act as Distributing Agent.

10

7.3     The Debtor shall monitor the operation of the Hello Nostrand LLC Real Property.

7.4     The litigation with the Secured Creditor will continue until there is a Final Court Order determining the allowability of the Secured Creditor's claims and priority.

7.5     The Plan is self-executing. Except as expressly set forth in the Plan, the Debtor shall not be required to execute any newly created documents to evidence the Claims, liens or terms of repayment to the holder of any Allowed Claim. The terms of this Plan will exclusively govern payments to creditors and any other rights of creditors as against the Debtor and their property. Furthermore, upon the completion of the payments required under this Plan to the holders of Allowed Claims, such Claims, and any liens that may support such Claims, shall be deemed released and discharged.

## ARTICLE VIII

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

8.1     **Time Limit for Objections to Claims**     Objections to Claims shall be filed by the Debtor with the Court and served upon each holder of each of the Claims to which objections are made not later than sixty (60) days subsequent to the Confirmation Date or within such other time period as may be fixed by the Court. Unless otherwise extended by Order of this Court, the Debtor may file an objection to the allowance of any Claim filed resulting from the rejection of an executory contract on the latter of sixty (60) days following the Confirmation Date or within thirty (30) days after the filing of such Claim and service a copy of such Claim upon the Debtor as provided for in the Plan.

8.2     **Resolution of Disputed Claims**     Unless otherwise ordered by this Court, the Debtor shall litigate to judgment, settle or withdraw objections to Disputed Claims, in its sole discretion, without notice to any party in interest, other than notice of not less than ten (10) days' notice, as between the Debtor and the Creditor of the Claim, who is being objected to.

11

8.3    Payments and distributions to each holder of a Disputed Claim that ultimately becomes an Allowed Claim shall be made in accordance with the provisions of the Plan with respect to the Class of creditors to which the respective holder of an Allowed Claim belongs. Reserves shall be maintained. Such payments and distributions shall be made as soon as practicable after the date that this Court enters a Final Order allowing such Claim, but not later than thirty (30) days thereafter. Payments shall be made as and when a Disputed Claim has become, in whole or in part, an Allowed Claim or a Disallowed Claim, pursuant to a Final Order or agreement between the Debtor and such Claimant or as allowed by this Plan.

## ARTICLE IX

## THE REORGANIZED DEBTOR

9.1    The Debtor shall continue with its corporate status and operate the Debtor' businesses.

9.2    The Debtor shall reserve all distributions from disputed claims pending determination that claims become Allowed claims.

9.3    The case may be closed after initial payments are made to creditors on the Effective Date and may be re-opened, without any fees, as necessary, to implement the Plan.

## ARTICLE X

## EXECUTORY CONTRACTS

10.1    There are no executory contracts.

## ARTICLE XI

## TRANSFER TAX AND RECORDING FEES EXEMPTIONS

11.1    There are not transaction for which a transfer tax is due.

12

## ARTICLE XII

## MODIFICATION OF THE PLAN

12.1    The Debtor may amend and modify this Plan at any time prior to the Confirmation

Order, without approval of this Court.  After Confirmation, the Debtor may modify this Plan before

a substantial consummation of this Plan, with the approval of this Court, and upon any Mortgagee's

right to respond.

## ARTICLE XIII

## PROVISIONS FOR CLASSES OR HOLDERS OF CLAIMS
## WHICH ARE AFFECTED BY AND DO NOT ACCEPT THIS PLAN

13.1    Any class or holders of claims or interests which are affected by and do not vote to

accept the Plan in accordance with the provisions of Bankruptcy Code § 1126 shall be treated in

fair and equitable fashion as provided by Bankruptcy Code § 1126(b).

## ARTICLE XIV

## EVENT OF DEFAULT

14.1    The occurrence of any of the following shall constitute a default by the Debtor

under the Plan with respect to creditors.

a.    If (i) the Debtor default in making payments due under the Plan (and a grace

period of ten (10) days after written notice of such default is given by a majority of the

holders of the Class in default shall have passed, and unless such default (hereinafter

referred to as an "Event of Default") has been waived in accordance with the term herein;

(ii) the Debtor breaches any of the covenants contained herein after ten (10) days written

notice by a creditor to the Debtor prior to payment due under the Plan; (iii) the Debtor

seeks relief under any Federal or State Statute (other than the Debtor' present Chapter 11

Case); (iv) or a receiver; liquidator, custodian or trustee is appointed for substantially all

13

of the property of the Debtor prior to completion of the payment due.

b.      Upon the occurrence of an Event of Default, any creditor shall notify the Debtor, and with the exception of any monetary default on account of payment, the Debtor shall have ten (10) business days from the date of the sending of such notice to cure such breach.  With respect to a breach for non-payment, the Debtor shall have a cure period of twenty-five (25) business days.  In the event the Debtor fails to cure such breach within the prescribed periods, the Debtor shall be deemed to have defaulted on the terms of the Plan and the creditors shall have all rights available to them under State Law or the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, or under this Plan.

