UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

In re:                                                          Chapter 11

HELLO LIVING DEVELOPER NOSTRAND, LLC,                           Case No.   21-22696 (SHL)

                                   Debtor.

------------------------------------------------------------------X


**DEBTOR'S THIRD AMENDED DISCLOSURE STATEMENT UNDER
CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED BY THE DEBTOR**

**This is not a solicitation of acceptance or rejection of the Plan.
Acceptances or rejections may not be solicited until a Disclosure Statement
Has been approved by the Court.   This Disclosure Statement is being
Submitted for approval but has not been approved by the Court.**


Leo Fox, Esq.
630 Third Avenue – 18th Floor
New York, New York 10017
(212) 867-9595 - Telephone
(212)   949-1857 - Facsimile
leo@leofoxlaw.com


***ATTORNEY FOR THE DEBTOR
AND DEBTOR-IN-POSSESSION***

## DEBTOR'S THIRD AMENDED DISCLOSURE STATEMENT
## DATED MAY 31, 2022

## INTRODUCTION

1.    The Debtor in the Third Amended Disclosure Statement has made the following material revisions to the Disclosure Statement and the Plan to enable this Court to approve the Disclosure Statement.

2.    The above-captioned Debtor[1] submit this Disclosure Statement pursuant to § 1125 of the Bankruptcy Code to its known creditors in order to disclose that information deemed by the Debtor to be material, important, and necessary for the Creditors and holders of equity interest to arrive at a reasonably informed decision in exercising their right to vote for acceptance or rejection of the Plan (hereafter the "Plan"), on file with the Bankruptcy Court.   Only "impaired" Creditors, as that term is defined in the Bankruptcy Code, are entitled to vote for the Plan or to reject the Plan.   A full definition of what constitutes impairment is contained in § 1124 of the Bankruptcy Code.   Approval of the adequacy of the information contained in this Disclosure Statement does not constitute any recommendation by the Court as to the merits of the Plan, whether the Creditors should vote for the Plan, or if the Plan should be confirmed.

3.    A copy of the Plan (*Exhibit A*) accompanies this Disclosure Statement, proposed Order approving the Disclosure Statement and Scheduling a Hearing on Confirmation, as well as a Ballot Form for the acceptance or the rejection of the Plan which will be a date fixed by the Court and notice which will be issued to you entitling you to vote on the Plan.   The Debtor has set _____, 2022 at __:00 _.m. for a hearing on and final approval of the Disclosure Statement

---

[1] Capitalized terms used herein, if not otherwise defined, shall have the same meaning as defined in the Plan.

which is the same day as the Confirmation Date.

4.      As a Creditor, your vote is important.   In order for the Plan to be deemed accepted, members of each impaired Class designated in the Plan that hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Claims of the Class that vote must vote for the Plan. A claim or interest is impaired unless the Plan: (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or (2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default; (A) cures or provides for a cure subject to Court approval of any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in § 365 (b)(2) of this title; (B) reinstates the maturity of such claim or interest as such maturity existed before such default; (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and (D) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

**NO REPRESENTATIONS CONCERNING THE DEBTOR ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS STATEMENT.   ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE WHICH IS OTHER THAN AS CONTAINED IN THIS STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR, WHO IN TURN SHALL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS MAY BE DEEMED APPROPRIATE.**

**THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY, ALTHOUGH GREAT EFFORT HAS BEEN MADE TO BE ACCURATE.**

**APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT BY THE COURT DOES NOT CONSTITUTE A RECOMMENDATION BY THE COURT AS TO THE MERITS OF THE PLAN. THE COURT DOES NOT RENDER ANY OPINION AS TO WHETHER THE PLAN SHOULD BE ACCEPTED OR REJECTED BY CREDITORS.**

**CREDITORS ARE URGED TO READ THE PLAN IN FULL. THE PLAN REPRESENTS A PROPOSED LEGALLY BINDING AGREEMENT BETWEEN THE DEBTOR AND ITS CREDITORS AND SHAREHOLDERS AND INTERESTED PARTIES, AND IT SHOULD BE READ TOGETHER WITH THIS DISCLOSURE STATEMENT SO THAT AN INTELLIGENT AND INFORMED JUDGMENT CONCERNING THE PLAN CAN BE MADE.**

5.      The following summarizes the Classes, the treatment of the Classes and the expected recovery.

| Class | Claim | Claim Amount/ Classification | Treatment | Projected Recovery | Status | Voting Rights |
|-------|-------|------------------------------|-----------|--------------------|--------|---------------|
| 1 | Secured Claim of Nostrand Mezz Lender | Asserted $3,00,000 in unpaid principal which is alleged to be $4,500,000 presently (Secured) (Disputed) | This Creditor shall receive payment of 100% of its Allowed Claim within 90 days after the Confirmation Date. | 100% of the Allowed Secured claim | Impaired | Entitled to vote |
| 2 | Any Allowed Unsecured claims | Undetermined | Such claims shall be paid, pro rata, in full, with interest at 4.5% from Confirmation until payment | 100% of the Allowed Unsecured claims | Impaired | Entitled to vote |

4

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | from sources which may include the completion of the second building at the Project site and the proceeds thereof in full satisfaction and settlement of claims but not from Lease Income. | | | |
| 3 | Equity Interests | | The equity holders shall be paid their investments upon the development project under the means provided for in the investment documents with the equity holders only after full payment has been made to Class 1 under the Plan. | | | |

6.     The Debtor has a mortgage debt owed to Nostrand Senior Lender ("*Nostrand Senior Lender*") by Hello Nostrand LLC ("*Hello Nostrand*") and a Mezz debt owed by the Debtor to Nostrand Mezz Lender.   Nostrand Senior Lender and Nostrand Mezz Lender ("*Nostrand Mezz Lender*") are affiliates.   The shares owned by the Debtor are secured by a security interest held by Nostrand Mezz Lender to secure the Mezz debt (having acquired the security interest by assignment from 1580 Nostrand Mezz LLC ("*1580 Nostrand Mezz*") having a secured debt of $2,900,000 principal in March 2022.   While both Nostrand Mezz Lender and Nostrand Senior Lender believe they are being confused with the prior Assignors, the Plan and Disclosure Statement had been filed before these entities had ever acquired the security interests.   The Plan and Disclosure Statement, as amended here, are replacing their prior Assignors with these entities.

7.      Nostrand Mezz Lender moved in the Bankruptcy Court for an Order lifting the bankruptcy stay to permit Nostrand Mezz Lender to complete a UCC Foreclosure Sale on its collateral consisting of the Debtor's ownership interest in Hello Nostrand and to dismiss the bankruptcy case to permit the same effect to occur.   The grant of these motions would jeopardize, significantly, the progress of this Chapter 11 and may result in the bankruptcy case being terminated.   The Debtor opposes the relief and instead had filed this Plan and Disclosure Statement to reorganize the affairs of the Debtor and to allow the Debtor to retain its shareholder interest in Hello Nostrand.

## THE REAL PROPERTY

8.      The Debtor owns 100% of the shares of stock of Hello Nostrand.   Hello Nostrand owns and operates valuable real property located at 1580 Nostrand Avenue, Brooklyn, New York (the "*Real Property*") consisting of a finished building with 93 units and commercial retail space which Eli Karp, the Managing Member, constructed at the Real Property.   The Real Property also consists of a vacant lot which is adjacent to the existing building and which is scheduled to be built along the same lines as the completed building with a greater number of apartments (the building and the vacant lot collectively called the "Project").   The Debtor has calculated the value of its stock interest in Hello Nostrand to be, based on a valuation of the assets less the liabilities of Hello Nostrand.   The asset value of the Project consisting of the finished building and the vacant lot adjoining the building has been determined by an Appraisal to be equal to at least $71,500,000. The Debtor has made adjustments of approximately $3,000,000 in improvements on the building rendered after the appraisal and an additional adjustment based on the Lease entered into between Hello Nostrand and its main Lessee providing for income of $3,200,000 per annum.   While it may be argued that that amount should not change the appraised value, it can be equally argued that the

6

increase in expected income should increase the value of the Real Property. Against these assets

there exists secured and unsecured liabilities of Hello Nostrand as follows, either $58,000,000,

$62,000,000 or $66,000,000 based upon statements made as of May 20, 2022 by Nostrand Senior

Lender in various pleadings to this Court, and Nostrand Senior Lender and Nostrand Mezz Lender

alleges that in addition to these amounts there exists a security interest in favor of Nostrand Mezz

Lender in the stock assets of the Debtor-holding company here in the approximate amount of

$4,550,000. There also exists no other secured or unsecured liabilities of Hello Nostrand. In

chart fashion,

| Assets of Hello Nostrand | | |
| --- | --- | --- |
| The project consisting of building and lot | $71,500,000 plus $3,000,000 | $74,500,000 |
| | | |
| Total Assets | $74,500,000 | |
| | | |
| Liabilities of Hello Nostrand | | |
| Mortgage Loan amount alleged by Nostrand Senior Lender | $58,000,000, $62,000,000, $66,000,000 | |
| | | |
| Mechanics Liens Secured | $1,600,000 | |
| | | |
| Unsecured Liabilities | $0          $0          $0 | $0 |
| | | |
| Value of Shareholder interest | $14,900,000, $10,900,000, $4,900,000 | |

9.    The Loan held by Nostrand Senior Lender as well as by Nostrand Mezz Lender are

subject to dispute by the Debtor. For the purposes of this Disclosure Statement, the Loans are

assumed to be correct in validity and subject to adjustment as to amount and not subject to an

7

objection.

## EVENTS LEADING UP TO THE CHAPTER 11 FILING

10.    The Debtor owns 100% of the equity of Hello Nostrand (see *Exhibit B* for a chart of the corporate structure).    The equity interest was scheduled to be foreclosed if a UCC Foreclosure Sale proceeded as scheduled in December 2021 and the Chapter 11 petition was not filed.    Hello Nostrand purchased the Real Property in 2014 for the purpose of constructing two (2) multi-unit housing developments.    Hello Nostrand started construction in March 2018 and completed the existing building construction in June 2021.    The building presently has a Temporary Certificate of Occupancy which was recently extended by the Debtor's Managing Agent.    Hello Nostrand recently entered into a Lease with 1580 Nostrand Management under a ten (10) year Lease (with a one (1) five (5) year option) at a beginning annual rental of $3,200,000 with increases.    The parcel of vacant land on the Real Property which adjoins the completed building, it is anticipated, will be constructed with another multi-unit development by the Debtor.

11.    The events leading up to this Chapter 11 filing arise from the following. As was noted in the filing papers, Hello Nostrand had a long and unsatisfactory relationship with the original lender, Madison Realty ("*Madison Realty*") and its affiliates.

12.    On December 19, 2017, Prophet Capital Asset Management ("*Prophet*"), entered into a commitment with the Hello Nostrand for a $63,000,000 construction loan (the "*Loan*") secured by the real property and any improvements.    On June 7, 2019, at a time that the loan was not in default, Prophet assigned the Loan to 1580 Nostrand Ave LLC ("1580 Nostrand Ave") affiliated with Madison Realty.    On December 2, 2019, Hello Nostrand requested a payoff from 1580 Nostrand Ave.    For ten (10) weeks, until February 14, 2020, 1580 Nostrand Ave failed to fund the Loan or give a payoff letter.    On February 14, 2020, 1580 Nostrand Ave delivered a

8

payoff letter reflecting a balance due of $47,392,000.    Total borrowings, including interest reserve up until December 2019 of $7,000,000 reflected a balance due of $41,322,000.

13.    On February 14, 2020, 1580 Nostrand Ave also declared the Loan to be in default, retroactively, since July 2019 claiming $6,000,000 in penalties running from July 2019 despite the $1,500,000 in interest reserves which would have kept the Loan current up until mid-November 2019.    Hello Nostrand was not aware of any default. when 1580 Nostrand Ave claimed the default was due to failure to pay interest and treated the interest reserve as cash collateral, thereby accruing default interest at the full default rate then applying the $1,500,000 interest reserve as a credit against the total default interest.    This resulted in depriving Hello Nostrand of credit for the payment of interest as part of the interest reserve which were on deposit which accrued interest and was readily available to 1580 Nostrand Avenue.    1580 Nostrand Ave's calculation of interest defeated the whole purpose of the interest reserve.    This method added $6,000,000 to the "balance".    Hello Nostrand contends it lost an opportunity to refinance the 1580 Nostrand Ave loan as a consequence of this default and added interest.

14.    On March 2, 2020, 1580 Nostrand Ave sent a corrected letter to Hello Nostrand, reversing 1580 Nostrand Ave's earlier default notice and instead declaring the default as of November 1, 2020 and running default interest from November 1, 2019 up until April 30, 2020 in advance of the March 2020 notice for a total of six (6) months of default.    This left Hello Nostrand with the same sum of $6,000,000 of default interest as before added to the loan now having a balance of $47,352,000.

15.    As a consequence of 1580 Nostrand Ave's refusal to fund a real estate construction loan, no monies were advanced, the project stalled, insurance lapsed, contractor's liens arose and the entire project was endangered.

9

16.     In June 2020, Hello Nostrand provided a Temporary Certificate of Occupancy to 1580 Nostrand Ave in exchange for an additional loan of $2,900,000 demonstrating that the building construction was complete.     Thereafter, in August 2020, 1580 Nostrand Ave "repackaged" the loan by (a) granting an additional "Mezzanine Loan" by a 1580 Nostrand Ave affiliate to the Debtor here as owner of the equity interest of Hello Nostrand of $3,000,000 (which was, in any event, part of 1580 Nostrand Ave's commitment obligation under the $63,000,000 Loan) and recalculating the loan default rate, by among other things, capitalizing default interest of $4,350,000 plus charging additional miscellaneous charges such as a $252,000 forbearance fee, which released all of the Debtor's and Hello Nostrand's claims against 1580 Nostrand Ave.     The $3,000,000 balance on the Mezz Loan to the Debtor went to $4,500,000.

