UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

```
--------------------------X  Case No.:  21-22696-shl
IN RE:                     .  Chapter 11
                           .
HELLO LIVING DEVELOPER     .  300 Quarropas Street
NOSTRAND LLC,              .  White Plains, New York 10601-4140
                           .
           Debtor.         .  July 12, 2022
--------------------------X  Time:  3:32 p.m. - 4:20 p.m.
```

**21-22696-shl**   Hello Living Developer Nostrand LLC   *Ch. 11*
BENCH DECISION Re: Doc. #45 Motion To Dismiss Case Or
Alternatively, Motion For Relief From The Automatic Stay

HONORABLE SEAN H. LANE
UNITED STATES BANKRUPTCY JUDGE

VIRTUAL APPEARANCES (VIDEO-ZOOM.GOV/TELEPHONE):

| | |
|---|---|
| FOR THE DEBTOR<br>HELLO LIVING<br>DEVELOPER LLC: | LEO FOX, ESQ. [*Video-Zoom.Gov*]<br>630 Third Avenue<br>New York, New York  10017 |
| | ELI KARP, CEO, PRINCIPAL [*Telephone*]<br>17 Tokay Lane<br>Monsey, New York  10952 |
| | MR. WORMS, (PHONETIC) PRINCIPAL [*Telephone*] |
| FOR NOSTRAND MEZZ<br>LENDER LLC: | LEO MUCHNIK, ESQ. [*Video-Zoom.Gov*]<br>ALAN BRODY, ESQ. [*Video-Zoom/Listen Only*]<br>Greenberg Traurig, LLP<br>One Vanderbilt Avenue<br>New York City, New York  10017 |
| | JEFFREY SIMPSON, PRINCIPAL [*Video-Zoom.Gov*]<br>15 West 27th Street<br>New York, New York  10001 |
| THE U.S. TRUSTEE: | TARA TIANTIAN, ESQ.[*Video-Zoom.Gov*]<br>Office of the United States Trustee<br>201 Varick Street<br>New York, New York  10014 |

*Proceedings digitally recorded.*
*Transcript produced by:  Catherine M. Griffin*

*American Legal Transcription*
*11 Market Street - Suite 215 - Poughkeepsie, NY 12601*
*Tel.: (845) 452-3090 - Fax: (845) 452-6099*
AmericanLegalTranscription.com

I N D E X

PAGES

CLARIFICATION AND RECITATION RE JUNE 2, 2022 RULING ON MOTION
TO DISMISS/ALTERNATIVELY, MOTION FOR RELIEF FROM STAY, DOC #45

Bench Ruling:  The Court            [*granted in full*]          5

BACKGROUND OF THE CASE:                                          6

DEBTOR'S REQUEST FOR DISMISSAL AND STATEMENT RE SAME:           32

DEBTOR'S COUNSEL CONFIRMS CLIENT'S DISMISSAL:                   33

U.S. TRUSTEE'S REQUEST FOR FEES OWED TO BE IN ORDER:            34

DEBTOR'S COUNSEL REAFFIRMS CONSENT TO DISMISSAL:               35

1    (Proceeding commences at 3:32 p.m.)

2         THE COURT:  Good afternoon, we're here for the case

3  of Nostrand Mezz Lender -- I'm sorry, we're here for the case

4  of Hello Living Developer Nostrand LLC, which is on for a

5  continued hearing on the motion of Nostrand Mezz Lender LLC to

6  dismiss the Chapter 11 case, or in the alternative, to lift the

7  automatic stay.

8         And this hearing today is essentially a sequel to

9  many hearings we've had before, including the hearing on June

10  2nd, when the Court heard the motion in the first instance.

11  And so, let me start as do always with appearances.

12         Let me find out who's here on behalf of the Debtor?

13         MR. FOX (Video):  Good afternoon, Your Honor.  Leo

14  Fox, representing the Debtor.  And -- and with me on the

15  telephone is Mr. Karp, a principal of -- of the Debtor; and I

16  think Mr. Worms is on as well.

17         THE COURT:  All right.  Good afternoon to you all.

18         MR. KARP (Telephone):  Good afternoon, Your Honor.

19         MR. WORMS (Telephone):  Good afternoon, Your Honor.

20         THE COURT:  Let me -- let me find out who's here on

21  behalf of the Movant, Nostrand Mezz Lender LLC?

22         MR. MUCHNIK (Video):  Good afternoon, Your Honor.  I

23  hope you're feeling better, recovering from COVID.  Leo

24  Muchnik, from Greenberg Traurig; my colleague -- on behalf of

25  Nostrand Mezz Lender LLC -- and my colleague, Alan Brody's on

1  as well.  He's actually in Wyoming right now, so he's just

2  dialed-in; he's not going to be speaking today.

3          THE COURT:  All right.  So --

4          MR. MUCHNIK:  And I'm not -- I believe -- I'm not

5  sure if he's on yet, but -- yep.  And also with me, is the

6  principal from Nostrand Mezz Lender, Mr. Jeffrey Simpson.

7          THE COURT:  All right.  Good afternoon to you all.

8          And let me find out who's here on behalf of the

9  United States Trustee's Office?

10         MS. TIANTIAN (Virtual):  Good afternoon, Your Honor.

11 Tara Tiantian, from the United States Trustee.

12         THE COURT:  All right.  Good afternoon.  And with

13 that, I think I have all the appearances; but in an abundance

14 of caution, let me ask if there's anyone who has not yet made

15 an appearance who wishes to do so at this time?

16    (No audible response)

17         THE COURT:  All right.  So I think that's the crew.

18 And so I think consistent with the discussions that we've had

19 at prior hearings, there had been a -- several hearings on this

20 motion, and the Court had made a ruling that partially lifted

21 the automatic stay.

22         The reasons that I set forth at that hearing on June

23 2nd were fairly -- somewhat abbreviated.  And so in the

24 aftermath of that hearing, and with the passage of more than a

25 month, the Mezz Lender has been asking for a -- a ruling to

1   allow it to go forward without any limitations as to lift the

2   stay in all respects, and I scheduled today for that purpose.

3        And so, I did see Mr. Fox's letter that was submitted

4   dated July 11th, and that I -- I didn't check the docket, given

5   other things I had going on today, but I assume that's made its

6   way onto the docket.  And with that, I think I am up to date.

7   And so, I'm ready to go ahead with the bench ruling, unless

8   there's any preliminary matters that pertain directly to the

9   bench ruling that need to be addressed first?