## ARTICLE XV

## DISCHARGE AND RELEASE

15.1    Pursuant to § 1141 of the Bankruptcy Code, the Confirmation Order shall discharge claims against the Debtor which are being treated under the Plan.  Except as expressly provided herein, the rights afforded in the Plan and the treatment of all creditors and holders of stock interest provided herein shall be governed by the Plan and shall release Eli Karp and professionals representing the Debtor (arising out of services in connection with this Chapter 11 Case excluding negligent acts or acts of willful misconduct, ultra vires acts and breach of fiduciary duty).  Upon the Confirmation Date, all other claims against the above referred to professionals will be satisfied, discharged and released (except for those obligations identified in the Plan) in full exchange for the consideration provided for hereunder.

15.2    The effects of Confirmation of the Plan are set forth in the Bankruptcy Code.  Upon Confirmation, the provisions of the Plan will bind the Debtor, its equity holders and creditors, whether or not they have accepted the Plan.

14

## ARTICLE XVI

### INJUNCTION AND EXONERATION

16.1    Except as otherwise provided in the Plan or Confirmation Order, all entities which have held, currently hold or may hold a debt, claim other liability of interest against the Debtor pursuant to, and subject to, the provisions of § 1141 of the Bankruptcy Code and are permanently enjoined with taking any of the following actions on account of such debt, claim, liability, interest or right: (a) commencing or continuing in any manner any action or other proceeding on account of such claim against property which is to be distributed under the Plan, other than to enforce any right to distribution with respect to such property under the Plan; (b) enforcing, attaching, collecting or recovering in any manner or judgment, award, decree, order against the Debtor other than as permitted under subparagraph (a) above; and (c) creating, perfecting or enforcing any lien or encumbrance against any property to be distributed under this Plan.

## ARTICLE XVII

### RETENTION OF JURISDICTION AND DISCHARGE

17.1    Notwithstanding Confirmation, the Bankruptcy Court shall retain jurisdiction for the following purposes.

(a)    Determination of the allowability of claims upon objections filed to such claims and to any litigation commenced by the Debtor post-confirmation related to the Chapter 11 Case, the Plan or any creditor claims;

(b)    Determination of requests for payment of Claims and fees entitled to priority under § 507;

(c)    Resolution of any disputes concerning the interpretation of the Plan;

(d)    Implementation of the provisions of the Plan;

15

(e)      Entry of Orders in aid of consummation of the Plan;

(f)      Modification of the Plan pursuant to § 1127 of the Code;

(g)      Adjudication of any causes of action including voiding power actions commenced by the Debtor-in-Possession; and

(h)      Entry of a Final Order of Consummation and closing the case.

Dated:       New York, New York
             March 21, 2022

                                    *HELLO LIVING DEVELOPER NOSTRAND LLC*

                            By:     /s/ Eli Karp
                                    Eli Karp
                                    Manager


*PLAN CONSENTED TO*

*HELLO NOSTRAND LLC*

By:

16

# *EXHIBIT B*





*EXHIBIT C*

Zoho Sign Document ID: ZQJR4IBCUGG4DRWRNBNGZQHA0BRBN7SDPc839tof46

## 21 E 29th St. Master Lease Rent Schedule

**$ 3,200,000.00**  Rent

| Year | RENT | % increase | Rent Increase |
|------|------|------------|---------------|
| 1 | $ 1,600,000.00 | *6 months consessions* | |
| 2 | $ 3,200,000.00 | | |
| 3 | $ 3,264,000.00 | 2% | $ 64,000.00 |
| 4 | $ 3,329,280.00 | 2% | $ 65,280.00 |
| 5 | $ 3,395,865.60 | 2% | $ 66,585.60 |
| 6 | $ 3,463,782.91 | 2% | $ 67,917.31 |
| 7 | $ 3,533,058.57 | 2% | $ 69,275.66 |
| 8 | $ 3,603,719.74 | 2% | $ 70,661.17 |
| 9 | $ 3,675,794.14 | 2% | $ 72,074.39 |
| 10 | $ 3,749,310.02 | 2% | $ 73,515.88 |
| 11 | $ 3,861,789.32 | 3% | $ 112,479.30 |
| 12 | $ 3,977,643.00 | 3% | $ 115,853.68 |
| 13 | $ 4,096,972.29 | 3% | $ 119,329.29 |
| 14 | $ 4,219,881.46 | 3% | $ 122,909.17 |
| 15 | $ 4,346,477.90 | 3% | $ 126,596.44 |
| | **$ 53,317,574.95** | | |

*HF*

# *EXHIBIT D*

## *HELLO LIVING DEVELOPER NOSTRAND LLC*

### *LIQUIDATION ANALYSIS*
### *(ESTIMATED AND APPROXIMATE)*

| *Assets* | | |
|---|---|---|
| | Undetermined Unliquidated | $3,000,000 |
| Shares of Stock of Hello Nostrand LLC, a privately held company | Subject to the value of the subsidiary Hello Nostrand LLC | |
| | | |
| *Liabilities* | | |
| | | |
| Chapter 7 liquidation claims | | $75,000 |
| | | |
| Chapter 11 administration claims | | $100,000 |
| | | |
| Secured claims | $4,500,000 Claimed | $2,825,000 |
| | | |
| Unsecured claims | $1,625,000 | $0 |
| | | |
| *Estimated Total of Liabilities* | | **$3,000,000** |

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

IN RE:                                                          Case No.: 21-22696 (SHL)
                                                                Chapter 11

HELLO LIVING DEVELOPER NOSTRAND LLC,

                                        Debtor.
-----------------------------------------------------------------X

## ORDER CONDITIONALLY APPROVING DISCLOSURE STATEMENT, COMBINING DISCLOSURE STATEMENT HEARING AND CONFIRMATION HEARING, SCHEDULING HEARING ON CONFIRMATION AND (1) FIXING DATES FOR FILING OF ACCEPTANCES OR REJECTIONS OF THE DEBTOR'S PLAN OF REORGANIZATION, (2) FOR FILING OBJECTIONS TO CONFIRMATION AND (4) FOR APPROVING FORM OF BALLOTS

A Plan of Reorganization, dated March 21, 2022 (the "Plan") and a Disclosure Statement, dated March 24, 2022 (the "Disclosure Statement"), having been filed with the Clerk of this Court and the Debtor having made an Application for ancillary relief and upon the hearings before this Court on _____, 2022.

Now, on motion of Leo Fox, Esq., counsel for the Debtor;

***IT IS HEREBY ORDERED AND NOTICE IS GIVEN THAT***:

1.          The Disclosure Statement is conditionally approved.

2.          A hearing on Final Approval of the Disclosure Statement and confirmation of the Debtor's Plan (the "Confirmation Hearing Date") of the Plan and on any objections to confirmation of the Plan and any motion for temporary allowance of the disputed portion of a claim or interest will be held on _____, 2022 at __:00 _.m. or as soon thereafter as counsel may be heard, in the Courtroom of the Honorable Sean H. Lane, United States Bankruptcy Judge, United States Bankruptcy Court, Southern District of New York, One Bowling Green,

New York 10601.   The Hearing may be adjourned from time to time without further notice other than the announcement in open court at the Confirmation Hearing Date or at any adjourned Confirmation Hearing Date;

3.     On or before a date which is no later than ten (10) days after entry of the within Order of the Court, pursuant to Federal Rule of Bankruptcy Procedure § 3017(d), the Debtor is hereby authorized and directed to transmit by first class mail, postage prepaid, to all known holders of claims against the Debtor and to all equity interest holders of the Debtor, and to other parties in interest having filed a Notice of Appearance and Demand for Service of Papers, (a) this Order, (b) the Plan, (c) the Disclosure Statement, and (d) a Ballot substantially in the form of the Ballot annexed to the Disclosure Statement (the "Ballot").

4.     Service made as provided in the preceding paragraph shall be deemed good and sufficient notice and service pursuant to Federal Rules of Bankruptcy Procedure Rule 3017.

5.     The form of ballot attached to the Disclosure Statement is approved.   Any Ballot which is annexed and returned, but which does not indicate thereon either acceptance or rejection of the Plan shall not be counted.