17.     The $3,000,000 loan to the Debtor was scheduled to be foreclosed pursuant to a UCC Foreclosure Sale in December 2021.     On December 21, 2021, the Debtor filed this Chapter 11 case to stay the UCC Foreclosure Sale.

18.     Previously, in two (2) separate State Supreme Court actions, an attempt was made by the Debtor and its principals to invalidate the above-mentioned transactions involving the Mezz Loan and the Mortgage Loan.     Both Courts refused, among other things, to invalidate the transactions based upon the existence of the Release contained in the Forbearance Agreement.

## SOURCE OF FUNDS FOR PLAN FEASIBILITY

## LEASE INCOME

19.     During the course of this bankruptcy, and, prior thereto, the Debtor, by Mr. Karp, searched for a management company to undertake the management of the project in particular the completed and brand-new building containing 93 units and communal facility.     The City of New York ("_CNY_") expressed an interest in leasing the space but the predecessors to Nostrand Mezz

10

Lender and Nostrand Senior Lender appear to be unwilling for CNY to undertake the Lease. During this time-period, the Debtor learned that Joyland Management LLC ("*Joyland Management*") was open to a discussion regarding management of the Real Property in conjunction with 1580 Nostrand Management LLC ("*1580 Nostrand Management*"). Negotiations ensued and a Lease was entered into dated as of March 15, 2022.

20.     The Lease between the Debtor's subsidiary, Hello Nostrand, as Landlord, and the Tenant, 1580 Nostrand Management, as Tenant, and Joyland Management, as Property Manager, is a Triple Net Lease (*Exhibit C*) involving the building at 1580 Nostrand Avenue pursuant to which the Debtor, here, as negotiated, that all expenses, repairs, construction and any other expense is payable by the Tenant (Lease - Article 4.4).    The Lease proceeds from March 15, 2022 until March 31, 2032.    The Lease has a five (5) year renewal term upon notice by the Tenant (Lease – Article 29).    The Rent Schedule attached to the Lease (*Exhibit D*) sets forth the rental schedule payable to Hello Nostrand, the Landlord.    The Lease anticipates that the rental income of $3,200,000 per year will commence in or about March 2023, after Tenant improvement concessions of the Tenant and other credits are completed.    These concessions include the finishing of some of the retail space areas, the completion of any aesthetic items such as landscaping and the like are completed.

21.     The Debtor expects that the commencement of the rental program should be within the space of several weeks.    Marketing activities will be conducted by the Tenant with the space geared towards a March 2023 occupancy.    Creditors can inquire of the Debtor during this and subsequent time-period on the progress of the rental program or by writing to the Debtor to seek this information, which is commonly what these creditors have been doing throughout the building process.    The Lease specifically states that Hello Nostrand, as Landlord, is not required to invest

11

any funds (Lease – Article 5.1 "Tenant Improvement").    Indeed, the Tenant has undertaken to

obtain an extension to the Temporary Certificate of Occupancy, a normal Landlord obligation.

These expenses include any repairs to the building including roof repairs or any other type of

repairs.    The Landlord will maintain casualty and hazard insurance (Lease – Article 1.3).    The

Plan has been modified to reflect this provision in the Lease.    In addition, the so-called additional

"Landlord Costs" which is required to be paid by Hello Nostrand appears to be close to nothing.

The building is a brand-new building and all the costs including the roof repairs are very unlikely

to occur and even if they did occur, the Lease provides that the Tenant is responsible to pay.

Although the definitional provisions Plan included roof repair, it is not the obligation of the Debtor

to do so but was mentioned as a possible claim by the Tenant.    The latest version of the Plan has

deleted any commitment on the part of the Debtor to effect any repairs or maintenance.    Parties

may review this Lease to determine all of the provisions provided therein.

23.    Joyland Management is a signatory under the Lease and is a well-known owner and

operator of real property.    It manages 33 other properties of substantial size and is well capable

of operating and managing the building under the Lease (see *Exhibit E*).

23.    While Nostrand Mezz Lender has contended that such Lease is invalid or improper

or illegally obtained, the Debtor believes that such Lease is valid and subsisting and cannot be

challenged.    The Lease provides for rents significantly higher than the Debtor's prior negotiations

with the rates provided by CNY.

24.    The Plan will provide for the payment of the Allowed secured claim of Nostrand

Mezz Lender, in full, within 90 days after the Confirmation Date.    Nostrand Debtor Investor

("*Nostrand Debtor Investor*") shall provide the payment.    Nostrand Debtor Investor shall receive

a 40% interest in the equity of the project based on its investment and shall be paid from that

interest.

25.    The Debtor believes that based on these modifications which limit all Lease Income

to the claims of Nostrand Senior Lender, the balance of the objections regarding the rights of the

Debtor to make payments to the secured lenders here is without merit.

26.    Hello Nostrand will then be able to make payments based on its Lease Income

commencing in March 2023 of over $3,200,000 per year which payments are fixed and not subject

to modification.    The net Lease thus leaves Hello Nostrand with 100% of these payments to pay

Nostrand Senior Lender. No Lease Income payments are being made other than to Nostrand Senior

Lender.

27.    The following are the amounts of the funds necessary for confirmation of the Plan.

| Leo Fox, Esq., Counsel to the Debtor (§507(a)(1) (net after prior payments) (Administration – Priority) – | To Be Determined To be paid based on cash calls of the investors |
|---|---|

(See *infra* "Implementation of Plan").    None of the administrative expenses will be paid

from the Lease Income unless, and until, all payments are made to Nostrand Mezz Lender and

Nostrand Senior Lender.    The United States Trustee fees shall also be paid from cash calls of the

investors or from Lease Income.    The professional claims shall be paid by the investors to the

project as part of a capital call as provided in the Operating Agreements.    The professionals agree

to this treatment as part of this Plan submitted by the Debtor, as long as this Plan is confirmed by

the Court.

28.    The Lease schedule reflecting the rent payable each year to Hello Nostrand by the

Tenant (see *Exhibit D*) demonstrates that such distributions are feasible.

29.    Subsidiary, Hello Nostrand, the Landlord of the Lease, agreed to make the monthly

payments provided for under this Plan as evidenced by its consent to the Plan and is thereby bound

13

to make such payments and is not simply a discretionary item for Hello Nostrand to agree to pay pursuant to the provisions of the Lease. This Lease is valid and effective and is between a substantial entity, as Tenant, and Hello Nostrand, as Landlord. The Master Tenant has confirmed that it opened up an Escrow Amount in the amount of $600,000 for tenant improvements (*Exhibit F*). Nostrand Mezz Lender has always contended that the Lease Income may not be used by the Debtor because such Lease Income constitutes collateral of its affiliate Nostrand Senior Lender. The only expenditures being made from Lease Income are to pay the United States Trustee fees if the Debtor does not obtain proceeds to pay the United States Trustee fees from a cash call. In light of the fact that the bankruptcy has provided for the cash payment of the Allowed secured claim of Nostrand Mezz Lender which is many time the amount of the unpaid United States Trustee fees, and the fact that Nostrand Mezz Lender is an affiliate of Nostrand Senior Lender owned by the same persons, it is submitted that it is an appropriate use of Lease Income.

30.    While the creditor, here, argues that its affiliate mortgagee will foreclose on the Real Property, the creditor does not explain the basis for such unsubstantiated comments or why such speculations are relevant here. To date, there is no Mortgage Foreclosure proceeding pending against Hello Nostrand. In fact, there exists every reason to believe that the claims of the Lender here will be fully paid even before a Mortgage Foreclosure proceeding has been commenced.

## IMPLEMENTATION OF PLAN

31.    The Debtor shall assist and cooperate with the development of the vacant lot owned by Hello Nostrand and pursue the litigation. Eli Karp shall continue to act as Manager to pursue these activities. In this connection, an action may be commenced against Nostrand Mezz Lender and Nostrand Senior Lender based on the fraudulent transfer that took place at the execution of the

14

Forbearance Agreement in August 2020 where the Debtor clearly received inadequate consideration under § 548 of the Bankruptcy Code at a time when the Debtor was engaged in a business where these Lenders' predecessors, with their fees, left the Debtor engaged in a business with unreasonably small capital under §§ 548(a)(1)(A) and (B). These issues were never addressed in any prior Court proceeding and may be considered with respect to the case here. This type of litigation will take years. However, the Allowed secured claim of Nostrand Mezz Lender shall be paid in accordance with the Plan, whether or not any action is commenced against Nostrand Mezz Lender.

32.    The Debtor shall act as Distributing Agent.

33.    The Debtor shall monitor the operation of the Hello Nostrand Real Property.

34.    The Plan is self-executing. Except as expressly set forth in the Plan, the Debtor shall not be required to execute any newly created documents to evidence the Claims, liens or terms of repayment to the holder of any Allowed Claim. The terms of this Plan will exclusively govern payments to creditors and any other rights of creditors as against the Debtor and their property. Furthermore, upon the completion of the payments required under this Plan to the holders of Allowed Claims, such Claims, and any liens that may support such Claims, shall be deemed released and discharged. The Debtor shall be responsible to effect all transactions to consummate the provisions.

**DISTRIBUTION PROCEDURES**

35.    Distributions shall be made to the Allowed secured claim of Nostrand Mezz Lender within 90 days after the Confirmation Date Reserves shall be set for disputed claims (other than Nostrand Mezz Lender's claim).

### SUMMARY OF PLAN

36.     The Plan is composed of a total of three (3) classes consisting of Creditor Classes and an equity holder Class.

37.     ***Class 1***:     The Allowed Secured Claims of Nostrand Mezz Lender holding a claim alleged to be in the amount of approximately $3,000,000 in unpaid principal which is alleged to be $4,500,000 presently which claim includes prepayment fees, forbearance fees, exit fees, servicing fees and any other charges charged by this creditor.

38.     This Creditor shall receive payment of 100% of its Allowed Claim within 90 days after the Confirmation Date.   The funds shall be provided by Nostrand Debtor Investor who shall receive a 40% investment interest in the Project on account of its investment.

39.     The Debtor intends to seek a determination that the amount of Nostrand Mezz Lender claim should be adjusted to accrue interest at the interest rate of the then applicable non-default contract rate of interest or 12% per annum for the period of March 2021 until December 21, 2021 the date of the filing of the Chapter 11 case and the rate thereafter to be determined by this Court.   In addition, the Debtor shall seek to cancel any exit fees, prepayment fees, forbearance fees or any other fees which this creditor shall seek to impose upon the Debtor as the "fee" or other charge to make the payment of the claim of Nostrand Mezz Lender including, but not limited to, requiring the payment of the Mortgage Loan prior to payment of the Allowed secured claim of Nostrand Mezz Lender.   The Court shall determine whether any disputed Plan provisions including interest rate and the term are allowed under a statutory and case authority and the Debtor's Plan shall be deemed modified to the extent provided by the Court's determination on any treatment of Class 1.   Notwithstanding, the Debtor shall make payment to this creditor in the amount fixed by the Court within the 90-day period after the Confirmation Date. Upon the full

16

payment by the Debtor as provided here, the Nostrand Mezz Lender and Nostrand Senior Lender agree not to challenge or attack the validity and enforceability of Hello Nostrand's existing Master Lease Agreement with 1580 Nostrand Management.

40.     Upon Confirmation, any and all prepayment premiums and any fees, exit fees or such other requirements set forth in the underlying loan shall also be cancelled, waived and released.   The Debtor shall pay all of its operating obligations.   The terms of the Plan shall be the exclusive terms relating to the repayment of the Allowed Class 1 Claim. The pre-petition loan documents shall have no force or effect after Confirmation. Upon completion of the payments to the holder for the Allowed Class 1 Claim as required by the Plan and resolution of the disputed claims, Class 1 shall be deemed to have released any and all liens on the Debtor' assets and any claims against the Debtor with respect to the Mezz Loan.   To the extent required by the Debtor, upon full payment of its Allowed Class 1 Claim, Class 1 holder shall immediately prepare and file any document necessary to effect a release of its liens on the Debtor's assets.

41.     As stated previously, any objection by Class 1 to any provision waiving any fees or premiums which may be objected to under State Law or Bankruptcy Law will be the subject of a Court hearing and Court approval and the Plan will be deemed amended to the extent of Court approval for the modification.   Any modifications under this Plan which Class 1 contends improperly impairs loan documents or guaranty obligations all follow the Bankruptcy Code and statutory authorization and shall be deemed to be an amendment to the Plan subject in all respects to a Court Order ruling in this respect.

42.     This Class is impaired and is entitled to vote.

43.     ***Class 2:***     Any Allowed unsecured claims in the approximate amount of $1,625,000.

17

44.    Such claims shall be paid, pro rata, in full, plus interest at 4.5% interest from the Confirmation Date from the funds received in connection with the Project but not from Lease Income as long as the claims of Nostrand Mezz Lender and Nostrand Senior Lender have not been satisfied.

45.    This Class is impaired and is entitled to vote.

*Class 3:*    Equity Interests – shall be the holders of the equity interest of the Debtor. The equity holders shall be paid their investments in the Project.   Equity holders shall not be paid until Nostrand Mezz Lender and Nostrand Senior Lender have been paid in full.

46.    This Class is unimpaired and is not entitled to vote.

**UNITED STATES TRUSTEES FEES UNDER 28 U.S.C. § 1930**

47.    The Debtor will undertake and be responsible for all payments due to the United States Trustee's office up through Confirmation, and thereafter up through any conversion of the case to Chapter 7 or the dismissal of the case or closing of the case.   These payments shall be paid timely. All United States Trustees fees accrued prior to Confirmation shall be paid at or prior to confirmation.   All subsequent United States Trustee fees shall be timely paid by the Debtor. All payments to the United States Trustee's Office will be paid by either a cash call from the Debtor's investors or from Lease Income.   All reports required by the United States Trustee shall be properly and timely filed.