10      (No audible response)

11   CLARIFICATION/RECITATION OF BENCH RULING OF JUNE 2, 2022 ON

12    MOTION TO DISMISS/MOTION FOR RELIEF FROM THE AUTOMATIC STAY

13        THE COURT:  All right.  Hearing nothing, before the

14   Court is the motion of Nostrand Mezz Lender LLC, which I'll

15   call "the Mezz Lender," to dismiss the Chapter 11 case of

16   Debtor, Hello Living Developer Nostrand LLC, or in the

17   alternative, to lift the automatic stay.  (See motion to

18   dismiss or lift stay ECF No. 45.)

19        For the reasons stated on the record at a hearing on

20   June 2nd, 2022, the Court partially lifted the automatic stay

21   to allow the Mezz Lender to proceed with foreclosure of its

22   ownership interests up to, but not including, any foreclosure

23   sale.  For these same reasons, which were -- which I will set

24   forth in detail shortly, as opposed to the more-abbreviated

25   version discussed on June 2nd, the Court now grants the Mezz

1  Lender's request to lift the automatic stay its in -- in its

2  entirety pursuant to Section 362(d) of the Bankruptcy Code.

3          The essential grounds for lifting the automatic stay

4  are that the Mezz Lender lacks adequate protection, as no post-

5  petition payments have been made to the Mezz Lender, and

6  there's a lack of equity in the Debtor's only asset, which is

7  the stock of its subsidiary.  So the background to this case is

8  as follows.

9                    BACKGROUND OF THE CASE

10         THE COURT:  The Debtor's sole material asset is its

11 ownership interests in a wholly owned non-Debtor subsidiary

12 called "Hello Nostrand LLC."  Hello Nostrand is the owner of

13 real property located at 1580 Nostrand Avenue, in Brooklyn.

14 Hello Nostrand acquired the property in 2014 for the purpose of

15 constructing a multi-unit housing development.  (See

16 Declaration Pursuant to Local Rule 1007, paragraph 5, and ECF

17 1-1, which is the First-Day Declaration.)

18         It was asserted at the time of the filing that "the

19 property is vacant and generating no income."  (See id.; see

20 also, Monthly Operating Report, at part 1, ECF Nos. 15, 30 and

21 36, which show no income.)  The Debtor now asserts that there's

22 a lease for the property that was entered into in March of

23 2022, but it appears that income from that lease does not begin

24 until March of 2023.  (See Debtor's Third Amended Plan of

25 Reorganization at 6, which is found at ECF No. 100.)

1          Hello Nostrand is the Borrower on four loans

2   currently held by Nostrand Senior Lender LLC, all of which are

3   secured by a first mortgage on the property, and which

4   collectively I'll refer to as "the mortgage loans."  As of the

5   petition date, the Debtor estimated that the aggregate amount

6   owed under the mortgage loans is approximately 64.6 million

7   with interest and other charges continuing to accrue.  (See

8   Debtor's Opposition to Motion to Dismiss or Lift Stay, Exhibit

9   B, ECF No. 65)

10          The Debtor is a Borrower on a mezzanine loan

11  currently held by Mezz Lender in the original principal amount

12  of $3 million -- and that, I'm referring to as "the mezz loan,"

13  and together with the mortgage loans, we'll refer to them

14  collectively as "the loans" -- and which was secured by

15  ownership interest of the Debtor in Hello Nostrand; that is the

16  mezz loan.  As of the petition date, the amount owed on the

17  mezz loan was approximately 4.6 million.

18          The loans are also backed by guarantees given by Eli

19  Karp, the Principal of the Debtor and Hello Nostrand.  (See

20  Schedule of Assets and Liabilities at Schedule H, ECF No. 6, as

21  amended by ECF Nos. 19 and 43, through collectively "the

22  Schedules.")  Followed certain purported defaults by the Debtor

23  and Hello Nostrand on the loan documents for the mortgage loan

24  and the mezz loan, including:  failure to maintain insurance on

25  the property; and failure to make interest payments; and

1  failure to pay the principal upon maturity, the original

2  Lenders of those loans began a non-judicial UCC Article 9

3  foreclosure sale against the ownership interests.

4      The foreclosure sale was scheduled for September of

5  2021, but in August of 2022, the Debtor and Hello Nostrand

6  sought to enjoin he foreclosure sale in a New York State Court

7  action.  (See Hello Living Developer Nostrand LLC, et al.

8  versus 5080 Nostrand Mezz LLC, et al.; Index No. 034885-2021

9  New York Superior Court, filed August 17th, 2021, which is the

10 foreclosure action.)

11     In that foreclosure action, the Debtor and Hello

12 Nostrand sought injunctive relief to prevent the foreclosure

13 sale from occurring, and also a declaratory judgment that,

14 among other things, the ownership interests were not subject to

15 sale in auction under Article 9 of the UCC.

16     In October of 2021, the state court denied the Debtor

17 and Hello Nostrand's request and authorized the UCC foreclosure

18 sale of the ownership interest on certain conditions and with

19 court supervision.  In accordance with these conditions, the

20 sale was rescheduled for December 22nd, 2021.

21     On that -- the Debtor then filed this Chapter 11 case

22 on December 21st, 2021, one day prior to the scheduled

23 foreclosure sale.  On March 8th, 2022, the mortgage loan was

24 assigned to Nostrand Senior Lender LLC, the Senior Lender, and

25 the mezz loan was reassigned to the Mezz Lender.  The Debtor

1  owns only the ownership interests of Hello Nostrand; conducts

2  no other business other than the membership interest ownership

3  and describes itself in its petition therefore as a single-

4  asset real estate debtor.  (See Petition at page 2, ECF No. 1;

5  see also Amended Petition at 2; see ECF No. 16.)

6       On January 4th, the Debtor filed its schedules, which

7  were subsequently amended.  The Debtor scheduled a total of

8  five claims inclusive of the Mezz Lender's claim.  The four

9  other claims are:  (1) Downstate Foot & Ankle Podiatry, has

10 scheduled claims of some $300,000; (b) Dr. Sumit Dharia,

11 D-h-a-r-i-a, with a scheduled claim of some 175--; (3) Laser

12 Mechlovitz (phonetic), with a scheduled claim of $500,000; and

13 (d) RH Equity New York LLC, with a scheduled claim of $650,000.