6.     Acceptance or rejection, of the Plan shall be in writing on the Ballot; shall conform with Federal Rule of Bankruptcy Procedure Rule 3018 and shall be returned by the holders of all claims and interests entitled to vote and received by the Debtor's attorney at the address provided on the Ballot not later than seven days before the Confirmation Hearing Date (the "Voting Deadline").

7.     Only holders of claims allowed under § 502 of the Bankruptcy Code, which are members of classes that are impaired under the Plan may vote to accept or reject the Plan.   If a claim or interest, otherwise allowable under § 502 of the Bankruptcy Code, has been disputed by

2

the Debtor by written objection filed with the Court and served on the holder of such claim or interest, prior to the Confirmation Hearing Date, only the undisputed portion of said claim shall be taken into account in determining whether the Plan has been approved by the requisite portion of the relevant class unless the Court authorizes additional amounts of such claim to be entitled to vote.

8.      Any objection the Confirmation of the Plan must be in writing, must set forth in detail the grounds and facts of such objection and the legal basis therefore, and in accordance with Federal Rule of Bankruptcy Procedure § 3020(b)(1), must be filed on or before seven days before the Confirmation Hearing Date with the Clerk of the Bankruptcy Court, Old Customs House, One Bowling Green, New York, New York, electronically in accordance with General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and, by all other parties in interest, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with a hard copy delivered directly to Chambers) and served in accordance with General Order M-242, and served so as to be received by (1) Leo Fox, Esq., as counsel to Debtor; and (2) The Office of the United States Trustee for the Southern District of New York, 201 Varick Street, Suite 1006, New York, New York 10014 on or before seven days before the Confirmation Date (the "Objections Deadline").

Dated: New York, New York
        March      , 2022

                                    _____
                                    HONORABLE SEAN H. LANE
                                    UNITED STATES BANKRUPTCY JUDGE

3

Leo Fox, Esq.
630 Third Avenue, 18th Floor
New York, New York 10017
(212) 867-9595
leo@leofoxlaw.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

In re:                                                           Chapter 11

HELLO LIVING DEVELOPER NOSTRAND LLC,                             Case No.  21-22696 (shl)

                                    Debtor.
---------------------------------------------------------------X

## BALLOT FOR ACCEPTING OR REJECTING
## PLAN OF REORGANIZATION

The above Debtor filed a Plan of Reorganization (the "Plan") attached to the approved Disclosure Statement (the "Disclosure Statement"). The Disclosure Statement provides information to assist you in deciding how to vote your Ballot. If you do not have a Disclosure Statement, you may obtain a copy from Leo Fox, Esq., 630 Third Avenue, 18th Floor, New York, NY 10017, Telephone No. (212) 867-9595, Facsimile No. (212) 949-1857 or by e-mail to leo@leofoxlaw.com. Court approval of the Disclosure Statement does not indicate approval of the Plan by the Court.

You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and your classification and treatment under the Plan. Your claim has been placed in Class __ under the Plan. If you hold claims in more than one class, you will receive a ballot for each class in which you are entitled to vote.

If your ballot is not received by Leo Fox, Esq., 630 Third Avenue, 18th Floor, New York, NY on or before _____, 2022 and such deadline is not extended, your vote will not count as either an acceptance or rejection of the Plan.

Leo\Clients\Nostrand Properties\Hello Living Developer Nostrand LLC\Disclosure Statement\Ballot V1\3-23-2022

If the Plan is confirmed by the Bankruptcy Court, it will be binding on you whether or not you vote.

***ACCEPTANCE OR REJECTION OF THE PLAN***

The undersigned, the holder of a Class __ claim against the Debtor in the unpaid amount of ($_____) Dollars.

(Check one box only)

☐   ACCEPTS THE PLAN               ☐   REJECTS THE PLAN

If you reject the Plan, you still have the right to opt out of the provisions of the Plan granting releases to the Debtor's principals. Please indicate below whether you accept or reject to allowing the principals to receive the releases provided for in the Debtor's Plan.

☐   ACCEPT                         ☐   REJECT

Dated: _____

Print or type name:    _____

Signature:             _____

Title :                _____
                       (*If Corporation or Partnership*)

Address:               _____

                       _____

***RETURN THIS BALLOT TO***:

Leo Fox, Esq.
630 Third Avenue, 18th Floor
New York, New York 10017

2