**ADMINISTRATION EXPENSES AND UNCLASSIFIED CLAIMS**

48.    All operating unpaid administrative expenses of the Chapter 11 case fees, the Court appointed professionals for the Debtor who have rendered services and who are entitled to compensation under §§ 327 and 503(b) of the Bankruptcy Code for services rendered prior to the Confirmation Date subject to a Fee Application on Notice and Court Order and the fees payable

18

to the Office of the United States Trustee under 28 U.S.C. § 1930, are not classified and shall be paid in full on the Effective Date or in a manner as agreed by the professional.   The professionals have agreed that if this Plan is confirmed, the professionals will not seek payment from the Lease Income.   The United States Trustee Fees and the professional fees, incurred after confirmation at the same hourly rates and terms shall continue to be paid up through the Closing Date of this Chapter 11 Case.   A reserve may be estimated on the Confirmation Date and instituted for the payment of these fees.   The within professional claims for post-confirmation services may be paid under a different agreement reached with the Debtor prior to Confirmation and may be paid without any Court Order.   These fees are to be paid by cash call of the Debtor's investors.

### PROCEDURES FOR RESOLVING DISPUTED CLAIMS

49.    ***Time Limit for Objections to Claims***        Objections to Claims shall be filed by the Debtor with the Court and served upon each holder of each of the Claims to which objections are made not later than sixty (60) days subsequent to the Confirmation Date or within such other time period as may be fixed by the Court.   Unless otherwise extended by Order of this Court, the Debtor may file an objection to the allowance of any Claim filed resulting from the rejection of an executory contract on the latter of sixty (60) days following the Confirmation Date or within thirty (30) days after the filing of such Claim and service a copy of such Claim upon the Debtor as provided for in the Plan.

50.    ***Resolution of Disputed Claims***        Unless otherwise ordered by this Court, the Debtor shall litigate to judgment, settle or withdraw objections to Disputed Claims, in its sole discretion, without notice to any party in interest, other than notice of not less than ten (10) days' notice, as between the Debtor and the Creditor of the Claim, who is being objected to.

1.    Payments and distributions to each holder of a Disputed Claim that ultimately

19

becomes an Allowed Claim shall be made in accordance with the provisions of the Plan with respect to the Class of creditors to which the respective holder of an Allowed Claim belongs. Reserves may be maintained. Nostrand Mezz Lender shall continue to be paid its Allowed secured claim whether or not the claim is being objected to or disputed.    Except for Nostrand Mezz Lender, such payments and distributions shall be made as soon as practicable after the date that this Court enters a Final Order allowing such Claim, but not later than thirty (30) days thereafter. Payments shall be made as and when a Disputed Claim has become, in whole or in part, an Allowed Claim or a Disallowed Claim, pursuant to a Final Order or agreement between the Debtor and such Claimant or as allowed by this Plan.

## THE REORGANIZED DEBTOR

51.    The Debtor shall continue with its corporate status and operate the Debtor's businesses.

52.    The Debtor shall reserve all distributions from disputed claims pending determination that claims become Allowed claims.

53.    The case may be closed after initial payments are made to creditors on the Effective Date and may be re-opened, without any fees, as necessary, to implement the Plan.

## OFFICERS, DIRECTORS, AND MEMBERS

54.    On Confirmation, Eli Karp shall continue to act as Member/Manager and conduct the Debtor's financial and other affairs.    This person is not paid a salary for his work prior to the Chapter 11 filing or subsequently.

## THE LIQUIDATION ANALYSIS

55.    The Debtor believes that the only alternative to confirming this Chapter 11 Plan is a conversion of this case to a case under Chapter 7 of the Bankruptcy Code.

56.    The liquidation analysis (_Exhibit G_) assumes that a liquidation sale of the Debtor's assets would result in there being insufficient funds to pay the Secured creditor even if the Secure creditor's claims were allowed, much less other junior claims.   In this connection, a Trustee will undoubtedly prevail against Nostrand Mezz Lender and Nostrand Senior Lender based on the blatant fraudulent transfer that took place in August 2020 where the Debtor clearly received inadequate consideration under § 548 of the Bankruptcy Code and further, at a time when the Debtor was engaged in a business where these Lenders' predecessors with their fees left the Debtor engaged in a business with unreasonably small capital under §§ 548(a)(1)(A) and (B).   These issues were never addressed in any prior Court proceeding and may be considered with respect to the case here.   This type of litigation will take years.   In the meantime, any Trustee would undoubtedly sell the property free and clear of liens including the liens of Nostrand Mezz Lender and Nostrand Senior Lender in order to attempt to achieve a significant price.   However, the extensive litigation may mar the results of a Chapter 7 liquidation.   Since the sale of assets may result in reduced prices, as a consequence above, the equity, in turn, owned by the Debtor, will be reduced.   The stock interest won't have the value that it presently has.

57.    The Debtor believes that the Debtor will be able to establish, under the terms of the Plan, that it has met one of the requirements to confirm a Plan, which is that the treatment under the Plan provides creditors with better and a more timely treatment than such creditors would receive in liquidation or treatment that is no worse than what the creditors would receive in the liquidation.

58.    **_Withholding and Reporting Requirements_**

a.    **_Withholding Rights_**   In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable

21

withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements. Notwithstanding the foregoing, each holder of an Allowed Claim or any other person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such distribution. Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

b.      ***Forms***          Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the Disbursing Agent, or such other Person designated by the Debtor (which entity shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8, unless such Person is exempt under the tax Code and so notifies the Disbursing Agent. If such request is made by the Debtor or such other Person designated by the Debtor and the holder fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the Debtor and any Claim in respect of such distribution shall be discharged and forever barred from assertion against any Debtor and its respective property.

67.      ***Exemption From Certain Transfer Taxes***    To the maximum extent provided by § 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of any security and the

22

making or delivery of any instrument of transfer or mortgage under this Plan as confirmed by the

Court, (including an instrument of transfer or mortgage executed in furtherance of the Plan) shall

not be subject to tax under any law imposing a stamp tax, real estate transfer tax, mortgage

recording tax or similar tax due on the sale or transfer of the Property in connection with or in

furtherance of the Plan as confirmed by the Court and the funding requirements contained herein

and shall not be subject to any state, local or federal law imposing such tax and the appropriate

state or local government officials or agents shall forego collection of any such tax or governmental

assessment and accept for filing and recordation any of the foregoing instruments or other

documents without the payment of any such tax or governmental assessment.

## EXECUTORY CONTRACTS

68.    While the Debtor is not aware of the existence of any executory contracts, there

may be agreements denominated executory contracts.

## PREFERENCE AND FRAUDULENT CONVEYANCE ACTIONS

69.    The Debtor has reviewed its books and records and has investigated whether there

are any valid causes of action, including proceedings to avoid transfers including, but not limited

to, proceedings under 11 U.S.C. §§ 544(b), 547, 548, 549, 550 of the Bankruptcy Code or

applicable State Law.    After analyzing the risks and expenses related to the prosecution of and

the limited recovery, if any, which would inure to the benefit of the creditors in the event that the

Debtor would be successful, and the ability to collect on any judgments obtained, the Debtor

determined that it does not intend to institute any causes of action (excluding, however, the making

of objections to claims) for preference or fraudulent conveyance, other than as identified herein,

as follows.    The Debtor may seek to commence an action against Nostrand Mezz Lender and

Nostrand Senior Lender based on the fraudulent transfer that took place in August 2020 where the

23

Debtor clearly received inadequate consideration under § 548 of the Bankruptcy Code.

## EVENT OF DEFAULT

70.    The occurrence of any of the following shall constitute a default by the Debtor under the Plan with respect to creditors.

a.    If (i) the Debtor default in making payments due under the Plan (and a grace period of ten (10) days after written notice of such default is given by a majority of the holders of the Class in default shall have passed, and unless such default (hereinafter referred to as an "*Event of Default*") has been waived in accordance with the term herein; (ii) the Debtor breaches any of the covenants contained herein after ten (10) days written notice by a creditor to the Debtor prior to payment due under the Plan; (iii) the Debtor seeks relief under any Federal or State Statute (other than the Debtor' present Chapter 11 Case); (iv) or a receiver; liquidator, custodian or trustee is appointed for substantially all of the property of the Debtor prior to completion of the payment due.

b.    Upon the occurrence of an Event of Default, any creditor shall notify the Debtor and, with the exception of any monetary default on account of payment, the Debtor shall have ten (10) business days from the date of the sending of such notice to cure such breach.   With respect to a breach for non-payment, the Debtor shall have a cure period of fifteen (15) business days.   In the event the Debtor fails to cure such breach within the prescribed periods, the Debtor shall be deemed to have defaulted on the terms of the Plan and the creditors shall have all rights available to them under State Law or the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, or under this Plan.

## RETENTION OF JURISDICTION BY THE COURT

71.    The Plan provides that the Court shall retain jurisdiction for specified purposes, including, without limitation, the determination of all controversies arising under or in regard to the Plan, objections to claims, hearing, and determining applications for allowances of compensation and reimbursement of expenses, and the enforcement or continuation of orders entered in this case, until substantial Consummation, and closing of the case.

## EFFECTS OF COURT'S CONFIRMATION
## AND FEASIBILITY OF THE PLAN

72.    Pursuant to § 1141of the Bankruptcy Code, the Confirmation Order shall discharge claims against the Debtor which are being treated under the Plan.    Except as expressly provided herein, the rights afforded in the Plan and the treatment of all Creditors and holders of equity interest provided herein shall be in exchange for, and in complete satisfaction, discharge, and release of all Claims, against the professionals representing the Debtor (arising out of services in connection with this Chapter 11 Case) in this Chapter 11 Case (excluding negligent acts of willful misconduct, *ultra vires* acts, and breaches of fiduciary duty by such professionals).    For the avoidance of doubt, Eli Karp shall continue to be liable under any claims of guaranty, contract or other provisions to the extent provided under State Law or Federal Law.    Except as otherwise provided in the Plan, upon the Confirmation Date, all Claims against the above referred to professionals will be satisfied, discharged, and released (except for those obligations identified in the Plan) in full exchange for the consideration provided for hereunder.    Nothing herein shall discharge any claim for fraud or gross negligence against a professional.

73.    The effects of Confirmation of the Plan are set forth in the Bankruptcy Code. The following is a brief summary of the effect of Confirmation upon the Debtor, its creditors, and other

25

interested parties. Upon Confirmation, the provisions of the Plan will bind the Debtor, its equity

holders and creditors, whether or not they have accepted the Plan.

## ANTICIPATED CONFIRMATION DATE

74.    It is anticipated the Plan will be confirmed by the Bankruptcy Court within forty

(40) days, assuming the following events take place:

A.    The Plan is duly accepted by creditors; and

B.    The Bankruptcy Court finds that the Plan is feasible and in the best interest
of creditors; and

C.    The Court finds that the Plan is fair and equitable and does not
discriminate unfairly; and

D.    The Debtor has made arrangement with the professionals for
the payment of professional fees.

## WHERE TO FILE BALLOTS ON THE PLAN

75.    Pursuant to a Court Order approving this Disclosure Statement, ballots on the

Debtor's Plan must be received by _____, 2022.    All ballots should be properly completed and

forwarded to:    Leo Fox, Esq., 630 Third Avenue, 18th Floor, New York, New York 10017.

Dated: New York, New York
May 31, 2022

### HELLO LIVING DEVELOPER NOSTRAND LLC

By:    /s/ Eli Karp
Eli Karp
Manager

/s/ Leo Fox, Esq.
Leo Fox, Esq.
Attorney for Debtor
630 Third Avenue, 18th Floor
New York, New York 10017
(212) 867-9595
leo@leofoxlaw.com

*EXHIBIT A*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

In re:                                                    Chapter 11

HELLO LIVING DEVELOPER NOSTRAND, LLC,                     Case No.  21-22696 (SHL)

                                      Debtor.
------------------------------------------------------------------X


## **DEBTOR'S THIRD AMENDED PLAN OF REORGANIZATION UNDER**
## **CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED BY THE DEBTOR**


Leo Fox, Esq.
630 Third Avenue – 18th Floor
New York, New York 10017
(212) 867-9595 - Telephone
(212)  949-1857 - Facsimile
leo@leofoxlaw.com


*ATTORNEY FOR THE DEBTOR*
*AND DEBTOR-IN-POSSESSION*

Nothing contained herein shall constitute an offer, an acceptance, or a legally binding obligation of the Debtor or any other party in interest. This Plan is subject to approval of the Bankruptcy Court and other customary conditions. This Plan is not an offer with respect to any securities. This is not a solicitation of acceptances or rejections of the Plan. Acceptances or rejections with respect to this Plan may not be solicited until a disclosure statement has been approved by the United States Bankruptcy Court for the Southern District of New York in accordance with § 1125 of the Bankruptcy Code. Such a solicitation will only be made in compliance with applicable provisions of securities and bankruptcy laws.

**YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS PLAN FOR ANY PURPOSE (INCLUDING IN CONNECTION WITH THE PURCHASE OR SALE OF THE DEBTOR' SECURITIES) PRIOR TO THE CONFIRMATION OF THIS PLAN BY THE BANKRUPTCY COURT.**

Leo Fox, Esq.
*Attorney for the Debtor and*
*Debtor-In-Possession*
630 Third Avenue – 18th Floor
New York, New York 10017
(212) 867-9595 (Phone)
(212) 949-1857 (Facsimile)
leo@leofoxlaw.com

## THIRD AMENDED PLAN OF REORGANIZATION
## DATED MAY 31, 2022

The above-captioned Debtor and Debtor-in-Possession proposed this Plan of Reorganization (the "_Plan_") pursuant to § 1121 of the Bankruptcy Code. The Plan proposes to pay the Secured Creditor's Allowed claim secured by the value of the Debtor's shareholders interest in Hello Nostrand LLC ("_Hello Nostrand_") in one payment within 90 days after the Confirmation Date and for unsecured creditors to be paid their claims from the Project and not from Lease Income.