14      The Mezz Lender has questioned whether these four

15 scheduled claims are valid claims against the Debtor.  In

16 discovery, the Debtor produced what are asserted to be

17 promissory notes for these Creditors in support of the

18 assertion they are valid claims.  (See Brody Declaration,

19 Exhibits 4 through 7, which contain copies of the notes.)

20      Each of these Creditors is described in the notes as

21 an investor.  (See id.)  Furthermore, each note states that the

22 investor was shifting portions of its prior investment with Mr.

23 Karp in other projects; i.e., not at the property, but other

24 Karp-related-entity locations.  (See id.; see also Karp

25 Deposition Transcript, page 29, line 22 through page 31,

1 line 1.)

2         The Debtor did not prove countersigned copies of the

3 note, even though the signature pages show that both parties

4 were to sign the agreement to indicate acceptance of its terms

5 and conditions.  (See Declaration of Alan Brody in support of

6 the Mezz Lender's Supplemental Object to Disclosure Statement,

7 and Motion to Dismiss the Lift Stay, at Exhibits 4 through 7;

8 that's ECF No. 85.)

9         In two instances, the investors under the notes

10 agreed that the promissory notes -- promissory note was itself

11 a buyout of its equity interest in Mr. Karp's other projects.

12 (See Brody Declaration, Exhibits 6 and 7; see also Deposition

13 Transcript of Eli Karp at page 66, line 6 through 16; page 105,

14 line 23 through 10 -- page 106, line 2, on May 17th, 2022,

15 which is the Karp Deposition attached as Exhibit 1 to the Brody

16 Declaration.)

17         The promissory note with Mr. Mechlovitz changed

18 during -- changed the duration and the interest rate of the

19 investor's initial investment with the other Hello Living

20 entity.  (See Brody Declaration, Exhibit4; see also Karp

21 Deposition Transcript at page 32, line 11s [sic] through 16;

22 page 39, line 10 through page 40, line 19.)

23         Mr. Karp further testified that the Debtor received

24 none of the monies referenced in the notes; but that the funds

25 were instead transferred to accounts of Mr. Karp's various

1  other entities.  And he subsequently transferred amounts from

2  his personal account to Hello Nostrand there -- thereby

3  skipping the Debtor.  (See Karp Deposition Transcript at page

4  35, line 13 through page 36, line 8; page 42, line 4 through

5  page 44, line 5.)

6        With the bar date now having passed in the case,

7  three other Creditors -- only three other Creditors -- other

8  than Mezz Lender have filed proofs of claim.  So there's Claim

9  Number 1-1 of the IRS, for some $3,000 in estimated partnership

10  taxes, for the period of 2017 through 2020; Claim Number 2-1 of

11  Hello Nostrand Holdings LLC or an entity I'll call "HNH," for

12  some $5,918,000 for an unsecured claim -- unsecured loan,

13  excuse me; and last -- third but not last, finally Claim 3.1 of

14  Magellan Concrete Structures Corporation, for some $620,000,

15  for materials sold and services rendered to Hello Nostrand.

16        The Court notes that HNH, that is the subject of

17  Claim Number 2-1, is an indirect equity holder of the Debtor

18  that owns approximately 13.95 percent of Hello Nostrand

19  Investors LLC, or "HNI," which in turn, owns 100 percent of the

20  equity of the Debtor.  (See Amended Corporate Ownership

21  Statement Pursuant to Rule 7007.1 at ECF No. 14, and Debtor's

22  Disclosure Statement under Chapter 11 of the Bankruptcy Code,

23  Exhibit B, ECF No. 41.)

24        HNH did not attach the loan or any documentation to

25  support its assertion that its $5.9 million claim is in fact a

1  claim against the Debtor as opposed to NHI or a capital

2  contribution.  In fact, the Debtor didn't schedule NH -- HNH on

3  its schedules.  The question therefore arises whether HNH has a

4  claim as a Creditor against the Debtor.  Additionally, it

5  appears that Magellan is in fact a Creditor of Hello Nostrand

6  and not the Debtor.

7          According to documents attached to Magellan's proof

8  of claim is a subcontractor with Supreme Builders & Developers

9  LLC, which is an entity of Mr. Karp, and it's a subcontractor

10  of -- of Supreme Builders & Developers as a general contractor.

11  (And see Magellan Proof of Claim, Standard Form of Agreement

12  Between Contractor and Subcontractor, at page 1, to identify

13  it's a contractor; page 20, identifying Eli Karp as the

14  managing member of the Contractor; see also Affirmation of Eli

15  Karp, dated January 24, 2022 at paragraph 1, ECF No. 22, which

16  Mr. Karp states:  "I am the Principal of Supreme Builders.")

17          Magellan asserts that it provided good [sic] and

18  services under a subcontract agreement with Supreme Builders in

19  relation to the property with Hello Nostrand as owner with an

20  outstanding balance of some $620,000.

21          On March 21st, 2022, the Debtor filed the Debtor's

22  Plan of Reorganization under Chapter 11 of the Bankruptcy Code

23  proposed by the Debtor.  (See ECF No. 38.)  On May 12th, 2022,

24  an amended version of the disclosure statement and plan were

25  filed, and they purport to pay all Creditors in full at some

1 discretionary point in the future, thus leaving equity

2 unimpaired.  The Debtor's source of income from -- a source of

3 income would be from its subsidiary, Hello Nostrand, which it

4 represents entered into a lease with a tenant entity supposedly

5 formed on the petition date; and the Mezz Lender asserts it is

6 somehow affiliated with the new manager of the property.

7          The Debtor then filed a Second Amended Disclosure

8 Statement and Plan on May 20th, 2022, which provided an option

9 to acquire the building on the property and return for release

10 of their rights to the remainder of the property, including the

11 vacant lot upon which the Debtor contemplates constructing an

12 additional building some time in the future.  (See amended --

13 Second Amended Plan at pages 10 through 11.)

14          On May 31st, 2022, the Debtor filed a Third Amended

15 Plan and Disclosure Statement, which provided that an

16 unidentified third buyout of the Mezz Lender in return for 40

17 percent investment interest in the Debtor's property at the

18 property site.  (See Debtor's Third Amended Plan of

19 Reorganization at pages 8 through 9, ECF No. 100.)  At a

20 hearing held on June 2nd, 2022, the Mezz Lender noted that this

21 third party and the source of these funds remain unidentified.

22          In light of all that background, the Mezz Lender now

23 seeks to have the Chapter 11 case dismissed, or have the

24 automatic stay lifted in full so the Mezz Lender can proceed

25 with its UCC foreclosure sale.  As explained at the prior

1  hearing, the Mezz Lender believes that it is appropriate now to

2  lift the stay completely, and that not doing so at this point

3  will impair the ability to conduct the UCC foreclosure sale to

4  maximize the value.