The Debtor is the proponent of the Plan. The Plan provides for distributions to the holders of Allowed Claims from funds realized by the Debtor from the Project involving the second building being constructed and after Nostrand Mezz Lender ("_Nostrand Mezz Lender_") has been paid. For a further discussion of the Plan, the reader's attention is directed to the Disclosure Statement being filed by the Debtor in connection with this Plan.

## ARTICLE I
## DEFINITIONS

1.1     All terms in this Plan, unless the context otherwise requires, are as defined in Title 11 of the United States Code. The following terms have the meaning set forth in this Article.

| | |
|---|---|
| _Administrative Claim_ | Allowed claims or requests for payment under § 503(b) entitled to Administrative priority under § 507(a)(2) of the Bankruptcy Code and United States Trustee fees under 28 U.S.C. § 1930 (United States Trustee fees are not required to have been filed as a request for payment) |
| _Allowed Claim_ | A "Claim (as defined below) (i) proof of which has been filed with the Bankruptcy Court within the time fixed by the Bankruptcy Court or applicable rules or statutes, and with respect to which no objection has been timely filed by any party |

| | |
|---|---|
| | in interest, or (ii) that has been, or hereafter is, listed by the Debtor as liquidated in amount and not disputed or contingent in the Debtor's bankruptcy schedules filed in these Chapter 11 cases, or (iii) that has been allowed by a "Final Order" (as defined below) by the Bankruptcy Court, or (iv) that is allowed by the permission of this Plan. |
| *Allowed Interest* | An "Interest" (as defined below) (i) proof of which has been filed within the time fixed by the Bankruptcy Rules or within the time fixed by the Bankruptcy Court; or (ii) that has been scheduled in the list of equity security holders identified in the Debtor's bankruptcy schedules which have been filed with the Bankruptcy Court in these Chapter 11 cases; and (iii) in the event of either (i) or (ii) as to which no objection to the allowance thereof has been filed within any applicable period of time fixed by an Order of the Bankruptcy Court, or as to which any such objection has been determined by a Final Order of the Bankruptcy Court. |
| *Bankruptcy Code* | Title 11 of the United States Code, § 101, *et. seq.* or as amended thereafter in effect as of the Filing Date. |
| *Chapter 11 Case* | The Chapter 11 Case No. 21-22696 (SHL) commenced by the Debtor on the Filing Date. |
| *Claim* | A Claim, as defined in § 101(5) of the Bankruptcy Code, against the Debtor including, without limitation, secured claims under § 506 of the Bankruptcy Code, claims allowable under § 502 of the Bankruptcy Code or requests for payment of administrative expenses allowed under § 503 of the Bankruptcy Code. |
| *Claimant or Creditor* | The holder of a Claim, including the holder of a claim for damages resulting from the rejection of an unexpired executory contract or lease. |

4

| | |
|---|---|
| *Confirmation Date* | The date on which an Order confirming this Plan is entered by the Court, provided that such Order has not been stayed. |
| *Court* | The United States Bankruptcy Court for the Southern District of New Yor, or such other Court as may, from time to time, have original jurisdiction over this Chapter 11 proceeding. |
| *Debtor* | Hello Living Developer Nostrand LLC |
| *Disallowed Claim* | Any Claim or portion thereof that is determined in a Final Order of the Court not to be allowed pursuant to §§ 502 and 503 of the Bankruptcy Code. |
| *Disclosure Statement* | Any disclosure statement required by § 1125 of the Bankruptcy Code and approved by the Court. |
| *Disputed Claim* | The whole or portion of any Claim against the Debtor to which an objection is timely filed as to which a Final Order has not been entered allowing or disallowing such Claim or any portion thereof. For any Disputed Claim which is or was asserted as a Secured Claim, the corresponding Lien shall be deemed subject to dispute. |
| *Distribution* | A distribution of cash or cash equivalents to the holders of Allowed Claims under the Plan. |
| *Effective Date* | Shall be a date that is 90 days after the Confirmation Date. |
| *Estate* | The Estate created in this case pursuant to § 541 of the Bankruptcy Code. |
| *Filing Date* | December 21, 2021 |
| *Final Distribution* | The date on which all Distributions provided for under this Plan have been mailed or otherwise issued to holders of all Allowed Claims. |
| *Final Order* | An Order of a Court from which no Appeal or |

| | |
|---|---|
| | review can be taken, or as to which all Appeals and reviews have been withdrawn or dismissed or granted with prejudice. |
| *Lease* | The Master Lease Agreement dated as of March 15, 2022 between Hello Nostrand LLC and 1580 Nostrand Management LLC providing for Lease rental to be paid commencing on or about March 15, 2023. |
| *Lease Income* | The Lease Income shall be determined in any year that the Lease in effect. Gross receipts of Lease income less all necessary and operating obligations of the Landlord, including, but not limited to, certain insurance. |
| *Plan* | The Debtor's Plan of Reorganization or as modified in accordance with the Bankruptcy Code. |
| *Project* | Project shall be the real property interest owned by the Debtor's Hello Nostrand LLC consisting of a building and a vacant lot which is a development site located at 1580 Nostrand Avenue, Brooklyn, New York. |
| *Real Property or Property* | Hello Nostrand's Real Estate and associated rights located at 1580 Nostrand Avenue, Brooklyn, New York. |
| *Secured Claim* | Any Claim held by a person against the Debtor secured by Collateral but only to the extent of the value of the collateral as set forth in the Plan pursuant to § 506(a) of the Bankruptcy Code, provided, however, that Secured Claim shall not include any portion of a Claim to the extent that the value of such person's interest in the Collateral is less than the amount of such Claim. |
| *Unimpaired* | A Claim or Equity Interest that is unimpaired within the meaning of § 1124 of the Bankruptcy Code, in that the Plan does not otherwise alter any legal, equitable or contractual rights to which such Claim entitles |

| | the holders of such Claim. |
|---|---|
| | |
| *Unsecured Claim* | Any Claim or right as defined in § 101 of the Bankruptcy Code whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, which is not a Secured Claim a Priority Claim or an Administration Claim. |

## ARTICLE II

## DESIGNATION OF CLAIMS AND INTEREST

2.1     The following classifies claims and equity interests required to be designated in Classes pursuant to §§ 1122 and 1123 (a)(1) of the Bankruptcy Code.  In accordance with § 1123(a)(1) of the Bankruptcy Code, the Administrative Claims have not been classified and their treatment is set forth herein.  Classification of Claim and equity interests in this Plan is for all purposes, including voting, confirmation and distribution pursuant to the Plan.  Claims shall be deemed classified in a particular Class only to the extent that such claim qualifies within the description of that Class and shall be deemed different and classified in a different Class only to the extent that any portion of such claim qualifies within the description of such different Class. Distribution, on account of any Claim, in any Class, is not required or permitted unless, and, until such Claim or Equity Interest becomes an Allowed Claim or Allowed Equity Interest, as the case may be, which might not occur, if at all, until after the Effective Date.  However, an exception exists for secured creditor Nostrand Mezz Lender whose Allowed secured claim shall be paid within 90 days after the Confirmation Date.  All payments to groups of creditors or equity holders are paid.  The following summarizes all creditors and equity classes, their amount and whether they are impaired.

## ARTICLE III

## CLASSIFICATION

**Class 1**

3.1    The Allowed Secured Claims of Nostrand Mezz Lender holding a claim alleged to be in the amount of approximately $3,000,000 in unpaid principal which is presently alleged to be $4,500,000 which claim includes any prepayment fees, forbearance fees, exit fees, servicing fees and any other charges charged by this creditor all of which the Court shall determine as to whether such fees and charges are part of the Allowed Class 1 Claim.

**Class 2**

3.2    Any Allowed unsecured claims.

**Class 3**

3.3    Equity Interests – shall be the holders of the equity interest of the Debtor.

## ARTICLE IV

## TREATMENT OF CLAIMS THAT ARE IMPAIRED
## AND WHO WILL VOTE ON THE PLAN

The following claims will be treated as follows:

**Class 1**

4.1    The Allowed Secured Claims of Nostrand Mezz Lender holding a claim alleged to be in the amount of approximately $3,000,000 in unpaid principal which is alleged to be $4,500,000 presently which claim includes prepayment fees, forbearance fees, exit fees, servicing fees and any other charges charged by this creditor.

4.2    This Creditor shall receive payment of 100% of its Allowed Claim within 90 days after the Confirmation Date. The funds shall be provided by Nostrand Debtor Investor ("*Nostrand Debtor Investor*") who shall receive a 40% investment interest in the Project on account of its

8

investment.

4.3    The Debtor intends to seek a determination that the amount of Nostrand Mezz Lender claim should be adjusted to accrue interest at the interest rate of the then applicable non-default contract rate of interest or 12% per annum for the period of March 2021 until December 21, 2021 the date of the filing of the Chapter 11 case and the rate thereafter to be determined by this Court.  In addition, the Debtor shall seek to cancel any exit fees, prepayment fees, forbearance fees or any other fees which this creditor shall seek to impose upon the Debtor as the "fee" or other charge to make the payment of the claim of Nostrand Mezz Lender including, but not limited to, requiring the payment of the Mortgage Loan prior to payment of the Allowed secured claim of Nostrand Mezz Lender.  The Court shall determine whether any disputed Plan provisions including interest rate and the term are allowed under a statutory and case authority and the Debtor's Plan shall be deemed modified to the extent provided by the Court's determination on any treatment of Class 1.  Notwithstanding, the Debtor shall make payment to this creditor in the amount fixed by the Court within the 90-day period after the Confirmation Date.  Upon the full payment by the Debtor as provided here, the Nostrand Mezz Lender and Nostrand Senior Lender ("_Nostrand Senior Lender_") agree not to challenge or attack the validity and enforceability of Hello Nostrand's existing Master Lease Agreement with 1580 Nostrand Management.

4.4    Upon Confirmation, any, and all prepayment premiums and any fees, exit fees or such other requirements set forth in the underlying loan shall also be cancelled, waived and released.  The Debtor shall continue to pay all of its operating obligations.  The terms of the Plan shall be the exclusive terms relating to the repayment of the Allowed Class 1 Claim. The pre-petition loan documents shall have no force or effect after Confirmation. Upon completion of the payments to the holder for the Allowed Class 1 Claim as required by the Plan and resolution of the

disputed claims, Class 1 shall be deemed to have released any, and all liens on the Debtor' assets and any claims against the Debtor with respect to the Mezz Loan. To the extent required by the Debtor, upon full payment of its Allowed Class 1 Claim, Class 1 holder shall immediately prepare and file any document necessary to effect a release of its liens on the Debtor's assets.

4.5     As stated previously, any objection by Class 1 to any provision waiving any fees or premiums which may be objected to under State Law or Bankruptcy Law will be the subject of a Court hearing and Court approval on whether the objection should be overruled and covered by any modification and the Plan will be deemed amended to the extent of Court approval for the objection and/or modification. Any modifications under this Plan which Class 1 contends improperly impairs loan documents or guaranty obligations shall all follow the requirements of the Bankruptcy Code and statutory authorization and shall be deemed to be an amendment to the Plan subject in all respects to a Court Order ruling in this respect.

4.6     This Class is impaired and is entitled to vote.

## Class 2

4.7     Any Allowed unsecured claims in the approximate amount of $1,625,000.

4.8     Such claims shall be paid, pro rata, in full, plus interest at 4.5% interest from the Confirmation Date from the funds received in connection with the Project but not from the Lease Income.

4.9     This Class is impaired and is entitled to vote.

## ARTICLE V

## NONIMPAIRED

### Class 3

5.1     Equity Interests – shall be the holders of the equity interest of the Debtor. The equity holders shall be paid their investments in the Project. Equity holders shall not be paid until Nostrand Mezz Lender and Nostrand Senior Lender have been paid in full.

5.2     This Class is unimpaired and is not entitled to vote.

## ARTICLE VI

## ADMINISTRATION EXPENSES AND UNCLASSIFIED CLAIMS

6.1     All operating unpaid administrative expenses of the Chapter 11 Case fees, the Court appointed professionals for the Debtor who have rendered services and who are entitled to compensation under §§ 327 and 503(b) of the Bankruptcy Code for services rendered prior to the Confirmation Date subject to a Fee Application on Notice and Court Order and the fees payable to the Office of the United States Trustee under 28 U.S.C. § 1930, are not classified and shall be paid in full on or before the Effective Date. The United States Trustee Fees and the professional fees, incurred after confirmation at the same hourly rates and terms shall continue to be paid up through the Closing Date of this Chapter 11 Case. The professional fees shall not be paid from Lease Income, on consent, if this Plan is confirmed by the Court but from a cash call upon the investors. The United States Trustee fees shall be paid either from a cash call upon the investors or from Lease Income. A reserve may be estimated on the Confirmation Date and instituted for the payment of these fees. The within professional claims for post-confirmation services may be paid under a different agreement reached with the Debtor prior to Confirmation and may be paid

11

without any Court Order.

## ARTICLE VII

## IMPLEMENTATION OF PLAN

7.1     The Debtor shall assist and cooperate with the development of the vacant lot owned by Hello Nostrand and pursue the litigation.  In this connection, an action may be commenced against Nostrand Mezz Lender and Nostrand Senior Lender based on the fraudulent transfer that took place at the execution of the Forbearance Agreement in August 2020 where the Debtor clearly received inadequate consideration under § 548 of the Bankruptcy Code at a time when the Debtor was engaged in a business where these Lenders' predecessors, with their fees, left the Debtor engaged in a business with unreasonably small capital under §§ 548(a)(1)(A) and (B).  These issues were never addressed in any prior Court proceeding and may be considered with respect to the case here.  This type of litigation will take years.