5          The Mezz Lender makes several assertions in its

6  motions, including that there's no equity in the Mezz Lender's

7  collateral; that is, the ownership interest in that the Debtor

8  has no realistic chance of reorganization.  And the Mezz Lender

9  also asserts there's an ongoing diminution of the property of

10 the estate and that it lacks adequate protection.

11         So turning now to legal standards, Section 362(d) of

12 the Bankruptcy Code provides in relevant part the following:

13         "On request of a party in interest, and after

14 noticing a hearing, the court shall grant relief from the

15 stay...

16         (1) for cause, including the lack of adequate

17 protection of an interest in property of such party in

18 interest; or

19         (2) with respect to a stay of an act against property

20 under subsection (a) of this section, if—

21         (A) the debtor does not have an equity in such

22 property; and

23         (B) such property is not necessary to an effective

24 reorganization."

25 And that's all 11 U.S.C. section 362(d)(1).

1    Section 362(d)(1), when evaluating a motion to lift

2 under that section, courts often use the following 12-factor

3 tests set forth by the Second Circuit in In re Sonnax

4 Industries, 907 F.2d 1280 (2d. Cir. at 1990)

5    The 12 factors are [as follows]:  (1) whether relief

6 would result in partial and complete resolution of the issues;

7 (2) whether any connection with or interference with the

8 bankruptcy case; (3) whether the other proceeding involves the

9 debtor as a fiduciary; (4) whether a specialized tribunal with

10 the necessary expertise has been established to hear the cause

11 of action; (5) whether debtor's insurer has assumed full

12 responsibility for defending it; (6) whether the action

13 primarily involves third parties; (7) whether litigation in

14 another forum would prejudice the interests of other creditors;

15 (8) whether the judgment claim arising from other action is

16 subject to equitable subordination; (9) whether movant's

17 success in the other proceeding would result in a judicial lien

18 avoidable by the debtor; (10) the interests of judicial economy

19 and an expeditious and economical resolution of litigation;

20 (11) whether the parties are ready for trial in the other

21 proceeding; and (12) the impact of the stay on the parties and

22 the balance of harms."  See Sonnax Industries at page 1286.

23    The decision of whether to lift a stay is entirely

24 within the discretion of the Court, and the Court need only

25 consider the relevant factors, and that is the relevant Sonnax

1   factors in making its determination.  (See <u>In re Sonnax</u>

2   <u>Industries</u>, 907 F.2d 1286; see <u>Mazzeo v. Lenhart</u>, 167 F.3d 139

3   at 143 (2d. 1999).)

4           In deciding whether to lift the stay and allow a

5   creditor to continue in litigation in another forum, the

6   bankruptcy court should consider the particular circumstances

7   of the case and ascertained what is just to the claimants, the

8   debtor and the estate, in <u>In re Touloumis</u>, 170 B.R. 825, 828

9   (Bankr. S.D.N.Y. 1994), indeed causes a broad and flexible

10  concept that must be determined on a case-by-case basis.

11  <u>(Spencer v. Bogdanovich</u>, 292 F.3d 104 at 110 (2d. Cir. 2002),

12  citing <u>In re Mazzeo</u>, 167 F.3d at 143.)

13          The burden of proof on a motion to lift or modify the

14  automatic stay is a shifting one.  (See <u>In re Sonnax</u>, 907 F.2d

15  1285.)  Section 362(d)(1) requires an initial showing of cause

16  by the movant; while Section 362(g) places the burden of proof

17  on the debtor on all issues other than the debtor's equity in

18  property.  (<u>In re Sonnax</u>, 907 F.2d at 1285.)  But in the event

19  the movant fails to make an initial showing of cause, the court

20  should deny relief without requiring a showing from the debtor

21  that it is entitled to continued protection.

22          Another factor that relates to whether cause exists

23  to lift the automatic stay is whether the creditor lacks

24  automatic -- I'm sorry -- adequate protection.  A prima facie

25  case that a party lacks adequate protection under Section

1   362(d)(1) could be satisfied by showing:  (1) a qualitative

2   decline in value of the property; or (2) that a debtor's failed

3   to make numerous post-petition bankruptcy payments.  (See In re

4   Garcia, 584 B.R. 483 at 488 (Bankr. S.D.N.Y.).)

5        Courts also make a determination of adequate

6   protection by examining whether there is equity in the

7   property.  (See id. at 489.)  An equity -- but an equity

8   cushion in property must be of some significance to constitute

9   adequate protection (see id., citing In re Rory (phonetic) 98

10  B.R. 215 and 221 (Bankr. E.D.N.Y. 1989) in which that Court

11  stated:

12       "In determining whether an equity cushion provides

13  adequate protection, the court considers factors such as the

14  size of the cushion, the rate at which the cushion will be

15  eroded, and whether periodic payments are to be made to prevent

16  or mitigate the erosion of the cushion."

17       And in that case, holding an equity cushion valued at

18  42 percent of the claim was sufficient to provide adequate

19  protection.  (See also In re McKillips, that's

20  M-c-K-i-l-l-i-p-s, 81 B.R. 454 at 458, (Bankr. N.D. Ill. 1987.)

21  And that case explained that an equity cushion of 20 or more

22  percent constitutes adequate protection; while an equity

23  cushion under 11 percent is insufficient to provide adequate

24  protection.  See also In re James River Associates, 148 B.R.

25  790 at 796, (E.D. Va. 1992.)  The case holding that a 2 percent

1 equity cushion is insufficient to provide adequate protection

2 because the deterioration of the equity cushion from

3 accumulating interests.

4          Applying all these principles here, the Court finds

5 cause exists to lift the automatic stay under Section

6 362(d)(1).  To start with, cause exists pursuant to the <u>Sonnax</u>

7 factors.  These factors that are relevant to this case clearly

8 outweigh -- clearly weigh in favor of the Mezz Lender.

9          With respect to the first and seventh factors,

10 allowing a foreclosure sale to proceed would result in a

11 complete resolution of the issues between the Debtor and the

12 Mezz Lender, which is the main dispute -- in fact, seems to be

13 the only dispute -- that has been addressed in the Debtor's

14 bankruptcy case.  And thus, there would seem to be no prejudice

15 to the few remaining Creditors of the Debtors itself,

16 especially given the legitimacy of -- of which is in question

17 for several of those claims.