7.2     The Debtor shall continue with the above litigation against the Secured Creditor (Class 1).  However, the Secured Creditor shall be entitled to full payment of its Allowed secured claim as provided above, whether or not the litigation has been commenced against the Secured Creditor, as long as the time period for payment occurs any disposition of the litigation subject to a subsequent determination.  Upon such a determination in which Nostrand Mezz Lender is required to return funds, the Debtor shall be entitled to seek recovery.

7.3     The Debtor shall act as Distributing Agent.

7.4     The Debtor shall monitor the operation of the Hello Nostrand Real Property.

7.5     The litigation with the Secured Creditor will continue until there is a Final Court Order determining the allowability of the Secured Creditor's claims and priority.

7.6     The Plan is self-executing. Except as expressly set forth in the Plan, the Debtor

shall not be required to execute any newly created documents to evidence the Claims, liens or terms of repayment to the holder of any Allowed Claim. The terms of this Plan will exclusively govern payments to creditors and any other rights of creditors as against the Debtor and their property. Furthermore, upon the completion of the payments required under this Plan to the holders of Allowed Claims, such Claims, and any liens that may support such Claims, shall be deemed released and discharged.  The Debtor shall be responsible to effect all transactions to consummate the provisions.

### ARTICLE VIII

### PROCEDURES FOR RESOLVING DISPUTED CLAIMS

8.1    ***Time Limit for Objections to Claims***            Objections to Claims shall be filed by the Debtor with the Court and served upon each holder of each of the Claims to which objections are made not later than sixty (60) days subsequent to the Confirmation Date or within such other time period as may be fixed by the Court.  Unless otherwise extended by Order of this Court, the Debtor may file an objection to the allowance of any Claim filed resulting from the rejection of an executory contract on the latter of sixty (60) days following the Confirmation Date or within thirty (30) days after the filing of such Claim and service a copy of such Claim upon the Debtor as provided for in the Plan.

8.2    ***Resolution of Disputed Claims***            Unless otherwise ordered by this Court, the Debtor shall litigate to judgment, settle or withdraw objections to Disputed Claims, in its sole discretion, without notice to any party in interest, other than notice of not less than ten (10) days' notice, as between the Debtor and the Creditor of the Claim, who is being objected to.

8.3    Payments and distributions to each holder of a Disputed Claim that ultimately becomes an Allowed Claim shall be made in accordance with the provisions of the Plan with

respect to the Class of creditors to which the respective holder of an Allowed Claim belongs. Reserves shall be maintained. Such payments and distributions shall be made as soon as practicable after the date that this Court enters a Final Order allowing such Claim, but not later than thirty (30) days thereafter. Payments shall be made as and when a Disputed Claim has become, in whole or in part, an Allowed Claim or a Disallowed Claim, pursuant to a Final Order or agreement between the Debtor and such Claimant or as allowed by this Plan.

## ARTICLE IX

## THE REORGANIZED DEBTOR

9.1    The Debtor shall continue with its corporate status and operate the Debtor' businesses.

9.2    The Debtor shall reserve all distributions from disputed claims pending determination that claims become Allowed Claims.

9.3    The case may be closed after initial payments are made to creditors on the Effective Date and may be re-opened, without any fees, as necessary, to implement the Plan.

## ARTICLE X

## EXECUTORY CONTRACTS

10.1    Debtor does not believe that there are executory contracts but in an excess of caution the Debtor leaves open the possibility that there may be executory contracts that the Debtor is not aware of.

## ARTICLE XI

## MODIFICATION OF THE PLAN

11.1    The Debtor may amend and modify this Plan at any time prior to the Confirmation Order, without approval of this Court. After Confirmation, the Debtor may modify this Plan before

a substantial consummation of this Plan, with the approval of this Court, and upon any Mortgagee's right to respond.

## ARTICLE XII

### PROVISIONS FOR CLASSES OR HOLDERS OF CLAIMS
### WHICH ARE AFFECTED BY AND DO NOT ACCEPT THIS PLAN

12.1    Any class or holders of claims or interests which are affected by and do not vote to accept the Plan in accordance with the provisions of Bankruptcy Code § 1126 shall be treated in fair and equitable fashion as provided by Bankruptcy Code § 1126(b).

## ARTICLE XIII

### WITHHOLDING AND REPORTING REQUIREMENTS

13.1    *Withholding Rights*.  In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

13.2    *Forms*.        Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the Disbursing Agent, or such other Person designated by the Debtor (which entity shall subsequently deliver to the Disbursing Agent

any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8, unless such Person is exempt under the tax Code and so notifies the Disbursing Agent. If such request is made by the Debtor or such other Person designated by the Debtor and the holder fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the Debtor and any Claim in respect of such distribution shall be discharged and forever barred from assertion against any Debtor and its respective property.

## ARTICLE XIV

## TRANSFER TAXES

14.1    *Exemption From Certain Transfer Taxes*    To the maximum extent provided by § 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of any security and the making or delivery of any instrument of transfer or mortgage under this Plan as confirmed by the Court, (including an instrument of transfer or mortgage executed in furtherance of the Plan) shall not be subject to tax under any law imposing a stamp tax, real estate transfer tax, mortgage recording tax or similar tax due on the sale or transfer of the Property in connection with or in furtherance of the Plan as confirmed by the Court and the funding requirements contained herein and shall not be subject to any state, local or federal law imposing such tax and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## ARTICLE XV

## EVENT OF DEFAULT

15.1    The occurrence of any of the following shall constitute a default by the Debtor

under the Plan with respect to creditors.

a.      If (i) the Debtor default in making payments due under the Plan (and a grace period of ten (10) days after written notice of such default is given by a majority of the holders of the Class in default shall have passed, and unless such default (hereinafter referred to as an "*Event of Default*") has been waived in accordance with the term herein; (ii) the Debtor breaches any of the covenants contained herein after ten (10) days written notice by a creditor to the Debtor prior to payment due under the Plan; (iii) the Debtor seeks relief under any Federal or State Statute (other than the Debtor' present Chapter 11 Case); (iv) or a receiver; liquidator, custodian or trustee is appointed for substantially all of the property of the Debtor prior to completion of the payment due.

b.      Upon the occurrence of an Event of Default, any creditor shall notify the Debtor, and with the exception of any monetary default on account of payment, the Debtor shall have ten (10) business days from the date of the sending of such notice to cure such breach or advise of the reasons for occurrence of the non-payment default.  With respect to a breach for non-payment, the Debtor shall have a cure period of fifteen (15) business days.  In the event the Debtor fails to cure such breach within the prescribed periods, the Debtor shall be deemed to have defaulted on the terms of the Plan and the creditors shall have all rights available to them under State Law or the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, or under this Plan.

## ARTICLE XVI

## DISCHARGE AND RELEASE

16.1    Pursuant to § 1141 of the Bankruptcy Code, the Confirmation Order shall discharge claims against the Debtor which are being treated under the Plan.  Except as expressly provided

herein, the rights afforded in the Plan and the treatment of all creditors and holders of stock interest provided herein shall be governed by the Plan and shall release professionals representing the Debtor (arising out of services in connection with this Chapter 11 Case excluding negligent acts or acts of willful misconduct, ultra vires acts and breach of fiduciary duty). For the avoidance of doubt, Eli Karp shall continue to be liable under any claims of guaranty, contract or other provisions under State Law. Upon the Confirmation Date, all other claims against the above referred to professionals will be satisfied, discharged and released (except for those obligations identified in the Plan) in full exchange for the consideration provided for hereunder.

16.2    The effects of Confirmation of the Plan are set forth in the Bankruptcy Code. Upon Confirmation, the provisions of the Plan will bind the Debtor, its equity holders and creditors, whether or not they have accepted the Plan.

## ARTICLE XVII

## INJUNCTION AND EXONERATION

17.1    Except as otherwise provided in the Plan or Confirmation Order, all entities which have held, currently hold or may hold a debt, claim other liability of interest against the Debtor pursuant to, and subject to, the provisions of § 1141 of the Bankruptcy Code and are permanently enjoined with taking any of the following actions on account of such debt, claim, liability, interest or right: (a) commencing or continuing in any manner any action or other proceeding on account of such claim against property which is to be distributed under the Plan, other than to enforce any right to distribution with respect to such property under the Plan; (b) enforcing, attaching, collecting or recovering in any manner or judgment, award, decree, order against the Debtor other than as permitted under subparagraph (a) above; and (c) creating, perfecting or enforcing any lien or encumbrance against any property to be distributed under this Plan.

## ARTICLE XVIII

### RETENTION OF JURISDICTION AND DISCHARGE

18.1    Notwithstanding Confirmation, the Bankruptcy Court shall retain jurisdiction for the following purposes.

(a)    Determination of the allowability of claims upon objections filed to such claims and to any litigation commenced by the Debtor post-confirmation related to the Chapter 11 Case, the Plan or any creditor claims;

(b)    Determination of requests for payment of Claims and fees entitled to priority under § 507;

(c)    Resolution of any disputes concerning the interpretation of the Plan;

(d)    Implementation of the provisions of the Plan;

(e)    Entry of Orders in aid of consummation of the Plan;

(f)    Modification of the Plan pursuant to § 1127 of the Code;

(g)    Adjudication of any causes of action including voiding power actions commenced by the Debtor-in-Possession; and

(h)    Entry of a Final Order of Consummation and closing the case.

Dated:    New York, New York
May 31, 2022

*HELLO LIVING DEVELOPER NOSTRAND LLC*

By:    */s/ Eli Karp*
Eli Karp
Manager

19

*PLAN CONSENTED TO*

*HELLO NOSTRAND LLC*

By:     */s/ Eli Karp*_____
        Eli Karp
        Manager

*EXHIBIT B*





# EXHIBIT C

Zoho Sign Document ID: ZQJR4IBCUGG4DRWRNBNGZQHA0BRBN7SDWU8EZDLKQY4

## NNN MASTER LEASE AGREEMENT

### HELLO NOSTRAND LLC

( "Landlord")

and

### 1580 Nostrand Management LLC

("Tenant")

Joyland Management LLC

("Property Management")

*HF*

Zoho Sign Document ID: ZQJR4IBCUGG4DRWRNBNGZQHA0BRBN7SDWU8EZDLKQY4

## MASTER LEASE AGREEMENT

MASTER LEASE AGREEMENT (this "Lease") made as of March 15, 2022, between HELLO NOSTRAND LLC, a New York limited liability company ("Landlord") and 1580 Nostrand Management LLC a New York limited liability company ( "Tenant").

**Article 1.1** Basic Terms and Definitions

**Article 1.2**    The following terms shall have the meanings set forth opposite each of them:.

"Leased Premises" - The entire building (the "Building") located at 1580 Nostrand Ave , Brooklyn, New York 11226.

"Commencement Date" – The date upon which all parties have signed the lease.

"Expiration Date" - March 31, 2032, or such later date as this Lease may be extended pursuant to the terms hereof, or such earlier date on which this Lease may expire or be cancelled or terminated pursuant to the terms of this Lease Agreement.

"Fixed Rent" – Three Million Dollars Two Hundred Thousand ($3,200,000.00) per annum; Payable in monthly installments of Two Hundred Sixty-Six Thousand Six Hundred Sixty-Six and Sixty-Seven cents ($266,666.67) per month. After year two fixed rent shall increase by 2% each subsequent year. If lease is extended, the fixed rent increases by 3% each subsequent year. The Fixed Rent is shown on Exhibit A to this lease.

"Permitted Use" - The rental of the residential units to individual residential tenants in accordance with all applicable laws and the terms and conditions of this Lease. The rental of the Community Facility in accordance with all applicable laws and the terms and conditions of this Lease.

"Term" - The period beginning on the Commencement Date and ending at 11:59 p.m. on the Expiration Date.

**Article 2.**    Leased Premises

**Article 2.1**    Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises for the Term, at the Rent and on the other terms of this lease. Each party hereto agrees to observe and perform all of the conditions and covenants herein contained on its part to be observed and performed.

*HF*

Zoho Sign Document ID: ZQJR4IBCUGG4DRWRNBNGZQHA0BRBN7SDWU8EZDLKQY4

**Article 2.2** Tenant acknowledges and agrees that it will be leasing the property based solely upon its inspection and investigations of the property and that Tenant will be leasing the property "AS IS" and "WITH ALL FAULTS" based upon the condition of the Property as of the date of this Agreement.

**Article 3.**    <u>Use; Occupancy Rentals</u>

**Article 3.1**    Tenant shall utilize the Leased Premises for the Permitted Use, subject to applicable laws and the terms and conditions of this Lease.

**Article 4.**    <u>Rent</u>

**Article 4.1**    Whenever used in this Lease, the term (insofar as it pertains to this Lease) "fixed rent", "minimum rent", "base rent" or "basic rent", shall mean Fixed Rent; and whenever used in this Lease, the term (insofar as it pertains to this Lease) "rent", "rental, "Rent", or the plural of any of them, shall mean, collectively, the Fixed Rent and additional rent.

**Article 4.2**    From and after the Commencement Date, Tenant shall pay to Landlord in lawful money of the United States of America, at the office of the Landlord as specified in Article 33 hereof or at such other place as Landlord may designate, the Fixed Rent reserved under this Lease for each month of the Term on or before the first day of each such month; and additional rent consisting of all such other sums of money as shall become due from and payable by Tenant to Landlord hereunder at the times provided in this Lease or, if not so provided, then within sixty (60) days after written demand therefore.

**Article 4.3**    Tenant shall pay the Fixed Rent herein reserved promptly as and when the same shall become due and payable under this Lease. If the Commencement Date shall occur on a day other than the first day of a calendar month, the Fixed Rent shall be prorated for the period from the Commencement Date to the last day of the said calendar month and shall be due and payable on the Commencement Date.

**Article 4.4**    Except as otherwise expressly set forth in this Lease, the Fixed Rent shall be on a NNN basis, such that all operating expenses of the Building shall be paid by Tenant, including without limitation real property taxes, utilities and insurance, and Joyland Management LLC Shall otherwise manage the operations of the building.