18          With respect to the second <u>Sonnax</u> factor, courts

19 frequently consider whether lifting the stay might invite

20 similar motions from similarly situated creditors.  (See <u>In re</u>

21 <u>Artisanal 2015, LLC</u>, 2017 Bankr. LEXIS 3813, at *47 (Bankr.

22 S.D.N.Y Nov. 3rd, 2017).  See <u>In re Northwest Airlines Corp.</u>,

23 2006 Bankr. LEXIS 2515, at *5, (Bankr. S.D.N.Y Mar. 10th, 20 --

24 2009) which describes the concern that lifting the automatic

25 stay to allow an antitrust action would open the floodgates for

1  similar motions and causes -- and caused the debtor to refocus

2  their energy on litigation for other courts rather than emerge

3  from Chapter 11.

4         In this case, no such debt exists here because as of

5  the petition date, the Mezz Lender is the only Creditor with a

6  security interest in the ownership interest, and in fact the

7  Debtor's only Secured Creditor.

8         As to the fourth Sonnax factor, the state court

9  clearly had the expertise to address any foreclosure issues or

10 property dispute.  See, e.g., In re Residential Capital LLC

11 2012 Westlaw 3423285 at *7, (Bankr. S.D.N.Y Aug. 14th, 2012)

12 noting that the state court is in the best position to address

13 state law defenses to foreclosure.

14        The ninth Sonnax factor also weighs in favor of

15 lifting the stay, as the Mezz Lender already has a consensual

16 lien on the ownership interest, and the Article 9 foreclosure

17 sale will not result in any judicial lien avoidable by the

18 Debtor.

19        The 10th and 11th Sonnax factors also weigh in favor

20 of the stay.  The state court has familiarity with the issues,

21 having previously presided over the foreclosure action, and any

22 remaining matters regarding the foreclosure would presumably be

23 resolved fairly quickly as the state court has already entered

24 an order providing for the UCC foreclosure sale, which was

25 ready to be conducted and closed promptly.

In Re Hello Living Developer Nostrand LLC          20
July 12, 2022

1   See, e.g., In re Cicale, that's C-i-c-a-l-e, 2007

2   Westlaw 1893301 at *4, (Bankr. S.D.N.Y Jun. 29th, 2007) a case

3   that notes that allowing litigation to proceed in state court:

4   "will provide the most efficient economic resolution of the

5   litigation, because the action may alleviate the need for

6   further proceedings in the bankruptcy court."

7   With respect to the 12th Sonnax factor, the impact of

8   the stay on the parties and the balance of the harm, and that

9   is somewhat of an equipoise:  on the one hand, it certainly

10  will impact the Debtor's case; on the other hand, there is an

11  issue of the various defaults under the loan.  (See, e.g.,

12  Thompson v. JPMorgan Chase Bank NA, 2012 Westlaw 739384 at *6,

13  (E.D.N.Y Bank -- I'm sorry, E.D.N.Y. Mar. 8th, 2012.)

14  A court considering the Sonnax factors and finding

15  cause where the debtor was not making mortgage payments, the

16  secured creditor begun foreclosure proceedings in the state

17  court and the secured creditor continued to expend money for

18  taxes and insurance on the property in question.

19  As discussed below, there is lack of adequate

20  protection on the part of Mezz Lender.  The Mezz Lender has not

21  been receiving post-petition payments.  And furthermore, as

22  discussed below, there is no equity in the ownership interest;

23  and it appears the Debtor has no prospect of a successful

24  reorganization based on the plan that's been put forward in the

25  case.

1       So, the segues to a discussion under Section

2   362(d)(2) which provides:  the stated relief must be granted if

3   the debtor does not have equity in the subject property and

4   such property is not necessary to an effective reorganization.

5   And to establish a prima facie cause for lifting the automatic

6   stay under 362(d)(2), the movant must show:  the amount of its

7   claim; that its claim is secured by a valid perfected lien in

8   the property of the estate; and that the debtor lacks equity in

9   the property.  (See In re Kaplan Breslaw Ash, 3 -- I'm sorry --

10  264 B.R. at 322.)

11      Under Section 362(d)(2), equity means the difference

12  between the value of the property and the total amount of

13  claims that it secures.  (See id.)  Courts use simple

14  arithmetic to calculate the equity on the property:

15  subtracting total claims from the value of the property.  The

16  value of the claims against the property exceed the value of

17  the property, and the Debtor has no equity.  See In re

18  Robinson, 2019 Bankr. LEXIS 103 at *5 through 6, (Bankr.

19  S.D.N.Y. Jan. 11th, 2019) which is actually citing 3 Collier on

20  Bankruptcy paragraph 362.07(4)(a).

21      The Supreme Court, in United States Association of

22  Texas v. Timbers of Inwood Forest Associates, set forth the

23  standard for necessary for effective reorganization under

24  Section 362(d)(2).  And it stated in sum and substance, once a

25  movant under Section 362(d) establishes that he is an under-

1  secured creditor, it is in the burden of the debtor to

2  establish that collateral issue is necessary to an effective

3  reorganization.  What this requires is not merely a showing

4  that if there needed -- that there be a need for it, but the

5  property is essential for an effective reorganization that is

6  in prospect.  That means that there must be a reasonable

7  possibility of a successful reorganization within a reasonable

8  time.  (See 384 U.S., 365 at 375 through pages 76, a Supreme

9  Court case from 1988.)

10         The burden rests on the debtor to show an effective

11  reorganization "is in prospect" and that there is a reasonable

12  possibility of a successful reorganization within a reasonable

13  time.  (See id.)

14         As previously noted, the Court finds the Mezz Lender

15  lacks adequate protection, and the Debtor lacks equity in the

16  ownership interest.  The Mezz Lender asserts that the loan has

17  matured and it's in default.  In a hearing on June 2nd, 2022,

18  the Mezz Lender stated that there have been no post-petitions

19  [sic] made on the mezz loan or the mortgage.

20         Additionally, the Mezz Lender is secured by its

21  interest in the ownership interests.  The value of that

22  ownership interest derived from the equity value of Hello

23  Nostrand, thus any analysis of value and equity must take into

24  account all liabilities owned by Hello Nostrand.