**Article 5.**    Rent Concessions. Tenant to receive the first six months free rent for the Punchlist, and Lease Startup.

*HF*

Zoho Sign Document ID: ZQJR4IBCUGG4DRWRNBNGZQHA0BRBN7SDWU8EZDLKQY4

Article 5.1 **Escrow Account**. Tenant agrees to fund an operating account the amount of $600,000.00 This amount will be used for tenant improvements to building as per article 6 below.

**Tenant Improvement**. Tenant to receive a credit of $1,300,000.00 to prepare the building for occupancy of tenants. This credit, can be used as rent credit for months seven (7) to eleven (11) in the first year of the lease, subject to article 5.1 above. Included in this obligation is that tenant will finish the basement with all storage rooms, cages, and recreational area. Tenant will complete the washer dryer & dishwasher hookups, basic punch-lists on all 93 units, and reconnect all low voltage systems together with all mechanicals & the elevator. Tenant agrees that Landlord does not have to invest any more funds into the building for the purpose of this lease and that landlord is not responsible for the build out.

Article 6.1 **Tax Abatement**.   There currently exists a 15 year tax abatement on the property. Tenant has the option to seek additional tax abatements and to seek a 35 year tax abatement in tenants sole discretion by July 1, 2022. The expected cost of such additional tax abatements is approximately $400,000.00. If tenant expends the approximate $400,000.00 , then tenant shall receive a credit towards rent in that amount.

Additionally , in the event that Tenant exercises the option to seek the tax abatement and at such time designates twenty-eight units towards affordable housing which shall remain vacant until such time as the units are filled by the HPD lottery, until such time Tenant shall receive a rent credit in accordance with the following formula: 125% of the per vacant unit @ the rate set by the HPD affordable rental guidance.

**Article 6.**     Alterations

**Article 6.1**    For the purposes of this Lease, the term "Alterations" shall include, but not be limited to, any changes, additions, work or improvements to the Leased Premises, the floors, walls and ceiling of the Leased Premises and alterations of a structural nature.

**Article 6.2**    Tenant shall not make any Alterations to the Lease Premises without the prior written consent of Landlord. Any Alterations to the Leased Premises shall be made or done pursuant to plans submitted in conformance with all laws, building codes and other governmental laws, ordinances and regulations. All necessary permits shall be received and posted prior to the commencement of any Alteration at the

*HF*

Zoho Sign Document ID: ZQJR4IBCUGG4DRWRNBNGZQHA0BRBN/SDWU8EZDLKQY4

sole cost and expense of Tenant. All Alterations shall belong to Landlord at the Expiration Date or upon sooner termination.

**Article 7.**    Intentionally Omitted

**Article 8.**    Intentionally Omitted

**Article 9.**    **Signs**

Intentionally Omitted.

**Article 10.**    **Repairs/Maintenance**

**Article 10.1**  Tenant shall be responsible at its cost to perform all maintenance and repairs to the Leased Premises.

**Article 11.**    **Destruction and Damage**

**Article 11.1**  If the Leased Premises and/or access thereto shall be substantially or totally damaged or destroyed by fire or other casualty, then either party may terminate this Lease, upon thirty (30) days' written notice to the other. In the event of the occurrence of casualty pursuant to which neither party terminates this Lease, then Landlord shall promptly restore the damage to the Lease Premises and Building, the parties hereby acknowledging that Landlord will be maintaining the casualty insurance for the Building.      Landlord's obligation to repair or restore the Leased Premises are stated herein as conditioned upon (a) all insurance proceeds and award for the Leased Premises being paid to Landlord.

**Article 12.**    **Eminent Domain**

*HF*

Zoho Sign Document ID: ZQJR4IBCUGG4DRWRNBNGZQHA0BRBN7SDWU8EZDLKQY4

**Article 12.1**  If the whole of the Premises (or use of occupancy of the Premises) shall be taken or condemned by any governmental or quasi-governmental authority for any public or quasi-public use or purpose (including sale under threat of such a taking), or if Landlord elects to convey title to the condemnor by a deed in lieu of condemnation, then the terms of this Lease shall cease and terminate as of the date when title vests in such governmental or quasi-governmental authority and the Rent shall be abated on the date when such title vests in such governmental or quasi-governmental authority.  If (i) only a part of the Premises is taken or condemned by any governmental or quasi-governmental authority for any public or quasi-public use or purpose (including sale under threat of such a taking), and the condemnation award is insufficient to restore the remaining portion of the Premises or if such award must be applied to repay any mortgages, now or hereafter, encumbering the Building or the Land, or (ii) whether or not a portion of the Premises is taken, a portion of the Building or the Land is taken and Landlord deems it commercially unreasonable to continue leasing all or a portion of the remaining space in the Building, or (iii) a substantial portion of the Premises is so taken, and it is commercially impossible for Tenant to continue its business within the Premises, then Landlord in the case of (i) and (ii) above and Tenant in the case of (iii) above, shall have the right to terminate this Lease on the date when title vests in such governmental or quasi-governmental authority.  .

**Article 12.2**  If this Lease is not so terminated after a partial condemnation, then after the date when the condemned portion of the Premises is delivered to the condemnor, the Fixed Rent and Additional Rent shall be reduced in the proportion which the condemned area bears to the entire area of the Premises.

**Article 12.3**    Tenant hereby waives all claims against Landlord with respect to a condemnation, and hereby assigns to Landlord all claims against the condemnor, including, without limitation, all claims for leasehold damages and diminution in the value of Tenant's leasehold estate

## Article 13.    Insurance

**Article 13.1**  Landlord shall maintain casualty and hazard insurance covering the Building. Each party shall carry with respect to itself commercial general liability insurance. Tenant shall add Landlord and its lenders and other designees as additional insured under Tenant's liability policies.

**Article 13.2**  Landlord and Tenant waive all rights to recover against each other, or against the officers, directors, shareholders, partners, joint venturers, employees, agents, customers, invitees, or business visitors of each other, for any loss or damage arising from any cause covered by any insurance actually carried by such waiving party.

*HF*

Zoho Sign Document ID: ZQJR4IBCUGG4DRWRNBNGZQHA0BRBN7SDWU8EZDLKQY4

## Article 14.    Assignment; Subletting

**Article 14.1**  Tenant shall not assign, sell, pledge, encumber, or otherwise transfer this Lease or its interests under this Lease or sublet all or any part of the Premises, without Landlord's prior written consent, which consent Landlord shall not unreasonably withhold or delay. Any assignment or sublease or other such encumbrance of transfer by Tenant in violation of this Lease shall be voidable by Landlord in its sole and absolute discretion. Any transfer in control or ownership of Tenant shall be deemed to be an assignment under this Lease and shall not be permitted except as expressly set forth herein. Notwithstanding the foregoing, subject to the provisions of Section 3.1, Tenant may enter into leases ("Occupancy Leases") with prospective users ("Occupancy Tenants"). The rental and other terms of the Occupancy Leases shall not be subject to the prior approval of Landlord. Tenant, at it's discretion, may request from Landlord and Landlord should immediately within 2 business days provide, an additional signature confirmation to confirm on such Occupancy Leases their consent. Upon an Event of Default by Tenant hereunder or the expiration or earlier termination of this Lease, Tenant does not hereby assign unto Landlord all such Occupancy Leases entered into by Tenant and such Occupancy Leases shall be deemed to be a direct lease between such Occupancy Tenants and Landlord. Tenant shall NOT change the property management company (Joyland Management LLC) without written Consent of the Landlord.

**Article 14.2**  Neither any assignment of Tenant's interest in this Lease nor any subletting, occupancy or use of the Leased Premises or any part thereof by any person other than Tenant, nor any application of any such Rent shall, in any circumstances, relieve Tenant of its obligations to fully observe and perform the terms, covenants and conditions of this Lease on Tenant's part to be observed and performed.

## Article 15.    Non-Liability and Indemnification

Zoho Sign Document ID: ZQJR4IBCUGG4DRWRNBNGZQHA0BRBN7SDWU8EZDLKQY4

**Article 15.1**  Subject to the provisions of Section 14.2, Tenant shall defend, indemnify and save harmless Landlord and its agents and employees against and from all liabilities, obligations, damages, penalties, claims, costs, charges and expenses, including reasonable attorneys' fees, which may be imposed upon or incurred by or asserted against Landlord and/or its agents or employees by reason of any action or cause occurring within the Leased Premises during the Term and any accident, injury or damage to any person or property occurring in, on or about the Leased Premises or any part thereof, except if caused by any negligence or willful misconduct of Landlord, its agents, employees, contractors and/or licensees or by the default of Landlord of its obligations under this Lease.  In case any action or proceeding is brought against Landlord by reason of any such claim, Tenant upon written notice from Landlord shall at Tenant's expense resist or defend such action or proceeding by reputable, competent counsel with respect to whom Landlord has no reasonable or just cause to request replacement.

**Article 15.2**  Intentionally Omitted.

**Article 15.3**  Tenant shall comply with any local, state or federal requirements applicable thereto and Landlord agrees to cooperate with Tenant in connection with any environmental hazards or Hazardous Material including, but not limited to:  hazardous waste, radon gas, formaldehyde gas, asbestos or asbestos containing materials located within the walls, floors, ceilings, vents, ducts or any other portion of the Leased Premises.  If any environmental hazard is detected during the Term of this Lease, Tenant shall at Tenant's cost and  liability take all steps to correct, alleviate or reduce the environmental hazard exposure below the minimum acceptable standards applicable thereto.  Additionally, if any environmental hazard is exposed by reason of Tenant's construction of Alterations, then Tenant shall remove same at Tenant's expense in accordance with any local, state or federal requirements, using a contractor licensed to perform such work.  During the period from the date of discovery of any environmental hazard to the date of complete removal of same, Landlord shall not be obligated to waive or forego any Rent on the Leased Premises if there is an interruption (in whole or in part) of Tenant's business.  Tenant shall defend, indemnify and save harmless Landlord and its agents and employees against and from all liabilities, obligations, damages, penalties, claims, costs, charges and expenses, including reasonable attorneys' fees, which may be imposed upon or incurred by or asserted against Landlord and/or its agents arising from the above environmental hazards.

**Article 16.**    Surrender of Premises

Zoho Sign Document ID: ZQJR4IBCUGG4DRWRNBNGZQHA0BRBN7SDWU8EZDLKQY4

**Article 16.1**  At the expiration of the Term, Tenant shall surrender and deliver up to Landlord the Leased Premises broom-clean, together with all Alterations and improvements which may have been made upon the Leased Premises (except movable furniture or movable trade fixtures put in at the expense of Tenant) in good repair and good order and safe condition except for reasonable wear and tear and damage by fire, other casualty or the elements excepted and/or condemnation excepted.  Tenant, on or before said date, shall be obligated to remove all of Tenant's personal property from the Leased Premises.

**Article 17.**    Intentionally Omitted

**Article 18.**    Landlord Liability.

**Article 19.1**    Transfer of Landlord's Interest.  Landlord has the right to sell, assign, convey or otherwise transfer the Premises and/or the Building and/or Landlord's interest in either or both.

**Article 19.2**    Limitation of Landlord's Liability.  Notwithstanding anything to the contrary provided in this Lease, there shall be absolutely no personal liability on the part of Landlord or any officer, director, shareholder, partner, member, employee or agent of Landlord, whether disclosed or undisclosed (or of any successor corporate landlord or any partner of any limited or general partnership which may become Landlord or any individual or other entity), with respect to any of the terms, covenants and conditions of this Lease, and Tenant shall look solely to the interest, income or equity, if any, of Landlord in the Building for the satisfaction of each and every remedy of Tenant in the event of a breach or default by Landlord of any of the terms, covenants and conditions of this Lease, such exculpation of personal liability to be absolute and without any exception whatsoever.  No other property or assets of Landlord, any successor to Landlord, or any officer, director, shareholder, partner, member, employee or agent of Landlord or any successor to Landlord, shall be subject to judgment, levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease or the use or occupancy of the Premises.

**Article 19.**    Intentionally Omitted

**Article 20.**    Subordination, Non-Disturbance and Attornment

**Article 20.1**  This Lease shall be subordinate and subject to all ground or underlying leases and any mortgages thereon and to any mortgages covering the fees of the Leased Premises, that now or may hereafter affect the Leased Premises, and to all renewals, modifications or replacements thereof; provided, however that with respect to

*HF*

Zoho Sign Document ID: ZQJR4IBCUGG4DRWRNBNGZQHA0BRBN7SDWU8EZDLKQY4

any future ground lease, future underlying lease and/or future mortgage, , the Landlord shall obtain from such future ground lessor, future underlying lessor and/or future mortgagee a subordination, non-disturbance and attornment agreement on such lessor's or mortgagee's standard form.  If the ground or underlying lessor and/or mortgagee or any successor in interest shall succeed to the rights of the Landlord under this Lease, whether through possession, surrender, assignment, subletting, judicial or foreclosure action, or delivery of a deed or otherwise, the Tenant will attorn to and recognize such successor-landlord as the Tenant's landlord and the successor-landlord will accept such attornment and recognize the Tenant's rights of possession and use of the Leased Premises in accordance with the provisions of this Lease.  This clause shall be self-operative and no further instrument of attornment and recognition shall be required.

### Article 21.    Brokerage

Article 21.1  Landlord and Tenant each represents to the other that, in the negotiation of this Lease, they dealt with no broker or brokers other than Oritlow Service Inc.  Each party hereto agrees to indemnify and hold the other harmless from any and all losses, costs, damages, expenses, claims and liabilities, including, without limitation, court costs and attorneys' fees and disbursements, arising out of any inaccuracy or alleged inaccuracy of their respective above representation.