25         So to begin that analysis, the total amount of the

1  Mezz Lender's claim as of the petition date is at least 3 --

2  $4,365,000.  In the proposed disclosure statement, liquidated

3  -- liquidation analysis attached as Exhibit D by the Debtor,

4  the Debtor states that the ownership interests are worth $3

5  million, which is not sufficient to cover the balance of the

6  mezz loan.  See Proposed Disclosure Statement at paragraphs 43

7  and 44, which states:

8           "The liquidation analysis assumes the liquidation

9  sale of the debtor's asset was a result in there being

10 insufficient funds to pay the Secured Creditor even if the

11 Secured Creditors were allowed, much less other junior claims.

12 This leaves an equity deficiency of no less than 1.65 million."

13          Furthermore, as discussed at the hearing on the Mezz

14 Lender's motion, even using the Debtor's numbers, regarding the

15 property, results in a lack of equity of the ownership

16 interest.  And the starting point analysis is the $71.5 million

17 valuation reflected in appraisal of the property provided by

18 the Debtor that took place on March 9th, 2020.  (See Exhibit A,

19 Periodic Report regarding value, operations, and profitability

20 of NH, in which the Debtor's estate holds a substantial and

21 controlling interest.  (That's at ECF No. 28.)

22          The appraisal includes the property in the existing

23 building and that is on the property.  Despite the Debtor's

24 urging that the Court take into account the hypothetical second

25 building, the Court is going to rejected that request.

1 Considering such a hypothetical second building would be

2 entirely inappropriate given that there's no financing in place

3 for such construction, and no construction has even started on

4 such a second building.

5       Indeed, as the Court the noted at the hearing, the

6 valuation provided the debt -- by the Debtor included the

7 current improved property; and thus, I gave a holistic view of

8 the entire value of the property as it is now making the

9 Debtor's position about a second building at odds with its own

10 valuation.

11       So when looking at the equity that the Debtor holds

12 in Hello Nostrand, you must look at the value of the assets

13 minus the value of all liabilities.  As a -- as an appraisal of

14 the property, this dollar amount would have -- have to include

15 the liabilities of Hello Nostrand against that appraisal.

16       So in examining those liabilities, you start with the

17 mortgage debt, which is listed by the Debtor itself at $69.1

18 million as of the petition date of December 21st, 2021.  (See

19 Debtor's Opposition to Motion to Dismiss from Lift Stay Exhibit

20 B and ECF 65.)  The mezz loan is listed by the Debtors at 4.5

21 million on that date.  (See Debtor's Opposition, Exhibit B.)

22 Subtracting this amount, would leave $64.6 million of mortgage

23 debt as of December 2021.

24       Additionally, the mortgage is accruing interest at

25 approximately $1 million a month, a figure that has not been

1 challenged. (See Declaration of Jeffrey Simpson in support of

2 the Motion to Dismiss, or Alternatively for Stay Relief, at

3 paragraph 34; see ECF No. 47.) This means that there's at

4 least an additional $5 million of interest that has accrued

5 since December of 2021. So taking the $71.5 million valuation

6 of the Debtor, subtracting $64.6 million as the value of the

7 mortgage loan, along with an additional $5 million interest,

8 that would leave approximately $2 million in value.

9         And as discussed at the prior hearing, there's at

10 least $1.6 million in mechanics liens on the property itself,

11 which leaves $400,000 in value of Hello Nostrand. This value

12 has most likely been, or will be soon, completely subsumed by

13 the $1 million in interest accruing every month as against the

14 mortgage loan. And thus, leaves a negative value of the equity

15 held by the Debtor in Hello Nostrand, which is the collateral

16 held by the Mezz Lender. This can be balanced against the $4.6

17 million, too, by the Debtor to the Mezz Lender on the mezz

18 loan.

19         While the Court need go no further on that valuation

20 analysis, there is also an issue of another $5.6 million in

21 unsecured claims listed on Exhibit A to the Debtor's petition.

22 (See Exhibit A to the Debtor's Petition.) While this exhibit

23 purports to list liabilities of the Debtor and Hello Nostrand,

24 the Mezz Lender asserts that these are in fact liabilities of

25 Hello -- Hello Nostrand. If these amounts were subtracted,

1  they would leave a negative value of $5.2 million, and not even

2  including any broker fees for the lease of Hello Nostrand at

3  the property level, or the attorneys' fees that have been

4  approved.

5          In addition, the Court notes, consistent with the

6  Supreme Court's guidance in <u>Timbers of Inwood Forest</u>, that

7  there is no evidence -- well, the Debtor has not satisfied its

8  requirement of showing an effective reorganization in prospect

9  here based on the Debtor's own filed proposed plan of

10  reorganization; and that there is not a reasonable possibility

11  of a successful reorganization within a reasonable time.

12          Such a reorganization appears unlikely, given that

13  the Debtor does not appear to have the necessary votes to

14  confirm its proposed plan, despite weeks of attempted

15  negotiations with the Mezz Lenders, raising an issue under

16  Section 1129(a) of the Bankruptcy Code.

17          In addition, in considering this case and this

18  motion, several cases in this jurisdiction note that the

19  standards establishing cause for dismissal under 1112(b) of the

20  Bankruptcy Code are similar to those for granting relief from

21  the automatic stay under 362(d)(1).  See <u>In re 234-6 West 22nd</u>

22  <u>Street Corporation</u>, 214 B.R. at 751, 757 (Bankr. S.D.N.Y.

23  1997), a case which states:

24          In the context of a motion either to dismiss a

25  Chapter 11 case under 1112(b) or to lift the stay under

1   362(d)(1), the standards of bad -- bad faith is evidence of

2   cause are not substantially different from one another.  (See

3   also In re Kaplan Breslaw Ash LLC 3 -- 264 B.R. 309 and 334

4   (Bankr. S.D.N.Y (2001); see also Inwood Heights Housing

5   Development Fund Corporation, 2011 Westlaw 3793324 at *20-21 --

6   I'm sorry, 20-26, (Bankr. S.D.N.Y. Aug. 25th, 2011) which also

7   notes the standards are similar.)  (See also In re Balco, Ltd.,

8   312 B.R. 734 at 752 (Bankr. S.D.N.Y. 2004), finding cause to

9   modify the stay where there was no prospect -- reorganization

10  in prospect.)

11          So here, cause for a dismissal is in fact a fact-

12  specific inquiry that includes a variety of factors, including

13  the purpose for which the petition was filed; and whether state

14  court proceedings adequately protect the party's interest.

15  (See Wilk Auslander LLP v. Murray, 900 F.3d 53 at page 60 (2d.