### Article 22.    Defaults, Remedies and Right to Cure

Article 22.1  If the Tenant shall default in the performance of any of its obligations under this Lease and if such default shall continue for ten (10) days after notice, in the case of monetary defaults, and thirty (30) days after notice in the case of all other defaults (except that if such non-monetary default cannot be cured within the thirty (30) day period, this period shall be extended for a reasonable additional time, provided that the Tenant commences to cure such default within the thirty (30) day period and proceeds diligently thereafter to effect such cure) then Landlord shall have the following remedies:  (a) to cure and add such amounts required to cure the default to additional rent; (b) seek damages under Article 24;  (c) renter the Premises in accordance with Article 23 and/or terminate this Lease by giving ten (10) days notice, and/or (d) such other rights and remedies as may be available to Landlord at law or in equity

Article 22.2  If either party shall default in the performance of any term or condition herein contained, the other party, without thereby waiving such default, may perform the same for the account and at the expense of the defaulting party without notice in case of emergency and in any other case if such default continues after three days from the expiration of the period to cure as set forth above by the giving of written

*HF*

Zoho Sign Document ID: ZQJR4IBCUGG4DRWRNBNGZQHA0BRBN7SDWU8EZDLKQY4

notice of intention so to do or if no such period is provided, within thirty (30) days after notice of such default is given to the defaulting party. Bills for any reasonable and necessary expense incurred by either party for the account of the other, and reasonable and necessary bills for all costs, expenses and disbursements, including (without being limited to) reasonable counsel fees, incurred in enforcing or endeavoring to enforce any rights under or in connection with this Lease, or pursuant to law are payable by the defaulting party within three (3) days of notice to defaulting party and if not paid when due, the amounts thereof shall immediately become due and payable. Any such sums so due and not timely paid to Tenant may be offset against Rent next accruing under this Lease.

## Article 23.    Re-Entry by Landlord

**Article 23.1**  If Tenant shall be in default beyond applicable notice and grace or this Lease shall terminate for any reason whatsoever, Landlord or Landlord's agents and employees may,  possess or repossess the Leased Premises either by summary dispossess proceedings, ejectment or by any suitable action or proceeding at law, or by agreement. The words "possess" or "repossess" as herein used, are not restricted to their technical legal meaning. In the event of any termination of this Lease, other than as permitted to Tenant under this Lease, or of re-entry by summary dispossess proceedings, ejectment or by any suitable action or proceeding at law, or by agreement, or otherwise by reason of default hereunder on the part of Tenant, Tenant shall thereupon pay to Landlord the Rent due up to the time of such termination of this Lease or of such recovery of possession of the Leased Premises by Landlord, as the case may be, and shall also pay to Landlord damages as provided in Article 25

**Article 23.2**  In the event of any breach by either party of any of the terms or conditions contained in this Lease, the other party shall be entitled to enjoin such breach and shall have the right to invoke any right and remedy allowed at law or in equity or by statute or otherwise.

**Article 23.3**  Each right and remedy of Landlord and Tenant provided for in this Lease shall be cumulative and shall be in addition to every other right or remedy provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise, and the exercise or beginning of the exercise by any party of any one or more of the rights or remedies provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise shall not preclude the simultaneous or later exercise by said party of any or all other rights or remedies provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise.

## Article 24.Damages

*HF*

Zoho Sign Document ID: ZQJR4IBCUGG4DRWRNBNGZQHA0BRBN7SDWU8EZDLKQY4

**Article 24.1**   If this Lease is terminated or if Landlord shall re-enter the Leased Premises under the provisions of this Lease or in the event of re-entry by summary dispossess proceedings, ejectment or by any suitable action or proceeding at law in each case, by reason of default hereunder on the part of Tenant, Tenant shall pay to Landlord as and for liquidated damages, sums equal to the Rent (as above presumed) payable hereunder which would have been payable by Tenant had this Lease not so terminated, or had Landlord not so re-entered the Leased Premises, payable monthly, but otherwise upon the terms therefor specified herein following such termination or such re-entry and until the expiration of the Term, provided, however, that Landlord shall commercial reasonable efforts to relet the Leased Premises or any portion or portions thereof during said period at the then current fair market rental, Landlord shall credit Tenant with the net rents received by Landlord from such reletting, such net rents to be determined by first deducting from the gross rents as and when received by Landlord from such reletting the reasonable expenses incurred or paid by Landlord in terminating this Lease or in re-entering the Leased Premises and in securing possession thereof, as well as the reasonable expenses of reletting, including altering and preparing the Leased Premises or any portion or portions thereof for new tenants, brokers' commissions, advertising expenses, attorneys' fees, and all other reasonable expenses properly chargeable against the Leased Premises and the rental therefrom.  If the Leased Premises or any part thereof should be relet in combination with other space, then proper apportionment shall be made of the rent received from such reletting and of the expenses of reletting.

**Article 24.2**   Anything in this Lease to the contrary notwithstanding, if either party shall at any time be in default hereunder, and if the aggrieved party shall institute an action or summary proceeding against the defaulting party based upon such default, and it is reasonably prudent for the aggrieved party to contact counsel, then the defaulting party shall reimburse the aggrieved party, if the aggrieved party is successful in its action, for the reasonable expense of attorneys' fees and disbursements thereby incurred by the aggrieved.

<u>Article 25.</u>    Intentionally Omitted

<u>Article 26.</u>    <u>Waivers</u>

**Article 26.1**   To the extent permitted by applicable law, Landlord and Tenant hereby waive trial by jury in any action, proceeding or counterclaim brought by either against the other on any matter whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, or Tenant's use or occupancy of the Leased Premises, or any emergency or other statutory remedy with respect thereto.

*HF*

Zoho Sign Document ID: ZQJR4IBCUGG4DRWRNBNGZQHA0BRBN7SDWU8EZDLKQY4

**Article 26.2**   Except as specifically otherwise may be provided under this Lease, each of the parties shall be entitled, in addition to the rights and remedies provided herein, to those provided by law, provided, however, in no event shall either party be liable to the other party for any consequential, punitive or exemplary damages.

### Article 27.    No Other Waivers or Modifications

**Article 27.1**   The failure of either party to insist in any one or more instances upon the strict performance of any one or more of the terms or conditions of this Lease, or to exercise any right, remedy or election herein contained, shall not be construed as a waiver or relinquishment for the future of the performance of such one or more obligations of this Lease or of the right to exercise such election, but the same shall continue and remain in full force and effect with respect to any subsequent breach, act or omission.  No agreement hereafter made between Landlord and Tenant shall be effective to change, modify, waive, release, discharge, terminate or effect an abandonment of this Lease, in whole or in part, unless such agreement is in writing, refers expressly to this Lease and is signed by the party against whom enforcement of the change, modification, waiver, release, discharge or termination or effectuation of the abandonment is sought.

### Article 28.    Estoppel Certificate

**Article 28.1**   Tenant and Landlord agree, at any time and from time to time during the Term, upon not less than thirty (30) days prior notice from the other, to execute, acknowledge and deliver to the other a statement in writing addressed to the other (i) certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that this Lease is in full force and effect as modified and stating the modifications); (ii) stating the dates to which the rent and other charges hereunder have been paid by the Tenant; (iii) stating whether or not the other has knowledge that the requesting party is in default in the performance of any term or condition contained in this Lease, and, if the other has knowledge of such a default, specifying each such default and (iv) stating the address to which notices shall be sent.

*HF*

Zoho Sign Document ID: ZQJR4IBCUGG4DRWRNBNGZQHA0BRBN7SDWU8EZDLKQY4

**Article 29.**    <u>Renewal Options</u>.

  **Article 30.1**    Provided that Tenant is not in default under this Lease, Tenant shall have the right to renew the Term of this Lease for (1) additional periods of five (5) years each, by giving Landlord at least nine (9) months prior notice of such election in each case. Each such renewal shall be on all of the same terms and conditions as the initial term of this Lease, except that the Fixed Rent for each such renewal term shall be 3% of the prior years' Fixed Rent, and shall further increase by 3% each subsequent year of each such renewal term..

**Article 30.**    <u>Early Termination Right</u>.  Intentionally Omitted.

**Article 31.**    <u>Parties Bound</u>

  **Article 31.1**    The obligations of this Lease shall bind and benefit the successors and assigns of the parties with the same effect as if mentioned in each instance where a party is named or referred to.  However, the obligations of Landlord under this Lease shall not be binding upon Landlord herein named with respect to any period subsequent to the transfer of its interest in the Leased Premise as owner thereof and in the event of such transfer said obligations shall thereafter be binding upon each transferee of the interest of Landlord herein named as such owner or lessee of the Building, but only with respect to obligations arising during the period commencing with such transfer and ending with a subsequent transfer within the meaning of this Article, and such transferee, by accepting such interest, shall be deemed to have assumed such obligations except only as may be expressly otherwise provided elsewhere in this Lease.

**Article 32.**    <u>Notices – Service of Process</u>

*HF*

Zoho Sign Document ID: ZQJR4IBCUGG4DRWRNBNGZQHA0BRBN7SDWU8EZDLKQY4

**Article 32.1**  Any notice, statement, demand, request or other communication required or permitted pursuant to this Lease or otherwise shall be in writing and shall be deemed to have been properly given if addressed to the Landlord at 1580 Nostrand Avenue, Brooklyn, New York 11226 and to Tenant at  C/O Joyland Management 84 14th Street, Brooklyn New York 11215 and (a) if sent to such address by registered or certified United States mail, return receipt requested, postage prepaid, by depositing the same in a United States Post Office or an official depository thereof, in which event notice shall be deemed to have been given, rendered or made upon receipt thereof, which will be evidenced by the signed and dated return receipt, or (b) if sent to such address by United States Express mail or private, established, reputable, overnight carrier, on the business day on which the delivery was made, or, if rejected, on which delivery was attempted, or (c) if delivered to such address to an officer, partner or other authorized representative of the other party, by hand, receipt requested, in which event notice shall be deemed to have been given, rendered or made upon such delivery.

Either party may, by notice as aforesaid, designate a different address or addresses for notices, statements, demands or other communications intended for it.

**Article 32.2**  Whenever either party shall consist of more than one person or entity, any notice, statement, demand, or other communication required or permitted and any payment to be made shall be deemed duly given or paid if addressed to or by (or in the case of payment by check, to the order of) any one of such persons or entities who shall be designated from time to time as the authorized representative of such party. Such party shall promptly notify the other of the identity of such person or entity who is so to act on behalf of all persons and entities then comprising such party and of all changes in such identity.

**Article 32.3**  Tenant shall give notice to Landlord promptly after Tenant learns thereof, (i) of any accident in or about the Leased Premises or the Building, (ii) of all fires in the Leased Premises, and (iii) of all damages to or defects in the Leased Premises, including the fixtures, equipment and appurtenances thereof, for the repair of which Landlord might be responsible under the applicable provisions of this Lease. Failure of the Tenant to give notice shall not relieve Landlord of any of its obligations under this Lease.

## Article 33.    Miscellaneous Provisions

**Article 33.1**  The Article headings in this Lease prefixed to this Lease are inserted only as a matter of convenience or reference, and are not to be given any effect whatsoever in construing this Lease.

*HF*

Zoho Sign Document ID: ZQJR4IBCUGG4DRWRNBNGZQHA0BRBN7SDWU8EZDLKQY4

**Article 33.2**   Any provision of this Lease which requires a party to consent, (a) shall be read not to permit such party to  withhold its consent unreasonably, and (b) shall be read as if the word "withhold" read "withhold, delay or defer".

**Article 33.3**   Landlord and its agents shall have the right to enter and/or pass through the Leased Premises at reasonable times and frequency, with at least twenty-four (24) hours notice to Tenant and in the company of an agent or representative of the Tenant: (a) to examine the Leased Premises and to show them to actual and prospective superior lessors, superior mortgagees, or prospective purchasers, mortgagees or lessees of the Building; and (b) to make such repairs in or to the Leased Premises and/or in or to the Building or its facilities and equipment as Landlord is required to make pursuant to the applicable provisions of this Lease.  Notwithstanding the foregoing, at no time (except in the event of an emergency) shall Tenant's conduct of business in the Leased Premises be impaired by such entries.

**Article 33.4**   LANDLORD AND TENANT WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY ACTION, COUNTERCLAIM, PROCEEDING OR LITIGATION ARISING OUT OF, UNDER OR IN CONNECTION WITH, OR RELATED TO, THE SUBJECT MATTER OF THIS LEASE.  THIS WAIVER IS KNOWINGLY, INTENTIONALLY, AND VOLUNTARILY MADE BY LANDLORD AND TENANT AND EACH ACKNOWLEDGES THAT NEITHER THE OTHER NOR ANY PERSON ACTING ON BEHALF OF THE OTHER HAS MADE ANY REPRESENTATIONS OF FACT TO INDUCE THIS WAIVER OF TRIAL BY JURY IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT.

**Article 33.5** Arbitration. The Parties agree that in the event of any and all disputes or controversies which develop in connection with, or resulting from or relating to, this Agreement (the "Controversy"), the Controversy will be exclusively submitted to binding arbitration before the Beis Din of Rabbi Shaya Leib Wachsman.. At such arbitration, the Parties waive compliance with CPLR 7506 (a-c) except for the right to be represented by counsel (CPLR 7506(d)) which may not be waived. All arbitration hearings may be held in an informal setting, via telephone,  email, or otherwise. Service of all papers via email is permitted. The final or partial award may be confirmed in the Supreme Court, County of New York or Kings or if applicable, a federal court sitting therein, all of which shall have personal jurisdiction of the Parties

**Article 34.**    Counterparts

*HF*

Zoho Sign Document ID: ZQJR4IBCUGG4DRWRNBNGZQHA0BRBN7SDWU8EZDLKQY4

**Article 34.1**   This Lease may be executed in several counterparts, each of which shall be deemed to be an original, and all counterparts shall constitute one and the same instrument.  The parties may deliver such counterparts by facsimile transmission or as a PDF attachment to an email or other electronic method, and such copies and all further copies thereof shall be deemed to be originals for all purposes.