16  Cir. 2018).)

17          For instance, the Second Circuit has upheld dismissal

18  for cause under Section 1112(b) where the filing was latest in

19  a two-party dispute, and could be fully resolved in a

20  bankruptcy forum; and where the primary function of the

21  petition was to serve as the litigation tactic.  (See id.,

22  citing In re C-TC Ninth Avenue Partnership, 113 F.3d at 1304,

23  pp. 1309-1310, (2d. Cir. 1997).)  And a two-party dispute

24  involves a Creditor and a Debtor with no other imminent threats

25  from other Creditors.  (See In Midway Investment, Ltd., 187

1  B.R. 382 and 388 (Bankr. S.D. Fla. 1995).)  <u>Midway</u>, the Debtor,

2  operated a shopping center, and the creditor held a mortgage on

3  the center.  (See <u>id.</u>, at 386)

4          The Court found it was plainly a two-party dispute

5  because <u>Midway</u> faced no other imminent threat from other

6  creditors, and that its only other pending dispute involved

7  claims brought by <u>Midway</u> against two tenants.  (See <u>id.</u>, at

8  388; see also <u>PPI Enterprises</u> 22 B.R. at 339, p. 345 (Bankr. D.

9  of Del. (1998).)  In that case, concluding that a two-party

10  dispute consists of a case between a debtor with a single asset

11  and the secured creditor holding a secured interest in that

12  asset.

13          In the case of <u>In re Murray</u>, the Second Circuit noted

14  that a case which involves only one creditor, and no risk of

15  asset depletion in favor of other creditors, is a two-party

16  dispute.  (See <u>In re Murray</u>, 900 F.3d at 61.)  The Court of

17  Appeals in that case noted the filing was simply part of a

18  long-running two-party dispute.  There were no other creditors

19  to protect.

20          They've been brought solely as a judgment enforcement

21  device for which adequate remedies existed in state law, and

22  that the debtor did not want or need to discharge, and there

23  were no other goals in the bankruptcy such as pari-passu

24  distribution among competing creditors that would be served by

25  continuing the petition.  (See <u>id.</u>)

1    Additionally, in that case, the court noted the

2 debtor could not show that it would be substantially prejudiced

3 by relying on mere remedies, and that the interest of the

4 Debtor in the bankruptcy system as a whole would be advanced if

5 the case were dismissed.  (See id.)

6    The Court of Appeals found that the parties'

7 preference for bankruptcy remedies to solve a two-party dispute

8 could not outweigh the lack of any other bankruptcy-related

9 purpose and constituted cause for dismissal.  (See id.; see

10 also In re Bos, 561 B.R. 868 at p. 901, (Bankr. N.D. Fla.

11 (2016) noting that in a two-party dispute, even if the creditor

12 wanted to purse bankruptcy remedies, the availability of the

13 state forum supported dismissal.

14    And other courts have held that a two-party dispute

15 is better resolvable in state court because the liquidation of

16 the debtor's assets in bankruptcy would not produce any benefit

17 nor realizable outside bankruptcy.  (See In re JER/Jameson Mezz

18 Borrower II LLC., 461 B.R. 293 at 295, (Bankr. D. of Del.,

19 2011).)

20    So, the court notes that in fact this case is

21 essentially a two-party dispute; whether the Creditors listed

22 on the Debtor's petition are truly Creditors of the Debtor is

23 disputed by the Mezz Lender.  And in fact, there's evidence to

24 suggest they're not.  But of more significance in this Court's

25 analysis is whether to -- lifting the stay on the -- is whether

1  the bankruptcy filing was precipitated by a dispute of the

2  Debtor over foreclosure of the property, which in fact it was.

3  (See First-Day Declaration, at paragraph 1, the filing by the

4  parent was done to stay the UCC Mezz Lender's -- to stay the

5  UCC mezz loan of $3 million principal foreclosure.)

6           Since the bankruptcy filing, the case has been driven

7  solely by the dispute between the Debtor and the Mezz Lender;

8  no other Creditors have even appeared at hearings in this case.

9  Whatever rights the Debtor has, these canons should be pursued

10  in state court as opposed to continuing to drain the estate by

11  accumulating huge administrative costs litigating these issues

12  in Chapter 11.

13           So, the Court notes that when it was first presented

14  with the Mezz Lender's motion to lift the automatic stay or to

15  dismiss the case, the Court opted to consider stay relief,

16  given the Debtor's professed desire to have time to negotiate

17  with the Mezz Lender.  Such negotiations are common in

18  bankruptcy are -- are encouraged.

19           The Court can understand a debtor's desire to have

20  time to negotiate with its creditors.  But such negotiations

21  are not a substitute for satisfying the requirements in the

22  bankruptcy case -- I'm sorry the Bankruptcy Code for making a

23  case work; nor can it cure the desire to negotiate -- I'm sorry

24  -- nor can the desire to negotiate be used an indefinite shield

25  by a debtor as against a creditor's rights under the code,

1  particularly, where there's been no post-petition payments and

2  where there's no adequate protection of the -- of the secured

3  creditor.

4          The Court notes the Debtor filed a letter dated

5  January -- I'm sorry -- July 11 in anticipation of today's

6  bench ruling.  But the letter itself is another attempt to

7  conduct negotiations on the public docket stating what they --

8  the Debtor is willing to do "to resolve the case," and that's

9  not how bankruptcy works.  While courts encourage negotiations,

10 we don't put our finger on the scale of parties' negotiations,

11 which is what the letter appears to seek.  (See Federal Rule of

12 Evidence 408.)

13         So given all those circumstances, this case is in the

14 end a fairly simple set of facts.  That is, the lack of

15 adequate protection of the Mezz Lender's secured interest,

16 given the value of the property and the lack of post-petition

17 payments, and that's coupled with the failure to present any

18 reasonable prospect of reorganization other than essentially

19 conclusory statements about the payment and complete payment of

20 -- of all claims, which -- which does not make for a feasible

21 plan.  It's -- it's makes only for an aspirational plan, which

22 is insufficient for purposes of the code and for purposes of

23 today's motion.

24         So given all those reasons, the Court will lift the

25 stay completely.  Again, I think there's grounds to dismiss the

1  case.  I have understood that it is the Debtor's preference to

2  proceed by lifting the automatic stay rather than dismissing

3  the case.  In the event that there's some other bankruptcy

4  purpose that can be somehow pulled from what is -- is still

5  here, or to the extent that there's some sort of agreement

6  that's reached in the course of state court proceedings that

7  allows a bankruptcy to flourish.

8         So, that's why I'm lifting the stay in full rather

9  than dismissing the case at this time.  Of course if the Debtor

10 believes that there's really no purpose left, in light of

11 lifting the stay in its entirety, then the alternative remedy

12 of dismissal would also be appropriate.  That's the Court's --

13         MR. KARP:  (Inaudible) --

14         THE COURT:  -- ruling, and I'd ask the Debtor -- I

15 mean, I'm sorry -- I'd ask the Movant to submit a proposed

16 order to grant the motion to lift the automatic stay in full

17 for the reasons set forth on the record.