(The remainder of this page is intentionally blank)

Zoho Sign Document ID: ZQJR4IBCUGG4DRWRNBNGZQHA0BRBN7SDWU8EZDLKQY4

IN WITNESS WHEREOF, the parties hereto have executed this instrument the day and year first above written.

LANDLORD:

**HELLO NOSTRAND LLC**

By: _Eli Karp_

Name:  Eli Karp

Title:  Managing Member


TENANT:

**1580 Nostrand Management LLC**

By: _Harold Friedman_

Name:  Harold Friedman

Title:  Member


**Property Management:**

Joyland Management LLC

By: _yehudis Wolcowitz_

Name:  Yehudis Wolcowitz

Title:  Managing Agent

HF

*EXHIBIT D*

Zoho Sign Document ID: ZQJR4IBCUGG4DRWRNBNGZQHA0BRBN7SDWU8EZDLKQY4

## 21 E 29th St. Master Lease Rent Schedule

**$ 3,200,000.00** Rent

| Year | RENT | % increase | Rent Increase |
|------|------|-----------|---------------|
| 1 | $ 1,600,000.00 | 6 months consessions | |
| 2 | $ 3,200,000.00 | | |
| 3 | $ 3,264,000.00 | 2% | $ 64,000.00 |
| 4 | $ 3,329,280.00 | 2% | $ 65,280.00 |
| 5 | $ 3,395,865.60 | 2% | $ 66,585.60 |
| 6 | $ 3,463,782.91 | 2% | $ 67,917.31 |
| 7 | $ 3,533,058.57 | 2% | $ 69,275.66 |
| 8 | $ 3,603,719.74 | 2% | $ 70,661.17 |
| 9 | $ 3,675,794.14 | 2% | $ 72,074.39 |
| 10 | $ 3,749,310.02 | 2% | $ 73,515.88 |
| 11 | $ 3,861,789.32 | 3% | $ 112,479.30 |
| 12 | $ 3,977,643.00 | 3% | $ 115,853.68 |
| 13 | $ 4,096,972.29 | 3% | $ 119,329.29 |
| 14 | $ 4,219,881.46 | 3% | $ 122,909.17 |
| 15 | $ 4,346,477.90 | 3% | $ 126,596.44 |
| | **$ 53,317,574.95** | | |

HF

# *EXHIBIT E*



## Experience Excellence

When you work with us, you'll soon come to appreciate The Joyland Management Difference, because we treat all of our clients with the same high level of respect, attention to detail and commitment to customer service. That's because we value building strong relationships with everyone we work with — from building owners and developers to property managers and renters.



### Flexible

We manage properties of all sizes.

GET STARTED TODAY

84 14TH STREET ,
BROOKLYN, NEW YORK, 11215

P 718.360.5902
F 718.717.8260

Website by  digital

About

Services

Property Showcase

Contact Us

## Meet Our Team

Our organization is thriving thanks to a team of dedicated, hard working women. Joyland Management team members bring a wealth of property management experience, and unparalleled customer service to our valued clientele.

# Judy Minster

## CEO

In many ways, Judy Minster *is* Joyland Management. The firm's property manager initially worked for us several years ago, on a project supervising construction on an eight-unit property. "After putting so much effort into the construction of the  building, I wanted to make sure it would be managed right. So I stayed on. That's how Joyland Management was born." says Judy, who's taken on more responsibility with each successive year. Today her workflow includes researching potential new projects, inspecting all construction jobs, and reviewing rental applications, leases, deeds and contracts, as well as signing off on all expenses. She serves as a liaison with owners and partners, keeping apprised of their concerns, and ensuring smooth interactions.  She also handles all of the arduous and irksome aspects of management, i.e. Refinance, Foreclosures, Evictions, Violations, Annual Filings and numerous additional components of the business.

## The Joyland Difference

Judy epitomizes Joyland's approach to quality service for both property owners and tenants. Owners are consistently updated on the status of their properties, receiving quarterly, monthly and even weekly performance

reports from Judy and her team. All property information is available online. Owners, investors, and tenants alike, have personalized login access to peruse relevant information at any time. "We treat each property as if it were the only property we manage, and give it 100% of our attention." Judy says. "For tenants, there is a 24-hour number. All repairs get a work order, and then we aim to resolve all work orders within a 48-hour turn around." Judy thrives on the demands of her intense position and blossoming career. "I enjoy producing, and this job is very productive!" she says. "There's always some fresh and new excitement, and I love the adrenaline of a very fast-paced work environment. And it goes without saying, I really love my team!"

## Crystal Garcia

### Accounts Receivable Manager

Crystal is our Accounts Receivable Manager. She earned her Bachelor's degree in Business Management in 2016 and has over 12 years of Property Management experience in New York City dwellings. She oversees the process of collecting payments from our company's clients. The prevalent responsibilities for this role includes receiving and recording all payments, generating invoices and reconciling accounts on a monthly basis. Crystal is familiar with all accounting procedures and ensures the timely collection of payments. "My favorite part of the job is providing tenants with positive and productive customer service by ensuring that they are heard and that their needs are met", says Crystal, who joined out team in March of 2020.

## Jeanette Venegas

### (Licensed Notary Public NY)

### Leasing & Maintenance Manager

An essential part of the Joyland team, Jeanette is a tremendous source of information for the property owners, managers and especially the tenants who call our offices with an multitude of questions, special requests and yes, even complaints. For our tenants, Jeanette is the friendly face and helpful voice of Joyland Management. Jeanette oversees repairs and maintenance. She handles each work order diligently, and ensures our tenants are happy and well-informed throughout the repair process. "I love the variety my job offers.", says Jeanette, who joined our team in 2021. "I like to see things getting done. I make it my job to always ensure their questions and concerns are addressed promptly." "My approach to service is ' the customer is always right' approach." she asserts proudly.

"We treat our tenants as we would like to be treated, as one of the family. I love happy tenants."- And we love happy tenants too!!

Jeanette processes all move ins and move outs as well.

# Yulia Vykhodtseva

## Accounts Payable Full Charge Senior Accountant

CUNY – Brooklyn College: Bachelor Degree in Accounting (Spring 2019) GPA 3.8
CUNY – Kingsborough Community College: Associate Degree in Accounting (Fall 2016) GPA 4.0
Special Achievements: Bloomberg Certificate in Finance. Member of The National Society of Collegiate Scholars and Phi Theta Kappa Honor Society. Winner of Guttman Transfer Scholarship and Dean's List Academic Scholarship.

Yulia keeps our accounting system in order and is becoming a fundamental asset to our company with an impressive list of responsibilities, including maintaining the annual budget and chart of accounts, as well as processing payroll in a timely manner and providing clerical and administrative support to management. Yulia conducts daily reconciliations of all accounts to ensure their accuracy, issues financial statements, and assembles information for our annual audits. Yuliya is always in compliance and up to date with local, state, and federal government reporting requirements.

# Nereida Dobson

## Customer Service Specialist

Nereida is the friendly face of Joyland Management, she is the milk to our coffee and the sunshine to our day, when reaching out for any and all inquiries Nereida handles all requests with professionalism, detail oriented and class. She has proved to be a real asset to our team.

84 14TH STREET ,
BROOKLYN, NEW YORK, 11215

P 718.360.5902
F 718.717.8260

Website by digital

About

Services

Property Showcase

Contact Us

# Property Management

**Joyland's team understands that successful property management is a challenging and demanding field that requires strong listening skills, attention to detail and a proactive approach to meeting the needs of owners and tenants.**

## Day in, day out, our approach produces results.

We have turned around many struggling properties, making the physical improvements and management changes necessary to convert marginal buildings into thriving, profitable, fully occupied properties where both residents and owners are satisfied.

Working with properties across the New York City area, our wide-ranging property management services include both standard offerings and some that are beyond the usual property management scope. While the services we offer are extensive, we work predominantly with residential rental properties, as well as some mixed-used developments. Our management program can deliver contract services in virtually every area of residential rental management.

## Property Management Services

Building management

Building sales and resales, including condos, lofts, commercial and residential co-ops

Condo and co-op conversions

Rent stabilization and rent control resources and management

Building conversion, renovation and décor for co-ops, lofts and condos

Consulting services for tenant relocation for building developers and managers

Serving as a liaison between tenants and developers

Joyland is known for our fast response time to client concerns and our commitment to tailoring our services to the needs of specific clients, properties and neighborhoods, from long-established areas to trendier addresses to promising neighborhoods ready for discovery. In addition, our property management team is always prepared to handle challenging insurance and government regulations compliance issues.

We also have a deep understanding of New York's zoning laws and regulations, which means you can trust us to help you get the maximum use out of your property.

Though Joyland manages thousands of units, we're still a tightly run business with a personal touch providing personal assistance for all of our clients' building management needs. We're large enough to have earned respect and recognition throughout the industry, but still retain a family feeling that makes owners and tenants enjoy working with our team.

P 718.360.5902
F 718.717.8260

Website by  digital

About

Services

Property Showcase

Contact Us

## Project Supervision

**At Joyland, we pride ourselves on being problem solvers and our team works hard to meet deadlines seamlessly, working closely with all parties to iron out any challenges along the way.**

## Joyland's Team Always Gets Off to a Strong Start

We do this through careful planning in the early stages of a project and by being flexible and responsive to problems throughout the development process. Joyland's team always gets off to a strong start by researching, vetting and hiring the best vendors for repairs, new construction and major renovation projects.

We're also intensely "hands-on" throughout repair and development projects. We do much more than just make occasional "spot checks." Instead, we visit sites on a consistent basis to make sure repairs and new construction are following specifications and staying on schedule.

## Our Services

Aiding the planning and bidding process

Working with the client to select the proper professionals

Analysis and recommendations during preconstruction phase

# Capital Improvements

**Developers, property owners, administrators, condo and co-op boards and other decision makers all rely on Joyland Management's smooth, friendly and highly professional capital improvement services. Our experienced staff understands the fine points of capital improvement projects, which begin with our strong relationships throughout the property management and construction industries.**

## Joyland's team always makes smart decisions

We focus on upgrades that are necessary as well as those that will make your property attractive to the tenants you're targeting, without overwhelming your budget.

We have a comprehensive network of contractors, engineers, architects and vendors – along with a deep knowledge of contractor logistics – that enables us to develop workable schedules with limited discomfort for building residents and owners.

When we partner with clients on capital improvement projects, Joyland starts with thorough planning, identifying and screening prospective contractors, obtaining/reviewing bids, scrutinizing plans and specifications once they're submitted, and then offering well-thought-out guidance to our clients, including assistance with finance options, when requested.

This emphasis on communication continues throughout the process, as our staff keeps in frequent contact with building owners, managers & staff, and the always-important residents throughout the capital improvement process.

We do much more than touch base by email and phone. Joyland Management's staff actively manages projects, frequently visiting worksites to make sure contractors are sticking to their specifications and providing residents with optimal access to their property.

Call us today to learn more about our thorough, hands-on approach to managing capital improvement projects and click here to see examples of New York buildings that our capital improvement initiatives have converted into showcase properties.

84 14TH STREET ,
BROOKLYN, NEW YORK, 11215

P 718.360.5902
F 718.717.8260

Website by digital

About

Services

Property Showcase

Contact Us

Property Showcase

Joyland Management manages a wealth of residential and commercial retail rental properties in Manhattan, Brooklyn, The Bronx, Queens, and across the Metropolitan New York area. From smaller buildings with fewer than a dozen units to large-scale mixed-use properties, we provide the same high level of service to all of our owners and their tenants.

**The images in this section highlight just a few of the more than 35 diverse properties we manage.**

South Shore
Commons

STATEN
ISLAND



Joyland Management manages a wealth of residential and commercial retail rental properties in Manhattan, Brooklyn, The Bronx, Queens, and across the Metropolitan New York area. From smaller buildings with fewer than a dozen units to large-scale mixed-use properties, we provide the same high level of service to all of our owners and their tenants.

**The images in this section highlight just a few of the more than 35 diverse properties we manage.**

























































84 14TH STREET ,
BROOKLYN, NEW YORK, 11215

P 718.360.5902
F 718.717.8260

 

Website by 

About

Services

Property Showcase

Contact Us

# EXHIBIT F

THE Law OFFICE OF ABRAHAM NEUHAUS LLC

March 25, 2022

Hello Nostrand LLC
1580 Nostrand Avenue
Brooklyn, New York 11226

Joyland Management LLC
84 14th Street, 4th Floor
Brooklyn, New York 11215

Re:   Master Agreement Dated March 15, 2022

To Whom It May Concern:

Please be advised that 1580 Nostrand Management LLC, the tenant under the above referenced Master Agreement (the "Lease") has deposited the amount of $600,000 with my firm, to cover tenant improvements as mandated by the terms of the Lease.

Please feel free to contact me at your convenience at (845) 548-7284.

Very truly yours,

Abraham Neuhaus

124 Benjamin Street          Telecopier: (646) 349-1381
Toms River, New Jersey 08755   abeneuhausesq@gmail.com
(845) 548-7284

# *EXHIBIT G*

*HELLO LIVING DEVELOPER NOSTRAND LLC*

*LIQUIDATION ANALYSIS*
*(ESTIMATED AND APPROXIMATE)*

| *Assets* | Undetermined Unliquidated Subject to the value of the subsidiary Hello Nostrand LLC | $3,000,000 |
|---|---|---|
| Shares of Stock of Hello Nostrand LLC, a privately held company | | |
| *Liabilities* | | |
| Chapter 7 liquidation claims | | $75,000 |
| Chapter 11 administration claims | | $100,000 |
| Secured claims | $4,500,000 Claimed | $2,825,000 |
| Unsecured claims | $1,625,000 | $0 |
| *Estimated Total of Liabilities* | | **$3,000,000** |