18         So with that, let me ask the Debtor, if there's

19 anything else to address at today's hearing?

20      DEBTOR'S REQUEST FOR DISMISSAL AND STATEMENT RE SAME

21         MR. KARP:  Yes, Your Honor.  If -- if -- if it's

22 over, then I would like to close the -- the case.  The

23 chapter --

24         THE COURT:  All right --

25         MR. KARP:  -- if it's -- if it's over, it's over.

1    THE COURT:  All right.  Mister -- Mr. Fox, what are

2  -- that's your client speaking.  If you wanna chance to talk to

3  your client after today's ruling, I -- I -- I understand that,

4  and that's an entirely appropriate thing to do.  And if you

5  wanna do that and then touch base with Mr. Muchnik as to

6  whether the order that he should submit should be a -- a order

7  to lift the stay in its entirety or to dismiss the action.

8    If it's to dismiss, it would be helpful to have

9  something on the record so that I know that that's clearly the

10  preference.  I think that would be -- that kind of clarity

11  would be preferable for all parties involved.  So, does that

12  makes sense to you, Mr. Fox?

13   DEBTOR'S COUNSEL STATEMENT RE CLIENT'S REQUEST FOR DISMISSAL

14    MR. FOX:  It -- it does, Your Honor.  Leo Fox.  I

15  think that my client has spoken.  He certainly has reasonable

16  grounds.  I think the Court had indicated has reasonable

17  grounds, and the fight's over; the battle is -- is completed.

18  And we would then ask Your Honor that the case be dismissed.

19  There's no good grounds or good reason to keep the case open.

20    I just don't see the reason.  I think the U.S.

21  Trustee raised it the last time as well.  Your Honor, we did

22  the best we could.  It wasn't sufficient, and I think that the

23  case is over and should be dismissed.

24    THE COURT:  All right.  Mr. Muchnik, I assume that

25  that's -- that result is something that is consistent with your

1  client's motion?

2          MR. MUCHNIK:  Yes, Your Honor.  And we'll --

3          THE COURT:  All right.

4          MR. MUCHNIK:  -- we'll talk to Mr. Fox, and we'll

5  submit a -- a -- an order under certification.

6          THE COURT:  All right.  And let me just hear from the

7  U.S. Trustee Office to finally wrap things up.

8    U.S. TRUSTEE'S COMMENTS REGARDING ORDER AND OUTSTANDING FEES

9          MS. TIANTIAN:  Ms. Tiantian, for the United States

10 Trustee.  I would love to be included in the circulation of the

11 proposed order.  The Debtor currently owes the U.S. Trustee a

12 small amount, about $250 in UST fees, and the order should

13 provide for payment of that fee within a certain period of

14 time; it's usually 10 days.  I would just love to be included

15 in the circulation of the proposed order.  Thanks.

16         MR. MUCHNIK:  I'll send it (inaudible) --

17         THE COURT:  All right.

18         MR. FOX:  As I will, too, Your Honor.

19         THE COURT:  All right.  So, Mr. Muchnik will

20 circulate an order based on canvassing the room at this time.

21 I understand that the result that is preferred as among those

22 two options is dismissal and that that's what the order will

23 be.  If for some reason that result changes, then I will expect

24 the order to -- submitted to reflect a lifting of the stay in

25 its entirety.

1        If -- if something -- I -- rather than make you take

2   an extra step, Mr. Fox, and spend the time and money of filing

3   something on the docket, I assume it's safe to state -- take

4   your statement and your client's statement on the record to

5   mean that as of now the request is dismissal, and I don't --

6   and that you're not -- you -- you don't have the need to

7   consult; is that right?

8        DEBTOR'S COUNSEL REAFFIRMS CONSENT TO DISMISSAL

9        MR. FOX:  That's correct, Your Honor.  The record

10  should reflect that the Debtor has consented to a dismissal.

11       THE COURT:  All right.  All right.  So I'm gonna so

12  order the record.  And I'll ask Mr. Muchnik to, again, to

13  circulate that order.  And then we will -- we will get it

14  entered.  And with that, is there any other business to address

15  here this afternoon?

16       MR. FOX:  Your Honor, we thank you for all the

17  efforts you've made in the case.  And we appreciate the fact

18  that you spent the time to -- to go through this case, and

19  afford the Debtor the opportunity that you did.  And we hope

20  that you feel 100 percent, according to Mr. Muchnik's

21  comments --

22       THE COURT:  Well, well, thank you.  I --

23       MR. FOX:  -- (inaudible).

24       THE COURT:  -- I appreciate the -- the good wishes.

25  I -- I did finally get my -- get-out-of-jail-free card which is

*American Legal Transcription*

1  the one -- the one stripe.  So it took longer than I would

2  like, but thank you for your good wishes.  And I appreciate --

3  we've had a lot of hearings in this case, which puts a burden

4  on Counsel; it puts a burden on clients.  We all wanna see

5  cases work, and -- and commercial solutions in cases work.

6  Sometimes that happens; sometimes it doesn't.  But that's the

7  -- that's sort of my theory in having all these conferences.

8  But I know that -- that does put a burden on you all, so I

9  appreciate everybody making the time and effort to do that so

10 that at least we have a process that's designed to maximize the

11 possibility of cases working for the benefit of all

12 stakeholders.

13         So -- so I appreciate that.  And I certainly do

14 appreciate the extra hearing or two that resulted from the joy

15 that is, the pandemic, and your all -- your flexibility to roll

16 with that.  So thank you very much.  And with that, the

17 business of the Court being concluded today, the Court is in

18 recess.  Thank you all very much.  Be well, and have a good

19 evening.

20         MR. FOX:  You, too, Your Honor.  Thank you.

21     (Proceeding adjourned at 4:20 p.m.)

22                          oOo

23

24

25

*American Legal Transcription*

In Re Hello Living Developer Nostrand LLC                    37
July 12, 2022

CERTIFICATION

1

2       I, Catherine M. Griffin, certify that the foregoing

3   transcript of proceedings is a true and accurate record of the

4   proceedings.

5

6       *Catherine M. Griffin*        Date:   July 16, 2022

7       AMERICAN LEGAL TRANSCRIPTION

8       11 Market Street, Suite 215

9       Poughkeepsie, New York  12601

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25